UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON L. JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>LONNIE G. BUNCH, III,<br>Secretary of the Smithsonian Institution<br><br>Defendant. | Civil Action No. 22-2240 (BAH) |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Table of Contents .................................................................................................... i

Table of Authorities ................................................................................................ ii

Introduction ..............................................................................................................1

Background...............................................................................................................2

I. Factual Background ..............................................................................................2

II. Procedural History ................................................................................................4

Legal Standards..........................................................................................................5

Argument...................................................................................................................6

I. Jackson Failed To Exhaust Several of His Claims. ..............................................6

II. Jackson's Discrimination and Retaliation Claims Fail. ........................................8

A. Jackson Cannot Establish A Prima Facie Case of Discrimination. ............9

B. Jackson Cannot Establish A Prima Facie Case of Retaliation. .................14

C. The Smithsonian Had Legitimate, Non-Discriminatory, and Non-Retaliatory Reasons For Its Actions. ......................................................17

III. Jackson's Hostile Work Environment Claims Fails. ..........................................23

Conclusion ..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Johnson*,
795 F.3d 34 (D.C. Cir. 2015)....................9

*Arnold v. Jewell*,
6 F. Supp. 3d 101 (D.D.C. 2013)....................17

*Babb v. Wilkie*,
589 U.S. 399 (2020)....................passim

*Bain v. Off. of Att'y Gen.*,
Civ. A. No. 21-1751 (RDM), 2022 WL 17904236 (D.D.C. Dec. 23, 2022)....................12

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008).................... 16, 23, 24

*Barbour v. Browner*,
181 F.3d 1342 (D.C. Cir. 1999)....................9

*Barkley v. Marshals Serv.*,
766 F.3d 25 (D.C. Cir. 2014)....................6

*Bell v. Raimondo*,
Civ. A. No. 19-3109 (CJN), 2023 WL 2662914 (D.D.C. Mar. 28, 2023) ....................9

*Bergbauer v. Mabus*,
934 F. Supp. 2d 55 (D.D.C. 2013)....................24

*Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008)....................9

*Bridgeforth v. Jewell*,
721 F.3d 661 (D.C. Cir. 2013)....................16

*Broderick v. Donaldson*,
437 F.3d 1226 (D.C. Cir. 2006)....................15

*Brown v. Marsh*,
777 F.2d 8 (D.C. Cir. 1985)....................7

*Brown v. Small*,
Civ. A. No. 02-1262, 2005 WL 736530 (D.D.C. Mar. 31, 2005)....................24

*Brown v. Vance-Cooks*,
920 F. Supp. 2d 61 (D.D.C. Feb. 1, 2013)....................22

*Burlington Northern & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)....................16, 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................5

*Chambers v. District of Columbia*,
35 F.4th 870 (D.C. Cir. 2022)....................11

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001)....................16

*Crawford v. Duke*,
867 F.3d 103 (D.C. Cir. 2017)....................6

*Crawford v. Metro. Gov't of Nashville*,
555 U.S. 271 (2009)....................9

*Czekalski v. Peters*,
475 F.3d 360 (D.C. Cir. 2007)....................12, 13

*Davila v. Mayorkas*,
Civ. A. No. 22-357 (CRC), 2023 WL 2072455 (D.D.C. Feb. 17, 2023)....................24

*Doak v. Johnson*,
19 F. Supp. 3d 259 (D.D.C. 2014)....................7

*Dorns v. Geithner*,
692 F. Supp. 2d 119 (D.D.C. 2010)....................7

*Drewrey v. Clinton*,
763 F. Supp. 2d 54 (D.D.C. 2011)....................7

*Duncan v. Johnson*,
213 F. Supp. 3d 161 (D.D.C. 2016)....................17

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998)....................24

*Fischbach v. D.C. Dep't of Corr.*,
86 F.3d 1180 (D.C. Cir. 1996)....................9

*Garza v. Blinken*,
Civ. A. No. 21-2770 (APM), 2023 WL 2239352 (D.D.C. Feb. 27, 2023)..............................12

*George v. Leavitt*,
407 F.3d 405 (D.C. Cir. 2005)..........................................................................................22

*Gomez-Perez v. Potter*,
553 U.S. 474 (2008)...................................................................................................11, 12

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993)..........................................................................................................23

*Hartzler v. Mayorkas*,
Civ. A. No. 20-3802 (GMH), 2022 WL 15419995 (D.D.C. Oct. 27, 2022) ......................21, 22

*Hinds v. Mulvaney*,
296 F. Supp. 3d 220 (D.D.C. 2018) ..........................................................................18, 24

*Holmes v. Washington Metro Area Transit Auth.*,
723 F. Supp. 3d 1 (D.D.C. 2024) .....................................................................................14

*Kabakova v. Off. of Arch. of Capitol*,
Civ. A. No. 19-1276 (BAH), 2020 WL 1866003 (D.D.C. Apr. 14, 2020)..............................25

*Kelly v. Mills*,
677 F. Supp. 2d 206 (D.D.C. 2010) ..................................................................................22

*Kizas v. Webster*,
707 F.2d 524 (D.C. Cir. 1983)............................................................................................6

*Lewis v. Columbia*,
653 F .Supp. 2d 64 (D.D.C. 2009) ...................................................................................15

*McDonnell Douglass Corp. v. Green*,
411 U.S. 792 (1973)...........................................................................................................9

*Mohmand v. Broad. Bd. of Governors*,
Civ. A. No. 17-0618, 2018 WL 4705800 (D.D.C. Sept. 30, 2018) ..........................................6

*Montgomery v. Mayorkas*,
Civ. A. No. 23-3931 (BAH), 2024 WL 4973406 (D.D.C. Dec. 4, 2024) ...............................16

*Mount v. Johnson*,
36 F. Supp. 3d 74 (D.D.C. 2014)........................................................................................7

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) ........................................................................................ 10, 11

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .......................................................................................... 6

*Ng v. LaHood*,
952 F. Supp. 2d 85 (D.D.C. 2013) ..................................................................... 15

*Pauling v. District of Columbia*,
286 F. Supp. 3d 179 (D.D.C. 2017) ................................................................... 14

*Payne v. Salazar*,
899 F. Supp. 2d 42 (D.D.C. 2012) ..................................................................... 15

*Rafi v. Sebelius*,
377 F. App'x. 24 (D.C. Cir. 2010) ....................................................................... 7

*Ransom v. Ctr. For Nonprofit Advancement*,
514 F. Supp. 2d 18 (D.D.C. 2007) ..................................................................... 16

*Rattigan v. Gonzalez*,
503 F. Supp. 2d 56 (D.D.C. 2007) ..................................................................... 17

*Scott v. Harris*,
550 U.S. 372 (2007) .......................................................................................... 5

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) .......................................................................................... 22

*Stewart v. Ashcroft*,
352 F.3d 422 (D.C. Cir. 2003) ............................................................................ 6

*Taylor v. Small*,
350 F.3d 1286 (D.C. Cir. 2003) ..................................................................... 8, 16

*Walker v. Johnson*,
798 F.3d 1085 (D.C. Cir. 2015) .......................................................................... 9

*Ward-Johnson v. Feleke*,
Civ. A. No. 19-0534 (CJN), 2022 WL 355239 (D.D.C. Feb. 7, 2022) ..................... 23

*Webster v. Del Toro*,
49 F.4th 562 (D.C. Cir. 2022) ............................................................................. 6

*Wiley v. Glassman*,
511 F.3d 151 (D.C. Cir. 2007) ........................................................................10

*Williams v. Spencer*,
883 F. Supp. 2d 165 (D.D.C. 2012) ...................................................................15

*Winston v. Clough*,
174 F. Supp. 3d 224 (D.D.C. 2013) ...................................................................14

**Statutes**

5 U.S.C. § 2302(a)(2)(A)...............................................................................12

29 U.S.C. § 633a(a)........................................................................................10

42 U.S.C. § 2000e-2(a)(1) ......................................................................10, 11

42 U.S.C. § 2000e-16(a).........................................................................10, 11

**Rules**

Fed. R. Civ. P. 56.......................................................................................1, 5

Fed. R. Evid. 602 ...........................................................................................21

**Regulations**

29 C.F.R. § 1614.105(a)(1) ................................................................................6

Pursuant to Federal Rule of Civil Procedure 56, Defendant Lonnie G. Bunch, Secretary of the Smithsonian Institution (the "Smithsonian") moves for summary judgment in this employment discrimination case.

**INTRODUCTION**

The Smithsonian moves for summary judgment on this nearly decade-old matter concerning a former employee who was discharged during his probationary period for poor performance. Pro se Plaintiff Milton Jackson was the Major Gifts Officer at the Smithsonian National Museum of African Art (the "Museum") for less than eight months in 2015. The Smithsonian terminated Jackson's employment during his probationary period because Jackson failed to raise any funds for the Museum. After his termination, Jackson brought various claims that his direct supervisor inhibited his success because she attempted to micromanage him, denied his travel requests, and prohibited him from contacting the Smithsonian's Board of Advisors or other Museum employees. According to him, the numerous events of which he complains constitute race and sex-based discrimination and retaliation, and created a hostile work environment in violation of Title VII. Not so. A close examination of the record shows that Jackson's supervisor—who interviewed and hired him—performed her supervisory duties, counseled Jackson in an effort to improve his performance, and ultimately recommended that Jackson's employment be terminated for lack of performance. Given that the supervisory who fired Jackson was the same person who hire, there is a lack of inference for discrimination or retaliation. Accordingly, there is no genuine issue of material fact that warrants a jury trial in this matter. Because the Smithsonian articulates legitimate, non-discriminatory, and non-retaliatory reasons for its actions, the Court should grant its motion for summary judgment and enter judgment in its favor.

## BACKGROUND

### I. Factual Background

Plaintiff Milton Jackson, s an African American male joined the Smithsonian on March 23, 2015, as a Senior Advancement Program Specialist ("Gift Officer") at the National Museum of African Art (the "Museum"). Compl. (ECF No. 1) at 1; Ex. 1, Defendant's Statement of Undisputed Material Facts ("Def.'s Stmt.") ¶ 9 (attached hereto). He was not part of the federal civil service because he was appointed as a trust employee; his salary, as a result, was paid from Smithsonian trust funds. *Id.* ¶¶ 11. His appointment, moreover, was subject to a one-year probationary period. *Id.* ¶ 12. In this role, he was responsible for raising $2,000,000 annually in gifts. *Id.* ¶ 10. During his employment, Jackson failed to raise any funds for the Museum. *Id.* ¶ 14. On October 26, 2015, he was notified of his separation with an effective date of November 9, 2015, and received his final paycheck on December 18, 2015. *Id.* ¶¶ 15, 16. Jackson was separated from the Smithsonian for lack of performance after eight months into his one-year probationary period. *Id.*

Jackson's time at the Smithsonian was turbulent. Within a week of employment, he was involved in a work-related disagreement with his direct supervisor, Marie Graves, regarding who would manage the relationship with Museum's Advisory Board. *Id.* ¶ 17. Jackson wanted that role, but Graves explained that the Museum's Director Johnetta Cole and Graves would continue engaging with the Advisory Board. *Id.* Jackson and Graves also disagreed about some of the prospective donors Jackson identified. *Id.* ¶¶ 19-21. Jackson's position envisioned him building and managing a portfolio of about one hundred donors who could give between $25,000 and $1,000,000. *Id.* ¶ 10. Jackson, however, pursued donors with questionable capacity or interest to donate to the Museum. Jackson aggressively pursued Dr. Harland, a former Howard University professor, as a potential donor. *Id.* ¶¶ 21-22. Jackson expended considerable time and energy to

pursue a gift from Dr. Harland, a strategy Graves questioned. *Id.* That is not to say that Graves or the Smithsonian did not try to help Jackson pursue Dr. Harland as a donor; for example, the Smithsonian permitted Jackson to invite Dr. Harland to a July 4, 2015, fundraising event. *Id.* ¶ 26. Jackson, however, failed to introduce Dr. Harland to Cole at the event, and ultimately, Jackson's efforts did not result in a monetary gift to the Museum. *Id.* ¶¶ 22. Rather, Jackson sought to accept as a gift scientific equipment with no apparent use for or connection to the Museum, which is an art museum. *Id.* ¶ 28.

Jackson also pursued travel to events with questionable relationship to the Museum. A week after beginning his employment at the Museum, Jackson sought approval to travel to Texas for an Earth Day Texas Celebration. *Id.* ¶ 34. While Graves scrutinized Jackson's reasons and strategy for attending the event, she authorized the travel. *Id.* ¶¶ 33-35. Graves, however, denied Jackson's request to travel for other events, including to play golf in California and North Carolina with potential donors. *Id.* ¶¶ 37-38.

Jackson also ran afoul of the Smithsonian's policy regarding the use of a Smithsonian charge card. *Id.* ¶ 24. Despite being provided with the policy, Jackson on several occasions in June 2015 submitted for reimbursement unauthorized and personal expenses, including to rent a vehicle for the purpose of escorting Dr. Harland to and from a meeting at the National Air and Space Museum and for a meal with a fellow Smithsonian employee. *Id.*

Graves repeatedly counselled Jackson. On July 1, 2025, Graves counselled Jackson regarding reimbursable expenses and requested that he share more information with her, as his supervisor. *Id.* ¶ 25. Graves also counselled Jackson about his failure to introduce Dr. Harland to Cole at the July 4, 2015, fundraising event. *Id.* ¶ 29. On July 6, 2015, Graves counselled Jackson regarding his tardiness and extended office absences, lack of communication, and the need to

improve in these areas. *Id.* ¶ 28. On July 23, 2015, Jackson was again counselled regarding his lack of communication, misspent time and effort pursuing Dr. Harland as a donor, violation of reimbursement policies, and bypassing Museum staff. *Id.* ¶¶ 30-31. On August 20, 2015, Graves again counselled Jackson on the need to consult with her rather than with the communications staff on fundraising ideas and instructed him to more effectively research potential donors, including by focusing on specific deliverables. *Id.* ¶ 32.

In the end, Jackson's job performance did not improve, and he was notified of his probationary discharge on October 26, 2015, with an effective date of November 9, 2015. *Id.* ¶¶ 15-16.

## II. Procedural History

Jackson contacted the Smithsonian's Office of Equal Employment and Minority Affairs ("EEO Office") on January 14, 2016. *Id.* ¶ 59. He filed a formal EEO complaint on May 3, 2016, alleging discrimination and hostile work environment on the bases of race, color, sex, and retaliation. *Id.* ¶ 63. After the EEO Office completed its investigation and prepared a Report of Investigation, Jackson sought a hearing with the Equal Employment Opportunity Commission (the "Commission"). *Id.* ¶ 64. The Commission identified thirteen issues for adjudication, the parties engaged in discovery, and thereafter the Commission granted the Smithsonian's motion for summary judgment. *Id.* ¶¶ 63-67. The Office of Federal Operations affirmed. *Id.* ¶¶ 68-69.

Proceeding pro se, Jackson filed his complaint in this Court on July 29, 2022. *See generally* Compl. (ECF No. 1). He asserts discrimination, harassment, retaliation, hostile work environment, and wrongful termination claims and seeks twenty-five million dollars in damages. *Id.* at 11. Specifically, Jackson alleges that his termination "during his probationary period" was motivated by "systemic discrimination, harassment and retaliation by [Museum] senior management[.]" *Id.* at 1. He alleges that managers desired to place a different individual in the position of major gifts

officer and that Graves and William Holmes were instruments of the Museum's senior leadership to execute their "malicious wishes[.]" *Id.*

The Smithsonian answered on April 5, 2023. *See generally* Answer (ECF No. 17). Jackson retained counsel and the parties proceeded to discovery. *See* Notice (ECF No. 23). Following protracted discovery, Jackson terminated his attorney and now again proceeds pro se. Order (ECF No. 43) at 2. On March 4, 2025, the parties reported that discovery concluded. Jt. Status Rep. (ECF No. 53). The Smithsonian now moves for summary judgment on all claims.

## LEGAL STANDARDS

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Summary judgment is warranted if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This occurs when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (internal quotation marks omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## ARGUMENT

## I. Jackson Failed To Exhaust Several of His Claims.

Title VII "imposes rigorous exhaustion requirements and time limitations to preserve for the employing agency a crucial administrative role in addressing alleged violations." *Webster v. Del Toro*, 49 F.4th 562, 566 (D.C. Cir. 2022) (cleaned up). "Before a federal employee can file suit against a federal agency for violation of Title VII, the employee must run a gauntlet of agency procedures and deadlines to administratively exhaust his or her claims." *Crawford v. Duke*, 867 F.3d 103, 105 (D.C. Cir. 2017). "[T]he required recourse to administrative review has special prominence with respect to the claims of federal employees." *Barkley v. Marshals Serv.*, 766 F.3d 25, 33-34 (D.C. Cir. 2014) (cleaned up); *accord Kizas v. Webster*, 707 F.2d 524, 543 (D.C. Cir. 1983) (same).

To exhaust remedies prior to filing suit, an employee must contact an EEO counselor "prior to filing a complaint in order to try to informally resolve the matter . . . within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). This requirement functions as a "statute of limitations." *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003). Where, as here, a plaintiff alleges discrete retaliatory or discriminatory acts, the question of timeliness is based on each particular act, and the employee must timely exhaust administrative remedies for each discrete claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Thus, if an employee fails to comply with the timeline set forth in the regulations, the "discrete discriminatory act[ ]" alleged is time barred—"even [if it is] related to acts alleged in timely filed charges." *Id.* at 113.

All of Jackson's claims, apart from the alleged delay in his last paycheck, were untimely raised with the Smithsonian's EEO Office. Any allegations that are not timely raised with an EEO counselor "cannot form the basis for a subsequent suit." *Mohmand v. Broad. Bd. of*

*Governors*, Civ. A. No. 17-0618, 2018 WL 4705800, at *4 (D.D.C. Sept. 30, 2018) (citing *Mount v. Johnson*, 36 F. Supp. 3d 74, 83 (D.D.C. 2014)). So, "the plaintiff who fails to comply, to the letter, with administrative deadlines 'ordinarily will be denied a judicial audience.'" *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985) (citations omitted); *see also Rafi v. Sebelius*, 377 F. App'x. 24, 25 (D.C. Cir. 2010) (affirming a district court's dismissal of Title VII claims because the plaintiff had not initiated EEO contact within forty-five days of the allegedly discriminatory hiring practice); *Drewrey v. Clinton*, 763 F. Supp. 2d 54, 62 (D.D.C. 2011) (granting the government summary judgment as to plaintiff's Title VII claims based on incidents that occurred more than forty-five days before plaintiff initiated EEO counseling); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 130–31 (D.D.C. 2010) (same); *Doak v. Johnson*, 19 F. Supp. 3d 259, 268 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015) (granting the government summary judgment as to plaintiff's Rehabilitation Act claims based on incidents that occurred more than forty-five days before plaintiff initiated EEO counseling). Here, Jackson was notified on October 26, 2015, of his separation and the separation also informed he had forty-five days to file any EEO complaint. Ex. 1, Def.'s Stmt. ¶ 15. That filing deadline would have been December 10, 2015. However, Jackson did not do so until January 14, 2016, approximately eighty days later. *Id.* ¶ 59. Accordingly, claims that arose before December 10, 2015—forty-five-days before he contacted the EEO Office—should be dismissed as untimely.

And even if the Court considers that Jackson timely contacted an EEO counselor, Jackson did not include in his administrative complaint at least four claims he alleges in his complaint here. Because Jackson did not raise those four claims during the administrative process, Jackson is now precluded from raising them. They are:

(1) Jackson alleges that on May 6, 2015, he informed Graves that "he was being harassed and sought relief." Compl. (ECF No. 1) at 6. However, Jackson did not allege in his administrative complaint that Jackson complained to Graves about harassment on May 6, 2015. *See* Ex. 1, Def.'s Stmt. ¶ 11. In the administrative complaint, he recalls Graves walking into Jackson's office and discussing Jackson's contacts with another Smithsonian employee. *Id.*

(2) Jackson alleges that Graves impermissibly contacted the organization conducting Jackson's background check and provided disparaging comments. Compl. (ECF No. 1) at 6. The administrative complaint does not mention this allegation. *See generally* Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000650-000663.

(3) Jackson alleges that on August 10, 2015, Graves requested a leave slip signed by a physician. Compl. (ECF No. 1) at 7. The administrative complaint does not mention this allegation. *Id.*

(4) Jackson alleges that Graves considered him late to a meeting when she was at another meeting. Compl. (ECF No. 1) at 7. The administrative complaint does not mention this allegation. *Id.*

As discussed further below, moreover, all of Jackson's claims fail on the merits.

## II. Jackson's Discrimination and Retaliation Claims Fail.

"Title VII provides that 'all personnel actions affecting employees . . . in the Smithsonian Institution . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (quoting 42 U.S.C. § 2000e-16(a)). Title VII likewise "'forbids retaliation [or discrimination] by employers against employees who report workplace . . . discrimination' on the basis of race, color, religion, sex, or national origin." *Bell v. Raimondo*, Civ. A. No. 19-3109 (CJN), 2023 WL 2662914, at * 4 (D.D.C.

Mar. 28, 2023) (quoting *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 273 (2009)). Traditionally, claims of discrimination and retaliation are analyzed under the burden-shifting framework of *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). Where, as here, the employer articulates "through a declaration, deposition, or other testimony from the employer's decisionmaker" non-retaliatory or non-discriminatory reasons for its actions, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in the original).

The burden is on the plaintiff to produce "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. "Title VII, it bears repeating, does not authorize a federal court to become a superpersonnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (cleaned up). The Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

### A. Jackson Cannot Establish A Prima Facie Case of Discrimination.

To establish a prima facie case of discrimination, Jackson must: show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

The federal sector provisions of Title VII provide that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination[.]" 42 U.S.C. § 2000e-16(a). The Civil Service Reform Act defines "personnel actions" to include an appointment, promotion, disciplinary action, transfer or reassignment, reinstatement, performance evaluations, decision concerning pay, benefits, or awards. 5 U.S.C. § 2302(a)(2)(A)(i)–(xi). This definition includes other, unenumerated "change[s] in duties, responsibilities, or working conditions" only if they are "significant." *Id.* The Supreme Court in *Babb v. Wilkie*, 589 U.S. 399, 405 (2020), agreed that the Civil Service Reform Act's definition of "personnel action" was "consistent with the term's meaning in general usage," and assumed it had the same meaning for purposes of the federal-sector provisions of the Age Discrimination in Employment Act ("ADEA"), which parallel those of Title VII. *Compare* 29 U.S.C. § 633a(a) (ADEA), *with* 42 U.S.C. § 2000e-16(a) (Title VII).

The Court in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), clarified the standard applicable to private and state and local government employers for assessing the existence of an adverse action under Title VII. *Id.* at 354 (discussing 42 U.S.C. § 2000e-2(a)(1)). In *Muldrow*, the Supreme Court rejected a reading requiring an employee to demonstrate that an alleged transfer resulted in "significant" harm to be actionable under the non-federal provisions of Title VII. *Id.* The Court reasoned that while an employee "must show *some harm* respecting an identifiable term or condition of employment" the employee need not show that harm caused "significant disadvantages[.]" *Id.* at 354–55 (emphasis added; "To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment. What the transferee does not have to show, according to the relevant text, is that the harm incurred was 'significant.'"). Notably, the Court's holding in *Muldrow* effectively displaces the decision

rendered by the en banc D.C. Circuit in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022). *See Muldrow*, 601 U.S. at 364–65 (Kavanaugh, J., concurring) (noting that the Court's standard of "some harm" differs from that described in *Chambers*).

Accordingly, were the federal sector provisions of Title VII coextensive with those applicable to non-federal employers, an employee attempting to bring a Title VII claim must identify an alleged event affecting their "compensation, terms, conditions, or privileges of employment" that caused "some harm." *Id.* But the provisions at issue here applicable to the Smithsonian differ from those applicable to non-federal employers. The non-federal provision of Title VII (§ 2000e-2(a)(1)) considered by the Court in *Muldrow* uses different language from the provision of Title VII applicable to the federal government (§ 2000e-16(a)). Specifically, the non-federal provisions of Title VII outlaw discrimination "with respect to [an employee's] compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), whereas the federal provisions prohibit discrimination with respect to "personnel actions," 42 U.S.C. § 2000e-16(a). The Court should honor Congress's choice to create different standards for federal and non-federal employers and apply the text of Title VII as written.

The difference in wording is meaningful as the Supreme Court has ruled in considering similar text in the ADEA, which has different provisions for federal and non-federal employers. *Babb*, 589 U.S. at 410 ("as we previously recognized, the ADEA's private- and public-sector provisions are 'couched in very different terms'" (quoting *Gomez-Perez v. Potter*, 553 U.S. 474, 487 (2008)). In *Gomez-Perez*, the Court considered the wording of the ADEA's federal sector provision, holding, "[t]he ADEA federal-sector provision was patterned 'directly after' Title VII's federal-sector discrimination ban." 553 U.S. at 487 (comparing text and collecting citations). In

so doing, the Court noted that while "Title VII's federal-sector provision incorporates certain private-sector provisions" it does not incorporate them all. *Id.*

In *Babb*, 589 U.S. at 410, the Supreme Court further explained the differences in the wording of the federal and non-federal provisions of the ADEA, which again are almost identical to those found in Title VII. *See id.* The Court emphasized that equating the scope of the two provisions was misplaced when they used different words. It noted, "Congress could have easily" used the same language in both provisions "[b]ut Congress did not choose this route. Instead, it 'deliberately prescribed a distinct statutory scheme applicable only to the federal sector,' and in doing so, it eschewed the language used in the private-sector provision[.]" *Id.* at 412 (citations omitted). In considering the distinct federal sector provisions of the ADEA, the Court observed that the ADEA's federal sector provisions, as those of Title VII, concern "personnel actions." *Id.* at 405. Specifically, it reasoned:

> Section 633a(a) concerns "personnel actions," and while the ADEA does not define this term, its meaning is easy to understand. The Civil Service Reform Act of 1978, which governs federal employment, broadly defines a "personnel action" to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews. *See* 5 U.S.C. § 2302(a)(2)(A). That interpretation is consistent with the term's meaning in general usage, and we assume that it has the same meaning under the ADEA.

*Id.*

Some judges in this District have declined to adopt this straightforward textual application of the Title VII and ADEA federal sector standards in the wake of *Chambers*, relying on pre-*Babb* precedents such as *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), which construed Title VII's federal and non-federal provisions as coterminous. *See, e.g., Bain v. Off. of Att'y Gen.*, Civ. A. No. 21-1751 (RDM), 2022 WL 17904236, at *21 (D.D.C. Dec. 23, 2022) (citing pre-*Babb* authorities); *Garza v. Blinken*, Civ. A. No. 21-2770 (APM), 2023 WL 2239352, at *5 (D.D.C. Feb. 27, 2023) (same). Respectfully, following this path runs contrary to the clear and necessary

holding of *Babb* and the plain text of the federal anti-discrimination provisions. For example, in *Czekalski*, the D.C. Circuit in setting forth the standard for an adverse action noted that while the federal sector "language differs from that of the provision governing private employers, we have held that the two contain identical prohibitions." *Czekalski*, 475 F.3d at 363 (citation omitted; collecting cases). But in *Babb*, decided in 2020 more than a decade after the D.C. Circuit's decision in *Czekalski*, the Supreme Court rejected that theory and, instead, held that when anti-discrimination statutes use different language in their federal and non-federal provisions they should not be interpreted the same. *Babb*, 589 U.S. at 411 (the federal sector provision of the ADEA, which are nearly identical to Title VII, "is markedly different from the language" of its non-federal provision and warrants a different standard).

Accordingly, for an event to be actionable under the federal sector provisions of Title VII the identified event must either be an enumerated "personnel action" under the Civil Service Reform Act, 5 U.S.C. § 2302(a)(2)(A)(i)–(xi), or fall into that term's catch-all (i.e., "any other significant change in duties, responsibilities, or working conditions[,]" 5 U.S.C. § 2302(a)(2)(A)(xii)) and that the employee suffer "some harm" from the alleged event (i.e., that the event was "adverse"). Here none of the events Jackson alleges, except for his employment termination, satisfy this standard.

Jackson's claims can be broadly placed in several buckets: (1) Jackson was denied access to the Museum's Board; (2) Graves discouraged Jackson from communicating with other Museum employees; (3) Graves scrutinized or denied Jackson's travel requests; (4) Jackson's employment was terminated during his probationary period; and (5) the Smithsonian delayed Jackson's last paycheck. None of these alleged actions, except employment termination, is an enumerated employment action in the CSRA. *See* 5 U.S.C. § 2302(a)(2)(A)(i)–(xi).

Nor do those alleged actions constitute a "significant change in duties, responsibilities, or working conditions." *See* 5 U.S.C. § 2302(a)(2)(A)(xii). Jackson never enjoyed the privileges he claims he was entitled to, so he did not suffer any "change." *Id.* Moreover, Jackson's primary duties involved cultivating a donor base in the Washington, D.C. area. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000772. As such, his duties did not involve communicating with the Board or traveling across the country to meet with potential donors. Jackson also cannot show that the delay of his final paycheck was an adverse employment action because it occurred after the Smithsonian terminated his employment. Even if there was a delay, there is no materially adverse action because "it is undisputed that [he] eventually received" his final check. *Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 207 (D.D.C. 2017). In short, none of Jackson's alleged discriminatory or retaliatory events, except his employment termination, constituted an adverse personnel action. His discrimination and retaliation claims, therefore, fail.

**B. Jackson Cannot Establish A Prima Facie Case of Retaliation.**

"To establish a prima facie case of retaliation, an employee must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action." *Winston v. Clough*, 174 F. Supp. 3d 224, 237 (D.D.C. 2013).

1. <u>Jackson Cannot Establish Retaliation Because He Did Not Engage In Protected Activity Until He Contacted An EEO Counselor.</u>

"An activity is 'protected for purposes of a Title VII claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Holmes v. Washington Metro Area Transit Auth.*, 723 F. Supp. 3d 1, 15 (D.D.C. 2024) (quotation marks omitted). "[F]or an exchange to constitute 'protected activity,' the employee 'must in some way allege unlawful discrimination.'" *Payne v. Salazar*, 899 F. Supp. 2d 42, 52

(D.D.C. 2012). Vague and uncorroborated allegations are insufficient to establish protected activity or defeat a well-supported motion for summary judgment. *Williams v. Spencer*, 883 F. Supp. 2d 165, 177-78 (D.D.C. 2012) (allegation that employee raised vague concern that employer's conduct might be based on race was insufficient to create a genuine issue of material fact at summary judgment.). Jackson alleges that he engaged in EEO activities when he participated in "all-staff and all-leadership discussions" in April 2015. Compl. (ECF No. 1) at 3. But Jackson only alleges that he participated in meetings that discussed "incessant bullying and micro-management" and whether "the hostile workplace issues being discussed also existed at other [m]useums on the Smithsonian's DC campus." *Id*. "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Here, Jackson does not allege that he or anyone else asserted discrimination or retaliation on any impermissible basis, a required element, in those meetings. *See id*. The only protected activity Jackson did engage in was contacting an EEO official in January 2016, after all alleged retaliatory events had occurred. Obviously, the decision to fire Jackson took place before his filing of any EEO complaint and, thus, his EEO complaint cannot serve as the requisite prior protected activity to anchor this retaliation claims. *See Ng v. LaHood*, 952 F. Supp. 2d 85, 91 n.4 (D.D.C. 2013) ("In order to succeed on a retaliation claim under Title VII, a plaintiff must show that retaliation was the but-for cause of the adverse employment action at issue.") (citation omitted); *Lewis v. Columbia*, 653 F .Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." (citation omitted)); *see also Ransom v. Ctr. For Nonprofit Advancement*, 514 F. Supp. 2d 18, 30 (D.D.C. 2007) ("There can be no requisite causation when

an employer merely implements a termination decision that was made before an employee engaged in protected activity.") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

2. Jackson Was Not Subject To A Materially Adverse Employment Action.

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). As this Court recently explained in *Montgomery v. Mayorkas*, Civ. A. No. 23-3931 (BAH), 2024 WL 4973406, *9 (D.D.C. Dec. 4, 2024):

> In the retaliation context, an adverse action is one that is "harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. [at] 57 []. This standard "encompass[es] a broader sweep of actions than those in a pure discrimination claim," *Baloch*, 550 F.3d at 1198 n.4, but "[t]ypically ... involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits,'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).

Here, Jackson's complaints concern the activities his supervisor permitted him or did not permit him to perform—not to communicate with the Board or certain other Smithsonian employees, or the times and circumstances under which to travel around the country. It may be that access to a board of advisors or domestic travel is a part of some gifts officer's duties in some institutions. Based upon the particular circumstances of this case, however, where Jackson's primary duties involved developing a donor base in the Washington, D.C. area, being denied travel outside of the Washington D.C. area or being discouraged from communicating with certain individuals "did not have a materially adverse effect on the terms or conditions of [Jackson's] employment—[Jackson] simply carried out [his] work responsibilities at the time" and in the manner "dictated by [his] supervisor." *Arnold v. Jewell*, 6 F. Supp. 3d 101, 112 (D.D.C. 2013) (quoting *Rattigan v. Gonzalez*, 503 F. Supp. 2d 56, 74 (D.D.C. 2007). Even assuming that Graves could have taken a more tactful management approach, Jackson's retaliation claims fail because

"Title VII . . . does not set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 67.

3. Even if Jackson Engaged in Protected Activity, Jackson's Supervisors Were Not Aware of That Activity.

Jackson must also establish that retaliation is the "but-for- cause for each of the alleged actions. *Duncan v. Johnson*, 213 F. Supp. 3d 161, 199 (D.D.C. 2016). He cannot do so because "there is no proof that [Graves or Cole] ever learned of [Jackson's] protected activity," at the time they took the alleged actions. *See Id*. Even if Jackson had engaged in protected EEO activity prior to contacting an EEO counselor in January 2016 (which he did not), his supervisors were unaware of any such activity. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000768, SI 000811, SI 000947, SI 000949. Nor can Jackson point to any conversations he may have had with Smithsonian coworkers or the Ombudsman about his workplace grievances because he never mentioned his membership in a protected class. *See* Ex. 1, Def's. Stmt. ¶¶ 48-49.

**C. The Smithsonian Had Legitimate, Non-Discriminatory, and Non-Retaliatory Reasons For Its Actions.**

1. Jackson Was Neither Discriminated Nor Retaliated Against When He Was Denied Access to the Museum's Board Because Other Museum Employees Managed That Relationship.

Jackson alleges that "Graves refused to allow [Jackson] contact with the Board." Compl. (ECF No. 1) at 5. Jackson requested access to the Board in an effort to reengage prior relationships. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000772. Graves explained, however, the Museum needed Jackson to focus on the Museum's greatest need—identifying and cultivating donors in the Washington, D.C. area. *Id.* Moreover, Cole and Graves were responsible for engaging with the Board. *Id*. The Smithsonian, therefore, had a legitimate, non-discriminatory, and non-retaliatory reason to deny Jackson's request to access the Museum's Board.

2. Jackson Was Neither Discriminated nor Retaliated Against When Graves Insisted That He Communicate With Her Rather Than Other Museum Employees Because She Was His Supervisor And Supervising Employees Is a Legitimate, Non-Discriminatory, Non-Retaliatory Purpose.

Jackson alleges that Graves discouraged Jackson's interaction with his fundraising colleagues. Compl. (ECF No. 1) at 7. Graves expressed concerns that Jackson sought outside input and assistance without first checking with appropriate Museum staff. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 001068-001070. Similarly, Jackson consulted the Museum's head of public affairs regarding a donor strategy before first discussing with his supervisor. *Id.* at SI 001074. Seeking supervisory approval first also ensured that Jackson's requests did not needlessly increase the workload of other Museum staff. *Id.* at SI 000779-000780. As Jackson's supervisor, Graves understandably wished to remain involved in Jackson's fundraising strategy and activities. Even if the Court considers Graves's conduct as micromanaging, it is a legitimate, non-discriminatory, and non-retaliatory reason for a supervisor to manage an employee – particularly one who was on probation - under her supervision. *See Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 242-43 (D.D.C. 2018).

In any event, Jackson concedes that other staffers were restricted "from communicating with colleagues." Compl. (ECF No. 1) at 3. According to him, this restriction negatively impacted his morale and work performance. *Id.* He does not allege, however, that this was due to race, sex, or any other prohibited animus toward Jackson. The Smithsonian had a legitimate, non-discriminatory reason to insist that Jackson communicate with his direct supervisor.

3. Jackson Was Neither Discriminated Nor Retaliated Against When Graves Scrutinized or Denied Jackson's Travel Requests Because Doing So Was Part of Performing Her Supervisory Duties and Guarding Donors' Contributions Against Wasteful Spending.

Jackson alleges that Graves delayed approving Jackson's request to travel to Texas to meet with "wealthy Texas prospects[.]" Compl. (ECF No. 1) at 7. Graves, in fact, approved the travel

to Dallas, Texas so that Jackson could attend an Annual Earth Day Texas event in late April 2015. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000774. It was not apparent, however, what relevance an Earth Day event has to the Museum's subject-matter—African Art. *Id.* As Graves explained, "[t]ypically, we travel to meet with donors/prospects who express an interest in our work or African Art." *Id.* Any delay that may have occurred in approving this travel was caused by Graves seeking additional information from Jackson to justify the time and expense of pursuing this particular trip. *Id.*

Jackson similarly alleges that Graves denied his requests for various other trips to Georgia, New York, California, and Maryland. Compl. (ECF No. 1) at 7. He points to the affidavit of Colleen Morith, which stated that "if [Graves] did want to terminate [Jackson] early, preventing him the ability to travel and not approving his expenses definitively would do it." *Id.* at 5. The Museum, however, expected Jackson to focus his efforts on cultivating potential donors in the Washington, D.C. area. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000775. Moreover, Jackson "never seemed to have a strategy for successful fundraising." *Id.* at SI 000818. As Graves explained to Jackson, "as fundraisers [they] must be good stewards of donor's gifts" and the Museum's "travel budget was limited," so they "needed to be judicious in how [they] used funds." *Id.* at SI 000774. Jackson proposed to travel to various events, such as golf tournaments. *Id.* "Donors want to see their dollars go towards educational programs or exhibits" and the Museum did not want to create a perception among donors that it "had extra money to spend on traveling to events." *Id.*

Even if the Court considers Graves's denials of Jackson's travel requests as improper, such denials were not motivated by prohibited discriminatory or retaliatory animus. Morith—the witness Jackson quotes in his Complaint—states that "any hostility towards [Jackson] by [Graves]

was relative to professional insecurity rather than race/sex. She treated a white female colleague of the same position similarly" and notes that "I had a white female colleague threatened with her job by [Graves] if she didn't produce results." Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000921. Graves "took the colleagues prospects and put them in her portfolio." *Id.* There is nothing to suggest that Graves denied Jackson's travel requests based on race, sex, or retaliation. Indeed, the Smithsonian had a legitimate, non-discriminatory reason to deny Jackson's requests for travel outside of the Washington, D.C. area.

4. Jackson Was Neither Discriminated Nor Retaliated Against When His Employment Was Terminated During His Probationary Period Because He Failed To Raise Any Money For The Museum.

Jackson asserts that he was wrongfully terminated from his position. Compl. (ECF No. 1) at 11. Jackson was separated on October 26, 2015, eight months into his one-year probationary period, with an effective date of November 9, 2015. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 001077. Graves, Jackson's supervisor, issued the separation letter. *Id.* While the letter did not specify the reasons for his separation, Cole, at Graves's recommendation, approved Jackson's termination because his "performance was unsatisfactory." *Id.* at SI 000821, SI 001077.

Jackson's termination was the culmination of repeated efforts by Cole and Graves to address Jackson's poor performance. Shortly after he joined the Museum, Graves and Jackson met, discussed the full scope of the position, set expectations, and established a goal for Jackson to raise $1.5 million. *Id*. at SI 000637. After about four months into the job, on July 7, 2015, Cole and Graves met with Jackson to discuss his performance. *Id.* at SI 001068. The three discussed Jackson's activities for identifying and cultivating donors, improper use of the travel card, and lack of communication and teamwork. *Id.* at SI 001068-001069. The discussion ended with corrective actions Jackson was expected to take, including developing a work plan, analyzing data, familiarizing himself with expense policies, and improving communications. *Id.* at SI 001069-

001070. While Jackson acknowledged his misuse of the travel charge card, he disputed that his performance was insufficient. *Id.* at SI 001071. He did not indicate or otherwise suggest that the negative review was motivated by discriminatory or retaliatory animus. In any event, Jackson's "own view of [his] performance says little about the whether the decisionmaker honestly believed its proffered non-discriminatory, non-retaliatory reasons." *Hartzler v. Mayorkas*, Civ. A. No. 20-3802 (GMH), 2022 WL 15419995, at *25 (D.D.C. Oct. 27, 2022) (collecting cases).

Graves and Jackson again met on August 20, 2015, because Jackson's performance remained unacceptable. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 001074. Bill Holmes attended that meeting. *Id*. The three discussed Jackson's continued refusal to discuss fundraising strategy with Graves. *Id.* So, Graves and Jackson agreed to implement a weekly development status report recapping Jackson's advancement activities for the prior week. *Id*. The key concern was that Jackson had not generated the activity necessary to reach his goal of raising $1.5 million. *Id.* at SI 001075.

To the extent Jackson relies on Kitchiner's affidavit to establish a discriminatory hostile work environment, Kitchiner's expressed "belie[f] that Jackson was discriminated on the bases of his race and sex" is inadmissible because it is based on speculation and without the requisite personal knowledge. *See* Fed. R. Evid. 602. Kitchiner testified that "Graves told [her] that [Graves] did not think Jackson would pass his probation because Kreamer wanted Colleen Morith to serve as Major Gifts Officer" but she did not state that Kreamer or Graves were motivated by discriminatory or retaliatory animus. Ex. 1, Def.'s Stmt. Ex. A, ROI Excerpts at SI 000846. And even if Kreamer's motivations were based on an impermissible animus, those are irrelevant because Cole decided to terminate Jackson at Graves's recommendation. For that reason, he cannot "show 'that discrimination or retaliation was the real reason' for the adverse action.

*Hartzler*, 2022 WL 15419995, at * 25 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

In short, the Smithsonian terminated Jackson for one of the most "common legitimate reasons for discharge: performance below the employer's legitimate expectations." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Jackson was hired as the Museum's major gifts officer. He was given the goal of raising $1.5 million. About eight months into his probationary term, Jackson had not raised any funds for the Museum. Jackson's supervisor counselled him on that point at least twice. For his failure to raise funds for the Museum, Jackson was separated during his probationary period. *See* Ex. 1, Def.'s Stmt. ¶¶ 9-15. Moreover, the undisputed facts show the lack of discriminatory or retaliatory inference because "'the same person who hired . . . [Jackson] later propose[d] that an adverse action be taken against him.'" *Brown v. Vance-Cooks*, 920 F. Supp. 2d 61, 69 (D.D.C. Feb. 1, 2013) (quoting *Kelly v. Mills*, 677 F. Supp. 2d 206, 223 (D.D.C. 2010) (collecting cases)). The Smithsonian, therefore, had legitimate, non-discriminatory, retaliatory reasons for terminating Jackson's employment.

5. <u>Jackson Was Neither Discriminated Nor Retaliated Against When the Smithsonian Sent Jackson His Final Paycheck in December 2015 Because The Smithsonian Promptly Processed the Paycheck After All Departure Procedures Were Complete.</u>

Finally, Jackson alleges that the Museum delayed his final paycheck. Compl. (ECF No. 1) at 2. Before Jackson could receive his final paycheck he had to be cleared by various departments to ensure that he returned all Smithsonian property and settled any debts. Ex. 1, Def.'s Stmt. ¶ 42. The Smithsonian accomplishes this using the Smithsonian's Automated Clearance process. *Id.* In Jackson's specific case, the Smithsonian Office of Protection Services Locksmith Office was the last office to enter its clearance in November 2015 after receiving Jackson's keys, which triggered Payroll to process the payment. *Id.* ¶¶ 43-44. Jackson received his final payment on December

18, 2015. *Id.* ¶ 45. Even if Jackson's paycheck was delayed (it was not), such delay was not due to some impermissible animus. Jackson Was Not Retaliated Against Because He Did Not Engage in Protected EEO Activity Prior To His Separation and Even if He Did So, His Supervisors Were Not Aware of Such Protected Activity.

In short, the Smithsonian neither discriminated nor retaliated against Jackson based on his race, sex, or any other protected characteristic, nor retaliated against during his less-than eight months with the Smithsonian. The Smithsonian had legitimate, non-discriminatory, and non-retaliatory reasons for each of Jackson's allegations. The Court should grant the Smithsonian's motion for summary judgment and dismiss Jackson's discrimination and retaliation claims.

## III. <u>Jackson's Hostile Work Environment Claims Fails.</u>

Title VII "prohibits employers from creating or condoning a hostile or abusive work environment. *Ward-Johnson v. Feleke*, Civ. A. No. 19-0534 (CJN), 2022 WL 355239, at *3 (D.D.C. Feb. 7, 2022). "A plaintiff asserting a hostile work environment claim must show that her employer subjected her to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Courts looks to the 'totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance' to determine whether a hostile work environment exists." *Id.* (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). "This standard is demanding" because "Title VII is not intended to function as a 'general civility code' policing 'the ordinary tribulations of the workplace.'" *Davila v. Mayorkas*, Civ. A. No. 22-357 (CRC), 2023 WL 2072455, at *8 (D.D.C. Feb. 17, 2023) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

For his hostile work environment claim, it appears that Jackson relies on the same conduct he alleges constitutes discriminatory conduct. *See generally* Compl. (ECF No. 1). Such claims are impermissible if the Court considers them "concrete or tangible employment actions" such that each individually support a claim of discrimination (it should not) because the "essence of a hostile work environment claim is that a series of acts, which might not individually alter the terms or conditions of employment, has collectively altered such terms." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 85 (D.D.C. 2013).

Nor is the alleged conduct "severe, pervasive, and abusive." *Id.* at 88 (cleaned up). Importantly, "none of the comments or actions directed at [Jackson] focused on his race," or any other protected class. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). "His allegations of insult are undercut by the legitimate reasons and constructive criticism offered in the letters of counseling and reprimand." *Id*. Much of the conduct he complains of—being denied access to the Museum's Board, being discouraged from communicating with other Museum employees, having travel proposals scrutinized, or denying Jackson's travel requests—concerns Graves's exercise of her supervisory duties. Such supervision is entirely legitimate. It may also very well be that Jackson was "difficult to supervise." *Hinds*, 296 F. Supp. 3d at 243. Jackson's allegations "'amount[] to little more than everyday workplace disputes' that, while unpleasant, are insufficient to sustain a hostile work environment claim." *Brown v. Small*, Civ. A. No. 02-1262, 2005 WL 736530, at *6 (D.D.C. Mar. 31, 2005) (granting summary judgment and concluding the alleged conduct was "nothing more than a supervisor's reasonable responses to his employee's questionable performance"). "Courts have frequently dismissed hostile work environment claims centered on similar allegations of conflict with a manager, occasional denial of privileges, minor changes to work duties, and close scrutiny" because "[s]uch occurrences are not sufficiently

offensive, intimidating, or out of the ordinary in a typical workplace to change the conditions of the plaintiff's employment." *Kabakova v. Off. of Arch. of Capitol*, Civ. A. No. 19-1276 (BAH), 2020 WL 1866003, at *17 (D.D.C. Apr. 14, 2020). At base, Jackson lacks evidence to support a hostile work environment claim under Title VII. Indeed, there is no evidence in the record suggesting that any actions toward Jackson were motivated by impermissible animus. The Court should grant summary judgment for the Smithsonian on Jackson's hostile work environment claim.

## CONCLUSION

For these reasons, the Smithsonian respectfully requests that the Court grant its motion for summary judgment and enter judgment for the Smithsonian.

Dated: May 15, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ *Dimitar P. Georgiev*
DIMITAR P. GEORGIEV, D.C. Bar #1735756
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 815-8654

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON L. JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>LONNIE G. BUNCH, III,<br>Secretary of the Smithsonian Institution<br><br>Defendant. | Civil Action No. 22-2240 (BAH) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendant's motion for summary judgment, Plaintiff's response thereto, and the entire record herein, it is hereby

ORDERED that Defendant's motion is GRANTED, and it is further

ORDERED that judgment is entered for the Defendant.

SO ORDERED:

________________
Date

____________________________
BERYL A. HOWELL
United States District Judge