UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON L. JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>LONNIE G. BUNCH, III,<br>Secretary of the Smithsonian Institution<br><br>Defendant. | Civil Action No. 22-2240 (BAH) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h)(2), Defendant Lonnie G. Bunch, III, Secretary of the Smithsonian Institution (the "Smithsonian") submits the following statement of material facts as to which it contends there is no genuine dispute.

**The Parties**

1. Plaintiff Milton Jackson (African American, Male, alleged prior EEO activity) was employed with the Smithsonian's National Museum of African Art for approximately seven months—from March 23, 2015, to November 9, 2015. Ex. A, Report of Investigation Excerpts ("ROI Excerpts") at SI 001007, SI 001080-001081 (attached hereto); Ex. B, Personnel Notification Document at SI 00353 (attached hereto).

2. The National Museum of African Art (the "Museum") is an art museum within the Smithsonian Institution. 20 U.S.C. §§ 80l, 80m.

3. The Museum's Advisory Board is appointed by the Smithsonian Board of Regents and includes representatives of African descendants in the United States, collectors of African Art, and scholars in the field of African art and culture. 20 U.S.C. § 80n. Current membership is

publicly available at: https://africa.si.edu/about/board/ (last visited on May 14, 2025).

4. At all times during Plaintiff Milton Jackson's employment at the Smithsonian:

a. Jackson (African American, Male, alleged prior EEO activity) was employed by the Museum as the Major Gifts Officer. *See* Ex. A, ROI Excerpts at SI 000690.

b. Ms. Marie Graves (female, African American, prior EEO activity) was his first line supervisor. *See* Ex. A, ROI Excerpts at SI 000767, SI 001007.

c. The Museum's former Director, Dr. Johnetta Cole (female, African American, prior EEO activity) was his second line supervisor. *See* Ex. A, ROI Excerpts at SI 000810, SI 001007.

d. Mr. William (Bill) Holmes[1] (white, male) was employed as the Museum's Administrative Officer. *See* Ex. A, ROI Excerpts at SI 000685-000686.

**Jackson's Employment with the Smithsonian**

5. In 2014, Jackson was terminated from his position at the National Geographic Society for what he has described as communications and travel issues. Ex. C, Jackson 2019 Dep. Tr. at SI 001108-001109 (attached hereto); Ex. T, Nat'l Geo. Soc. Termination at 000002-0000006. He then applied to work at the Smithsonian. *Id.*; *see also* Ex. D, Jackson Feb. 4, 2015, Email at SI 00146 (attached hereto).

6. Jackson interviewed with Dr. Cole and Ms. Graves. Ex. C, Jackson 2019 Dep. Tr. at SI 1109 – 1110.

7. The Museum exercised its discretion to offer Jackson an increased starting step and annual leave accrual. Ex. E, Holmes Mar. 13, 2015, Email at SI 00151-00157, SI 00350, SI 00362-00363.

8. His supervisors expressed confidence about his selection. Ex. F, Graves Mar. 3,

---

[1] Mr. Holmes is deceased, and as a result there is no affidavit in the EEO investigation from Mr. Holmes.

2015, Email at SI 00143-00145, SI 00147-00150 ("I am confident that Milton will be an excellent match for this position and a strong asset to the Advancement team.").

9. Jackson began work on March 23, 2015, at the Museum in the position of Senior Advancement Program Specialist ("Gift Officer"), IS-1001-13. *See* Ex. A, ROI Excerpts at SI 001007, SI 001080-001081; Ex. B, Personnel Notification Document at SI 00353.

10. In this position Jackson was responsible for building and managing a portfolio of prospects and donors to execute a program focused on high capacity giving, specifically, 100 individuals who could give between $25,000 and $1,000,000, and raise $2,000,000 annually in gifts. Ex. A., ROI Excerpts at SI 001007, SI 001009.

11. Jackson was not a federal employee and not part of the federal civil service. Jackson is a trust employee, which means that he is paid from Smithsonian trust funds.[2] Ex. B, Personnel Notification Document at SI 00353.

12. Jackson's appointment was subject to a one-year probationary period. *Id.*

13. The Smithsonian uses the probationary period "to provide the supervisor with the opportunity to fully assess an individual's performance and conduct to assure that the potential perceived in the interview and selection process is demonstrated by the employee on the job. … It also provides a means for the supervisor to separate the employee if, after a fair opportunity, he or she fails to demonstrate the appropriate conduct or performance." Ex. A, ROI Excerpts at SI 000959.

14. Jackson did not successfully raise any funds for the Museum or the Smithsonian

---

[2] Trust funds are funds received by the Smithsonian from various sources other than federal government appropriations, *i.e.*, gifts, grants, research contracts, and business operations revenues. *See generally* Smithsonian, People & Operations, *available at* https://www.si.edu/dashboard/people-operations (last visited on May 6, 2025).

during his employment. Ex. C, Jackson Dep. Tr. at SI 001206-001208.

15. On October 26, 2015, Jackson was notified of his separation due to lack of performance, effective November 9, 2015, which was during his one-year probationary period. Ex. A, ROI Excerpts at SI 000786-000787, SI 000819-000821, SI 001077, SI 001080-001081.

16. He received his final paycheck from the Smithsonian on December 18, 2015. *Id.* at SI 000726.

***Jackson's Poor Job Performance with the National Museum of African Art (the "Museum")***

17. Within the first week of his arrival, in March 2015, Jackson got into a work-related disagreement with his supervisor Ms. Graves regarding who would manage the Museum's Advisory Board. *Id.* at SI 000772. Jackson sought this role, but Ms. Graves explained that Dr. Cole and she would remain in this role. *Id.* at SI 000772, SI 000813.

18. In approximately April 2015, Ms. Graves, disagreed with Jackson's proposal to hire a vendor in the United Kingdom because the Museum was not in a position to take on more global contacts. *Id.* at SI 000654, SI 000704).

19. Ms. Graves also disagreed with Jackson's identification of a retired Smithsonian executive assistant and a current employee as legitimate prospective donors of Major Gifts for the Museum. *Id*. at SI 000704; *see also* Ex. C, Jackson Dep. Tr. at SI 001187-001189.

20. Ms. Graves also expressed doubt regarding two other prospective donors that Jackson identified, and Ms. Graves noted that they unlikely had capacity or interest in making major gifts to the Museum. Ex. A, ROI Excerpts at SI 000704.

21. On or around May 8, 2015, Ms. Graves spoke with Jackson in his office about another coworker Ms. Bonnie Berry. *Id*. at SI 000655. Jackson told Ms. Graves that he was not going to let anyone interfere in the performance of his job duties. *Id.*

22. In or around June 2015, Ms. Graves questioned Jackson's judgment in identifying as a prospective Museum donor a 90-year-old woman whom they both knew from their prior employment at Howard University, and whom Jackson identifies as his "good friend" (Dr. Harland). *Id.* at SI 000710, SI 000781.

23. Ms. Graves did not agree with his efforts to bring Dr. Harland (i) to a private event, (ii) on a private tour of the Smithsonian's Air and Space Museum, and (iii) to a private lunch with planned giving staff. Ms. Graves states that not only do these activities lack any apparent connection to the National Museum of African Art, but also that Dr. Harland explicitly disclaimed any interest in making a planned gift to the Smithsonian, and that Jackson unwisely excluded the family from the solicitation of a planned gift from an elderly prospective donor. *Id.* at SI 000777-000778, SI 000781, SI 000787-000789.

24. Jackson was provided with Smithsonian policy regarding charge card usage, which prohibits use of the card for personal expenses. Ex. G, Braun Apr. 14, 2015, Email at SI 000158-000261 (attached hereto); *see also* Ex. A, ROI Excerpts at SI 000972-001005. Nonetheless, on several occasions in June 2015, Jackson submitted unauthorized and personal expenses to the Smithsonian for such things as a rental car to escort Dr. Harland to and from a meeting at the National Air and Space Museum in Washington, D.C., and a meal with a fellow Smithsonian employee—none of which appeared likely to lead to major gifts for the Museum. Ex. H, Expense Reps. at SI 00097-00109, SI 00267, SI 00271, SI 00282-00283, SI 00314-00316 (attached hereto).

25. On July 1, 2015, Ms. Graves counselled Jackson regarding appropriate expenses that may be reimbursed, and requested that he share more information with her, as his supervisor. *Id.* at SI 00267.

26. Jackson was provided with an invitation list for a July 4, 2015, fundraising event to

which he was bringing Dr. Harland as a prospective donor. Ex. A, ROI Excerpts at SI 000756; *see also* Ex. I, Graves Jul. 24, 2015, Email at SI 000286–000290 (attached hereto). Jackson failed to act on this information, that is, he did not introduce Dr. Harland to Dr. Cole at the event. *See* Ex. I, Graves Jul. 24, 2015, Email at SI 000286–000290; *see also* Ex. C, Jackson Dep. Tr. at SI 001203; Ex. J, Jackson Jul. 6, 2015, Email at SI 00269-00270.

27. Ms. Graves and Dr. Cole counselled Jackson about his failure to introduce Dr. Harland to Dr. Cole at the July 4, 2015, fundraising event. Ex. A, ROI Excerpts at SI 000713-000714.

28. From July 4, 2015, through August 11, 2015, Jackson sought for the Smithsonian to accept scientific equipment offered as a gift by Dr. Harland, even though the equipment lacked apparent use for, or connection to, the Museum, which is an art museum. *See id.* at SI 000729, SI 000757, SI 000783; Ex. C, Jackson Dep. Tr. at SI 001206-001208; *see also* Ex. K, Graves Jul. 28, 2015 Email at SI 000295-000298 (attached hereto). Jackson's efforts were unsuccessful. Ex. L, Jackson Aug. 11, 2015, Email at SI 00303-00305 (attached hereto).

29. On July 6, 2015, Ms. Graves counselled Jackson regarding his tardiness and extended office absences, lack of communication, and the need for improvement in these areas. Ex. M, Graves Jul. 6, 2015, Email at SI 000268 (attached hereto).

30. On July 23, 2015, when Jackson asked for approval of a diversity fundraising proposal from the Associate Director for Collections and Facilities, Steve Mellor, Mr. Mellor stated that while he supported the proposal "there are concerns that need to be articulated and addressed to give clarity to both this museum and the intended funder before the program could be implemented." Ex. A, ROI Excerpts at SI 000686, SI 000749-000755. These included "how many is in a 'cadre', what is the target of 'underrepresented', what is time frame, what is the

anticipated level of skill for applicants, who makes and how is the selection made, what are the liability concerns for the institution and how are they mitigated, as examples." *Id.* at SI 000754.

31. On July 23, 2015, Jackson was counselled regarding: his failure to advise his supervisor (Ms. Graves) ahead of prospective donor meetings with Dr. Harland and others; misspent time and effort arranging for Dr. Harland to visit and potentially give to other Smithsonian units; poor management of a lunch with the Smithsonian's planned giving employees and Dr. Harland; violation of Smithsonian policy by submitting unauthorized expenses for reimbursement; and bypassing Museum staff who were responsible for addressing his needs. He was instructed to refocus his time and effort on soliciting gifts for the Museum, provided with recommended methods for doing so, and instructed to provide weekly reports. Ex. A, ROI Excerpts at SI 001067-001070, SI 001064–001065, SI 001071.

32. On August 20, 2015, Ms. Graves counselled Jackson on the need for improved communication, namely to bring fundraising ideas to her rather than communications staff, and instructed him to use his time to research donors more effectively, with a focus on deliverables. Ex. A, ROI Excerpts at SI 000734–000735 ("Have you qualified 80 to 90 donors for your portfolio? What is the strategy for these individuals? How many meetings requests have you initiated…How many asks have you made? How many proposals do you have in your pipeline?").

***Facts Pertaining to Jackson's Travel Requests***

33. Typically, Museum advancement staff travelled for one-on-one meetings with qualified donors or prospects or to attend events the Museum was hosting. Ex. A, ROI Excerpts, at SI 000775, SI 000866.

34. Jackson alleges that on Monday, March 30, 2015, one week after he began work at the Museum, he requested to travel to Texas for an Earth Day Texas Celebration scheduled to occur in less than a month's time (April 24 – 26, 2015). Ex. A, ROI Excerpts at SI 000652. The

Earth Day Texas event lacked an apparent connection to the Museum, which is an art museum. The event was organized by someone Jackson knew from his prior employment. *Id.* at SI 000740–000743, SI 000774–000775, SI 000866.

35. On or around April 22, 2015, Ms. Graves approved Jackson's request. Ms. Graves did not immediately approve the trip because it lacked a clear connection to the NMAfA, was not structured as a one-on-one donor meeting, or a fundraising event organized by the museum, and she needed additional information from Jackson to justify the expense. Ex. A, ROI Excerpts at SI 000774-000775.

36. In July 2015, Jackson was asked to provide a strategy for following up with any donor prospects from his travel to Earth Day Texas. Ex. N, Jackson Jul. 28, 2015, Email at SI 000292-000294 (attached hereto).

37. Sometime in April 2015, Ms. Graves denied Jackson's verbal request to travel for an event in New York. Ex. A, ROI Excerpts, at SI 000775-000776, SI 000868.

38. In July 2015, Jackson told Mr. Holmes (the Museum's Administrative Officer) that he proposed travelling to Los Angeles, California to meet with a donor and play golf. Ex. A, ROI Excerpts at SI 000660. On July 28, 2015, Ms. Graves denied Jackson's verbal request to travel to Los Angeles, California, referencing use of funds concerns she had previously expressed to Jackson when he asked to travel to North Carolina for a golf tournament. *See* Ex. N, Jackson Jul. 28, 2015, Email at SI 000292-000294; *see also* Ex. A, ROI Excerpts at SI 000785, SI 000818 (denial of travel because "…he never seemed to have a strategy for successful fundraising."). Ms. Graves wrote: "please think about this from a donor's prospective [sic]. If a donor feels we'll travel 3,000 miles to play golf, I worry that he may feel we will fail to proper [sic] steward their gift or even worse, that we do not need their money and that is not the image we wish to convey

to our donors." *See* Ex. N, Jackson Jul. 28, 2015, Email at SI 000292.

***Facts Pertaining to Jackson's Disregard for the Chain of Command***

39. Ms. Graves asked Jackson to limit the requests he made to the Special Assistant to the Museum's Director, for workload reasons. Ex. A, ROI Excerpts at SI 000779-000780.

40. Ms. Graves repeatedly counselled Jackson to discuss fundraising issues with her, as his supervisor, and to keep her apprised of his contacts with donors. *See* Ex. A, ROI Excerpts at SI 001067-001070, SI 001073-001075; Ex. H, Expense Reps. at SI 00267.

41. The Deputy Director also reminded Jackson to discuss his fundraising strategies with his supervisor. Ex. A, ROI Excerpts at SI 000853 ("…I encouraged [Jackson] to run his idea by his supervisor and to develop a plan if his supervisor and our director agreed. I pointed out that it was not within my authority to assign or approve his work…").

42. Ms. Graves expressed a concern about Jackson's office absences, sociability, and practice of explaining long office absences as "meeting with colleagues." Ex. A, ROI Excerpts at SI 000729, SI 000733, SI 000779; *see also* Ex. M, Graves Jul. 6, 2015, Email at SI 000268; Ex. O, Graves Jul. 10, 2015, Email at SI 000279-000281, SI 000284-000285, SI 000300-000301.

***Facts Pertaining to Jackson's Final Payment***

43. At the Smithsonian, before a departing employee can receive his or her final paycheck and/or lump sum leave payout, he or she must be cleared by various departments to ensure that all Smithsonian property has been returned and all debts settled or acknowledged. This is accomplished through the Smithsonian's Automated Clearance process. Ex. P, Auto. Exit Clearance, SI 000367-000368 (attached hereto).

44. Museum staff promptly returned Jackson's keys to the Office of Protective Services Locksmith Office in November 2015. Ex. Q, Starun Nov. 15, 2015, Email at SI 000374-000375, SI 000388-000389 (attached hereto).

45. The Smithsonian Office of Protection Services Locksmith Office was the last office to enter its clearance, which triggered Payroll to process the payment. Ex. A, ROI Excerpts at SI 000927-000929; *see also* Ex. R, Emp. Exit Clearance at SI 000398-000400 (attached hereto).

46. On December 18, 2015, Jackson received his final lump sum payment. Ex. A, ROI Excerpts at SI 000726, SI 000927-000929.

***Facts Pertaining to Jackson's Lack of Prior EEO Activity***

47. The Smithsonian has no record of Jackson having visited or called the Smithsonian Office of Equal Employment and Minority Affairs on July 31, 2015. Ex. A, ROI Excerpts at SI 000947-000949.

48. Jackson alleges that he communicated his concerns to multiple people, Ex. A, ROI Excerpts at SI 000692, and that he believes he expressed these as relating to discrimination on the basis of race and sex, Ex. C, Jackson Dep. Tr. at SI 001152, but the record does not contain references to race, sex, prior EEO activity, or discrimination:

a. Jackson's notes regarding a meeting with a consultant do not refer to race or sex or prior EEO activity. *See* Ex. A, ROI Excerpts at SI 000763-000764; Ex. C, Jackson Dep. Tr. at SI 001151-001152.

b. Jackson's communications with central Advancement employees did not reference race or sex or prior EEO activity, and they were unaware that he considered this to be discrimination. Ex. A, ROI Excerpts at SI 000748, SI 000933, SI 000940.

49. Similarly, the Smithsonian's Ombudsman stated that Jackson contacted her regarding an "unpleasant" work situation. Ex. A, ROI Excerpts at SI 000951-000956.

***Facts Pertaining to Alleged Comparators: Catherine (Catie) Anchin and Colleen Morinth***

50. Jackson's position was Senior Advancement Program Officer, IS 1001-13-5 and subject to a one-year probationary year. *See supra* ¶¶ 4, 9-14. He was the only person holding this position for the Museum. Ex. A, ROI Excerpts at SI 000690, SI 000864-000869, SI 000918–

000924.

51. Mss. Anchin and Morinth held non-senior positions in a different series (IS 0303). Ms. Morinth held the position of Membership Coordinator (Museum Programs), Grade 9. Ms. Anchin held the position of Development Officer, Grade 13. Ex. A, ROI Excerpts at SI 000686, SI 000864-000869, SI 000918-000924.

52. The alleged comparators were not probationary employees. Mss. Anchin and Morinth had been employed by the Museum in their current positions for several years prior to Jackson's hire. Ex. A, ROI Excerpts at SI 000864, SI 000918.

53. Jackson travelled sooner than Mss. Anchin and Morinth. Neither Ms. Anchin nor Ms. Morinth had asked to travel or been issued a travel card. Ex. A, ROI Excerpts at SI 000866, SI 000920. Although she had worked at the Smithsonian for four and a half years, Ms. Anchin only had travelled once, to cover an event for which she was the lead coordinator. *Id.* at SI 000869. Although she had been hired in 2012, Ms. Morinth did not travel until 2016, after Jackson had been terminated. *Id.* at SI 000920.

***Facts Pertaining to Dr. Lanisa Kitchiner***

54. Dr. Lanisa Kitchiner did not report to Jackson's supervisor Ms. Graves. Ex. A, ROI Excerpts at SI 000838. Dr. Kitchiner was not a fundraising professional, but rather worked as a Senior Educator and reported to Christine Kreamer, the Chief Curator for the Museum. (*Id.*).

55. Dr. Kitchiner reported that Ms. Graves treated others similarly to how she treated Jackson. Ex. A, ROI Excerpts at SI 000842.

***Facts Pertaining to Alleged Personality Differences at the Museum***

56. Multiple museum employees observed that Ms. Graves was non-discriminatory, but suffered from professional insecurities, could be difficult, and said disparaging things. Ex. A,

ROI Excerpts at SI 000873-000874, SI 000878, SI 000886, SI 000910, SI 000912-000914, SI 000920. Jackson likewise notes that Ms. Graves disparaged many of his coworkers—Ms. Anchin (White, Caucasian, Female); Bonnie Berry (White, Caucasian, Female); Mr. Frank Esposito (White, Caucasian, Male); Mr. Eddie Burke (Black Male)—and did not trust many employees. *Id.* at SI 000654-000655, SI 000685-000688.

57. A coworker observed tension between Jackson and Ms. Graves but noted that Ms. Graves treated others in similar ways as she treated Jackson. Ex. A, ROI Excerpts at SI 000911-000912.

58. In 2015, Museum morale was low due to workload and a perception of micromanagement and incivility. Ex. A, ROI Excerpts at SI 000920, SI 000893, SI 000847; *see also* Ex. S, Mgmt Resp. at SI 00497-00499, SI 00499-00514 (attached hereto); Ex. C, Jackson Dep. Tr. at SI 001140.

**<u>Jackson's EEOC Complaint and Relevant Procedural History</u>**

59. Jackson's first contact with the Smithsonian's Office of Equal Employment and Minority Affairs (OEEMA) was January 14, 2016. Ex. A, ROI Excerpts at SI 000639-000640, SI 000649-000663, SI 000947-000949. This was more than forty-five days after the effective date of his termination. *See id.* at SI 001080-001081.

60. Jackson's responsible management officials lacked knowledge of any alleged prior EEO activity by Jackson. Ex. A, ROI Excerpts at SI 000768, SI 000811, SI 000947, SI 000949.

61. On October 26, 2015, Jackson was notified of his termination, as well as the 45-day period to commence a proceeding. Ex. A, ROI Excerpts at SI 001077-001078, SI 001080-001081.

62. Jackson testified that on October 26, 2015, he notified Mr. Holmes and Ms. Graves

that he would pursue legal action "with all vigor." Ex. C, Jackson Dep. Tr. at SI 001218-001219. But he waited until January 14, 2016, to first contact OEEMA. Ex. A, ROI Excerpts at SI 000947-000949.

63. Jackson filed a formal complaint with OEEMA on May 3, 2016, and alleged discrimination and hostile work environment on the bases of race (African-American), color (black), sex (male), and retaliation. Ex. A, ROI Excerpts at SI 000632.

64. OEEMA accepted the complaint in part, conducted an investigation, and issued a Report of Investigation containing more than 500 pages. Jackson filed a hearing request with the Equal Employment Opportunity Commission ("EEOC").

65. The EEOC identified the following issues and claims for adjudication *TY S. v. Bunch*, EEOC Doc 2021000775, 2022 WL 1631917, at *2-3 (EEOC May 2, 2022):

> On May 3, 2016, Complainant filed an EEO complaint alleging that the Agency discriminated against him and subjected him to a hostile work environment on the bases of race (African-American), sex (male), and in reprisal for prior protected EEO activity when:
>
> 1. On March 26, 2015, during his first week, Marie Graves (RMO-1) became angry at him for asking questions concerning seeking board members' contacts for potential donations, calling him naïve, and questioning her [sic] judgment;
> 2. From March 30, 205 [sic] to April 2015, RMO-1 delayed approving his request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event;
> 3. On April 15, 2015, RMO-1 denied his request to attend a donor event in New York and seemed to take pleasure in denying the request publicly;
> 4. On May 7, 2015, RMO-1 stated a prospective donor with whom he was working with was "useless." RMO-1 gave similar sharp critic of his work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015;
> 5. On April 23, 2015, RMO-1 told him that he could not talk to or associate with more than ten of his colleagues at [NMAfA] beause they were incompetent, and that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties.
> 6. On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statemen[t] as a threat and that she felt uncomfortable in his presence.
> 7. On June 3, 2015, RMO-1 asked if he and a potential donor we[r]e romantically

involved, which he felt was very inappropriate.

8. During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring that he perform 14 rewrites and then stating that it would not work;
9. On or around July 4, 2015, after he received a commitment for a large donation at the Smithsonian's 4th of July Celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further RMO-1 was intentionally unhelpful in helping him to arrange receipt of the gift, which was eventually rescinded;
10. In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;
11. On October 20, 2015, RMO-1 told him that he could not meet with a prospective donor that he had engaged, and did not provide any reason;
12. On October 26, 2015, he was terminated during his probationary period for poor performance; and
13. His final paycheck was delayed through December 2015.

66. In the administrative proceeding, the parties had an opportunity to, and did, engage in discovery.

67. On June 25, 2020, the EEOC issued a decision granting the Smithsonian's motion for summary judgment and found that there was no genuine issue of material fact that warranted a hearing on Jackson's claims before the EEOC. *TY S.*, 2022 WL 1631917, at *3.

68. Jackson appealed the administrative judge's decision before the Office of Federal Operations ("OFO"). OFO affirmed the decision in favor of the Smithsonian on May 2, 2022. *TY S.*, 2022 WL 1631917, at *4.

69. OFO denied Jackson's motion to reconsider. *See Tyler W. v. Bunch*, EEOC Doc. 2022003338, 2023 WL 3318172, at *2 (EEOC Apr. 18, 2023).

* * *

Dated: May 15, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ *Dimitar P. Georgiev*
DIMITAR P. GEORGIEV, D.C. Bar #1735756
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 815-8654

*Attorneys for the United States of America*

# EXHIBIT A

(Report of Investigation
("ROI") Excerpts)

# COMPLAINT OF DISCRIMINATION

## BECAUSE OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, RETALIATION, AGE, DISABILITY OR GENETIC INFORMATION

(Please type or print clearly)

1. Full name of person complaining:
MILTON JACKSON

Street address:
3248 ARROWHEAD CIRCLE APT D
City, state, zip code:
FAIRFAX VA 22030

(FOR OEEMA USE ONLY: DO NOT WRITE IN THIS SPACE)
2. Case Number: ______
Date Filed: ______

3. Area code and home phone:
734-262-1467
Area code and work phone:

4. What is the title and grade of your job?
IS-1001-13 STEP 5,
SENIOR ADVANCEMENT PROGRAM SPECIALIST

5. Date on which most recent discrimination took place.
Month: 12 Day: 16 Year: 2015

6. Office/Organization where you work?
NATIONAL MUSEUM OF AFRICAN ART (FORMER EMPLOYER)
Street Address: 950 INDEPENDENCE AVE., SW
City, state, zip code: WASHINGTON, DC 20560

7. Indicate why you believe you were discriminated against:

| | | | |
|---|---|---|---|
| ☒ Race | AFRICAN AMERICAN | ☐ National Origin | |
| ☐ Color | | ☐ Age | |
| ☐ Religion | | ☐ Disability | |
| ☒ Sex | MALE | ☒ Retaliation | PRIOR EEO CONTACT/ATTEMPTED TO INITIATE A COMPLAINT |
| ☐ Sex-LGBT | | ☐ Genetic Information | |
| ☐ Equal Pay | | | |

8. Explain how you believe you were discriminated or retaliated against (treated differently from other employees or applicants) because of a reason identified in Item 7 above. Please use additional sheet(s) of paper if you need more space

MR. JACKSON WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED ON RACE, GENDER AND/OR REPRISAL, INCLUDING SEVERE AND PERVASIVE HARASSMENT BY HIS SUPERVISOR MARIE GRAVES, AND THE AGENCY'S FAILURE TO ISSUE HIS TERMINAL PAY FOR SEVERAL WEEKS AFTER HIS UNWARRANTED TERMINATION.

9.a. What corrective action(s) are you seeking? Be specific, please.

REINSTATEMENT, BACKPAY, CORRECTIONS TO HIS PERFORMANCE RECORD, SUFFICIENT ACCESS TO TRAVEL AND FUNDS TO PERFORM HIS DUTIES, COMPENSATORY DAMAGES, AND REIMBURSEMENED OF LEGAL EXPENSES

9.b. If available, are you interested in participating in some form of Alternative Dispute Resolution? ☒ Yes ☐ No

10. Have you discussed this complaint with an EEO Counselor?
☒ Yes SHADELLA DAVIS
Name of Counselor
☐ No

11. Do you have a representative? ☒ Yes ☐ No
Name: HEATHER G. WHITE
Address: THE FEDERAL PRACTICE GROUP
1750 K STREET, NW, SUITE 900
WASHINGTON, DC 20006
Phone: 202-862-4360

12. Signature and Date:
*Heather G. White* 5-3-2016

OEEMA 11/14

000070

# MEMORANDUM

DATE: May 19, 2016

TO: Director, Office of Equal Employment and Minority Affairs (OEEMA)

FROM: EEO Counselor – Shadella Davis

SUBJECT: EEO Counseling Report – Milton Jackson

1. Name, Job Title, Series, Grade and Office Number of Person Counseled:

Milton Jackson, former Senior Advancement Program Specialist, IS-1001-13, (734) 262-1467

2. Organization Designation and Location:

National Museum of African Art (NMAFA)
950 Independence Avenue SW
Washington, DC

3. Date of First Contact: January 14, 2016
3A. Date Forms Received: March 11, 2016

4. Date of Initial Interview: January 14, 2016

5. Bases of Alleged Discrimination: Sex (male), Race (African American), Age (DOB -11/19/60) and Reprisal

6. Dates of Alleged Discrimination: March 26, 2015 through December 16, 2015

7. Claims:

Whether Mr. Jackson was subjected to a hostile work environment based on sex (male), race (African American), age (DOB – 11/19/60) and reprisal during the period of March 26, 2015 through December 16, 2015. This includes, but is not limited to, the following examples:

1. He was marginalized, isolated and ignored;
2. He was not allowed to travel or charge expenses to the Museum;
3. He could not attend events, seminars and meetings without undue constraints;
4. He was terminated; and
5. His final check was delayed.

8. Corrective Action Requested by Person Counseled:

Mr. Jackson requests (1) full back pay and full benefits from the time he was wrongfully terminated; (2) reinstatement as a major gift officer (at the same pay level) in another Smithsonian area better suited for his talents, abilities and skillset; (3) compensatory damages; and (4) full reimbursement of attorney fees.

9. Name and Job Title of Official Involved:

Ms. Marie Woodward Graves, Associate Director for Advancement, NMAFA, (202) 633-4648
Mr. Bill Holmes, Administrative Officer, NMAFA, (202) 633-4602
Dr. Johnnetta Cole, Director, NMAFA, (202) 633-4600

10. Summary of Interviews:

Mr. Jackson selected Alternative Dispute Resolution (ADR) as an alternative to the traditional EEO counseling process.

Management stated that Mr. Jackson was separated during the probationary period because of poor performance, and they declined to participate in ADR.

11. Management Response to Corrective Action Requested: Management declined to grant the requested remedy.

12. Date of Notice of Right to File: April 11, 2016

13. Date of Final Interview: April 11, 2016

14. Date of Report: May 19, 2016

15. Documents Reviewed: See #16

16. Listing of Attachments:

Notice of Final Interview, dated 4/11/16
EEO Rights and Responsibilities, dated 3/23/16
Request for EEO Counseling with attachments, received 3/11/16
Documents from Management
Email from Ms. Graves to Mr. Jackson with attachment, dated 8/20/15
Email thread between Mr. Jackson and Ms. Graves, dated 7/22 – 7/28/15
Email from Ms. Graves to Mr. Jackson without attachment, dated 7/24/15
Letter from Ms. Graves to Mr. Jackson, dated 7/23/15

Signature of EEO Counselor

**SMITHSONIAN OFFICE OF EQUAL EMPLOYMENT AND MINORITY AFFAIRS EEO COMPLAINT FORM ADDENDUM**

**1. HIRE/CONTACT INFORMATION**

NAME: MILTON JACKSON

JOB TITLE: SENIOR ADVANCEMENT PROGRAM SPECIALIST

GRADE: IS-1001-13 STEP 5

PLACE OF EMPLOYMENT: NATIONAL MUSEUM OF AFRICAN ART (NMAFA)

DATES OF EMPLOYMENT: 3/23/2015-11/9/2015 (ON PAID ADMINISTRATIVE LEAVE 10/26/2015-11/9/2015)

CELL PHONE NUMBER: 734-262-1467

EMAIL ADDRESS: ML_JACKS@YAHOO.COM

MAILING ADDRESS: 3248 ARROWHEAD CIRCLE APT D FAIRFAX, VA 22030

**2. PRIMARY AGENCY WITNESSES (INDIVIDUALS WHO DISCRIMINATED)**

NAME: MARIE GRAVES, ASSOCIATE DIRECTOR OF ADVANCEMENT

ADDRESS: NMAFA 950 INDEPENDENCE AVENUE SW WASHINGTON, DC 20013

TELEPHONE NUMBER: 202-633-4648 (0) 202-316-6943 (C)

IMMEDIATE SUPERVISOR: DR. JOHNNETTA COLE

NAME: BILL HOLMES, ADMINISTRATIVE OFFICER HUMAN RESOURCES/FINANCES

ADDRESS: NAMFA (SAME AS ABOVE)

TELEPHONE: 202-633-4602

IMMEDIATE SUPERVISOR: DR. JOHNNETTA COLE

DR. JOHNNETTA COLE, DIRECTOR

ADDRESS: NAMFA (SAME AS ABOVE)

TELEPHONE: 202-633-4600

IMMEDIATE SUPERVISOR: RICHARD KURIN

**3. SELECT THE BASIS FOR THE ALLEGED DISCRIMINATION:**

- SEX (GENDER): MALE
- RACE: AFRICAN AMERICAN
- AGE: 11/19/1960
- REPRISAL/RETALIATION (#7 COMPLETED BELOW)

**4. MY ATTORNEY:**

HEATHER WHITE 202-862-4360

THE FEDERAL PRACTICE GROUP

1750 K STREET NW, STE 900

WASHINGTON, DC 20006

**5. ON WHAT DATES DID THE ALLEGED DISCRIMINATION TAKE PLACE?**

3/26/2015-12/16/2015

**6. PLEASE EXPLAIN AS CLEARLY AS POSSIBLE:**

**A. WHAT HAPPENED**

**B. WHY I BELIEVE IT HAPPENED**

**C. EXPLAIN WHO AND HOW OTHER PERSONS WERE TREATED DIFFERENTLY FROM ME**

I was hired as a Major Gifts Officer by the Museum which was a dream come true for me given my science interests, patents and the Smithsonian's reputation. During the interview process, I was informed that the rationale for my hiring was a Campaign critical $4-5M need for funding in, but not limited to, the following areas: staff salaries; outreach programs for the African immigrant community; diversity; unrestricted purposes (such as direct mail, event spaces); endowed positions; conservation; preservation; named Museum spaces; exhibitions and education. I was also informed that, given these critical funding needs, I would be traveling as much as possible, both domestically and internationally, on Museum business with a Smithsonian travel card; that I would be given a viable prospect list to work from and that I would be provided the proper support and resources to "hit the ground running." During the process, I interviewed – either via phone or in person - with Marie Graves, Bill Holmes (finance, HR), Magdalene Johnson Obaji (NMAFA board member), Dr. Chris Kreamer (deputy director), Dr. Karen Milbourne (curator), Molly Sverdlov (advancement), Eddie Burke (communications), Dr. Johnnetta Cole and Advancement VP Ginny Clark, among others.

My first day was 3/23/2015, during which I attended orientation then stopped by the Museum after orientation concluded. In contrast to the information given to me during the interview process, during my first few days, I discovered that there were scant appropriate/current printed fundraising materials (nor any in the pipeline due to personality issues and poor planning according to Ms. Graves) for me to give to prospects/donors; a website that needed significant updating; few properly vetted prospects/donors; significant staff burnout; a marginal development strategy and that the Museum had a poor fundraising history, among other things. This situation was in contrast to, if I recall correctly, an October 2014 board report that stated that plans were in place to correct these critical disparities.

On or around 3/26/2015, I attended my first Museum advancement meeting. I believe Catie Anchin (corporate/foundations officer) and Sarah Holmes (advancement assistant) also attended, and Ms. Graves supervised the meeting. At one point, I inquired (to Ms. Graves) if/when our board members were strategically approached for their contacts and financial support, and if so, what level of financial support they were providing. Immediately, she became visibly upset and left the room. Later via phone, she told me that I was naïve for asking such questions; she questioned my judgement in an angry tone and then informed me that as our board was "ignorant" about fundraising and had been only marginally supportive in the past of her fundraising efforts, she didn't utilize them or trust them. She then told me that I was not to contact any of our board members. When I inquired of Ms. Anchin and Ms. Holmes as to the exact nature of Ms. Graves' concerns, they told me that "that was just how she behaves and that there are big issues between the board and Marie." The fact that they said little beyond this concerned me.

Later, after getting to know them better, I discovered from Ms. Anchin, Ms. Holmes, Bonnie Berry (director's assistant) and Colleen Morith (annual giving officer; white; young female) that Ms. Graves had angered at least 3 board members (Marcella Jones, Magdalene Johnson Obaji and Lucia Riddle) with her "less-than-professional, bizarre behavior" and that each of these board members had gone directly to Dr. Cole regarding this behavior. Per my colleagues (Ms. Anchin, Ms. Holmes, docent coordinator Frank Esposito, Mr. Burke and later, Ms. Morith, Sherrie White, Nicole Shivers, Migs Groves, etc.), as Ms. Graves had come to the museum in June 2014; as she had not raised any significant funds since that time; as she had angered members of the board and consistently displayed divisive, destructive, unprofessional behavior, the general question around the Museum was why Ms. Graves had continued to keep her position despite these and other significant issues consistently presented to Dr. Cole, human resources, the Ombudsman's Office and other Museum managers.

On 3/30/2015 at a Portfolios/prospects meeting, I outlined the case to Ms. Graves for approval to visit Mr. Trammell Crow, a wealthy entrepreneur and environmentalist in Dallas, TX. If I recall correctly, I made this request as, according to Ms. Graves' 10/14 board report, Dallas was a target area for the Museum. As we are well-acquainted, Mr. Crow had extended an invitation for me to meet with him and attend an annual Earth Day Texas reception/event on 4/24-26 that he was hosting. Per her request, I provided a pre-visit rationale to Ms. Graves which included my strategy to initially engage Mr. Crow (and those in his social network) on behalf of the Museum and also informed her that I could save money by staying at Mr. Crow's family hotel (the Anatole) for $99/night. Ms. Graves stated that she would let me know her decision after thinking about my request. Soon after, in another meeting with her, she bluntly told me that, through other people, she knew of Mr. Crow; that he was a "fuck-up" and that he likely had no interest in the Museum or the Smithsonian writ large. Still later, though she had informed me that I needed to plan at least a two-week approval window before my travel, she approved my travel to

see Mr. Crow and others on 4/22, two days before the reception/event – which caused significant planning/meeting issues between me, Mr. Crow and other prospective supporters. Subsequently, though bad weather intruded on the reception, I did engage Mr. Crow, Laura Turner Seydel (Ted Turner's daughter), and wealthy Nigerian entrepreneur Paul Odili (both are personal friends of Mr. Crow) on behalf of NMAFA. Mr. Crow indicated that he was willing to explore an Earth day Africa event at NMAFA for 2016 and Mr. Odili and Ms. Seydel both indicated that they would like more information about the Museum and that they would like to discuss engaging with the Museum and its mission. However, upon my return back to DC, as Dr. Cole knew Mr. Turner and Ms. Seydel, Ms. Graves indicated that perhaps she (Dr. Cole) would be the best Museum rep for Ms. Seydel and that I should perform donor research on Mr. Crow and Mr. Odili. Though this research was performed, and Mr. Crow continued to express interest in engaging with the Museum, I did not obtain approval from Ms. Graves at any time following to visit these two valid prospects – even after later receiving an invitation from Mr. Crow to meet with him on 10/22/2015.

On 4/15/2015, Ms. Graves informed me that I was to attend a mandatory meeting. When I asked about the agenda of the meeting, she refused to provide any information. Upon arriving, I discovered it was organized by Chandra Heilman (Ombudsman) and Tim Holliman (Employee Assistance) as a sounding board in response to significant and ongoing staff complaints against Museum management. I also discovered that this was not the first time the Ombudsman's Office and Employee Assistance had been brought into discussions between Museum staff and management. At this meeting, I watched and listened as various staff members, some visibly upset and clearly frustrated, conveyed their many concerns to Ms. Heilman and Mr. Holliman about Museum management and about how badly they (staff) were being treated. Due to the significant nature of their concerns and their statements about how long they had been dealing with these issues (which included, in great measure, Ms. Graves, Mr. Holmes and Dr. Cole), I left this meeting with deep-seated concerns about my workplace environment; about my position and tenure with the Museum and about my impressions of senior management – especially Ms. Graves. When I spoke with Ms. Anchin, Ms. Holmes, Mr. Burke, Mr. Esposito and Ms. Berry (later Ms. Morith, Ms. White and Ms. Grove also), they indicated that yes, some of the most egregious complaints were against Ms. Graves; that her presence, harassment, vindictiveness and divisive actions toward many staff members had substantially lowered morale, productivity and teamwork so much so that at one point in the past, they along with Kim Williams (special events) had decided to go to the Ombudsman en masse and also to file a class-action lawsuit against senior management due to the way Ms. Graves and others had been treating them. Additionally, at various points during my time with the Museum, I discussed with each of them why Dr. Cole seemed to be turning a blind eye to the issues that were causing the Museum to be a less-than-ideal work environment for so many.

Later the same day, while in a meeting in the Education conference room, Ms. Graves announced that a New York donor dinner was being organized and specifically that one of the attendees she invited would be Philádelphia criminal defense attorney Ted Simon. I found this curious and asked if I could attend given my position and as I had worked very closely with Mr. Simon (while at American University) to organize a successful R2L Restaurant fundraising event in Philadelphia (I had mentioned this fact during my interview with Ms. Graves and others). Ms. Graves said that no, I could not attend the NY event and I, along with my advancement colleagues, noted that she seemed to take pleasure in publicly denying

my request. Later I discovered that Mr. Simon did not attend the NY event and strongly believe that he was not even invited. Though he remains in my contact list, I have not yet contacted him to ask if he knows Ms. Graves or if he was invited to this event.

On 4/17/15 I contacted former NMAFA executive assistant Holly Laffoon who had donated $50 on 4/7/15. Migs Groves (Museum writer and editor) helped arrange this meeting and was extremely helpful in all subsequent conversations/interactions with me as well. Ms. Holmes and I met with Ms. Laffoon on May 7, 2015. We had a very pleasant and informative discussion, during which I positively identified Ms. Laffoon as an annual fund prospect (not major gift), but an excellent resource given those in her circle and her passion for the Museum. She indicated that she would like to be more engaged with the Museum and that she would try to recall others who may want to be re-engaged with the Museum and get back to me. Ms. Holmes and I thanked her for her time and then Ms. Laffoon departed. Upon informing Ms. Graves of my meeting, she dismissed Ms. Laffoon as "useless" and her connection with the Museum as outdated. At this point, it became clear to me that each external contact I made from this point forward would likely be described/received in the same fashion which caused me to be very uncomfortable in meeting with Ms. Graves about Museum advancement; about meeting metrics during my probationary period and in personally interacting with Ms. Graves as well. Also, Ms. Graves at this point informed me that my breakfast/lunch/dinner meetings with donors was outdated, despite her reporting to the board in 10/14 that this would be part of Museum strategy moving forward.

On 4/22, at Dr. Kreamer's urging, I met with Francis Prenn, a principal at UK firm Scott Prenn Associates, who was interested in contractually assisting the Museum in establishing fundraising contacts in the EU and possibly Africa as well. Later, when I reported this information to Ms. Graves, she dismissed the idea saying that Dr. Kreamer was ignorant of fundraising; that she personally knew of Prenn Associates and that she had more than enough contacts globally for us to manage.

On 4/23, Ms. Graves indicated in my brief personal meeting with her that I would have to be very entrepreneurial in advancing the Museum's mission. She, and Mr. Holmes, at this point had taken more than one occasion to personally remind me of the dire funding needs, especially with respect to staff salaries, of the Museum. However, in stark contrast to their words, Ms. Graves presented me with a prospect list that she said she had vetted herself with approximately 30 names on it and stated that I was going to have to come up with the remainder of my prospects (approx. 100) via research/personal contacts, etc. When I pointed out that Pres. Barack Obama and Michelle Obama were on the list – along with other politically sensitive individuals – and that I knew that I could not initiate contact with them, Ms. Graves responded, "Oh yeah, I didn't see them. That's okay, just find others when you do your research." She also informed me that she was going to fire Ms. Anchin because she spent too much time teleworking due to her kids and that she was not productive. She also stated that she was going to fire Mr. Esposito because she did not like him personally and he was incompetent. She further stated that though she had issues with Mr. Burke, she could not fire him because he was too close to Dr. Cole. Finally, she told me that, in addition to our board members, I could not talk to/associate with:

- Bonnie Berry;
- Eddie Burke;
- Colleen Morith;
- Catie Anchin;
- Migs Grove;

- Dr. Kreamer;
- Dr. Cole;
- Sherrie White;
- Frank Esposito;
- All external development colleagues.

According to Ms. Graves, all of these Smithsonian colleagues were incompetent or problematic in some way for my fundraising efforts, so, accordingly I was to come to her with all questions and for all my needs. Additionally, she said she did not trust "Castle fundraising people" because they did not support the Museum. Her lack of trust was due, in part she said, to a past large gift which came in from a Women's organization of which Dr. Cole was a member. Apparently, the gift was instead directed to the African-American Museum – which, according to Ms. Graves, were our sworn enemies. When I stated to Ms. Graves that these constraints would not allow me to do my job, she responded by saying, "You should do what you think is best." I chose to continue to interact well with my colleagues as my position and responsibilities dictated I do so.

This day also, senior management held another mandatory meeting and provided staff with a written response to the concerns expressed during the 4/15 meeting. Among other items, "...encourage(ing) a culture of civility and respect in emails" and "...consider(ing) the benefits of walking to speak directly with a colleague" were listed. Following the meeting, during my conversation with Mr. Esposito, Ms. White, Ms. Anchin, Ms. Berry and others, all indicated that they did not anticipate that management would change anytime soon; that they expected the negative environment to remain the same; that the words in the senior management's response were without substance and that all previous Ombudsman activities on their behalf were a sham.

On 4/28, during a telephone call with Ms. Graves, she informed me again that I was not to contact Dr. Cole other than generally speaking with her; that I should focus not on major gifts but mid-level gifts and that I should not integrate Ms. Berry in my efforts. Her requests were both a change in my documented responsibilities and a substantial limitation on my achieving assigned metrics.

On 5/8/2015 Ms. Graves came into my office. It was clear to me that she was agitated. She stated again that I was specifically not to have any further conversations or interactions with Ms. Berry going forward. When I asked why, she said that we had discussed this before; she called Ms. Berry a "snake" who could not be trusted; said that Ms. Berry was a gossip; that they did not get along at all and that Dr. Cole was blind to Ms. Berry's myriad faults. When I responded that Ms. Berry was a colleague with a great deal of knowledge who had direct access to Dr. Cole's schedule; who had been very helpful to me and that her (Ms. Graves') request was extremely difficult to execute, Ms. Graves became angry. She then stated that at some point Ms. Berry was going to "screw me like she's screwed everyone else." It was interesting to me that she was saying this as Ms. Berry's office was next door to mine. Also, as I had had the exact same conversation with Mr. Holmes in his office regarding Ms. Berry a day or so before, I became even more concerned about my relationships with Ms. Graves and Mr. Holmes; about my position and I was perturbed that these grade school antics were being played out with my involvement. At that point, I told Ms. Graves, as I had told Mr. Holmes earlier in his office, that I knew what I was doing; that I was a mature professional and that I had no intention of letting anyone interfere with the performance of my duties. Ms. Graves immediately left my office and on 5/11 informed me that she perceived this statement as a threat and that she felt uncomfortable in my presence. I quickly scheduled

a 6/10 appointment with Laura Browender, a Castle advancement colleague I trusted, to discuss at length the issues I was experiencing with Ms. Graves; my deep concern about being possibly terminated during my probationary period by Ms. Graves and to inquire about other positions in the system.

On 5/9/15, I attended the 39th Annual James Smithson Dinner in Chantilly. Ms. Berry had assisted me in being able to attend the event, which I took as the partial basis for Ms. Graves' unprofessional outburst the day before. I arrived at the event and as I was speaking with other guests, Ms. Graves arrived. She was very curt, despite my efforts to be civil and, as a result, I focused on meeting others, such as Gen. Dailey and Randi Rubovits-Seitz. I arrived at the table to find that Ms. Graves was to be seated there as well. Former NMAFA board member Lucia Riddle introduced herself and we spoke briefly. As Ms. Graves knew Ms. Riddle, the two ladies spoke as the evening progressed. Later, in private, Ms. Graves indicated that though she and Ms. Riddle had served on the same board committee, she was glad that Ms. Riddle had transitioned off the board because she was a "burden" to Dr. Cole and the Museum and that she had not contributed much while a member. She also complained about being seated at the only "all-Black table" at the event. As I was remained very uncomfortable with both her comments and her demeanor, I stated that I needed to leave – and while heading out met a Togolese security guard/artist, Mr. Kangni, who was working at Udvar Hazy. I asked if I could speak with him at some point about the Museum - and perhaps also discuss advancing the Museum mission with metro DC African-born immigrants. We exchanged cards and then, as I was leaving, he indicated that he did not know that the Smithsonian had an African Art Museum.

On 5/12/2015, after being asked by the Office of Advancement to do so, I gave the greeting and send-off at the Advancement All-Staff Meeting in the Capital Ballroom of the Holiday Inn Capital. This was an honor and a privilege for me, both personally and as a NMAFA advancement member. Most significantly during this meeting, I introduced Advancement VP Ginny Clark, whom I had met during my interview process, and I had the opportunity to meet many other advancement professionals. Two of my Museum colleagues, Ms. Anchin and Ms. Holmes attended this meeting as well; however, before this meeting, when I had spoken with Ms. Graves about my participation, she stated that she had another meeting elsewhere and would not attend.

In early May, after I informed Ms. Graves that I had received an invitation to attend a 5/13/2015 event at the Italian Embassy – where Trammell Crow, Tom Prasil (Chicago financier), Johan Schott (Swiss foundation exec) and Italian Prince Lorenzo Medici would be in attendance – she informed me that the event was not going to be beneficial for fundraising and she refused to provide approval for my attendance on behalf of the Museum. Thus, I attended the event representing only myself - along with Mr. Esposito (who also represented only himself), whom I invited given our friendship as well as his heritage. The next morning after the event, 5/14/2015, the event organizer contacted me and asked if, given our Dante exhibit, we could host about 15 guests associated with the Embassy who wanted to tour the Museum. I worked quickly with Mr. Esposito, Mr. Burke and other Museum staff to make this tour happen and these impromptu guests, along with Ethiopian artist Yodith Dammlash whom I had met with earlier, toured the Museum and thoroughly enjoyed themselves. Even though this event was placed on the Museum's website (**http://africa.si.edu/2015/05/nmafa-receives-vatican-visitors-for-tour-of-divine-comedy-exhibition/**), Ms. Graves continued to belittle/characterize the tour as not beneficial to the mission of the Museum when I informed her.

On Saturday, 5/16, at his invitation, I met with Mr. Schott to inquire about his interest in the Museum. Though he had no interest, the discussion was informative and the prospect of his future engagement remained.

On 5/27, Judith Terra (former DC Commission Arts and Humanities member) and Anne Howard-Tristani (niece of Hubert Humphrey; VP Humphey helped Warren Robbins establish the Museum) visited with Dr. Cole over brunch. I organized this brunch in cooperation with Ms. Berry and other Museum colleagues and I informed Ms. Graves every step along the way. Ms. Graves responded by stating that she knew people who knew both ladies and that neither Ms. Terra nor Mrs. Howard-Tristani actually had substantial financial resources in the major gifts area. Then she expressed regret about gaining another board member who only wanted the Smithsonian position for their resume. I informed her that my research and personal experiences dictated otherwise and let the subject drop. At this point, Ms. Graves stated that she would be in Senegal during the brunch. I had become familiar with Ms. Terra from past advancement work and she had graciously agreed to meet Dr. Cole, and to also bring Mrs. Howard-Tristani, to the meeting given her past familial tie to the establishment of the Museum. Ms. Berry made all the arrangements and the meeting went very well - with Dr. Cole informing me afterward that she was pleased with the outcome and possibly interested in having Mrs. Howard-Tristani join the board. I was very pleased as well and I thanked Dr. Cole and Ms. Berry for making the visit a success. When I spoke with Ms. Terra and Mrs. Howard-Tristani afterward, they expressed gratitude at their new connection. Upon her return, I informed Ms. Graves personally about Dr. Cole being pleased about the structuring/success of the meeting. I kept in touch with both women as time progressed (especially Anne as her name was submitted by Dr. Cole for a board position). However, no information was provided to me – except by Ms. Berry - as the nomination process progressed and, interestingly, I was wrongfully terminated just before Ms. Howard-Tristani joined the Museum board in November 2015.

On 5/29, on behalf of the Museum, I had an impromptu meeting at a Fairfax Starbucks with Mr. Kangni, the Togolese Udvar-Hazy security guard. During our meeting, he told me that he is an artist and his brother in Togo is an artist as well. He also mentioned that he would be thrilled to assist the Smithsonian in other ways. Though he did not have major gift resources, he stated that he had connections in the DC metro African community and in Togo that could possibly benefit the Museum. I believe coffee/pastries for this meeting came to ~$22 and I paid with my Smithsonian card. Upon my return, I informed Ms. Graves of my meeting. She disparaged Mr. Kangni's prospective assistance in building relations with the African community – even though we had discussed at length during my interview strengthening connections with this very community; even though this goal was in the May 2015 development plan that Ms. Graves had presented to the Museum board and even though our colleague in Education, Ms. Gathoni Kamou, was at that time exploring projects to deepen the Museum's involvement with the African-born immigrant community in the DC metro area. Instead, Ms. Graves and Mr. Holmes criticized me for meeting with a "useless Smithsonian colleague" and I was told that, according to policy, I had to pay for the coffee/pastries myself, which I eventually did, as I did not recall this specific policy from the training. My subsequent attempts at connecting with this community also fell flat with Ms. Graves as well every time I presented options to her.

During this time, after a conversation with Dr. Kreamer in her office, I saw a Disney book and inquired about the current relationship between the Walt Disney Company and the Museum. Disney had contributed the $40M (according to published reports) Disney-Tishman Art Collection to the Museum in 2005 and Marty Sklar (former Senior VP Imagineering at Disney), Robert Iger (current Disney Chairman

and CEO) and Michael Eisner (former Disney CEO), among others, had ensured at that time that the artwork was transitioned smoothly to the Smithsonian. Dr. Kreamer indicated that, though the Disney/Museum relationship was intact following receipt of the artwork in 2005, to her knowledge no significant contacts had been maintained since. Bryna Freyer (Museum curator) seconded this and also provided an in-depth historical context to me. After speaking with Museum Librarian Janet Stanley, Dr. Kreamer, Ms. Grove, and Ms. Freyer multiple times, I realized that re-connecting the Museum with the Disney Company and the Tishman family/Tishman Construction entity was an excellent major gifts effort and strove to make it reality. Specifically, I sought to have the Museum host a 2016 10th Anniversary celebration of the gift with guests from the Walt Disney Company, Tishman/AECOM, the Tishman family and Mr. Sklar, among others, in attendance. Of course, given my position, the event would also serve as a $2M major gifts vector for the Museum.

I began by connecting solidly with Mr. Sklar who confirmed many of the points that Dr. Kreamer, Ms. Freyer, Ms. Grove and Ms. Stanley had provided. Additionally, he graciously provided a detailed sense of the gift transaction from Disney's viewpoint – and a strong link to Tishman. Following my multiple conversations with him, Mr. Sklar indicated that he would be interested in taking part in a 2016 anniversary event at the Museum. He stated that he would assist, as much as he could, in my securing Disney and the Tishman Company to be a part of the celebration as well – financially as well as physically. Initially, when, as a requirement of my position, I contacted a colleague in the Office of Advancement (Lindsey Burkholder) who managed the Disney relationship, I received permission to move forward with the relationship. However, this permission was later withdrawn by Ms. Burkholder as another Museum had moved up in priority and the thought was that the Disney name on the ~$40M Collection was old news and would not be sufficient enough for Disney to consider another gift to the Museum...Though disappointed, I accepted OA's decision, but hoped that in the future a means for the Museum to approach Disney would develop. In the meantime, I focused on advancing the Tishman relationship. Upon advising Ms. Graves of OA's decision, as I had been consistently keeping her abreast of my progress, she stated that I had erred in contacting OA and that they should not have been contacted at all; that she routinely does not contact OA with faced with such decisions; that she even told the board during her October 2014 board report that OA is bureaucratic and that OA did not have the Museum's best interest in mind. Subsequently, she said she checked with her contacts at OA and could not discover why their initial decision was reversed. Additionally, she kept bringing up my "bad decision" in our meetings, both between us and others for some time afterward. Finally, though I reached out to Tishman I do not know whether or not there was a response as I left my position on 10/26/2015.

Additionally:

- I attended some trainings (such as a 5/20/15 Creating Major Gifts Success seminar) in order to improve my skillset and to learn proper Smithsonian processes and procedures. Unfortunately, approval for my attending these trainings from Ms. Graves was consistently either delayed or denied so many times that on 10/26/2015, Ms. Browender herself approved my attendance for a training to be held that day.
- On 6/3/2015, I had a lunch with prospect Dr. Barbara Harland at the Congressional Country Club in Bethesda. Dr. Harland and I knew each other from my past work at Howard University (Ms.

Graves knew her as well). Upon returning to the office, Ms. Graves asked me if I was Dr. Harland's paramour. Dr. Harland is 90 years old and a good friend of mine. Though I was both insulted and disgusted by Ms. Graves' remark, I simply responded no.

- I connected with Ms. Makeba Clay, Museum diversity consultant and, per Ms. Graves, submitted a fundraising diversity plan involving the 84 Lumber Company to Ms. Clay and Ms. Graves which was supposed to be forwarded to Dr. Cole. Ms. Graves blocked the forwarding of this document and further delayed it by demanding 14 rewrites of this document (which I performed) then stated that it would not work.
- On 6/10/2015 I had lunch with Laura Browender near her office and I outlined all the harassment/retaliation issues I was experiencing at the Museum. Given her position, she offered herself as a sounding resource but could do little else. Subsequently, I also met with Todd Cain of Advancement and outlined my concerns to him as well. As I had indicated that I wasn't being allowed to travel or meet with prospects/donors, he asked me to speak with Ms. Graves about my budget. I did and she refused to discuss the budget – yet later stated in a Museum advancement meeting that we had excess travel money and needed to utilize it immediately.
- On 6/11 I took a Smithsonian CPR training course. This course came in handy when, following a NASM docent tour for Dr. Harland, the docent experienced a cardiac emergency. Despite the helpful nature of this course – and the fact that (to my knowledge) no one else in our office sphere had taken the course, Ms. Graves disparaged both the course and the NASM docent emergency, calling the course a waste of time and the docent too old to be there.
- Following my attendance of the 6/27/2015 Latino Center's 10th Anniversary Celebration of the Young Ambassadors Program (I was invited by Museum colleague Glenn Ojeda) and my introduction to Center Director Eduardo Diaz by Mr. Ojeda, I spoke with Ms. Graves about the event. She remarked that, as Mr. Diaz was a good friend of Dr. Cole's that I should "watch myself."
- On 6/30/15 after performing more than 10 work plan revisions for Ms. Graves, I left for the Smithsonian picnic. During my time out, I met Anna Barbour of Advancement. Among other things, I outlined my inability to use my Smithsonian credit card to her, either locally or for travel and she said that she had experienced the same issues in the past due to a poor manager and that there was an approval form process for local use that I could utilize. While walking we saw Ms. Graves. Upon returning to the office, I requested the form from Mr. Holmes. I received the form from him on 8/27/2015, signed it immediately and gave it back to him. Despite my repeated requests for action following my submission of the form, neither he nor Ms. Graves ever provided permission, which severely limited my ability to meet metrics.
- On 7/4/2015, I attended the Smithsonian's 4th of July Celebration. Though I made multiple requests to Ms. Graves for me to attend and for me to invite high-level prospects donors in my portfolio, she never responded and I had to obtain tickets via JJ in Planned Giving. At this event, my guests, including Dr. Barbara Harland, and I met Secretary Skorton and Dr. Davisson (the doctors had Iowa in common) and we had a wonderful time. Following meeting Dr. Skorton and his wife, Dr. Harland presented me with a letter stating that she wanted to contribute $40K in scientific equipment to the Smithsonian. Per her request, I copied the letter and presented it to Ginny Clark, who was attending, and mapped out a strategy to move forward. Toward the end of the event, I saw Dr. Cole and she came over and introduced herself to Dr. Harland and my other guest. Upon returning to my office, I met with Ms. Graves and Dr. Cole – not so much to

discuss the gift, but to discuss why I had not introduced Dr. Harland to Dr. Cole. During this discussion, in effect, I was called a liar for not knowing that Dr. Cole was in attendance at the 4th event (which had over 300 people attending) and not for introducing Dr. Harland to her – especially as, in Ms. Graves words, "Everyone knows when Dr. Cole is in the room." Later, as Ms. Graves and others offered little assistance in bringing the gift-in-kind to the Smithsonian, Dr. Harland withdrew her gift. I subsequently discovered, per Becky in Advancement, that our Museum had received 3 tickets to the event that were not utilized; that the Museum owed $600 for these unused tickets and that Ms. Graves had done a shoddy job of inviting guests to the event and communicating with OA. Additionally, Ms. Graves actively worked against receipt of this gift, harassing and haranguing me even when I went to her for advice on next steps.

- Around this time, Fred Nicholas, a wealthy Los Angeles arts patron, mailed in a gift to the Museum. As he had forgotten critical information on the returned form, I connected with Ms. Holmes (who managed these things), then I called Mr. Nicholas. We connected, speaking about the state of the Museum and golf, among other things. He extended an invitation for me to come to LA and meet to discuss the Museum – and perhaps golf with him as well. I went into Mr. Holmes' office to ask his advice on informing Ms. Graves about the opportunity. He said that all sounded well, but not to present golfing as the rationale for the trip – which it was not (and which I wouldn't do given past experiences). Later when I presented the opportunity to Ms. Graves, she said that Mr. Holmes had spoken to her about Mr. Nicholas and that I could not fly across the country for golf. She then stated that Anna Barbour would be taking over the Nicholas relationship. Thus, again, I was denied the ability to travel for the Museum (as with Atlanta and New York events in the past as well) and another fundraising opportunity for the Museum was stunted.
- On 7/30 I attended a Smithsonian harassment meeting. On 7/31, I contacted Ms. Davis at EEO and attempted to lodge a complaint. Ms. Davis instead encouraged me to speak to either the Ombudsman or Dr. Cole about the issues I had been facing. As I had been accused of lying by Dr. Cole and Ms. Graves following the July 4th event, I chose the Ombudsman.
- On 8/10/15, Ms. Anchin, Ms. Holmes, Ms. Morith and I met in the quad outside the Museum for discussion. Shortly afterward, Ms. Graves sent out an accusatory email to everyone except me stating that "...I (she) must know your whereabouts at all times" and that leaving the premises without her permission amounted to being AWOL. Dr. Kreamer was apprised of this email.
- On 8/7/2015, I met with Ms. Heilman and conveyed my concerns about, among other things, being fired from my position.
- On 8/25/2015, Dr. Jeff Gusky of Dallas, TX came at my invitation to the Museum and met Dr. Kreamer.
- On 10/8/2015, I met with Karin George, an external consultant brought in by OA. I outlined my many concerns to her and also had her speak with Mr. Burke and Mr. Esposito to buttress my concerns.
- On 10/19, I volunteered in setting up for Secretary Skorton's installation dinner.
- On 10/20 I engaged Mr. Eugene Aaron, a previous donor from Maryland via phone, however, I could not meet with him, per Ms. Graves, for an unknown reason.
- On 10/21 I went to Diana Davis in human resources and conveyed my concerns about harassment, retaliation/reprisal and the performance review that Mr. Holmes had earlier forced me to sign (saying HR had to have it that exact moment). She stated, among other things, that

both the Museum and HR had some flexibility in these matters and that my modifying the document to fit the reality of my situation was possible. Discussions with Mr. Holmes and Ms. Graves, in their respective offices (per the senior management contract) resulted in no response.

- On 10/26, as an important advancement training was taking place that I had been invited to, I received a call from Ms. Browender (who was organizing the trainings). Ms. Graves refused to respond to my request to attend the event and I was asked to come into her office. There, I met with her and Mr. Holmes and both told me I was being fired due to poor performance.
- On 10/29 a Museum Halloween event took place. Approximately 20 of my invitees attended, including a Verizon General Counsel member, but I did not. As a result, my reputation and credibility was publicly damaged by my forced absence.
- On 11/2, I called payroll regarding my final pay. I was told that I would be paid by 11/24. This did not happen. Subsequent calls yielded information from Angela that delays were due to Security concerns. Subsequent emails to Angela in payroll on 12/11 and 12/17 were not responded to.

In summary, I believe the harassment, retaliation and reprisals took place because I took my hostile workplace concerns to EEO, Ombudsman's Office, Human Resources and senior Office of Advancement personnel.

Additionally, two of my development colleagues, Ms. Anchin and Ms. Morith, were treated differently from me:

- Despite their poor (according to Ms. Graves) performances, neither has been terminated and Ms. Morith was promoted to my position following my termination;
- During meetings, they were not harassed, marginalized, isolated or ignored by Ms. Graves to the level that I experienced;
- They were able to charge expenses to the Museum;
- They received timely, pertinent information from Ms. Graves;
- They weren't sent emails by Ms. Graves following 5 minute visits to the restroom asking their whereabouts;
- They had access to Dr. Cole per Ms. Graves;
- They could travel per Ms. Graves;
- They could attend events, seminars, meetings without undue constraints.
- Upon my termination, Ms. Morith was placed in my position despite the fact that she had previously applied for the position (during my candidacy) as an in-house employee. Originally, she did not get the position (I did) as she was not, according to my past conversations with Mr. Holmes and Ms. Graves, "appropriate or qualified to be a major gifts officer." It is my also understanding that, following my termination, Ms. Morith has been traveling as a function of her new responsibilities.

**7. IF YOU ARE ALLEGING REPRISAL FOR HAVING FILED OR PARTICIPATED IN AN EEO COMPLAINT, PLEASE EXPLAIN IN DETAIL:**

**A. WHO DID IT**

**B. WHAT WAS DONE**

**C. WHEN IT WAS DONE**

On July 31, 2015, I spoke with Ms. Shadella Davis by telephone and sought to file an EEO Claim of harassment and retaliation against NMAFA senior management - with a specific focus on Ms. Graves, Mr Holmes and Dr. Cole's negative actions and allowance of these negative actions. Ms. Davis informed me that I had no valid claims of harassment or reprisal and suggested that I approach either Dr. Cole or the Ombudsman's Office instead for relief.

Following this contact with Ms. Davis, along with speaking personally with Chandra Heilman of the Ombudsman's Office (8/7/2015); Diana Davis of Human Resources (10/21/2015); Todd Cain of Advancement (unknown date); Laura Browender of Advancement (6/10/2015 and subsequent times); and Karin George of Advancement (External Consultant) at other times during my employment with the Smithsonian, via harassment and retaliation/reprisal by Ms. Graves, Mr. Holmes and Dr. Cole, I was denied the ability to utilize critical resources common to my position, such as travel to meet with prospects/donors, use of an already issued Smithsonian credit card, attending events/seminars/meetings and to establish/build on relationships with colleagues/prospects/donors. These harassing and retaliatory actions and limitations consistently and completely blocked/denied me the ability to meet even the basic requirements of my position. As a direct result, on 10/26/2015, I was wrongfully terminated by Ms. Graves and Mr. Holmes for poor performance and placed on administrative leave until 11/9/2015. Following my termination, despite assurances to the contrary from payroll about previously promised paydates, I was still waiting for my final check on 12/16/2015. I sent two emails to Angela in payroll on 12/11/2015 and 12/17/2015 requesting information about the delays, but never received a response. Accordingly, from 7/31/2015-12/16/2015 I am alleging reprisal/retaliation following my contact with Ms. Davis in EEO. Additional documents will be possibly provided after I consult with counsel.

**8. WHAT REMEDY AM I SEEKING FOR THE ALLEGED DISCRIMINATION?**

I am seeking full back pay and full benefits from the time I was wrongfully terminated; complete reinstatement as a major gift officer (at the same pay level I left at) in another Smithsonian area better suited for my talents, abilities and skillset; and full reimbursement of my attorney's fees. I am also seeking appropriate compensatory damages.

**9. DO I WANT TO REMAIN ANONYMOUS?**

ANSWER: NO

10. I UNDERSTAND THAT OEEMA DETERMINES IF ALTERNATIVE DISPUTE RESOLUTION (ADR) IS APPROPRIATE ON A CASE-BY-CASE BASIS AND I HAVE NOT RECEIVED A COPY OF THE ADR BROCHURE. IF ADR IS DETERMINED APPROPRIATE, MY DECISION IS AS FOLLOWS:

YES, I DO WISH TO PARTICIPATE IN OEEMA'S ADR PROGRAM.

3/11/2016

SIGNATURE AND DATE

# Smithsonian National Museum of African Art



| Name | Series | Grade | Title | Race | Sex | ORG_STR_SH_N |
|---|---|---|---|---|---|---|
| [redacted] | 301 | 13 | DVLPMT OFFCR | White | F | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 301 | 11 | SPEC EVENTS COORD | Black | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| [redacted] | 301 | 11 | Staff Assistant | White | F | NAT'L MUSEUM OF AFRICAN ART |
| [redacted] | 301 | 9 | Admnstrtve Spprt Spclst | White | M | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 301 | 9 | MEMBERSHIP COORD (MUSEUM PROGRAMS) | White | F | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 301 | 9 | MGMT SUPP SPLCT | Black | F | NMAFA-ADMINISTRATION |
| [redacted] | 303 | 5 | PROG ASST | White | M | NMAFA-EDUCATION & PUBLIC PRGMS |
| [redacted] | 341 | 13 | ADMV OFFCR | Black | M | NMAFA-ADMINISTRATION |
| [redacted] | 1001 | 14 | ASSOC DIR FOR COLLS | White | M | NMAFA-ADMINISTRATION |
| [redacted] | 1001 | 14 | Associate Director for Advancement | Black | F | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 1001 | 13 | Senior Advancement Program Specialist | Black | M | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 1001 | 12 | REGISTRAR | White | F | NMAFA-REGISTRATION |
| [redacted] | 1001 | 12 | Senior Conservator | White | F | NMAFA-CONSERVATION |
| [redacted] | 1001 | 12 | MULTI-MEDIA SPECLST | White | M | NMAFA-EXHIBITIONS |
| [redacted] | 1001 | 11 | Community Outreach Specailist | Black | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| [redacted] | 1001 | 11 | Design Production Coord | White | M | NMAFA-EXHIBITIONS |
| [redacted] | 1001 | 9 | Assistant Registrar | White | F | NMAFA-REGISTRATION |
| [redacted] | 1001 | 7 | Collections Assistant | Black | M | NMAFA-CONSERVATION |
| [redacted] | 1001 | 5 | PROGRAM ASSISTANT (YOUTH ENGAGEMENT) | White | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| [redacted] | 1010 | 12 | EXHIBITS SPECIALIST (GEN) | White | M | NMAFA-EXHIBITIONS |
| [redacted] | 1010 | 11 | EXH SPECLST GEN | White | M | NMAFA-EXHIBITIONS |
| [redacted] | 1010 | 11 | EXH SPECLST GEN | Hispanic | M | NMAFA-EXHIBITIONS |
| [redacted] | 1010 | 11 | EXHIBITS SPECIALIST | White | M | NMAFA-EXHIBITIONS |
| [redacted] | 1015 | 0 | DIR, NAT'LMUS OF AFRICAN ART | Black | F | NAT'L MUSEUM OF AFRICAN ART |
| [redacted] | 1015 | 15 | SUPVRY MUSEUM CUR | White | F | NMAFA-ADMINISTRATION |
| [redacted] | 1015 | 13 | MUSEUM CUR ART | White | F | NMAFA-CURATORIAL |
| [redacted] | 1015 | 11 | MUSEUM CUR ART | White | F | NMAFA-CURATORIAL |
| [redacted] | 1016 | 9 | MUSEUM SPECLST | White | F | NMAFA-CURATORIAL |
| [redacted] | 1035 | 11 | PUBLIC AFF SPECLST | Black | M | NMAFA-EXTERNAL AFFAIRS DEPT |
| [redacted] | 1060 | 12 | PHOTOGR | White | M | NMAFA-PHOTOGRAPHY STUDIO |
| [redacted] | 1082 | 12 | WRI EDIT | White | F | NMAFA-PUBLICATIONS |
| [redacted] | 1084 | 13 | VIS INF SPECLST | White | F | NMAFA-EXHIBITIONS |
| [redacted] | 1420 | 13 | SUVRY ARCHVST | White | F | NMAFA-REGISTRATION |

| | | | | | | |
|---|---|---|---|---|---|---|
| [redacted] | 1420 | 9 | ARCHVST | White | M | NMAFA-PHOTO ARCHIVES |
| | 1701 | 13 | SUPERVISORY EDUCATION SPECIALIST | Black | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| | 1701 | 12 | EDUC SPECST (Youth/School Public Progr | White | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| | 1701 | 12 | EDUC SPECLST | Black | F | NMAFA-EDUCATION & PUBLIC PRGMS |
| | 2210 | 13 | ITSPEC | Black | F | NMAFA-AUTOMATION |
| | 1010 | 12 | SUPVY EXH SPECLST GEN | White | M | NMAFA-EXHIBITIONS |
| | 1010 | 12 | EXH SPECLST GEN | White | M | NMAFA-EXHIBITIONS |

EEO History - 2015 - 2016

| NMAFA | Date Filed: | Sex of Person Filed: | Bases of EEO Activity: | Management Official Named: |
|---|---|---|---|---|
| | Apr-16 | M | Sex, Race and National Origin | [redacted] |
| | Dec-14 | F | Sex, Race, Disability and Retailation | [redacted] |
| | Jan-16 | F | Race and Retailation | [redacted] |
| | May-16 | M | Race, Sex and Retailation | [redacted] |
| | | | | [redacted] |
| | | | | |

**INTERROGATORY**
**of**
**MILTON JACKSON**

I, Milton Jackson, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that I have filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am/was a (series/grade) **IS-1001-13 STEP 5** (title) **SENIOR ADVANCEMENT PROGRAM SPECIALIST**

(division) **Office of Advancement** (branch/office) **NMAfA**

(agency) **Smithsonian** (location) **950 INDEPENDENCE AVENUE SW WASHINGTON, DC 20013**

Present telephone number: **734-262-1467**

How long have you been/were you employed by the National Museum of African Art (NMAfA)? From what date to what date? How long have you been in your position?

**Ans: 7 months; from 3/23/15 – 10/26/15; I have been a MGO for more than 10 years.**

For the record my race is: **African American**
For the record my sex is: **Male**
For the record I have **(X)**/have not ( ) participated in prior EEO activity:

If you participated in prior EEO activity, what was the date(s) of your prior EEO activity?

**Ans: On 4/15/15, I attended a mandatory meeting for staff organized by the Ombudsman's Office, the Employee Assistance Office and Museum management. At this meeting, Museum staff spoke out about their respective harassment, hostile environment and retaliation experiences. Eight days later, on 4/23/15, I informed Ms. Graves that her directive telling me not to speak with/associate with my colleagues would not allow me to do my job properly. Prior to and beyond 4/23/15, I had multiple conversations with Eddie Burke (another African-American male reporting to Ms. Graves) about our respective harassment experiences with Ms. Graves. On 5/8/15 following her outburst (and multiple times following), I asked Ms. Graves why she and Mr. Holmes were harassing me about**

**Ans: Yes. I informed Ms. Graves on 4/23/15 that her directive of not allowing me to speak/associate with my colleagues would not allow me to do my job properly. Ms. Graves knew that it was critical for me, given my position, to speak with/associate with internal and external colleagues in order to learn more about the institution and to effectively and efficiently close large gifts with constituents. This, combined with my discussion with Mr. Holmes in his office a day or so before 5/8/15, compelled me to ask Ms. Graves, on 5/8/15 following her outburst (and multiple times following) why she and Mr. Holmes were harassing me about speaking/associating with Ms. Berry. I also reminded her that I was a mature professional who had no intentional of letting anyone interfere with the performance of my duties. Instead of answering, Ms. Graves left my office and, to my knowledge, took no positive actions to either address or resolve my concerns. Later, on 5/11/15, she informed me that she perceived my statement as "a threat and that she felt uncomfortable in my presence."**

**With respect to Mr. Holmes: as he had mentioned shortly before 5/8/15 that I should not speak with/interact with Ms. Berry; as he did not later provide support to me with information about the existence of Form OCON420, nor did he submit my completed Form OCON420 to Vince Shippy so that I could use my Smithsonian travel card locally; as he had a propensity to (in concert with Ms. Graves) refer to my prospects as "useless"; and as it appeared that he clearly was a close confidant of Ms. Graves, I did not feel either comfortable or confident speaking with him about the harassment I was experiencing – though managing human resources and accounting was part of his responsibilities.**

**With respect to Dr. Cole: given her pre-existing senior management relationships with Ms. Graves and Mr. Holmes, I did not feel either comfortable or confident speaking with her about the harassment I was experiencing.**

Did you report the incidents of harassment to anyone? If so, to whom and when?

**Ans: Yes. I reported the incidents of harassment to OEEMA's Shadella Davis (7/31/15); Office of Advancement's (OA) Laura Browender (6/10/15); OA's Karin George (10/8/15); OA's Todd Cain (Summer 2015); Ombudsman Chandra Heilman (8/7/15 and another unknown date as well); Human Resources' Diana Davis (10/21/15) and I spoke with many of my colleagues, such as Eddie Burke, as well. I have documentation concerning my discussions with Ms. Browender and Ms. George.**

Was any corrective action taken as a result of your reporting the incidents? If so, what action was taken?

**Ans: To my knowledge, no corrective action was taken by Ms. Graves or anyone else in the Museum; Ms. Shadella Davis informed me that my case had no merit and suggested I speak with either Dr. Cole or Ms. Heilman; I believe Ms. Heilman was going to speak with NMAfA senior management, but I do not recall the outcome.**

State how often the alleged harassment occurred. Did it occur often enough to lead to you being subjected to a hostile work environment?

**Mrs. Howard-Tristani for the board and her dismissal of Mr. Kangni Amenounve as "useless" while disparaging our potential to further connect with the African-born immigrant community through him were all part of a continuing, clear and pervasive pattern of denigrating conduct that substantially interfered with my work performance and created a hostile work environment. My opinion is confirmed by the fact that my colleagues, Catie Anchin and Colleen Morith (both white women) did not experience this type of behavior from Ms. Graves.**

In what manner did Ms. Graves criticize your work on each date?

**Ans: On 5/7/15, Ms. Graves dismissed Ms. Laffoon as "useless" and her connection with the Museum as outdated. Also, Ms. Graves at this point informed me that my breakfast/lunch/dinner meetings with donors was outdated, despite her reporting to the board in 10/14 that this would be part of Museum strategy moving forward.**

**On 4/22/15, Ms. Graves dismissed the idea of engaging Prenn Associates, saying that Dr. Kreamer was ignorant of fundraising (which implied to me that Dr. Kreamer was of no value to our fundraising efforts); that she personally knew of Prenn Associates and that she had more than enough contacts globally for us to manage (which implied to me that my efforts to expand the Museum's contacts list were unnecessary).**

**On 5/27/15, Ms. Graves dismissively stated to me that she "knew people" who knew both Ms. Terra and Mrs. Howard-Tristani and that neither of these ladies actually had substantial financial resources in the major gifts area. I knew then, from past experience and research, that this was not true. Then she expressed regret about gaining another board member who only wanted the Smithsonian position for their resume.**

**On 5/29/15, Ms. Graves disparaged Mr. Amenounve's status as an artist and his prospective assistance in building relations with the African community – even though we had discussed at length during my interview strengthening connections with this very community; even though this was goal of strengthening connections was in the May 2015 development plan that Ms. Graves had presented to the Museum board and even though our colleague in Education, Ms. Gathoni Kamou, was at that timepresent exploring projects with us to deepen the Museum's involvement with the African-born immigrant community in the DC metro area. Later, Ms. Graves and Mr. Holmes criticized me for meeting with a "useless Smithsonian colleague"**

What impact did Ms. Graves' statements and disapprovals have on you and your ability to perform the functions of your position?

**Ans: Each of her dismissive, disparaging statements and disapprovals frustrated me immensely and caused me to question both my existence and my present and future effectiveness as a major gifts fundraiser at the Museum. They also caused me to begin to lose focus on achieving my goals. At this point, it became crystal clear to me that each external contact I made moving forward would likely be described/received in the same fashion which caused me to be very uncomfortable in meeting with Ms. Graves about**

**Ans: On 5/11/15, Ms. Graves gave no reason for stating that she felt threatened by my statement and uncomfortable in my presence. At some point during my tenure, however, Mr. Burke did indicate to me that she had made a similar statement to him.**

What impact did Ms. Graves' telling you she perceived your statement that you were a professional and could handle the colleague as a threat and she felt uncomfortable in your presence have on you?

**Ans: I was deeply concerned and I quickly scheduled a 6/10 appointment with Laura Browender, a Castle advancement colleague whom I trusted, to discuss at length the issues I was experiencing with Ms. Graves (See Ex14); my deep concern about possibly being terminated during my probationary period by Ms. Graves and to inquire about other positions in the Smithsonian system.**

In regard to this issue, state why you believe you were discriminated against due to your:

**Race: See immediately below**
**Sex: See immediately below**
**Reprisal for prior EEO activity: See immediately below**

**As Mrs. Anchin, Mrs. Morith and Ms. Holmes did not receive the same unreasonable request from Ms. Graves, I firmly believe Ms. Graves' bias was based on my race, sex, prior EEO activity and collegial relationship with Mr. Burke (whom Ms. Graves treated similarly to me). Later, when I spoke with both Mrs. Anchin and Mrs. Morith about my experiences, both indicated that it was clear to them that she was likely specifically targeting me for eventual dismissal. Ms. Graves' angry request and subsequent perception/actions exacerbated an already hostile work environment for me and made it impossible for me to achieve my probationary performance goals.**

**(7) On June 3, 2015, RMO-1 asked if you and a potential donor were romantically involved, which you felt was very inappropriate.**

Exactly what did Ms. Graves say about you and a potential donor being romantically involved and what did you respond?

**Ans: On 6/3/2015, I had a lunch with prospect Dr. Barbara Harland at the Congressional Country Club. Dr. Harland and I knew each other from my past work at Howard University (Ms. Graves, who also worked at Howard, knew her as well) and I had secured a gift from her and a substantial tax advantage for her given her generosity to the University. With respect to the Smithsonian, her (deceased) husband had been integral to building the Air and Space Museum in DC as a safety engineer. Upon returning to the office, Ms. Graves asked me if I was Dr. Harland's paramour. Dr. Harland is 90 years old and a good friend of mine. Though I was both insulted and disgusted by Ms. Graves' remark, I simply responded no.**

**respected part of the NMAfA team, thus I could not achieve my performance goals. Originally, per Ms. Graves, Mrs. Morith, Mrs. Anchin and I were strongly encouraged to support the new diversity efforts of Mrs. Clay as "this was a passion of Dr. Cole's" and thus, one of our new fundraising priorities. The prospect that my extended efforts to assist the Museum "did not fit in" also gave me pause when future initiatives became priorities.**

What adverse impact did these actions of Ms. Graves have on the NMAfA?

**Ans: In the 7/23/15 iteration of my diversity plan, I conservatively calculated that, if properly executed, the three initiatives in the plan would yield $850K/annum. As the plan "did not fit in," the adverse impact on the Museum was $850K/annum.**

In regard to this issue, state why you believe you were discriminated against due to your:

> **Race: See immediately below**
> **Sex: See immediately below**
> **Reprisal for prior EEO activity: See immediately below**

**As Mrs. Anchin, Mrs. Morith and Ms. Holmes did not did not experience the same unreasonable blocking/rejection conduct from Ms. Graves, I firmly believe Ms. Graves' bias was based on my race, sex, and prior EEO activity. Later, when I spoke with both Mrs. Anchin and Mrs. Morith about my experiences, both indicated that it was clear to them that she was likely specifically targeting me for eventual dismissal. Ms. Graves' conduct exacerbated an already hostile work environment for me and made it impossible for me to achieve my probationary performance goals.**

**(9) On or around July 4, 2015, after you received commitment for a large donation at the Smithsonian's 4th of July Celebration, RMO-1 "harangued" you and called you a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping you to arrange receipt of the gift, which was eventually rescinded.**

Please state why you believe you were subjected to a hostile work environment when Ms. Graves harangued you and called you a liar for not introducing a donor to the Director.

**Ans: On 7/4/2015, I attended the Smithsonian's 4th of July Celebration. Though I made multiple requests to Ms. Graves for me to attend and asked to invite high-level prospects/donors (such as Mr. Crow) in my portfolio, she never responded and I had to obtain tickets via the OA Planned Giving director. At this event, my guests, including Dr. Barbara Harland, and I met Secretary Skorton and Dr. Davisson (they all had Iowa in common and took pictures together). A few moments later, Dr. Harland presented me with a typed letter stating that she wanted to contribute $40K in scientific equipment (See Ex18-19) to the Smithsonian. As Advancement VP Ginny Clark was present at the event (I had interviewed with her and also emceed a 5/12/15 meeting for her), and I was somewhat unsure of proper next Smithsonian steps, I spoke with her about receipt options. She asked me to copy the letter and get it to her, along with a reminder email on Monday. Toward the end of the event, I saw Dr. Cole and she came over and introduced herself to Dr. Harland (I**

**learned afterward that Ms. Graves did not attend the event, that she instead attended a Rolling Stones concert in the Carolinas). Upon returning to my office Monday, I was asked to meet with Ms. Graves and Dr. Cole – not to discuss the gift, but to discuss why I had not introduced Dr. Harland to Dr. Cole at the 7/4 event. During this discussion, in effect, I was called a liar for not knowing that Dr. Cole was in attendance at the over 300 person event (I had received no information beforehand <u>confirming</u> that anyone from the Museum would attend) and chastised for not introducing Dr. Harland to her – especially as, in Ms. Graves words, "Everyone knows when Dr. Cole is in the room." I subsequently discovered, per Becky Barat in Advancement, that our Museum had received 3 tickets to the event that were not utilized; that the Museum owed $600 for these unused tickets and that Ms. Graves had done a shoddy job of inviting guests to the event and communicating with OA. Additionally, Ms. Graves actively worked against receipt of this gift, harassing and haranguing me even when I went to her for advice on next steps or to pick up equipment specs requested by our conservation colleagues (See Ex1). This response was curious to me, specifically because she and I had discussed potential paths for the gift to the Museum (and the prospect of a $100K subsequent gift from Dr. Harland) and she knew that Dana Moffett in Conservation had expressed interest in finding out more about the equipment. When I reminded her of this, she again began harassing me about pursuing the gift and causing delays in my responses to Dr. Harland. Eventually, Dr. Harland withdrew her offer to gift the equipment to the Smithsonian as, given our missteps and delays, it was easier to gift the equipment elsewhere.**

**As Mrs. Anchin and Mrs. Morith were not subjected to this type of unreasonable interference/harassment, I firmly believe Ms. Graves' bias was based on my race, sex, prior EEO activity and collegial relationship with Mr. Burke, whom Ms. Graves treated similarly to me. Ms. Graves' actions were part of a continuing, clear and pervasive pattern of denigrating conduct that substantially slowed or stopped my work performance; that exacerbated an already hostile work environment and made it impossible for me to achieve my probationary performance goals. Subsequent conversations with Mrs. Anchin and Mrs. Morith yielded that Ms. Graves and Dr. Cole had never treated them similarly.**

How large was the committed donation?

**Ans: $40,000**

What reason did Ms. Graves give for haranguing you and calling you a liar? State in what manner she harangued you.

**Ans: At this writing, I still do not completely understand why Ms. Graves harangued and harassed me because she gave no reason for doing so, she just did it. With respect to calling me a liar, Ms. Graves did so because she believed I "knew" that Dr. Cole was in attendance at the 4th of July event, yet I did not introduce Dr. Harland to her. With respect to the manner in which she harangued/harassed me: though I informed Ms. Graves about Dr. Harland's intentions every step along the way (we both even met with Dr. Harland at one time), in my opinion, she did everything she could to discourage receipt of this gift. On 6/30/15, she asked if Dr. Harland was my paramour; she constantly questioned the veracity**

**limitations consistently and completely denied me the ability to meet even the basic requirements of my position. These are the reasons why I believe I was discriminated against.**

**(13) Your final paycheck was delayed through December 2015.**

Please state why you believe you were subjected to a hostile work environment when your final paycheck was delayed through December 2015?

**Ans: On 11/2/15, I called payroll regarding my final pay. I was told that I would be paid in full by 11/24. This did not happen. Subsequent calls yielded information from Angela that delays were due to "problems with my former unit" and "security concerns." Subsequent emails (See Ex25) to Angela in payroll on 12/11 and 12/17 were not responded to. I was finally paid on 12/18.**

What were you told was the cause of your paycheck being delayed?

**Ans: I was told the delays were due to "problems with my former unit" and "security concerns."**

On what date was your paycheck due to you?

**Ans: 11/24/15**

On what date did you receive your paycheck?

**Ans: 12/18/15**

Who was responsible for the delay, what action was taken as a result of this delay, and who took action?

**Ans: I do not concretely know the answers to any of these question, because my calls/emails generated no response. All I know is I was I was finally paid on 12/18/15.**

What impact did the delay of your paycheck have on you?

**Ans: I had delayed responses for my normal monthly financial expenditures, my vacation with family was delayed and my health/stress levels were negatively impacted**

In regard to this issue, state why you believe you were discriminated against due to your:

**Race:**
**Sex:**
**Reprisal for prior EEO activity:**

Ex 1
Harland gift

**Jackson, Milton L.**

**From:** Graves, Marie W.
**Sent:** Monday, July 20, 2015 3:54 PM
**To:** Jackson, Milton L.
**Subject:** Re: Heads up

Milt,

Why are you going to Dr. Harland's office to pick up specs for the machine? She can easily email you the information or provide you with the manufacturers information.

More importantly, why are you pursuing this gift?

Sent from my iPhone

On Jul 20, 2015, at 11:01 AM, Jackson, Milton L. <JacksonML@si.edu> wrote:

> Hi Marie, Sarah: I am headed out of the office to Howard University. I am going there to pick up from Dr. Harland the scientific equipment specifications booklets for the equipment she wants to donate so that our conservation colleagues can determine if they can use the equipment or not. Should be back by 1:30 at the latest.
>
> Best,
>
> Milt Jackson
> Senior Advancement Program Specialist
> Smithsonian Institution
> National Museum of African Art
> 950 Independence Avenue SW
> MRC 708 PO Box 37012
> Washington, DC 20013
> Office: 202-633-4635
> Cell: 202-679-7894
> JacksonML@si.edu

E45
Timestamp verification

**Jackson, Milton L.**

**From:** Jackson, Milton L.
**Sent:** Wednesday, August 19, 2015 4:23 PM
**To:** Graves, Marie W.
**Subject:** RE: Today

Marie: When I got back from lunch, you were already in the presentation. Please note that the first email in this thread that I sent to you is timestamped at 3:18pm today. I got back, asked Bonnie if she knew where you were and, after she responded that you were in the presentation, sent you an email.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Graves, Marie W.
**Sent:** Wednesday, August 19, 2015 3:53 PM
**To:** Jackson, Milton L.
**Subject:** RE: Today

I have been waiting since 3:20. Lack of Veracity

**From:** Jackson, Milton L.
**Sent:** Wednesday, August 19, 2015 3:18 PM
**To:** Graves, Marie W.
**Subject:** Re: Today

Bonnie said you are in the presentation, will speak with you afterward. -Milt

Sent from my iPhone

On Aug 19, 2015, at 2:48 PM, Graves, Marie W. <GravesMW@si.edu> wrote:

> Hi Milt,
>
> Can you please drop by my office around 3:15?
>
> Thanks,
> Marie

Ex. 6
Templeman

Smithsonian
*National Museum of African Art*

August 20, 2015

Dear Milt,

I thought it would be helpful to summarize our notes from today's meeting (August 20, 2015), which followed up on your progress and areas of improvement needed, which I outlined to you in my letter of July 23rd. In our meeting today, which was also attended by Bill Holmes, as our administrative officer, I discussed critical elements in your performance that are still unacceptable. As we explained, we looked for progress made to date on the outlined areas for improvement, but we also asked you about any impediments you perceived in making progress. Specifically, in our meeting today, we identified the following areas as still unsatisfactory and requiring improvement:

Communication and information sharing:

> To reach our campaign goal and to build and foster a collaborative team environment, it is incumbent upon you to reach out to me proactively to discuss advancement strategies and activities that you propose in your capacity as our major gifts officer. A perfect example of your need to improve your communication with me is your approach to Maurice Templeton. Rather than coming to me to discuss donor strategy, you sought advice from our museum's head of public affairs. I mention this example, but I want to emphasize that this has been your pattern—you rarely proactively come to me; instead I have to ask to meet and only then find out that you are considering a particular prospect. When I have drawn this behavior to your attention in the past, as well as today, you have noted how you don't wish to trouble me with the details—but I continue to emphasize that in building our relationship and ensuring that your efforts are well-placed to meet the advancement needs of our museum, it is important for you to discuss your strategies in advance with me.

In an effort to encourage improvement in this critical area of effective communication, we agreed at today's meeting to implement a weekly development status report you would draft that would recap your advancement activities for the week, and the status of those activities, and would look ahead by listing the goals and action items for the coming week. This report is due via email to me by noon each Friday, beginning next Friday, August 28th.

These status reports will be used by us each week as we meet to review your progress.

Of particular interest with regards to activities you have mentioned to me, I am requesting immediate closure on the following:

- Disney strategy and draft of letter to Disney CEO: due by August 26, 2015
- Schedule and appointment to meet with Dr. Harland (for the week August 31st)

- Detailed weekly work plan: Please see my letter July 23 for the elements I would like to see listed in your work plan (due by August 27, 2015)
- Weekly status report (due by August 28, 2015)

Finally, as discussed at our last weekly meeting, I am concerned that you have not generated the activity to reach your goal of $1.5 million. By your own admission, you spend an inordinate amount of time researching donors; however, I have not seen the results. Have you qualified 80 to 90 donors for your portfolio? What is the strategy for these individuals? How many meetings requests have you initiated with donors or prospects? How many asks have you made? How many proposals do you have in your pipeline? I raise these questions as ways for you to assess if you are spending your time wisely and productively or if you need to rethink your approach or reprioritize your time in order to meet your goal as our major gifts officer.

Lack of Veracity

As you know, I am out on annual leave all next week, but I will be checking emails and will look forward to progress reports on the items noted above and in my letter to you of July 23rd, as well.

Best,

Marie

181
Texas approval

### Document Header Information

| | | | |
|---|---|---|---|
| Document Type: | Authorization | Document Name: | SI00004817 |
| Travel Authorization Number: | TACA0B1G96 | Trip Name: | Trip from Washington to Dallas |
| TA Date: | 04/23/15 | Currency: | USD |
| Organization: | GSI57NMAFA | Current Status: | PENDING |
| Purpose: | DONOR CULTIVATION | Document Detail: | Will meet with philanthropist and founder of Earth Day Texas and be introduced and meet with potential donors. Had started a rapport with this philanthropist in previous job. |
| Type Code: | SINGLE TRIP (emp only) | | |

### Traveler Profile

| | | | |
|---|---|---|---|
| Name: | Jackson, Milton L | ID: | 1000857930 |
| TID: | 0000122064 | Organization: | GSI57NMAFA |
| Title: | | Duty Station: | |
| Security Cl: | | Card: | CARDHOLDER |
| Office Address: | 950 Independence Ave. S.W. <BR>Washington, DC 20560 | EMAIL: | jacksonml@si.edu |
| Office Phone: | (202) 633-4635 | Cell Phone: | |
| Home Phone: | (202) 633-4635 | Alternate Address: | |
| Alternate Phone: | | | |

### Profile Custom Fields

Trip Number: 1

| Label | Value |
|---|---|
| Location Code | |
| Traveler Status | Trust |

### Document Information

Trip Number:Selected Trip
1

Purpose: Will meet with philanthropist and founder of Earth Day Texas and be introduced and meet with potential donors. Had started a rapport with this philanthropist in previous job.

Itinerary Locations

| Check In | Check Out | Location | Purpose | Rate |
|---|---|---|---|---|
| 04/24/15 | 04/26/15 | DALLAS, TX | DONOR CULTIVATION,DONOR CULTIVATION | 125.00 / 71.00 |

### Document Totals

| | |
|---|---|
| Total Expenses: | 1,541.11 |
| Reimbursable Expenses: | 1,526.36 |
| Non-Reimbursable Expenses: | 14.75 |
| Advance Authorized: | .00 |
| Advance Requested: | .00 |

### Document Totals by Expense Category

| Expense Category | Cost | Advance Amount |
|---|---|---|
| Ancillary Fees | 50.00 | .00 |
| Com. Carrier | 724.20 | .00 |
| Lodging | 396.00 | .00 |
| M&IE-PerDiem | 177.50 | .00 |
| Rental Car | 71.36 | .00 |
| TMC Fees | 7.30 | .00 |
| Transportation | 100.00 | .00 |
| Transxn Fees | 14.75 | .00 |
| Total Expenses: | 1,541.11 | .00 |

## Trip 1 Details

### Reservations Summary

| Reservation Type | Vendor | Ticket# | Location | Cost |
|---|---|---|---|---|
| COMM-CARR | American Airlines | 1000794023 | | 724.20 |
| COMM-CARR | American Airlines | 1000794023 | | .00 |
| RENTAL | Enterprise RentaCar | 1000794023 | | 71.36 |

### Trip Itinerary

**From: DCA-Washington, DC (USA) (National Apt) TO: DFW-Dallas / Ft. Worth, TX (USA) (IntL.**

**Air**

**Friday April 24, 2015**

**DCA-Washington, DC (USA) to DFW-Dallas / Ft. Worth,**

Apr 24 American Airlines 1530
Washington, DC (USA) (National Apt) 04/24/2015 11:59AM
Confirmation Number: KPHZLS

Duration: 3 Hours 21 Minutes Nonstop
Dallas / Ft. Worth, TX (USA) (IntL. Apt) 04/24/2015 2:20PM

Flight Information
Distance 1189 miles
No Seat Assigned

Emissions 463.7 lbs of $CO_2$
Cost 724.20 USD

**Car**

**Car Rental at DFW-Dallas / Ft. Worth,**

Apr 24 Enterprise RentaCar
Picking Up 04/24/2015 2:20PM
Picking Up at DFW-Dallas / Ft. Worth,
Confirmation Number: 594098019COUNT

Returning 04/26/2015 11:45AM
Returning to DFW-Dallas / Ft. Worth,
Total Rate: 71.36 USD

**Air**

**Sunday April 26, 2015**

**DFW-Dallas / Ft. Worth, to DCA-Washington, DC (USA)**

Apr 26 American Airlines 251
Dallas / Ft. Worth, TX (USA) (IntL. Apt) 04/26/2015 11:45AM
Confirmation Number: KPHZLS

Duration: 3 Hours Nonstop
Washington, DC (USA) (National Apt) 04/26/2015 3:45PM

Flight Information
Distance 1189 miles
No Seat Assigned

Emissions 463.7 lbs of $CO_2$

### Expenses

Trip#: 1 — Total Non-Per Diem Expenses: 967.61 — Total Per Diem Expenses: 573.50

| Date | Description | Category | Cost | Pay Method | Per Diem |
|---|---|---|---|---|---|
| 04/23/2015 | Travel Fee | TMC Fees | 7.30 | IBA | |
| Comment: | OTRS Domestic-Intl w-Air-Rail | | | | |
| 04/23/2015 | TDY Voucher Fee | Transxn Fees | 14.75 | Invoice | |
| 04/24/2015 | Baggage Fees (Personal) | Ancillary Fees | 50.00 | IBA | |
| 04/24/2015 | Airfare | Com. Carrier | 724.20 | IBA | |
| 04/24/2015 | Lodging | Lodging | 198.00 | IBA | * |
| 04/24/2015 | M&IE | M&IE-PerDiem | 53.25 | PAID BY TRAVELER | * |
| 04/24/2015 | Rental Car | Rental Car | 71.36 | IBA | |
| Comment: | Conf Num: 594098019COUNT Cmt: | | | | |
| 04/24/2015 | Parking | Transportation | 100.00 | PAID BY TRAVELER | |
| 04/25/2015 | Lodging | Lodging | 198.00 | IBA | * |
| 04/25/2015 | M&IE | M&IE-PerDiem | 71.00 | PAID BY TRAVELER | * |
| 04/26/2015 | M&IE | M&IE-PerDiem | 53.25 | PAID BY TRAVELER | * |

### Per Diem Allowances

Trip#: 1 Total Per Diem Allowances: 573.50

| Date | Rate | Ldg Cost | Ldg Allowed | M&IE Cost | M&IE Allowed | [illegible] % |
|---|---|---|---|---|---|---|
| 04/24/2015 | 125.00/ 71.00 | 198.00 | 198.00 | 53.25 | 53.25 | |
| 04/25/2015 | 125.00/ 71.00 | 198.00 | 198.00 | 71.00 | 71.00 | |
| 04/26/2015 | 125.00/ 71.00 | 0.00 | 0.00 | 53.25 | 53.25 | |

## Other Authorizations

Trip#: 1

| Other Authorization | Remarks |
|---|---|
| ACTUAL EXPENSE | <p></p> |

## Account Summary for the Selected Trip

| | | | |
|---|---|---|---|
| Org: GSI57NMAFA | Label: 15 TEMPLATE1 | Acct Code: 411^2015^041101^574100^6100^2111^9600^^ | 1,541.11 |
| Expense Category: Ancillary Fees | Fiscal Year: 2015 | Amount: 50.00 | |
| Expense Category: Com. Carrier | Fiscal Year: 2015 | Amount: 724.20 | |
| Expense Category: Lodging | Fiscal Year: 2015 | Amount: 396.00 | |
| Expense Category: M&IE-PerDiem | Fiscal Year: 2015 | Amount: 177.50 | |
| Expense Category: Rental Car | Fiscal Year: 2015 | Amount: 71.36 | |
| Expense Category: TMC Fees | Fiscal Year: 2015 | Amount: 7.30 | |
| Expense Category: Transportation | Fiscal Year: 2015 | Amount: 100.00 | |
| Expense Category: Transxn Fees | Fiscal Year: 2015 | Amount: 14.75 | |
| | | Total: | 1,541.11 |

## Payment Detail Information

| Organization | Label | Accounting String | Payment Method | Amount |
|---|---|---|---|---|
| GSI57NMAFA | 15 TEMPLATE1 | 411^2015^041101^574100^6100^2111^9600^^ | IBA | 1,248.86 |
| GSI57NMAFA | 15 TEMPLATE1 | 411^2015^041101^574100^6100^2111^9600^^ | Invoice | 14.75 |
| GSI57NMAFA | 15 TEMPLATE1 | 411^2015^041101^574100^6100^2111^9600^^ | PAID BY TRAVELER | 277.50 |

### Totals by Label

| | | | |
|---|---|---|---|
| GSI57NMAFA | 15 TEMPLATE1 Total | 411^2015^041101^574100^6100^2111^9600^^ | 1,541.11 |

### Totals by Payment Method

| | |
|---|---|
| IBA Total | 1,248.86 |
| Invoice Total | 14.75 |
| PAID BY TRAVELER Total | 277.50 |

## Attachments

Attachments Exists

## Receipt Checklist

| Date | Description | Cost |
|---|---|---|
| 04/23/15 | Travel Fee | $7.30 |
| 04/24/15 | AIR | $724.20 |
| 04/24/15 | Lodging | $198.00 |
| 04/24/15 | M&IE | $53.25 |
| 04/24/15 | RENT | $71.36 |
| 04/24/15 | PARK | $100.00 |
| 04/25/15 | Lodging | $198.00 |
| 04/25/15 | M&IE | $71.00 |
| 04/26/15 | M&IE | $53.25 |

## Audits

| Audit Name | Result | Reason |
|---|---|---|
| ACTUALS EXIST | FAIL | LODGING ACTUALS EXIST |
| | Traveler Justification: | Closest hotel to meetings |
| ACTUALS EXIST | FAIL | LODGING ACTUALS EXIST |
| | Traveler Justification: | Closest hotel to meetings |
| ACTUALS EXIST | FAIL | LODGING ACTUALS EXIST |
| | Traveler Justification: | Closest hotel to meetings |

**Document History 04/23/2015 Authorization: SI00004817**

**Copyright 1989-2009 Concur Government Edition: Concur Inc.** **Jackson, Milton L. 0000122064**

| STATUS | DATE | TIME | SIGNATURE NAME | REASON |
|---|---|---|---|---|
| CREATED | 04/23/2015 | 11:47AMEST | Frank Esposito | |
| SIGNED ON BEHALF | 04/23/2015 | 12:35PMEST | Esposito, Frank P | |
| ADJUSTED | 04/23/2015 | 12:41PMEST | Jennings, Annette V | |
| CERTIFIED | 04/23/2015 | 12:45PMEST | Jennings, Annette V | |
| ADJUSTED | 04/23/2015 | 12:46PMEST | Holmes, William H | |
| APPROVED | 04/23/2015 | 12:48PMEST | Holmes, William H | |
| PENDING | 04/23/2015 | 12:48PMEST | SYSUTILITY | |

**I certify that the electronic signatures listed above are valid and on file**

____________________________

**SIGNED DATE**

**Document Signatures**

Traveler/Preparer Name: __________
Traveler/Preparer Signature: __________
Date: __________
Approver Name: Bill Holmes
Approver Signature: [signature]
Date: 4/23/15

Ex 14 MJ & Browender emails

**Jackson, Milton L.**

**From:** Browender, Laura
**Sent:** Thursday, July 30, 2015 11:00 AM
**To:** Jackson, Milton L.
**Subject:** Re: Checking in

Milt,

Have you looked into opportunities in other units? I think it sounds like the only thing I can do is listen and provide support. I'm sorry... Let me know if you are able to make time for coffee—I will be back in DC next week.

Laura

**From:** "Jackson, Milton L." <JacksonML@si.edu>
**Date:** Thursday, July 30, 2015 at 8:37 AM
**To:** Laura Browender <browenderl@si.edu>
**Subject:** RE: Checking in

Laura,

At this point, almost every tool, including travel and attending events, normally available to a development professional has been limited for me. Thus, I cannot perform my job as a major gifts officer effectively or productively. Add to this an atmosphere of accusation, suspicion and low morale and, given my familial concerns as I said before, my options are clear. It is my understanding that reps from the Ombudsman's Office are aware of the issues here – including legal action pending - however, there is little confidence in their involvement.

I remain impressed by the Smithsonian mission and potential, both personally and professionally, but remain concerned that the above issues, among others, significantly threaten my professional tenure here.

Thank you, again, for your time and consideration.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Browender, Laura
**Sent:** Wednesday, July 29, 2015 6:02 PM
**To:** Jackson, Milton L.
**Subject:** Re: Checking in

Diversity draft

**PROPOSED DIVERSITY INITIATIVES FOR THE NATIONAL MUSEUM OF AFRICAN ART – EXECUTIVE SUMMARY**

TO: DR. JOHNNETTA COLE

FROM: MAKEBA CLAY, MILT JACKSON

DATE: JULY 15, 2015

In accordance with your directive for the increase and diffusion of diversity at NMAfA, and in the greater arts sphere, we respectfully provide the following initiatives for your consideration. These initiatives, some of which include unrestricted funding components, have been structured specifically to benefit NMAfA's mission, cause and purpose from short, intermediate and long-term perspectives.

INITIATIVE 1: Increasing the diversity of museum woodworking experts. <Funding: $100K/annum>

In the interest of increasing diversity in this area, NMAfA's Graham Kopp has been approached about providing professional mentorship to a cadre of underrepresented apprentices. Graham, a Pennsylvania native who possesses seasoned woodworking skills, an entrepreneurial background and direct experience mentoring apprentices, would be an excellent fit for this initiative – and he has expressed interest given the right parameters. To fund this effort, 84 Lumber (headquarters in Eighty Four, PA), the nation's largest privately held building materials and services supplier to professional contractors and do-it-yourselfers, has been approached. Following initial conversations, the company requested a letter and proposal be submitted for review. It is important to note that:

- Milt has successfully worked with 84 Lumber in the past (also on funding a diversity initiative) and that such efforts remain decidedly in the company's wheelhouse;
- 84 Lumber has a strong c-suite relationship with the Senator John Heinz History Center, a Smithsonian affiliate.

OUTCOME(S): An increase in the diversity of museum woodworking experts, a primary pool from which NMAfA (and other Smithsonian entities, as well as the greater arts sphere) can draw from and a solid new relationship with a corporate funder.

INITIATIVE 2: Increasing the number of African-born immigrants in the arts, sciences and humanities via the NMAfA Young Ambassadors Program. <Funding: $500K/annum>

At present, one of the most engaging and successful initiatives in the Smithsonian system is its Young Ambassadors Program (YAP) under the aegis of the Latino Center. This 10-year effort, under the leadership of director Eduardo Diaz, is a unique program that empowers young Latinos to become community leaders and life-long learners. Students in the YAP program come to the Smithsonian to participate in workshops with scholars, filmmakers curators and scientists.

Following this experience, students complete a four-week internship at a partner cultural or science museum in one of 17 cities across the US and Puerto Rico. Students also participate in community outreach events, some of which promote early childhood literacy. Becoming part of the YAP alumni network – which provides continuing professional and leadership opportunities – helps transform high school graduates into college-educated, young professionals poised for success. The YAP alumni network boasts a 97% college graduation rate, with many alums enjoying successful careers in myriad fields. Substantially funded by the Ford Motor Company Fund, this initiative establishes a foundational pipeline for the Latino Center that ensures the success of its participants, as well as the success of the Center.

Simply put, it would behoove NMAfA to duplicate this program – incorporating the substantial African-born immigrant population in the DC metropolitan area – with similar goals in mind. Given the following factors:

- Your legacy of championing diversity;
- You and Eduardo's relationship;
- Glenn Ojeda's completion of this program and his current NMAfA presence;
- NMAfA's relationship with DC's Office of African Affairs;
- Potential corporate interest from African entities;
- Potential interest from successful African business leaders/entrepreneurs;
- Potential corporate interest from Disney;

among others, duplicating this initiative would greatly benefit NMAfA and a significant portion of its constituent base.

Ex. 16
MJ Diversity Initiatives

***PROPOSED DIVERSITY INITIATIVES FOR NMAFA - EXECUTIVE SUMMARY***

TO: DR. JOHNNETTA COLE

FROM: MAKEBA CLAY, MILT JACKSON

DATE: JULY 23, 2015

In accordance with your directive for the increase and diffusion of diversity at NMAfA, and in the greater arts sphere, we respectfully provide the following initiatives for your consideration. These initiatives have been structured specifically to benefit NMAfA's mission, cause and purpose from short, intermediate and long-term perspectives and legacy considerations.

***INITIATIVE 1: Increasing diversity in the museum woodworking expert field. <Funding: $100K/annum>***

In the interest of increasing diversity in this area, NMAfA's Graham Kopp has been approached about providing professional mentorship to a cadre of underrepresented apprentices. Graham, a Pennsylvania native who possesses seasoned woodworking skills, an entrepreneurial background and direct experience mentoring apprentices, would be an excellent fit for this initiative – and he has expressed interest given the right parameters. To fund this effort, 84 Lumber (headquartered in Eighty Four, PA), the nation's largest privately-held building materials and services supplier to professional contractors and do-it-yourselfers, has also been approached. Following initial conversations, the company requested a letter and proposal be submitted for review. It is important to note that Milt has successfully worked with 84 Lumber in the past (also on funding a diversity initiative) and that such efforts remain decidedly in the company's wheelhouse and that 84 Lumber has a strong c-suite relationship with the Senator John Heinz History Center, a Smithsonian affiliate.

**OUTCOME(S):** An increase in the diversity of museum woodworking experts, a primary pool from which NMAfA (and other Smithsonian entities, as well as the greater arts sphere) can draw from and a solid new NMAfA relationship with a corporate funder.

JBC

**INITIATIVE 2: Increasing the number of youthful African-born immigrant professionals in the arts, sciences and humanities via the NMAfA Young Ambassadors Program. <Funding: $500K/annum>**

At present, one of the most engaging and successful initiatives in the Smithsonian system is its Young Ambassadors Program (YAP) under the aegis of the Latino Center. This 10-year effort, directed by Eduardo Diaz, is a unique program that empowers young Latinos to become community leaders and life-long learners. Students in the YAP program come to the Smithsonian to participate in workshops with scholars, filmmakers, curators and scientists, among others.

Following this experience, students complete a four-week internship at a partner cultural or science museum in one of 17 cities across the US and Puerto Rico. Students also participate in community

outreach events, some of which promote early childhood literacy. Becoming part of the YAP alumni network – which provides continuing professional and leadership opportunities – helps transform high school graduates into college-educated, young professionals poised for success. The YAP alumni network boasts a 97% college graduation rate, with many alums enjoying successful careers in myriad fields. Substantially funded by the Ford Motor Company Fund, this initiative establishes a foundational pipeline for the Latino Center that ensures the long-term success of its participants, as well as the sustainability success of the Center.

Simply put, it would behoove NMAfA to duplicate this program – incorporating the substantial African-born immigrant population in the DC metropolitan area and incorporating the existing NMAfA Teen Ambassadors Program/Education colleagues – and enjoy the long-term benefits of its existence.

**OUTCOME(S):** Given the following factors:

- Assist with cementing NMAfA's/your legacy of championing diversity;
- Successful utilization of Glenn Ojeda's completion of the YAP program/current NMAfA presence;
- Strengthen NMAfA's relationship with DC's Office on African Affairs;
- Attract corporate interest from African entities;
- Attract interest from successful African business leaders/entrepreneurs (Ex: Paul Odili);
- Attract unrestricted corporate interest from Disney (the 10th anniversary of the Disney-Tishman gift will occur in 2016), the Disney Dream Academy and other entities;

among others, duplicating this initiative would greatly benefit NMAfA'S fundraising efforts; further cement its position as a valuable community participant and deepen the long-term engagement of a significant portion of its constituent base.

**INITIATIVE 3: Increasing the number of mature African-born immigrants, principally in the DC metropolitan area, engaged with NMAfA who have familial/cultural/business links in Africa via the NMAfA Hubert H. Humphey Ambassadors Corps and a grassroots annual event. <Funding: $250K/annum>**

A number of African-born adult professionals have expressed interest in establishing/and or strengthening their personal, business, artistic and socio-cultural ties with NMAfA. Given their interest, and their expectation that others in their respective communities (and in Africa) would likely find engagement with NMAfA compelling, establishing a mature cadre of NMAfA Humphrey Ambassadors is presented as an option. To do so, in part via an annual **Earth Day Africa** event (with the Department of Energy, Trammell Crow, Anne Howard-Tristani and DC's Office on African Affairs as collaborative partners) and via Gathoni's existing Education outreach efforts would greatly benefit both NMAfA and its untapped constituent base in the DC metropolitan area.

**OUTCOME(S):** This initiative would expand the pipeline of NMAfA's African-born constituents in the DC metro area; expand the pipeline of those residing in Africa who are interested in engaging with NMAfA; greatly expand the fundraising/friendraising efforts of advancement and raise visibility and awareness of NMAfA as a valuable community partner within its critical constituent base.

Ex. 17
Meller + Clay + MJ Diversity

**Jackson, Milton L.**

**From:** Makeba Clay <makeba.clay@gmail.com>
**Sent:** Tuesday, July 28, 2015 1:27 PM
**To:** Jackson, Milton L.
**Subject:** Re: FW: Please review/comment

Glad he believes it could actually be a $1M effort!

Doesn't "underrepresented" refer to the populations that are not currently within that field--women? minorities?

Cadre-12? 15? 20?

Steve and Graham would be part of the selection committee. They, and perhaps others, would also be helpful to determine the selection criteria.

M

On Tue, Jul 28, 2015 at 11:19 AM, Jackson, Milton L. <JacksonML@si.edu> wrote:

Makeba,

In response to your email, see below. In the interest of accelerating things shortly after conception of the idea, I spoke with Graham and his manager, Steve to gauge traction/support for the concept. Their support (same with Gathoni and LaNisa's support of the other two initiatives), obviously, was critical to the initiative getting past the culture of "no." Both Steve and Graham were (and remain) interested. However, when I emailed Steve the final language for his approval, Steve cc'd Marie and now Marie wants to discuss it.

Best,

Milt Jackson

Senior Advancement Program Specialist

Smithsonian Institution

National Museum of African Art

950 Independence Avenue SW

MRC 708 PO Box 37012

Washington, DC 20013

Office: 202-633-4635

Cell: 202-679-7894

JacksonML@si.edu

**From:** Mellor, Steve
**Sent:** Thursday, July 23, 2015 5:12 PM
**To:** Jackson, Milton L.
**Cc:** Graves, Marie W.
**Subject:** RE: Please review/comment

Milt,

This is a great initiative and at this point I wholeheartedly support it. I do not know the intended audience for the below but, of course, there are concerns that need to be articulated and addressed to give clarity to both this museum and the intended funder before the program could be implemented. Some that come to mind are – how many is in a 'cadre', what is the target of 'underrepresented', what is the time frame, what is the anticipated level of skill for applicants, who makes and how is the selection made, what are the liability concerns for the institution and how are they mitigated, as examples. I'm not a fundraiser, but couldn't this be a $1M endowment to establish a sustainable program?

Thanks,

Steve

**From:** Jackson, Milton L.
**Sent:** Thursday, July 23, 2015 12:33 PM
**To:** Mellor, Steve
**Cc:** Kopp, Graham
**Subject:** Please review/comment

Hi Steve,

I have been in recent discussions with Makeba Clay, our diversity guru, about new initiatives with strong potential utility to NMAfA – and which also encompass fundraising components.

One of these initiatives (see below) involves your area and, per our (you and me) previous hallway conversation, I wanted to ask for your review/comments before I forward it to Dr. Cole via Makeba. Also, per our conversation, I have spoken with Graham about this new initiative and he is interested. Let me know, I look forward to your response Steve.

***INITIATIVE 1: Increasing diversity in the museum woodworking expert field. <Funding: $100K/annum>***

***In the interest of increasing diversity in this area, NMAfA's Graham Kopp has been approached about providing professional mentorship to a cadre of underrepresented apprentices. Graham, a Pennsylvania native who possesses seasoned woodworking skills, an entrepreneurial background and direct experience mentoring apprentices, would be an excellent fit for this initiative – and he has expressed interest given the right parameters. To fund this effort, 84 Lumber (headquartered in Eighty Four, PA), the nation's largest privately-held building materials and services supplier to professional contractors and do-it-yourselfers, has also been approached. Following initial conversations, the company requested a letter and proposal be submitted for review. It is important to note that Milt has successfully worked with 84 Lumber in the past (also on funding a diversity initiative) and that such efforts remain decidedly in the company's wheelhouse and that 84 Lumber has a strong c-suite relationship with the Senator John Heinz History Center, a Smithsonian affiliate.***

***OUTCOME(S): An increase in the diversity of museum woodworking experts, a primary pool from which NMAfA (and other Smithsonian entities, as well as the greater arts sphere) can draw from and a solid new NMAfA relationship with a corporate funder.***

Best,

Milt Jackson

Senior Advancement Program Specialist

Smithsonian Institution

National Museum of African Art

950 Independence Avenue SW

MRC 708 PO Box 37012

Ep. 18
July 4 event

**Cc:** Feldmann, Emily; Sverdlov, Molly; Gobbi, Laura
**Subject:** July 4th Celebration Follow Up

Good afternoon everyone,

Hope you had a nice weekend! We're in the homestretch before the 4th, and are hoping to bump up our numbers. This is one of our keystone events, and we want to share it with as many of our donors as possible. It's also Secretary Skorton's first big event, and we want a packed house – it's a great opportunity for your donors to meet the new Secretary and show him what the Smithsonian's all about. The more, the merrier on the 4th!

Attached please find the current attendance list. Take a look and follow up with any guests that would be interested in attending our event. We do still have complimentary tickets that your unit can provide, so do not let the ticket price hold you back from reaching out to any parties you think may be interested. Contact me if you would like to offer these tickets.

An invitation is also attached for easier follow up. You are welcome to give out my information in case your guests have questions.

As always, I'm here to provide any information you may need. Thank you for your continued help!

Best,
Becky

Becky Barat
Programming and Stewardship, Office of Advancement
202.633.8037 (o)
703.489.2151 (c)

Ex 19
Harland 40K letter

# HOWARD UNIVERSITY

College of Pharmacy, Nursing and
Allied Health Sciences
Division of Allied Health Sciences
Department of Nutritional Sciences

July 4, 2015

I am retiring from my position as Professor after 30 years in this Department. I choose to DONATE to the Smithsonian Institution Two Valuable Instruments. I have been working with the following experts who can attest to the existence of these instruments. I will be happy to make my self available to exhibit these instruments to you. They are currently located in the NUMA P. ADAMS Building, Room 1408.

Instrument I: Atomic Absorption Spectrophotometer- Brand New-Value $17,000.

Instrument II: High Performance Liquid Chromatography- Used-Value $23,000.

The following people may confirm my words since I have worked with them.

SHIMADZU COMPANY: 7102 Riverwood Drive; Columbia MD 21046.

Laura Bowman, Coordinator (410) 381-6996.

Shane Wheeler, 1-800-388-6996- Regional Service Supervisor.

Scott Ingraham, Technical Support- Shimadzu- Extension 1663.

Tom Russell, Technical Support-(443) 812-3084.

Bill Everett, Technical Support (443) 472-7970.

I would appreciate the earliest possible resolution of this situation.

Sincerely, Professor Barbara Harland, Ph.D. (202) 806-5656
H(301) 469-7593

Consultant George - email

**Jackson, Milton L.**

**From:** Karin George <kgeorge@wash-mcg.com>
**Sent:** Thursday, October 01, 2015 11:01 AM
**To:** Jackson, Milton L.
**Subject:** Our Meeting on October 8 and work plan - WASHBURN & McGOLDRICK

Dear Milt,

I hope this finds you well! I am really looking forward to meeting you next week and writing now to confirm our plans.

Shall I come to your office and maybe we can go and get a cup of coffee/tea and have our meeting? I am also fine with an alternative you'd like to suggest. I'll be meeting with Jeanny Kim in the morning and then will head in your direction after that meeting concludes at noon. Let me know what you'd prefer and then I'll need directions. And I hope that 1:00 p.m. until 2:30 p.m. still works?

Background / Have you spoken to anyone else at NMAAHC? Purpose of Prog

As for the meeting content, this is a "get to know each other meeting" and one where I'll be doing more listening than anything else. There are a few questions I'd like you to think about in advance and you can either write out your answers, or just have them at the ready. There are are no grades of course and this is a focus on you and your goals.

(1) Part of a unit that is focused on big gifts and has the collaborative resources/support to succeed. Learn the landscape then lead.

The questions: (2) 2-3 big gifts/annum

*How do you define and picture success for yourself in this role at SI? And in your professional life?

*Name some of the work related accomplishments about which you are most proud and why? (whether at SI or elsewhere) Tristani / Trammell / Disney (Sklar) / Tishman / Odili / Ital Emb / Africans / Board / Earth Day

*What are the top challenges in your job (and how do they impact your ability to achieve success)

Thank you in advance and it will be great to meet with you next week.

Kind regards,
Karin

Karin L. George
Principal
WASHBURN & McGOLD
Karin L. George
Principal
WASHBURN & McGOLDRICK, LLC
P.O. Box 1053
Northampton, MA 01061-1053

413-387-5184 (office)
413-280-0328 (fax)

kgeorge@wash-mcg.com

C423
Consultant Georg-
issues age

10/8 Karen George mtg

I love the Smithso, its mission and it is a dream job for me, given my love of science. However, I'd rather work elsewhere in the system as I am not being allowed to do my job:

- 4/15 Ombudsman mtgs, low morale;
- Not allowed to travel (once to TX – given permission 2 days b4 to visit billionaire) told to focus on DC despite job description, expectations are bound to desk (colleagues as well), while mgr/sr mgrs./communic staff are (Atl, NY);
- My abilities/communication/professionalism/competence/presence/judgement are consistently questioned and there is little positive support from mgrs which means non-productive, non-efficient time. Spoke with HR/Ombudsman/Laura/Todd;
- Construed my comment as a threat 5/8;
- Told that meeting with prospects/donors over lunch/dinner was outmoded;
- Constant documenting of my faults, misinformed accusations suggest I have a limited tenure at Af Art;
- Took leave and was asked to provide a drs note for procedure I was thinking about during leave;
- Performing donor research (existing is thin) is seen as wasteful;
- Harland visit (4th of July $40K, lunch leaving, cole intro, gift for another unit, email to Ginny,
- Constantly re-doing tasks limits actual development work;
- No mgr support/financing for events/efforts that are development specific;
- Mission/legacy of director seems more important than museum's, adv priorities seem tied to areas where she has sway;
- Accused of sleeping with a 90 y/o prospect who is a friend;
- Few substantial dev meetings take place, most are chatter/peripheral conversations;
- Priorities/strategies are scattershot;
- No acknowledgement of successes/accomplishments
- Gov. credit card, but not allowed to use it locally, instead, encouraged to spend my $$ then expense costs for reimbursements (local form submitted in August, not signed; no rentals) and no access to budget;
- New prospects researched are either disparaged, taken by mgr, assigned by mgr to Anna Barber (Fred Nicholas and golf) or designated as known by either mgr or director;
- Restricted from interacting with Board, mgr has bad relationship with at least 3 board members;
- Not encouraged to interact with unit colleagues or other colleagues in Smithso system;
- Limited re: attending Smithso events and no tix provided (July 4th);
- Significant fear of OA (Disney) and of the prominence of NMAAHAC fundraising (Chicago);
- Ombudsman, HR and mediator are consistently involved in NMAfA;
- CPR course seen as useless;

  Portfolio still being finalized

- Got prospective board member;
- Connected Trammell;
- Re-connected past staff, prospects, donors;
-

# INTERROGATORY
of
MARIE GRAVES

I, Marie Graves, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am/was a (series/grade) 13 not certain, (title) Associate Director for Advancement,

(division) ______________, (branch/office) National Museum of African Art, (agency) ______________, (location) Washington, DC,

My telephone number is: 757-722-6926.

How long were you employed by the National Museum of African Art (NMAfA)? From what date to what date? How long were you in your position?

Ans:
**I was employed from June 2, 2014 to August 26, 2016.**

For the record my race is: **African American**
For the record my sex is: **Female**
For the record I have (X)/have not ( ) participated in prior EEO activity:

Who was your first-line supervisor at the time of this complaint? Provide his/her grade, series, and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor..

Ans: **Dr. Johnnetta Cole**
**Museum Director**
**African American**
**Female**
**Dr. Cole has participated in EEO activity.**
**Dr. Cole supervised me from June 2, 2014 thru August 26, 2016.**

Who was your second-line supervisor at the time of this complaint? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

Ans:

**To my knowledge, I did not have a second-line supervisor.**

What was your relationship to Complainant and when did this relationship commence?

Ans:
**I hired and served as Milt Jackson's supervisor and I believe the relationship began in the spring of 2015.**

Were you aware of Complainant's prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

Ans:
**I seem to recall a time when Milt and I were discussing his prospect, Dr. Harland and I asked if this "was a good use of Milt's time" since it was clear that she had no interest in our museum or African Art. " Milt became irritated and he leaned over his desk and in a low threatening voice, he informed me that "no one, I mean no one is going to interfere with me doing my job". He further stated, he has done this before and was willing to employ his "team of attorney's" services and "go to the press", if necessary. At that point, I assumed he participated in some form of employment litigation.**

Was Complainant ever counseled about any issues with his performance? If so, who counseled him, and how and when was he counseled; what was stated in counseling? If he was not counseled, state why.

Ans:

**Milt received counseling from myself, Dr. Cole and I believe Bill Holmes may have participated in one or two of the sessions as well. To the best of my knowledge, we addressed Milt's prospect management, his territory, donor visits, travel expenses, fundraising goals, and museum priorities.**

**In July 2016, I accepted a position with another organization, so I no longer have access to my emails and files—unfortunately, I cannot provide you with more specificity at this time.**

Did Complainant respond to your counseling? If so, what did he respond? Please provide a copy of his response.

Ans:

**I remember discussing Dr. Harland (donor) and Milt expressed that he was being harassed. Milt leaned forward and in a low, threatening voice told me that "no one and I mean no one--would get in the way of him doing his job." I felt uncomfortable and immediately left his office.**

**I reported the incident to my colleagues (senior management team) that I felt he was trying to threaten or intimidate me.**

The following issues have been accepted by the Smithsonian Institution for investigation. Please provide your response to the following questions in as much detail as possible.

**Whether the National Museum of African Art (NMAfA) discriminated against you (Complainant) and subjected you (Complainant) to a hostile work environment based on your sex (male), race (African American) and/or in reprisal for prior EEO activity.**

**(1) On March 26, 2015, during your first week, Ms. Marie Graves (RMO-1) became angry at you for asking questions concerning seeking board members' contacts for potential donations, calling you "naïve," and questioning your judgment.**

Did you refer to Complainant as naïve and question his judgment when he asked questions about contacting Board members for their contacts and financial support at his first Museum advancement meeting? If so, explain why you felt his actions were naïve and in bad judgment?

**I do not recall every detail of this meeting, but I did not get angry. I do remember Milt telling me he had reviewed our files and his plan of action was to reach out to previous donors in an attempt to rekindle previous relationships. I remember explaining to Milt that Dr. Cole managed (along with myself) and inspired (Dr. Cole) our board and we needed him to concentrate his efforts on identifying and cultivating prospects/donors in the Washington, D.C. area. This was our greatest need.**

**Ans:**
Did you tell Complainant he was not to contact any Board members? If so, why did you tell him not to contact them?

**Ans:**
**I do not recall telling Milt that he could not contact a board members nor do I remember seeing Milt list them on his work plan.**

What is SI NMAfA policy/guidelines in regard to contacting Board members for potential donors?

**(2) From March 30, 2015 to April 2015, RMO-1 delayed approving your request to travel to a donor reception, which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event.**

Did you approve Complainant's request to attend an Annual Earth Day Texas reception/event on April 24-26, 2015? If so, when did Complainant request your approval and when did you grant him approval? If your approval was delayed, explain when it was due, how long it was delayed, and why it was delayed.

Ans:
**I approved his travel to Dallas. We are an African Art museum and Milt wanted to travel to an Earth Day event. Typically, we travel to meet with donors/prospects who express an interest in our work or African Art. If there was a delay, perhaps it occurred when I requested that Milt provide a donor report/itinerary to help justify the cost of his trip and make the connection between the prospects attending this Earth Day event and African Art.**

**I explained to Milt early on that as fundraisers we must be good stewards of donor's gifts and that our travel budget was limited, so we needed to be judicious in how we used funds. We wouldn't want our donors to think we had extra money to spend on traveling to events. Donors want to see their dollars go towards educational programs or exhibitions.**

**Most gift officers identify qualified donors/prospects, secure meetings with qualified donor/prospect and then request to travel. Milt made a couple of requests to travel and attend events, i.e. Earth Day or golf tournaments, but I do not recall Milt securing appointments with qualified donors/prospects and asking me to approve his travel.**

Complainant states that you did not approve him to visit the prospective donors he had met at this reception.
On what date did Complainant request to meet with the prospective donors?

Ans:
**I do not recall this request. Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes**

Did you refuse to allow him to visit the prospective donors he recommended? If so, please explain in detail why you did not approve his request to make these visits.

Ans:
**Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes.**

Did this refusal adversely impact Complainant's ability to perform the functions of his position?

Ans:
**I am unable to answer. Please see above.**

Please provide the names of persons, other than Complainant, who you have not approved travel to meet with prospective donors and the reason(s).

Ans:
**I do not recall anyone asking me aside from Milt.**

Do you believe Complainant was subjected to a hostile work environment and/or discriminated against due to his sex, and/or race, and/or prior EEO activity when you delayed his request to travel to this donor reception and then did not approve visits to prospective prospects that he had developed?

Ans:
**Again, Milt was a new employee on probation and his assigned territory was the Washington, DC area. Milt was not discriminated against because of his race, sex or EEO activity. I do not know of many, or any organization that allows employees to travel without justification. Milt's travel requests were to attend a golf tournament, Earth Day fair or dinner because a donor that he knew from another organization was attending.**

**From what I observed, Milt didn't seem to possess (or demonstrate) a basic understanding non-profits, identification of prospects and cultivation of donors and stewardship of funds.**

**Typically, travel was approved prior when we secured one on one meetings with qualified donors or prospects or to attend an event that "we" were hosting.**

**(3) On April 15, 2015, RMO-1 denied your request to attend a donor event in New York and seemed to take pleasure in denying the request publicly.**

Did you deny Complainant's request to attend a donor event in New York where Ted Simon, Philadelphia criminal defense attorney, would be in attendance? If so, please state why you denied Complainant's request.

Ans:

**Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes.**

**I do not recall denying Milt's request to travel to New York to attend an event. However, Milt was asked by Dr. Cole and myself to concentrate his efforts and cultivate donors in the Washington DC area. Ted Simon lives in Philadelphia and the event was in New York and I reminded Milt we wanted one on one meetings.**

Did you attend this donor event? Was Ted Simon in attendance?

**Ans:**
**No one from our office was invited or attended the event.**

Were you aware Complainant had previously worked closely with Mr. Simon?

Ans:
**I do not recall Milt telling me he had previously worked with Ted Simon.**

Did you publicly deny this request of Complainant? If so, what was the public forum?

**Ans:**
**I do not recall publically denying this request.**

Did this denial adversely impact Complainant's ability to perform the functions of his position?

Ans:
**If Milt was denied travel to New York and given the fact that Milt was charged with focusing his efforts in the Washington, DC area, I would have to say no.**

Do you believe Complainant was subjected to a hostile work environment when you denied his request to attend this donor event in New York?

**Ans:**
**Again, I do not recall denying this request.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity when you denied his request to attend this donor event in New York?

**Ans:**
**Again, if Milt was denied the opportunity to attend this event---it wasn't personal, it was a business decision.**

**(4) On May 7, 2015, RMO-1 stated a prospective donor with whom you were working was "useless". RMO-1 gave similar sharp criticism of your work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015.**

Did you state that a prospective donor of Complainant was "useless?" If so, who was the donor and why did you feel this person was useless?

Ans:
**I do not recall saying a donor was useless. Please provide specifics.**

Did you criticize Complainant's work with prospective donors? If so, why did you criticize his work? Who were the donors?

Ans:

**I was concerned about Milt's judgment with a donor, Dr. Harland. Milt arranged a lunch with a prospective and invited our Director of Planned Giving and I believe a gift offer from Air and Space Museum. Milt rented a car to pick up the donor in Bethesda, MD and drove her to the lunch. He explained to our colleagues that Dr. Harland indicated she wanted to make a planned gift to the Smithsonian.**

**It was reported, after they ordered, Milt received a call and explained to the donor, Dr. Harland, our Planned Giving Director and Air and Space Gift Officer that he received a call from his daughter's camp and she didn't have a lunch. Milt jumped up from the table and said he had to grab lunch for his daughter and left the restaurant.**

**Our colleagues mentioned to the donor, Dr. Harland that Milt indicated she wanted to make a planned gift to the museum and they asked her to share the details of the gift.**

**Dr. Harland responded, "Where did you get that idea? I am not going to give the Smithsonian a planned gift."**

**My colleagues were embarrassed and felt mislead. Why were they asked to attend this lunch if the donor had no intention of giving a planned gift and more importantly, why did Milt leave the lunch. Milt arrived an hour later—just in time to pick up the donor and drive her back to Bethesda, MD.**

**This event raised some concerns about Milt's judgment. I was quite familiar with this donor because I worked with her at another organization. Dr. Harland's philanthropic interest was to donating laboratory equipment that she purchased to advance her research in nutrition.**

**I inquired with his daughter's camp's personnel what happens when a child forgets their lunch and learned the camp would have provided a meal for any child that didn't have food.**

**I expressed my concerns with Milt. I explained that our colleagues were puzzled why he left the donor lunch and that Dr. Harland stated she had no intention of giving a planned gift. Milt assured me that Dr. Harland's intentions were to give the museum a gift. I asked him why didn't call me or someone at our museum to purchase lunch for his daughter since the camp was one flight below our office. He didn't reply.**

**I asked Milt to confirm the planned gift with Dr. Harland. I asked that he arrange a meeting with Dr. Harland, myself and Dr. Harland's daughters to confirm the donor's intentions and clear up any misunderstandings with our colleagues. Milt made excuses for not securing the meeting and we never met with Dr. Harland or her daughters to confirm the planned gift.**

Do you believe Complainant was subjected to a hostile work environment when you allegedly stated his donor was useless and criticized his work with prospective donors??

Ans:
**Not at all. My request to arrange a meeting with Dr. Harland and her daughters was the correct strategy considering her age and the daughter's involvement with her financial affairs.**

Did this criticism of Complainant adversely affect his ability to perform the functions of his position?

Ans:

**Not at all. It is always best to be transparent with donors and families, when necessary.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and or prior EEO activity when you stated his donor was useless and criticized his work in this manner?
Ans:
**NO**

**(5) On April 23, 2015, RMO-1 told you that you could not talk to or associate with more than ten of your colleagues at NMAfA because they were incompetent, and that you had to go to RMO-1 with all questions and for all needs, which you felt substantially limited your ability to perform your duties.**

State why you told Complainant he could not talk to or associate with more than ten of his colleagues at NMAfA. Who were the colleagues you told Complainant he could not talk to and/ or associate with and why did you tell him this?

Ans:
**Please provide more details. Milt was extremely social and spent much of his time with colleagues both in our museum and other units.**

**I asked Milt to refrain from answering his cell phone during our staff meetings perhaps that was the colleague he is referring to.**

How would not being able to talk to or associate with these colleagues impact Complainant's ability to perform the functions of his position?

Ans:
**I observed Milt regularly conferring with colleagues within and outside our museum. It was not unusual for Milt to leave his office for long periods at a time and when he returned, he would explain that he was meeting with colleagues.**

Do you believe Complainant was subjected to a hostile work environment in regard to this issue?

Ans:
**I do not believe Milt was subjected to a hostile work environment.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue?

Ans:

**I do not believe Milt was discriminated against due his race, sex of prior EEO activity.**

**(6) On May 8, 2015, RMO-1 told you not to associate with another colleague because she was a "snake" and a "gossip," and when you told her that you were a professional and could handle it, RMO-1 told you that she perceived your statement as a threat and that she felt uncomfortable in your presence.**

Did you tell Complainant he was not to have any further conversations or interactions with Ms. Bonnie Berry? If so, why did you so inform Complainant?

Ans:

**I asked Milt to refrain from making requests of Ms. Berry. I explained to Milt, Ms. Berry's supervisor preferred that we limit our requests of Ms. Berry. Ms. Berry**

**worked long hours to meet the demands of her job and did not need other departments contributing to her workload with additional assignments.**

Did you state Ms. Berry was a snake who could not be trusted and that she was a gossip; that you and Ms. Berry did not get along and Dr. Cole was blind to Ms. Berry's myriad faults?

**Ans:**

**I explained to Milt that Ms. Berry was eager to help out and that it may not be in your best efforts to involve her with your work since she had a demanding job. Our director traveled extensively and Ms. Berry played a major role keeping things running smoothly in the director's office. I encouraged Milt to rely on the advancement team since we had more bandwidth within our department.**

Did you state that Ms. Berry was at some point going to "screw me like she had screwed everyone else?"

**Ans:**

**I mentioned to Milt that Ms. Berry was extremely busy and we didn't want anything to fall between the cracks. We were ultimately responsible and held accountable responsible for our work.**

Did your actions in this issue adversely affect Complainant's ability to perform the functions of his position?

**Ans:**

**Absolutely not. Ms. Berry did not work in our department and typically, I engaged Ms. Berry when her supervisor suggested that I work with Ms. Berry.**

**In fact, Milt worked with Ms. Berry when scheduling a lunch for our director and a prospect/donor.**

Do you believe Complainant was subjected to a hostile work environment in regard to this issue?

**Ans:**
**Absolutely not, Milt was in a new environment. He was assigned to concentrate his efforts on identifying and cultivating donors/prospect in the Washington, D.C.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue?

**Ans:.**

**Absolutely not.**

(7) **On June 3, 2015, RMO-1 asked if you and a potential donor were romantically involved, which you felt was very inappropriate.**

Did you ask Complainant if he and Dr. Barbara Harland, 90 years of age and a potential donor, were romantically involved? If so, why did you ask this question?

Ans:

**I do not mean to be flippant, but really. As I stated before, I have a personal relationship with Dr. Harland and I wouldn't have to ask that question. Dr. Harland mentioned to me that her daughters were not comfortable with Milt and Dr. Harland's relationship. I am not certain; I may have mentioned to Milt this was another reason why we should include his daughters when discussing a gift with Dr. Harland.**

What was Complainant's response?

**Ans:**
**I don't recall asking this question.**

Was Complainant adversely impacted by your question to him? If so, in what manner was he adversely affected?

**Ans:**
**I don't recall asking this question.**
Do you believe Complainant was subjected to a hostile work environment in regard to this issue?

**Ans:**
**No.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and or prior EEO activity in regard to this issue?

**Ans:**
**No**

**(8) During the summer of 2015, RMO-1 blocked your fundraising diversity plan from reaching the Director by requiring you to perform 14 rewrites and then stating that it would not work.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue?

**Ans:**
**No.**

**(9) On or around July 4, 2015, after you received commitment for a large donation at the Smithsonian's 4th of July Celebration, RMO-1 "harangued" you and called you a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping you to arrange receipt of the gift, which was eventually rescinded.**

Did you harangue and call Complainant a liar as alleged in this issue? If so, why did you harangue him and call him a liar?

**Ans:**

**I did not berate Milt. Milt attended a 4th of July event and he failed to introduce the donor to our director—this was faux pas. I explained to Milt the purpose of this events was to invite and cultivate qualified donors/prospects and introduce them to our museum director and any board members in attendance.**

**Milt did not advise me we had received the gift and I did not play any role in arranging the receipt of this gift. If I recall correctly, the gift was a piece of equipment and it was decided by another unit that the Smithsonian would not accept this machine. Again, we are an art museum and I do not recall this machine having any connection to African Art.**

Did you ask Complainant why he had not introduced Dr. Barbara Harland, who had proposed a $40K contribution, to Dr. Cole, Director? Why was Complainant supposed to introduce Dr. Harland to Dr. Cole?

**Ans:**
**See answer above.**

Did you insinuate Complainant was lying when he responded he was not aware Dr. Cole was in the room by stating that everyone knows when Dr. Cole is in the room?

**Ans:**
**See answer above.**

**Our director has a big personality and huge presence—she is difficult to miss. Our director noted that she saw Milt at the event pushing an elderly woman around in a wheelchair the entire evening.**

Ans:
**I have no knowledge that Nichols was assigned to Ms. Barbour nor do I know who made the assignment.**

Why was Ms. Barbour more qualified to handle this relationship than Complainant?

Ans:
**I have no knowledge that Nichols was assigned to Ms. Barbour nor do I know who made the assignment. I do know that Ms. Barbour, who was a regional fundraiser is one of the top performers on the SI advancement team and she travels to the west coast regularly. It is not unusual for the regional fundraising team to meet with all Smithsonian donors, including donors who are assigned to specific units or major gift officers.**

Was Ms. Barbour approved to travel to meet with Mr. Nichols? Did Mr. Nichols become a donor?

Ans:
**I have no knowledge or recollection that Nichols was assigned to Ms. Barbour nor do I know if Ms. Barbour traveled to meet with him.**

Was Complainant's ability to perform the functions of his position adversely impacted by the denial of his request to travel to Los Angeles to meet a prospective donor?

Ans:

**No. Milt was assigned to focus on donors, prospects and organizations in the Washington, DC area.**

Do you believe Complainant was subjected to a hostile work environment in regard to this issue?

Ans:
**No. Milt was assigned to raise money in the Washington, DC area.**

Do you believe Complainant was discriminated against due to his sex, and/or race, and or prior EEO activity in regard to this issue?

Ans:
**No.**

**(11) On October 20, 2015, RMO-1 told you that you could not meet with a prospective donor that you had engaged, and did not provide any reason.**

On October 20, 2015, did you tell Complainant that he could not meet with Eugene Aaron, a prospective donor? If so, why did you deny him meeting with this prospective donor?

Ans:
**I do not recall this conversation or donor. I do not recall this request. Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes.**

Have you denied other persons who were similarly situated to Complainant their requests to meet with prospective donors? If so, who did you deny approval to meet and why? Please provide these people's name, race, sex, and EEO activity.

Ans:

**Not that I recall. Only if it involved travel and was not a good investment of our resources. Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes.**

Was Complainant's ability to perform the functions of his position adversely impacted when he was not approved to meet with this prospective donor?

Ans:
No

Do you believe Complainant was subjected to a hostile work environment in regard to this issue?

Ans:
No

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue?

Ans:
No

(12) **On October 26, 2015, you were terminated during your probationary period for poor performance.**

Please state in detail why Complainant was terminated during his probationary period.

Ans:

**Please see termination letter.**

In a letter of July 23, 2015, you identified the areas in which you stated Complainant needed improvement. Please provide specifics to the following and the names of anyone who provided input to the termination.

Ans:
**I discussed Milt's termination with Dr. Johnnetta Cole.**

***Identification and cultivation of donor prospects:***

***Complainant arranged a tour of NASM for a prospective donor without including a tour of African Art and introducing the donor to NMAfA Director/staff.**

What tour had Complainant arranged? Why did it need to include African Art?

**Ans:**

**I am not certain what tour was arranged. However, Milt was charged to raising funds for African Art and there was an expectation that Milt will identify, cultivate and solicit donors to give to African Art.**

**Please provide specifics, reason for visit, donor/prospect name, giving history, connection to museum purpose of visit and possible outcomes**

What reason did Complainant give for not touring African Art and introducing the prospective donor to the Director and staff?

**Ans:**
**Please identify the donor. I have to assume the donor had no interest in giving to African Art.**

When prospective donors are taken on tours, is it policy/standard practice to always introduce them to the Director and staff?

**Ans:**
**It depends upon the Director's and staff's availability.**

What is the proper protocol when arranging tours? Please provide the policy/guidelines that show what is to be included when arranging tours for the NMAfA and/or NSAM.

Ans:
**It is a judgment call on the part of the gift officer.**

***It was reported to Ms. Graves that Complainant left a donor lunch, left his SI colleagues to navigate the meeting, and ultimately returned after the meeting had ended.**

What reason did Complainant give for leaving the donor lunch when he did?

**Ans:**
**His daughter attended a Smithsonian summer camp and left her lunch at home and left the restaurant to take lunch to his daughter. The camp was located one flight below our office and anyone on staff would have been happy to grab food for Milt's daughter. Also, it is not unusual for campers to forget their lunch or snack and the camp staff provide food, if necessary.**

What were Complainant's responsibilities at this donor lunch?

**Ans:**

**Milt was hosting the donor cultivation lunch and his role was to introduce his colleagues to the donor and guide the discussion.**

What was impacted by Complainant leaving the donor lunch and returning after it was concluded?

**Ans:**

**Milt asked our colleagues to attend the lunch because the donor expressed an interest in giving the Smithsonian a planned gift. After Milt abruptly left the restaurant things were awkward. Our colleagues recovered, engaged in small talk and eventually shared that they learned from Milt that she wanted to discuss giving a planned gift to the museum. Our colleagues felt blindsided and mislead. Creditability with our donor and colleagues was lost.**

***Complainant failed to introduce a donor to Dr. Cole at the 4th of July Fireworks at NMAH.**

What reason did Complainant give for not introducing a donor to Dr. Cole in this instance?

**Ans:**

**The 4th of July Fireworks is a cultivation event for major donors. The event is to invite the museum top prospects or donors and give them opportunity to meet and**

**spend quality time museum directors. If you invite a guest, the expectation is that the museum director and any board members in attendance will meet, help vet and cultivate the prospect/donor.**

What policy/guideline states when Dr. Cole is to be introduced to donors?

**Ans:**

**See above expectations.**
***Complainant pursued the solicitation of a gift for another unit without a strategy to secure funding for NMAfA.**

What reason did Complainant give for pursuing a gift for another unit?

**Ans:**

**I am not certain that he provided an explanation.**

Please explain in what manner Complainant should have pursued this solicitation; to whom should he have proposed his strategy and when? Is the issue that he should have had a strategy to secure funding for NMAfA when pursuing a gift for another unit?

**Ans:**
**Milt hosted a lunch that he abruptly left with two colleagues to secure a gift from this donor.**

***Complainant sent an email regarding an in-kind gift to the Director of Advancement and Philanthropic Giving to the SI Central Advancement Office and bypassed the chain-of-command and operated independently of you.**

What did Complainant say was his reason for going directly to the SI Central Advancement Office?

**Ans:**
**I explained to Milt that staff rarely, if at all, contacted the Director of Advancement and Philanthropic Giving.**

What do policy/guidelines state as the proper chain-of-command when handling gifts/donations?

**Ans:**
**Gifts are processed through our development associate. The Director of Advancement and Philanthropic Giving does not process gifts and there are**

**INTERROGATORY**
**of**
**JOHNNETTA COLE**

I, Johnnetta Cole, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson, former Senior Advancement Program Specialist, Office of Advancement, NMAfA has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am a (series/grade) __Executive – Trust employee /Director –____National Museum of African Art ___________, (title) ______________________________,

(division) _____History, Art and Culture of Smithsonian Institution________________,
(branch/office) _National Museum of African Art _________________________,

(agency) ______________NMAfA Washington, DC ________, (location)
_________________________________,

My telephone number is: __(202) 633-4610 _________________.

How long have you been employed by the National Museum of African Art (NMAfA)? From what date to what date? How long have you been in your position?

**Ans:** I began working at NMAfA on March 9, 2009.

For the record my race is: African American
For the record my sex is: Female
For the record I have (x )/have not ( ) participated in prior EEO activity:

Who was your first-line supervisor at the time of this complaint (2015)? Provide his/her grade, series, and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

 Initials: [signature]

**Ans:** Richard Kurin, Acting Provost and Undersecretary for History, Art and Science Museums. His race is White and Sex is Male. He has participated in prior EEO activity. He has been my supervisor since 2009.

Who was your second-line supervisor at the time of this complaint (2015)? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.
**Ans:** There is no second line supervisor.

What was your relationship to Complainant and when did this relationship commence?

**Ans:** I was the director of the Smithsonian National Museum of African Art. Mr. Jackson was an staff member in the office of Advancement in the museum.

Were you aware of Complainant's prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans:** No, I was not aware of any prior EEO history from the Complainant.

Was Complainant ever counseled regarding his project management, his territory, donor visits, travel expenses, fund-raising goals, and museum priorities? If so, who counseled him, and how and when was he counseled; what was stated in counseling? If he was not counseled, state why.

**Ans:** According to his supervisor, he was counseled re: his responsibilities.

Please explain the scope of Complainant's position and the expectations of him.

**Ans:** He was hired as a Major Gift's officer in the Office of Advancement.

When Complainant was hired was he told that due to the critical funding needs ($4m-$5M) he would be traveling as much as possible, both domestically and internationally, on Museum business with an SI travel card, he would be given a viable prospect list from which to work, and he would be provided the proper support and resources to "hit the ground running?"

Is this your understanding of what Complainant was told when he was hired? If not, how does what you were told differ?

**Ans:** I think he was told that his fundraising goal would be $1.5 million.

Did Ms. Graves ever report to you that she felt threatened by Complainant? If so, what was the reason she felt threatened?

**Ans:** Ms. Graves did express this to me after Milt Jackson was told he would not continue at NMAfA.

**Ans:** No.

The following issues have been accepted by the Smithsonian Institution for investigation. Please provide your response to the following questions in as much detail as possible.

**Whether the National Museum of African Art (NMAfA) discriminated against you (Complainant) and subjected you (Complainant) to a hostile work environment based on your sex (male), race (African American) and/or in reprisal for prior EEO activity.**

**(1) On March 26, 2015, during your first week, Ms. Marie Graves (RMO-1) became angry at you for asking questions concerning seeking board members' contacts for potential donations, calling you "naïve," and questioning your judgment.**

Are you aware of Ms. Graves referring to Complainant as naïve, and questioning his judgment when he allegedly asked questions about contacting Board members for their contacts and financial support at his first Museum advancement meeting? If so, why are Board members not to be consulted about their contacts and financial support?

**Ans:** No.

Were you aware of Ms. Graves telling Complainant not to contact any Board members?

**Ans:** No.

What is SI NMAfA policy/guidelines in regard to Senior Advancement Program Specialists contacting Board members for potential donors?

**Ans:** Such contacts should be made by the Associate Director for Advancement.

Do you believe Complainant was subjected to a hostile work environment and/or discriminated against due to his sex, and/or race, and or prior EEO activity in regard to this issue?

**Ans:** No.

**(2) From March 30, 2015 to April 2015, RMO-1 delayed approving your request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event.**

Did you and/or Ms. Graves approve Complainant's request to attend an Annual Earth Day Texas reception/event on April 24-26, 2015? If so, when did Complainant request approval and when was he granted approval?

**Ans:** I do not have knowledge for this.

Do you believe Complainant was discriminated against due to his sex, and/or race, and or prior EEO activity in regard to this issue?

**Ans:** No.

**(10) In July 2015, RMO-1 denied your request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;**

Please state in detail why Ms. Graves denied Complainant's request to travel to Los Angeles to meet with Fred Nichols, a prospective donor.

**Ans:** I lack sufficient knowledge to respond to this question.

Did Ms. Graves tell Complainant that Mr. Holmes had told her about Mr. Nichols and that Complainant could not fly across the country for golf?

**Ans:** I do not know.

Did you, or someone, assign Ms. Barbour to the Nichols' relationship? If so, please state why.

**Ans:** I did not.

Why was Ms. Barbour more qualified to handle this relationship than Complainant?

**Ans:** I lack information to answer this question.

Was Ms. Barbour approved to travel to meet with Mr. Nichols? Did Mr. Nichols become a donor?

**Ans:** I do not know.

Was Complainant's ability to perform the functions of his position adversely impacted by the denial of his request to travel to Los Angeles to meet a prospective donor?

**Ans:** I lack information to answer this question.

Are all Senior Advancement Program Specialists allowed to travel in the performance of their duties (locally and outside the local area)? If so, why was Complainant denied his request for travel outside the Washington, DC area and others were not?

**Ans:** I do not have specific information on why Mr. Jackson was denied traveling outside of Washington, DC other than he never seemed to have a strategy for successful fundraising.

Was the person who replaced Complainant (Ms. Morith) allowed to travel to California as a function of serving in Complainant's position? If so, why was she allowed to travel to California and Complainant was not?

**Ans:** Ms. Morith did have a strategy for successful fundraising when I traveled to California with her.

Do you believe Complainant was discriminated against due to his sex, and/or race, and or prior EEO activity in regard to this issue?

**Ans:** No.

**(11) On October 20, 2015, RMO-1 told you that you could not meet with a prospective donor that you had engaged, and did not provide any reason.**

On October 20, 2015, did Ms. Graves tell Complainant that he could not meet with Eugene Aaron, a prospective donor? If so, why did Ms. Graves deny him meeting with this prospective donor?

**Ans:** I do not have knowledge that would allow me to answer this question.

Have other persons who were similarly situated to Complainant had their requests to meet with prospective donors denied? If so, who was denied and for what reason? Please provide these people's name, race, sex, and EEO activity.

**Ans:** I do not have this specific information.

Was Complainant's ability to perform the functions of his position adversely impacted when he was not approved to meet with this prospective donor?

**Ans:** I do not have this information required to answer this.

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue?

**Ans:** I lack information required to answer this question.

**(12) On October 26, 2015, you were terminated during your probationary period for poor performance.**

Did Ms. Graves meet with you to discuss Complainant's termination? If so, what input did you provide to the decision to terminate Complainant during his probation period?

**Ans:** I indicated to Ms. Graves that I did not see any evidence that Mr. Jackson was an effective Major Gifts Officer.

Documentation shows in a letter of July 23, 2015 (attached) that on July 7, 2015, Complainant met with you and Ms. Graves to discuss Complainant's performance and Ms. Graves stated that Complainant's "performance to date was an indicator that he had not completely grasped the goals and objectives of his positon and an understanding of the museum's mission." Please state what first-hand knowledge you had of each item, and if you did or did not agree that the noted issues warranted being rated as unsatisfactory and in need of improvement. Please state why you agreed/disagreed.

***Identification and cultivation of donor prospects:***

*Complainant arranged a tour of NASM for a prospective donor without including a tour of African Art and introducing the donor to NMAfA Director/staff.

**Ans:** I am aware that this happened.

*It was reported to Ms. Graves that Complainant left a donor lunch, left his SI colleagues to navigate the meeting, and ultimately returned after the meeting had ended.

**Ans:** I heard of this.

*Complainant failed to introduce a donor to Dr. Cole at the 4th of July Fireworks at NMAH.

**Ans:** It was only after the event was over and I happened to see Mr. Jackson with a potential donor that I was aware that he and the potential donor were at the event.

*Complainant pursued the solicitation of a gift for another unit without a strategy to secure funding for NMAfA.

**Ans:** It is my understanding that this did happen.

*Complainant failed to adequately brief you in advance of his donor meetings, specifically with Dr. Harland, representatives of the Disney Corporation and the Tishman family, and visitors from the Italian Embassy.

**Ans:** It is my understanding that he failed to brief his supervisor.

*Improper use of travel card:*

**Ans:** It is my understanding that Mr. Jackson did use his travel cared in an improper way.

*Communication and teamwork:*

**Ans:** It is my understanding that Mr. Jackson did not work collaboratively.

Was Complainant issued a letter of proposed termination? If so, please state the name of anyone who provided input to the proposed letter of termination and the input provided.

**Ans:** Mr. Jackson was terminated during his probation period.

Who recommended Complainant's termination and who approved the recommendation?

**Ans:** Ms. Graves recommended termination and after consultation with appropriate individuals at the Smithsonian and I approved it.

Please state in detail why Complainant was terminated during his probationary period.

**Ans:** Mr. Jackson's performance was unsatisfactory.

**(13) Your final paycheck was delayed through December 2015.**

Please provide any information of which you are aware in regard to why Complainant's paycheck was delayed from October 2015 until December 2015, when he was terminated during his probationary period.

**Ans:** I do not have any information about this.

Do you believe Complainant was discriminated against due to his sex, and/or race, and/or prior EEO activity in regard to this issue??

**Ans:** I cannot answer this question because I lack sufficient knowledge about this situation.

If you have any other first-hand, relevant information that you believe is pertinent to this investigation, please state the information.

**Ans:** I do not have any.

If you have any people you believe can provide first-hand, relevant information that you would like to have interviewed, please provide their name, contact number, and what information you believe they can provide.

**Ans:** I do not have any names of such individuals.

I have read the above statement consisting of ____ pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and

**INTERROGATORY**
**of**
**LANISA KITCHINER**

I, Lanisa Kitchiner, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am/was a (series/grade) 13/4, (title) Senior Educator,

(division) Education, (branch/office) National Museum of African Art,

(agency) Smithsonian Institution, (location) 950 Independence Ave, SW,

My telephone number is: (202) 633-4636.

How long have you been employed by the National Museum of African Art (NMAfA)? From what date to what date? How long have you been in your position?

**Ans: May 22, 2014 until present. May 22, 2014.**

For the record my race is: African American
For the record my sex is: Female
For the record I have (X )/have not ( ) participated in prior EEO activity:

Who was your first-line supervisor at the time of this complaint (March – December 2015)? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Christine Mullen Kreamer, Deputy Director and Chief Curator, GS 15/10. White, Female, the named subject in multiple EEO complaints. She has been my supervisor from my date of hire, May 22, 2014, to present.**

Who was your second-line supervisor at the time of this complaint (March – December 2015)? Provide his/her grade, series and title, race, sex, and whether or not they have

Please state any and all first-hand information you have in regard to Ms. Graves making disparaging remarks about employees, including Complainant, and or potential donors? Who did she disparage and in what manner? Did she ever criticize Complainant's work? If so, how did she criticize Complainant's work?

**Ans: I recall Graves berating Jackson for suggesting that the museum build a stronger public identity in a meeting with Education and Advancement staff. I also recall Graves commenting that board member Marcella Jones was a "two-face liar" that hated Dr. Cole. Additionally, Graves regularly complained to me that Administrative Officer Bill Holmes was inept in his duties and that Kreamer and Cole were racists. I do not recall Graves criticizing Jackson's work.**

Are you aware of Ms. Graves restricting which colleagues Complainant could associate with? If so, state who he was not to associate with and why.

**Ans: I intentionally avoided conversations with Jackson because I thought they might have an adverse impact on his success at the museum. I was aware that Jackson was required to remain in his office and that Graves monitored his meetings with staff.**

Did Ms. Graves ever restrict which of your colleagues you could associate with? If so, state who you were not to associate with and why.

**Ans: No. Graves was not my direct supervisor. Therefore, she had no authority to formally restrict my association with colleagues. However, Graves did attempt to discourage me from engaging with contract employee Makeba Clay. Graves said that Clay was determined to secure a permanent position at the museum and that Clay would not hesitate to malign an co-worker if would help achieve her goal.**

Were you aware Complainant had been told not to contact board members?

**Ans: No.**

Did Ms. Graves at any time deny Complainant's request to travel to meet a prospective donor and then assign a different employee to manage the relationship with this donor? If so, who was the employee to whom Complainant's prospective donor was assigned?

**Ans: I am not sure.**

Did you recommend termination of an employee to management and Human Relations and subsequently management interceded on behalf of the employee? If so, who intervened and what reason was given for the intervention? What action, if any, did you take as a result of management's action?

**Ans: Yes. Upon the advice of the Labor and Employee Relations Office, I made several recommendation to terminate my subordinate [redacted], a probationary trust employee who had received six counseling sessions for repeated incidents of disruptive behavior and subpar performance. On one occasion, [redacted] spent several hours crying, and screaming, and angrily and unprofessionally ranting**

**Ans: Yes. See response above.**

Please provide any first-hand information of which you are aware in regard to why Complainant was terminated.

**Ans: Graves told me that she did not think Jackson would pass his probation because Kreamer wanted Colleen Morith to serve as Major Gifts Officer.**

**Additionally, I experienced a similar situation of management's abuse of hiring and promotion authority when Michelle Edwards was chosen as the top candidate for a Docent Coordinator position in my department. Kreamer preferred internal candidates [redacted] and Frank Esposito for the position. Although Human Resources disqualified Esposito's candidacy, Kreamer attempted to constructively promote Esposito by re-assigning him from the Advancement team to the Education department to perform duties assigned to the incumbent Docent Coordinator.**

**Kreamer then threatened that she would fire me and cancel the Docent Coordinator position announcement if I did not select her other preferred candidate, [redacted]**

**Kreamer and Cole then announced the cancellation of the position to the Education Department staff and placed me on a Performance Improvement Plan.**

Do you believe Complainant was at any time discriminated against by Ms. Graves and/or any SI management due to his sex, race, and/or prior EEO activity? If so, in what manner was he discriminated against?

**Ans: Yes. I believe that Jackson was discriminated on the bases of his race and sex. He was denied the same privileges afforded his colleagues and other probationary trust employees**

Do you believe the actions of Ms. Graves and/or SI management precluded and/or hindered Complainant's ability to perform the functions of his position and had an adverse impact on him? If so, please explain the actions of Ms. Graves and/or SI management that hindered Complainant in performing the functions of his position.

**Ans: Yes.**

If you have any other first-hand, relevant information that you believe is pertinent to this investigation, please state the information.

**Ans: Although museum Director Johnnetta Cole has a lengthy and notable public career in advocating for gender equality and racial diversity and inclusion, she unfortunately deferred much of her leadership responsibility for the operational management of the museum to Kreamer, who has a growing record of hostility and discrimination toward African-Americans in particular. Graves and Holmes, who are also African-American, repeatedly told me that Kreamer encroached upon their offices, undermined their roles, and micro-managed their work. They also**

**shared that Cole did not intervene despite receiving multiple complaints about Kreamer.**

**Staff-wide issues with Kreamer were made apparent in a series of all-staff discussions facilitated by Ombudsman Chandra Heilman and Employee Assistance Program Director Tim Holloman. The museum staff writ large called upon Cole to curtail Kreamer's incessant bullying and micro-management. Staff also asked for Cole to appoint a new Deputy Director or to at least separate that function from the Chief Curator role.**

**During the session that Heilman and Holloman facilitated for supervisors, it was revealed that Kreamer restricted several staff from communicating with their colleagues as a matter of course.**

**Both Graves and Holmes confided that they felt conflicted in their roles as senior managers and powerless to affect a healthier work environment where rules, policies, and privileges were evenly applied. Holmes retired early. And Graves subsequently filed a complaint of her own.**

If you have any people you believe can provide first-hand, relevant information that you would like to have interviewed, please provide their name, contact number, and what information you believe they can provide.

**Ans: None at this time.**

**African Art Collection. Since he was interested in pursuing the Disney Corporation as a major donor, I suggested that it might be worthwhile to try and secure funds to enable the Museum to care for and display the Walt Disney-Tishman African Art Collection in perpetuity. He had a copy of the 2007 *African Vision* publication that I authored regarding the Walt Disney-Tishman African Art Collection. Each time the Complainant came in to discuss his ideas regarding cultivation of the Disney Corporation, I encouraged him to speak directly to his supervisor (then-Associate Director of Advancement), to develop a plan, to identify a strategy for engaging with the Disney Corporation, to set a meeting with relevant parties at our Museum, including his supervisor, to provide an update and next steps, and to make sure that his supervisor, our Director, and colleagues in Central Advancement at the Smithsonian were apprised of this potential cultivation, since Smithsonian requires that the Advancement staff of unit Museums clear high-level corporate and foundation cultivation approaches with them first to avoid competition within the Smithsonian. I pointed out on several occasions to the Complainant that it was not within my authority to assign or approve his work. I don't recall receiving a specific follow-up plan or strategy from the Complainant; to my knowledge, no broader Museum meetings were scheduled by the Complainant or his supervisor to move the idea forward.**

5. Did you state that no one in the Museum had been exploring/re-establishing a relationship with Disney?

**Ans: I don't recall those exact words. I did say that we had not reached out to the Disney Corporation because at the time of their 2005 collections gift to the Museum, they made it very clear that the donation would not include additional funds. Of course, given that ten (10) years had passed since the collection donation, it struck the Complainant as the right time to think about approaching the Disney Corporation. Per my answer to question #4, above, I encouraged the Complainant to run his idea by his supervisor and to develop a plan if his supervisor and our director agreed. I pointed out that it was not within my authority to assign or approve his work, but that I would attend any meeting on any cultivation idea, including one regarding the Disney Corporation, if my assistance was requested.**

6. Please provide any information of which you are aware as to why Ms. Graves told Complainant he could not visit Disney-Tishman, or Mr. Sklar, formerly with Disney.

**Ans: I have no information on what the former Associate Director for Advancement, Marie Graves, told the Complainant regarding a visit to the Walt Disney Corporation or to Marty Sklar, who has retired from the Disney Corporation. [NOTE: it is not Disney-Tishman … that is the name of an African art collection that was donated to the Museum by the Walt Disney Corporation.]**

7. After Complainant was terminated during his probationary period, did the Museum senior management team reach out to Disney contacts and implement Complainant's proposed plan/contacts?

**Ans: No. We have not reached out to the Disney Corporation seeking to secure funds for the Museum as discussed above. However, the Walt Disney Imagineering team reached out to the Museum, unsolicited, regarding ideas about displaying African art and culture as**

**INTERROGATORY**
**of**
**CATHERINE ANCHIN**

I, Catherine Anchin, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I **am**/was a (series/grade) IS-13, (title) Development Officer,

(division) Advancement, (branch/office) NMAfA,

(agency) Smithsonian Institution, (location) Washington, DC,

My telephone number is: 202-633-4647.

How long were you employed by the National Museum of African Art (NMAfA)? From what date to what date? How long were you in your position?

**Ans: I've been with NMAfA for 4.5 years.**

For the record my race is: Caucasian
For the record my sex is: Female
For the record I have ( )/have not (X) participated in prior EEO activity:

Who was your first-line supervisor at the time of this complaint? Provide his/her grade, series, and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Marie Graves, IS-14, Associate Director for Advancement, African-American, Female. Supervisor as of June 2014 – August 2016. Unsure about EEO history.**

Who was your second-line supervisor at the time of this complaint? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Johnnetta Betsch Cole, Director. African-American, Female. Second-line Supervisor as of July 2012. Unsure about EEO history.**

What was your relationship to Complainant and when did this relationship commence?

**Ans: Colleague – March 2015**

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans: Yes. African-American Male. Unsure about EEO history.**

Did Ms. Graves send an email stating anyone leaving the work area without letting her know would be charged as AWOL which could result in termination?

**Ans: I assume this is the email you are referring to. : "*Dear Colleagues,***

***I am writing to remind everyone to review SI procedures for requesting and receiving approval for leave.***

***Additionally, I must know your whereabouts at all times. If you leave the work area during duty hours, please let me know as a courtesy, otherwise you may be charged absence without leave (AWOL) and disciplinary action, up to and including removal may be taken against you.***

***Best to you, Marie"***

Milton Jackson, Complainant, has filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA) discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity when:

- he was called naïve and his judgment was questioned;
- his requests to travel to donor events and prospective donors, both local and outside the area, were denied;
- he was told some of his prospective donors were useless;
- he was told he could not meet with a prospective donor;
- he was told he could not talk to or associate with some of his colleagues because they were incompetent and that he had to go to Ms. Graves with all questions;
- he was told not to associate with a colleague because she was snake and a gossip;
- he was asked if he was romantically involved with an older potential donor;
- his fundraising diversity plan was blocked from reaching the Director (Dr. Cole) when he was required to perform 14 rewrites and then told it would not work;
- he was harangued and called a liar when he stated he did not see the Director at a celebration and therefore did not introduce a donor to her.
- he was terminated during his probationary period; and
- his final paycheck was delayed.

Complainant states that all of the above reported issues limited his ability to perform the functions of his position.

1. Please state if you believe, and/or have first-hand knowledge of, Complainant being harassed and/or subjected to a hostile work environment. Who subjected him to harassment and/or a hostile work environment, when was he subjected, and what incidents constituted this harassment and hostility?

**Ans: No.**

2. Are you aware that at a point in time working conditions, harassment, etc., were to the point that there was a discussion of filing a class action lawsuit?

**Ans: No.**

3. Please provide any knowledge you have of Complainant being denied travel to meet with prospective donors, both locally and otherwise.

**Ans: Complainant wanted to go to a golf tournament and to Texas to meet with someone he had known from a previous organization. Museum runs on a very tight budget, and justification for travel has to be very clear.**

4. Were you approved to travel both internationally, nationally, and locally? If so, were you allowed to use your SI travel card for this travel?

**Ans: I do not have an SI travel card. I only traveled once to manage an event in Atlanta during this time.**

5. Did you ever have a travel request denied? If so, who denied the request and when was the request denied? What reason(s) were you given for the denial?

**Ans: I never asked to travel.**

6. Are you aware of Complainant ever making any statement that could be construed as a threat? If so, what did he say that was threatening?

**Ans: No.**

7. Are you aware of Ms. Graves ever making any statement that could be construed as a threat? If so, what did she say that was threatening?

**Ans: No.**

8. Do you believe you and/or others were subjected to discriminatory harassment and a hostile work environment by SI management? If so, who subjected you to harassment and a hostile work environment? What were the incidents that were harassing and hostile in nature?

**Ans: No.**

 Initials: CA

9. Did you ever report these actions of management to anyone? If so, to whom did you report what happened and when? What action was taken as a result of your report?

**Ans: N/A**

10. Do you believe you were treated in the same manner as Complainant? If so, how were you treated in the same manner? If not, how were you not treated in the same manner?

**Ans: Yes. We both had similar roles and expectations by the supervisor.**

11. Do you believe others were treated in the same manner as Complainant? If so, how were they treated in the same manner? If not, how were they not treated in the same manner?

**Ans: Yes. We were all on the same team and had expectations to achieve our goals.**

12. Please provide the names, series/grade, title, race, and/or sex, and/or EEO history of anyone similarly-situated to Complainant who was not treated in the same manner as Complainant.

**Ans: N/A**

13. Did you attend a meeting on March 26, 2015 and observe Marie Graves become upset and leave the meeting? If so, what caused Ms. Graves to become upset?

**Ans: My outlook calendar doesn't have a meeting on that date and I don't have any recollection of attending a meeting where she was upset. Marie would leave meetings early periodically.**

14. Did Ms. Graves become angry because Complainant asked questions about seeking board members' contacts for potential donations? Did she call Complaint naïve and questions his judgment?

**Ans: I don't recall her being angry or calling him naïve.**

15. Please provide any and all information of which you are aware in regard to Ms. Graves providing obstacles to Complainant during the request/approval period for his Texas trip.

**Ans: I remember her saying no to his Texas travel.**

16. Did you ever observe Ms. Graves negating Complainant's comments/input and talking over him? If so, do you believe her actions treated him in a disparate manner? Did Ms. Graves ever treat you in the same manner as Complainant? Do you believe Ms. Graves' actions discriminated against Complainant because of his race and/or sex and/or EEO activity?

**Ans: No.**

17. Please state any and all first-hand information you have in regard to Ms. Graves making disparaging remarks about employees and or potential donors, e.g., Holly Laffoon. Who did she disparage and in what manner?

**Ans: N/A**



Initials: CA

18. Were you aware of Ms. Graves stating that the Board was ignorant about fundraising and had been only marginally supportive of her fundraising efforts? If so, when and how did you become aware?

**Ans: No.**

19. Were you aware that there were big issues between Ms. Graves and the Board? If so, what were the issues?

**Ans: No.**

20. Did Ms. Graves threaten to fire you if you did not meet your performance goals?

**Ans: She informed me that my performance goals were tied to my performance review.**

21. Did you meet your goals for 2015?

**Ans: Yes.**

22. Did Ms. Graves modify your performance plan? If so, when did she modify your plan and how was your plan modified?

**Ans: No.**

23. Were you ever harassed by Ms. Graves in the performance of your duties; i.e., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, please explain.

**Ans: No.**

24. Do you believe Complainant was harassed by Ms. Graves in the performance of the duties of his position; i.e., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, please explain.

**Ans: No.**

25. Did you ever witness Ms. Graves denying Complainant's request to attend a donor event in New York? If so, do you believe this denial impacted his ability to perform the functions of his position?

**Ans: Yes. No, it was a small donor event – less than 30 people and only one Advancement person was to attend. She was the person to attend.**

26. Do you believe Ms. Graves was targeting Complainant for early dismissal? If so, please state why you believe she was targeting him.

**Ans: No.**

27. Did Ms. Graves ever preclude you from talking to or associating with internal and external colleagues? If so, what was the reason?

**Ans: No.**

28. Did Ms. Graves allow you to travel as a function of your position?

**Ans: N/A – I never asked to travel, and was assigned to travel once to cover an event where I'was assigned as the lead coordinator.**

29. Do you believe the actions of Ms. Graves had an adverse impact on Complainant's ability to perform the functions of his position? If so, please state in what manner Complainant was adversely affected.

**Ans: No.**

30. If you have any other first-hand, relevant information that you believe is pertinent to this investigation, please state the information.

**Ans: N/A**

31. If you have any people you believe can provide first-hand, relevant information that you would like to have interviewed, please provide their name, contact number, and what information you believe they can provide.

**Ans: N/A**

I have read the above statement consisting of 6 pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

[signature]
Catherine Anchin

11/8/16
Date

Signed at (City/State) Alexandria VA
on this 8th day of November, 20 16.

[signature]
Signature of Investigator/Notary/Witness

that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties;

(6) On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statement as a threat and that she felt uncomfortable in his presence;

(7) On June 3, 2015, RMO-1 asked if he and a potential donor were romantically involved, which he felt was very inappropriate;

(8) During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring him to perform 14 rewrites and then stating that it would not work;

(9) On or around July 4, 2015, after he received commitment for a large donation at the Smithsonian's 4th of July celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping him arrange receipt of the gift, which was eventually rescinded;

(10) In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;

(11) On October 20, 2015, RMO-1 told him he could not meet with a prospective donor that he had engaged, and did not provide any reason;

(12) On October 26, 2015, he was terminated during his probationary period for poor performance; and

(13) His final paycheck was delayed through December 2015. (Exhibit 4)

Complainant states that all of the above reported issues discriminated against him because of his sex, race, and prior EEO activity, and limited his ability to perform the functions of his position which led to his termination during his probationary period.

Please state if you have first-hand knowledge of Complainant being harassed and/or subjected to a hostile work environment by Marie Graves and/or SI management; e.g., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, state who subjected him to harassment and/or a hostile work environment, when was he subjected, and what incidents constituted this harassment and hostility?

**Ans:**

I cannot say that I have first hand knowledge of Mr. Jackson being harassed or subject to hostile work environment, but know that Marie Graves was his supervisor and he told me in conversations about her statements and that he was not to speak to me about anything at the Smithsonian African Art museum. Her statements to other like colleagues in that department were similar. She created a very hostile work environment.

Do you believe you and/or others were subjected to discriminatory harassment and a hostile work environment by SI management in the performance of your duties; e.g., travel not approved, denial of attendance at seminars, meetings, and/or meetings with

prospective donors? If so, who subjected you to harassment and a hostile work environment? What were the incidents that were harassing and hostile in nature?

**Ans:**

I do believe that I was a subject of discriminatory harassment and a hostile work environment. Because I did not report to Marie Graves, she could not deny me directly travel or meetings since I represented the Director but she made is very difficult to complete assignment or goals that I were part of my performance goals for the museum.

Did you ever report these actions of management to anyone? If so, to whom did you report what happened and when? What action was taken as a result of your report?

**Ans:**

No, I never directly reported these actions to my director, but did so indirectly. Ms. Graves is no longer an employee of the museum.

Are you aware that at a point in time, working conditions and harassment at the Museum were to the point that there was a discussion of filing a class action lawsuit?

**Ans:**

No I didn't know that there was a talk of filing a class action lawsuit against Ms. Graves. Since I didn't report to her directly, I would not have been included.

Did Ms. Graves and/or SI management ever call Complainant "naïve" and question his judgment for proposing to contact board members about potential donations?

**Ans:**

I do not recall that statement.

Is it considered bad policy to contact board members about donations?

**Ans:**

No, previous Major Gifts officers contacted board members regarding donations.

Were you aware of Complainant ever being denied travel to meet with prospective donors, both locally and otherwise? If so, state who denied him travel and why. What travel request(s) was he denied?

**Ans:**

I recall that there was an incident, but not being involved directly in the request, I cannot comment on it in totality.

Were you aware of Ms. Graves stating that the Board was ignorant about fundraising and had been only marginally supportive of her fundraising efforts? If so, when and how did you become aware?

**Ans:**

Yes, Ms. Graves did not think very highly of the board. The board was always asking how to best assist in our fundraising efforts with our Director and with Ms. Graves.

Were you aware that there were big issues between Ms. Graves and the Board? If so, what were the issues?

**Ans:**

Ms. Graves did not have a good relationship with our board members. She was hired during the start of our gala fundraising period and there were many issues with regards to how she handled meetings with them and expectations on board involvement.

On August 10, 2015, did Ms. Graves send an email stating anyone leaving the work area without letting her know would be charged as AWOL? Was Complainant included in this email?

**Ans:**

Since I am not in the Advancement department, I would not have received the email, although it was read to me by numerous of staff members who received it.

Do you believe Ms. Graves was targeting Complainant for early dismissal? If so, please state why you so believe.

**Ans:**

I really cannot answer what Ms. Graves was or was not targeting Mr. Jackson since she did not confide in me.

Do you believe Complainant was at any time discriminated against by Ms. Graves and/or any SI management due to his sex, race, and/or prior EEO activity? If so, in what manner was he discriminated against?

**Ans:**

I really don't think that he was discriminated by his sex or race or any prior EEO activity. I think he was just bullied by Ms. Graves due to her total lack of management experience in leading a department. She was in totally over her head and was hugely lacking in experience in fundraising at the level of a Smithsonian Museum and was a wrong fit from the beginning of her hire.

 Initials: [signature]

At the SI 4th of July 2015 celebration, did Ms. Graves call Complainant a liar when he told her he did not introduce Ms. Harland, a prospective donor, to Dr. Cole because he did not realize she was there?

**Ans: No first-hand knowledge**

Do you believe Ms. Graves and or SI management at any time targeted Complainant for early dismissal? If so, please explain why you so believe.

**Ans: No first-hand knowledge**

Please provide any first-hand information of which you are aware in regard to why Complainant was terminated.

**Ans: No first-hand knowledge**

Do you believe Complainant was at any time discriminated against by Ms. Graves and/or any SI management due to his sex, race, and/or prior EEO activity? If so, in what manner was he discriminated against?

**Ans: No, I do not. In my opinion, formulated from inter-departmental interactions, Ms. Graves was an incompetent manager and a difficult personality but I do not believe Mr. Jackson was singled out or victimized due to race or sex or any former EEO activity.**

Do you believe the actions of Ms. Graves and/or SI management precluded and/or hindered Complainant's ability to perform the functions of his position and had an adverse impact on him? If so, please explain the actions of Ms. Graves and/or SI management that hindered Complainant in performing the functions of his position.

**Ans: No first-hand knowledge**

If you have any other first-hand, relevant information that you believe is pertinent to this investigation, please state the information.

**Ans: none**

If you have any people you believe can provide first-hand, relevant information that you would like to have interviewed, please provide their name, contact number, and what information you believe they can provide.

**Ans: none**

**As part of the interview process with the Smithsonian, was Complainant and/or others told they would be traveling both nationally and internationally on behalf of the Museum?**

Ans: I was on the interview panel to hire Mr. Jackson. He was told that he would be traveling nationally and internationally.

**Are you aware of Complainant ever threatening Ms. Graves? If so, when did you become aware and what did Complainant say that threatened Ms. Graves?**

**Ans:** I was not aware of Mr. Jackson ever threatening Ms. Graves.

**Did Ms. Graves ever tell you she felt threatened by you? If so, please explain the circumstances under which she stated she felt threatened by you.**

**Ans:** She told me she felt uncomfortable traveling with me on a work trip to London. I immediately reported this claim to my director Johnnetta Cole and deputy director Christine Mullen Kreamer.

**Do you believe Complainant was subjected to discriminatory harassment and a hostile working environment by Ms. Graves? If so, do you believe her actions were based on his race, and/or sex, and/or EEO activity?**

**Ans:** Absolutely. Ms. Graves treated Mr. Jackson and me less favorably than other female colleagues. She would not allow him to engage with colleagues in a manner which would allow him to perform his job. She told me on occasions not to speak to Milt and be careful what you tell him.

**Please provide any and all information and documentation of which you are aware in regard to Ms. Graves subjecting Complainant to discriminatory harassment and a hostile work environment. Explain the incidents that caused you to believe he was subjected to discriminatory harassment and/or a hostile work environment.**

**Ans:** It was clear, within a number of weeks of Mr. Jackson starting at the museum and working under Ms. Graves that she was treating him differently. Scoping his whereabouts, making sure that he did not leave his office, scrutinizing him in a really demeaning way. Working conditions across museum had been bad for several years. It reached a point in 2015 Smithsonian Ombudsman was brought in to help facilitate relations between staff and management. The education team was in flux so senior management brought in a conflict facilitator to work on the issues they were having.

**Were working conditions, harassment, etc., to the point that there was discussion of filing a class action lawsuit.**

**Ans:** Yes, there was talk of a class action suit. I am aware of two colleagues who brought EEO claims.

Who was your second-line supervisor at the time of this complaint? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Dr. Johnnetta B. Cole, I do not know the GS level, Director, African American, Female, unknown**

What was your relationship to Complainant and when did this relationship commence?

**Ans: I worked with the Complainant in the advancement office, where he served as the major gifts officer and I served as the development assistant. This relationship began when he started working at the museum.**

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans: I was aware of the complainant's race and sex, but I was not aware of any EEO history. This information did not have any impact on any decisions I made.**

Please provide any and all first-hand relevant information and documentation of which you are aware in regard to Ms. Graves subjecting Complainant to discriminatory harassment and submitting him to a hostile work environment based on his race and/or sex and/or EEO activity.

**Ans: I do not know of or remember any discriminatory harassment based on his race and/or sex and/or EEO activity.**

Please provide any and all first-hand relevant information and documentation of which you are aware in regard to Ms. Graves subjecting other persons to discriminatory harassment and submitting them to a hostile work environment based on their race, and/or sex, and/or EEO activity.

**Ans: I do not know of or remember any discriminatory harassment towards others based on their race and/or sex and/or EEO activity.**

Were working conditions, harassment, etc., to the point that there was a discussion of filing a class action lawsuit?

**Ans: Not that I was aware of.**

Did Ms. Graves send an email stating anyone leaving the work area without letting her know would be charged as AWOL?

**Ans: Yes.**

Milton Jackson, Complainant, has filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA)

discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity when:

- he was called naïve and his judgment was questioned;
- his requests to travel to donor events and prospective donors, both local and outside the area, were denied;
- he was denied local travel on his SI travel card even though he had been told his donor area was the Washington, DC area;
- he was told some of his prospective donors were useless;
- he was told he could not meet with a prospective donor;
- he was told he could not talk to or associate with some of his colleagues because they were incompetent and that he had to go to Ms. Graves with all questions;
- he was told not to associate with a colleague because she was snake and a gossip;
- he was asked if he was romantically involved with an older potential donor;
- his fundraising diversity plan was blocked from reaching the Director (Dr. Cole) when he was required to perform 14 rewrites and then told it would not work;
- he was harangued and called a liar when he stated he did not see the Director at a celebration and therefore did not introduce a donor to her;
- he was terminated during his probationary period; and
- his final paycheck was delayed.

Complainant states that all of the above reported issues limited his ability to perform the functions of his position.

Please state if you believe, and/or have first-hand knowledge of, Complainant being harassed and/or subjected to a hostile work environment. Who subjected him to harassment and/or a hostile work environment, when was he subjected, and what incidents constituted this harassment and hostility?

**Ans: There was tension between the Complainant and Ms. Graves that could have resulted in a hostile work environment for the Complainant. I do not recall specifics.**

- Are you aware that at a point in time working conditions, harassment, etc., were to the point that there was a discussion of filing a class action lawsuit?

  **Ans: No.**

Please provide any knowledge you have of Complainant being denied travel to meet with prospective donors, both locally and otherwise.

**Ans: Marie Graves denied the Complainant the ability to travel both locally and nationally. I do not remember specifics, but I believe he was denied a trip to Texas for donor cultivation. There may have been other trips that were also denied. I believe, after being told that he was not allowed to travel nationally, there were then issues with local travel.**

Were you approved to travel both internationally, nationally, and locally? If so, were you allowed to use your SI travel card for this travel?

**Ans: No, it was not part of my job.**

Are you aware of Ms. Graves and/or other SI management personnel discriminating against Complainant due to his race, and/or sex, and/or subjecting him to reprisal? If so, please state why you so believe.

**Ans: No.**

Did you ever have a travel request denied? If so, who denied the request and when was the request denied? What reason(s) were you given for the denial?

**Ans: No, traveling was not part of my role.**

Are you aware of Complainant ever making any statement that could be construed as a threat? If so, what did he say that was threatening?

**Ans: I do not remember.**

Are you aware of Ms. Graves ever making any statement that could be construed as a threat? If so, what did she say that was threatening?

**Ans: I do not remember.**

Do you believe you and/or others were subjected to discriminatory harassment and a hostile work environment by SI management? If so, who subjected you to harassment and a hostile work environment? What were the incidents that were harassing and hostile in nature?

**Ans: I was not and I do not know about others.**

Did you ever report these actions of management to anyone? If so, to whom did you report what happened and when? What action was taken as a result of your report?

**Ans: n/a**

Do you believe you were treated in the same manner as Complainant? If so, how were you treated in the same manner? If not, how were you not treated in the same manner?

**Ans: I do not believe I was treated in the same manner. I acted in a support role, rather than as front line, so travel, for example, was not part of my role, therefore, my travel was not questioned or denied.**

Do you believe others were treated in the same manner as Complainant? If so, how were they treated in the same manner? If not, how were they not treated in the same manner?

**Ans: In some regards, others were treated in similar ways by Marie Graves, such as her negating input. I do not remember other regards.**

Please provide the names, series/grade, title race, sex, and EEO history of anyone similarly-situated to Complainant who was not treated in the same manner as Complainant. State in what manner they were not treated like Complainant.

**Ans: n/a**

Please provide any and all information of which you are aware in regard to Ms. Graves impeding the efforts of Complainant in the performance of the duties of his position.

**Ans: Marie Graves denied the Complainant's travel requests and questioned or rejected his ideas and proposals. I do not remember the specific details.**

Do you believe the actions of Ms. Graves had an adverse impact on Complainant's ability to perform the functions of his position? If so, please state in what manner Complainant was adversely affected.

**Ans: His travel to meet with potential donors was denied and he was told that he could not proceed with various projects, proposals, or prospective donors, all of which are central to a development officer's role.**

Complainant alleges that the aforementioned issues impeded his ability to perform the functions of his position and led to his eventual termination during his probationary period.

Please respond to the following questions:

Did you attend a meeting on March 26, 2015 and observe Marie Graves become upset and leave the meeting? If so, what caused Ms. Graves to become upset?

**Ans: I did attend a meeting on March 26, but I do not remember if that was when Marie became upset and left the meeting.**

Did Ms. Graves become angry because Complainant asked questions about seeking board members' contacts for potential donations? Did she call Complaint naïve and questions his judgment?

**Ans: I do not remember exactly when this happened, but I do remember the Complaint asking questions during a department meeting about our board members, including contact information, so that he could reach out to them and become acquainted, which caused Marie Graves to become short, defensive, and upset. I do not remember if she called him naïve or questioned his judgement.**

Please provide any and all information of which you are aware in regard to Ms. Graves providing obstacles to Complainant during the request/approval period for his Texas and other trips.

**Ans; I do not remember specifics, but I do remember there were issues with his travel to Texas to meet with a potential donor.**

Did you ever observe Ms. Graves negating Complainant's comments/input and talking over him? If so, do you believe her actions treated him in a disparate manner?

**Ans: Yes, I did observe some instances of Marie Graves negating the Complainant's comments and input and talking over him, however, I do not believe her actions treated him in a disparate manner.**

Did Ms. Graves ever treat you in the same manner as Complainant?

**Ans: No.**

Do you believe Ms. Graves' actions discriminated against Complainant because of his race and/or sex and/or EEO activity?

**Ans: No.**

Please state any and all first-hand information you have in regard to Ms. Graves making disparaging remarks about employees and or potential donors, e.g., Holly Laffoon. Who did she disparage and in what manner?

**Ans: Ms. Graves made disparaging remarks about other staff members and potential donors. I do not recall specific remarks or details and do not know about remarks made about Holly Laffoon.**

Did Ms. Graves state that Ms. Laffoon was useless and her fundraising methods were outdated?

**Ans: I do not recall.**

Do you believe Ms. Graves' actions had an adverse effect upon Complainant and his ability to perform the functions of his position? If so, please state in what manner Complainant was adversely affected.

**Ans: Because of denied travel and rejected proposals, projects, and meetings, the complainant was unable to perform many of the essential functions of his position.**

Were you aware of Ms. Graves stating that the Board was ignorant about fundraising and had been only marginally supportive of her fundraising efforts? If so, when and how did you become aware?

**Ans: No.**

Were you aware that there were big issues between Ms. Graves and the Board? If so, what were the issues?

**Ans: Yes. I do not know specifics, but I remember that there were issues between the board and Marie and that several board members had problems with Marie.**

Are you aware of anyone going to Director Cole regarding Ms. Graves' behavior? If so, please state what issues were reported to Dr. Cole and what action was taken.

**Ans: I do not know or remember.**

**INTERROGATORY**
**of**
**COLLEEN MORITH**

I, Colleen Morith, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am/was a (series/grade) ______9__________, (title) _________6___________________,

(division) ______________________, (branch/office) ___NMAfA________________________,

(agency) _____Smithsonian _________________, (location) ________Washington DC_________________________,

My telephone number is: __202-633-2105________________.

How long were you employed by the National Museum of African Art (NMAfA)? From what date to what date? How long were you in your position?

**Ans: 1/2012-6/2016**

For the record my race is:w
For the record my sex is:f
For the record I have (x )/have not ( ) participated in prior EEO activity:

Who was your first-line supervisor at the time of this complaint? Provide his/her grade, series, and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Marie Graves, no idea on grade. She is a black female. She was my supervisor from 5/2014-6/2016**

Who was your second-line supervisor at the time of this complaint? Provide his/her grade, series and title, race, sex, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans: Johnnetta Cole, no idea of grade, she is a black woman. She has been director through my entire time at African Art.**

What was your relationship to Complainant and when did this relationship commence?

**Ans: He was a co-worker. I started working with him on 8/15**

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans: NO**

Milton Jackson, Complainant, has filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA) discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity when:

- he was called naïve and his judgment was questioned;
- his requests to travel to donor events and prospective donors, both local and outside the area, were denied;
- he was denied local travel on his SI travel card;
- he was told some of his prospective donors were useless;
- he was told he could not meet with a prospective donor;
- he was told he could not talk to or associate with some of his colleagues because they were incompetent and that he had to go to Ms. Graves with all questions;
- he was told not to associate with a colleague because she was snake and a gossip;
- he was asked if he was romantically involved with an older potential donor;
- his fundraising diversity plan was blocked from reaching the Director (Dr. Cole) when he was required to perform 14 rewrites and then told it would not work;
- he was harangued and called a liar when he stated he did not see the Director at a celebration and therefore did not introduce a donor to her:
- he was terminated during his probationary period; and
- his final paycheck was delayed.

Complainant states that all of the above reported issues limited his ability to perform the functions of his position.

1. Please state if you believe, and/or have first-hand knowledge of, Complainant being harassed and/or subjected to a hostile work environment. Who subjected him to harassment and/or a hostile work environment, when was he subjected, and what incidents constituted this harassment and hostility?

**Ans: I never personally saw him being harassed in the work environment. He did share experiences he has in meetings with Marie Graves and Bill Holmes where he felt they were making it impossible to do this job.**

2. Are you aware that at a point in time working conditions, harassment, etc., were to the point that there was a discussion of filing a class action lawsuit?

**Ans: No**

3. Please provide any knowledge you have of Complainant being denied travel to meet with prospective donors, both locally and otherwise.

**Ans: I know that he was denied travel because he reported the experience to me. I was not in the meeting.**

4. Were you approved to travel both internationally, nationally, and locally? If so, were you allowed to use your SI travel card for this travel?

**Ans: I have never been given a SI travel card at NMAfA. I traveled in 1/16 and used my personal credit card for all expenses and was reimbursed.**

5. Did you ever have a travel request denied? If so, who denied the request and when was the request denied? What reason(s) were you given for the denial?

**Ans: I was only asked to go on the single trip to California.**

6. Are you aware of Complainant ever making any statement that could be construed as a threat? If so, what did he say that was threatening?

**Ans: I don't recall anything threatening from Milt.**

7. Are you aware of Ms. Graves ever making any statement that could be construed as a threat? If so, what did she say that was threatening?

**Ans: I do not remember hearing anything that can be construed as a threat.**

8. Do you believe you and/or others were subjected to discriminatory harassment and a hostile work environment by SI management? If so, who subjected you to harassment and a hostile work environment? What were the incidents that were harassing and hostile in nature?

**Ans: I would say management at NMAfA is disorganized and authoritarian but not hostile and particularly not discriminatory. The only hostility I have felt has been from a colleague, not management**

9. Did you ever report these actions of management to anyone? If so, to whom did you report what happened and when? What action was taken as a result of your report?

**Ans: No reporting done. I did participate in a museum wide conversation with the ombudsman because morale is very low there due to management's style.**

10. Do you believe you were treated in the same manner as Complainant? If so, how were you treated in the same manner? If not, how were you not treated in the same manner?

**Ans: No**

11. Do you believe others were treated in the same manner as Complainant? If so, how were they treated in the same manner? If not, how were they not treated in the same manner?

**Ans: Yes, I had a white female colleague threatened with her job by Marie if she didn't produce results. Marie also took the colleagues prospects and put them in her portfolio.**

12. Please provide the names, series/grade, title, race, and/or sex, and/or EEO history of anyone similarly-situated to Complainant who was not treated in the same manner as Complainant.

**Ans: none**

13. Did you attend a meeting on March 26, 2015 and observe Marie Graves become upset and leave the meeting? If so, what caused Ms. Graves to become upset?

**Ans: I do not remember this meeting.**

14. Did Ms. Graves become angry because Complainant asked questions about seeking board members' contacts for potential donations? Did she call Complaint naïve and questions his judgment?

**Ans: I do not remember this meeting**

15. Please provide any and all information of which you are aware in regard to Ms. Graves providing obstacles to Complainant during the request/approval period for his Texas trip.

**Ans: I was out on maternity leave during a majority of these complaints and do not recall most of this. Anything I know about Texas was relayed to me by Milt only.**

16. Did you ever observe Ms. Graves negating Complainant's comments/input and talking over him? If so, do you believe her actions treated him in a disparate manner? Did Ms. Graves ever treat you in the same manner as Complainant? Do you believe Ms. Graves' actions discriminated against Complainant because of his race and/or sex and/or EEO activity?

**Ans: I do not recall this well. I believe any hostility towards Milt by Marie was relative to professional insecurity rather than race/sex. She treated a white female colleague of the same position similarly for a few months before that behavior stopped.**

17. Please state any and all first-hand information you have in regard to Ms. Graves making disparaging remarks about employees and or potential donors, e.g., Holly Laffoon. Who did she disparage and in what manner?

**Ans: I don't know who Holly Laffoon is.**

18. Were you aware of Ms. Graves stating that the Board was ignorant about fundraising and had been only marginally supportive of her fundraising efforts? If so, when and how did you become aware?

**Ans: She seemed to not have a good relationship with the board, whether it was because she thought they were ignorant, I don't remember.**

19. Were you aware that there were big issues between Ms. Graves and the Board? If so, what were the issues?

**Ans: I am vaguely aware that the board had issues with Marie on a personal and professional level, but this is not first hand experience.**

20. Did Ms. Graves threaten to fire you if you did not meet your performance goals?

**Ans: No**

21. Did you meet your goals for 2015?

**Ans:** Yes.

22. Did Ms. Graves modify your performance plan? If so, when did she modify your plan and how was your plan modified?

**Ans: My performance plan was never completed for 2015 or 2016.**

23. Were you ever harassed by Ms. Graves in the performance of your duties; i.e., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, please explain.

**Ans:** No.

24. Do you believe Complainant was harassed by Ms. Graves in the performance of the duties of his position; i.e., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, please explain.

**Ans: Based on reports from Milt, yes, she did make performance of his duties difficult by not approving travel or expenses.**

25. Did you ever witness Ms. Graves denying Complainant's request to attend a donor event in New York? If so, do you believe this denial impacted his ability to perform the functions of his position?

**Ans: I do not recall this.**



Initials: CM

26. Do you believe Ms. Graves was targeting Complainant for early dismissal? If so, please state why you believe she was targeting him.

**Ans: I don't know Marie's intent. If wanted to fire Milt within the 90 day period preventing him from travel or expenses is a good way to do it.**

27. Did Ms. Graves ever preclude you from talking to or associating with internal and external colleagues? If so, what was the reason?

**Ans: If she did I do not recall it stopping me in anyway.**

28. Did Ms. Graves allow you to travel as a function of your position?

**Ans: Yes.**

29. Do you believe Complainant possessed and demonstrated a basic understanding of non-profits, identification of prospects and cultivation of donors, and stewardship of funds?

**Ans: He talked about his skills as a fundraiser all the time. I have no reason to doubt his reports. Whether he was good at fundraising for an art museum, I have my doubts. He was constantly bringing in scientific minded people or in-kind donations that didn't fit the mission of the non profit.**

30. On August 10, 2015, did Ms. Graves send an email stating anyone leaving the work area without letter her know would be charged as AWOL?

**Ans: Yes**

31. Did you discuss this with Dr. Chris Kraemer, Deputy Director? If so, what was the outcome?

**Ans: I did share the email with her. I don't know if much was done about it except that Marie could have used better terminology but was not in the wrong.**

32. Did you ever observe Ms. Graves negating Complainant's comments and talking over him? If so, do you believe her actions treated him in a disparate manner?

**Ans: I know there was a testy relationship in meetings but it seemed mutual.**

30.. Do you believe the actions of Ms. Graves had an adverse impact on Complainant's ability to perform the functions of his position? If so, please state in what manner Complainant was adversely affected.

**Ans: Yes, if she denied travel and expenses to prevented him from being a fundraiser.**

31. Were you chosen to serve in Complainant's position after he was terminated?

**Ans: Yes, on a temporary basis.**

32. Were you allowed to travel to California in the performance of your duties?

**Ans: Yes.**

33. Do you believe Ms. Graves was targeting Complainant for early dismissal? If so, please state why you so believe.

**Ans: As I said previously, if she did want to terminate him early by preventing him the ability to travel and approve expenses definitely would do it.**

34. Did Ms. Graves ever preclude you from talking to or associating with internal and external colleagues? If so, who were you precluded from talking to and for what reason?

**Ans: As I said previously, I don't recall this being and issue and I talked to internal and external colleagues as needed.**

35. If you have any other first-hand, relevant information that you believe is pertinent to this investigation, please state the information.

**Ans: no**

36. If you have any people you believe can provide first-hand, relevant information that you would like to have interviewed, please provide their name, contact number, and what information you believe they can provide.

**Ans:no**

I have read the above statement consisting of 7 pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.



Initials: tm

**AFFIDAVIT**
**of**
**ANGELA YANG-KIM**

I, Angela Yang-Kim, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am a (series/grade) GS 9 Series: 0501, (title) Payroll specialist,

(division) Office of Finance & Accounting, (branch/office) Payroll Department,

(agency) Smithsonian Institution, (location) Crystal City: Arlington, Virginia,

(telephone number) (202) 633-7239.

How long have you been employed by the Smithsonian Institution? From what date to what date? How long have you been in your position?

**Ans:**

For the record my sex is Female.
For the record my race is Asian.
For the record I have (x)/have not ( ) participated in prior EEO activity.

Who was your first-line supervisor at the time of this complaint? Provide his/her grade, series, and title, sex, race, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans:** Cheryl Williams, GS11, Series 0501, Financial Analyst, Female, African American, no prior EEO activity to my knowledge, Supervisor from January 11, 2015 to present time.

Who was your second-line supervisor at the time of this complaint? Provide his/her grade, series and title, sex, race, and whether or not they have participated in prior EEO activity. State for what period of time he/she was your supervisor.

**Ans:** N/A

Were you aware of Complainant's prior EEO history/protected activity? If so, when and how did you become aware, and did this awareness have any impact on any decision(s) you made?

**Ans:** NO

**The Smithsonian National Museum of African Art (NMAfA) has accepted the following issue for investigation:**

**Whether Complainant was discriminated against and subjected to a hostile work environment based on his sex (male), race (African American), and/or in reprisal for prior EEO activity when his final paycheck was delayed through December 2015.**

Please provide any and all information of which you are aware in your response to the following questions and provide as much detail as possible.

Complainant states that his final paycheck was due to him on November 24, 2015 and he was not paid until December 18, 2015.

Did Complainant call you or someone else in payroll in regard to the status of his final paycheck? If so, what was he told at this time?

**Ans:** I do not recall this specific employee.

Complainant states that in subsequent calls to you, he was told the delays were due to "problems with his former unit" and "security concerns".

Please explain what the problems were with his former unit and the name of his former unit.

**Ans:** I am unaware of any problems the complainant had with his former unit.

What were the "security concerns" and who was concerned?

**Ans:** I am unaware of any security concerns, other than the exit clearance not being cleared by SI-Keys unil 12/16/15. This information was obtained by looking at prior history in the system, not by recollection of events which happened at the time of the events given by the complainant.

Complainant also states that his subsequent emails concerning this issue were not answered.

Please explain why Complainant's emails concerning his last paycheck were not answered.

**Ans:** I do not recall not answering any email concerning his pay.

If you have any other information you believe is relevant to this complaint, please so state.

**Ans:**

I have read the above statement consisting of 3 pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Angela Yang-Kim

11/14/16
Date

Signed at (City/State) Arlington, Virginia
on this 14 day of November, 2016.

Signature of Investigator/Notary/Witness



Initials: ayk

(7) On June 3, 2015, RMO-1 asked if he and a potential donor were romantically involved, which he felt was very inappropriate;

(8) During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring him to perform 14 rewrites and then stating that it would not work;

(9) On or around July 4, 2015, after he received commitment for a large donation at the Smithsonian's 4th of July celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping him arrange receipt of the gift, which was eventually rescinded;

(10) In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;

(11) On October 20, 2015, RMO-1 told him he could not meet with a prospective donor that he had engaged, and did not provide any reason;

(12) On October 26, 2015, he was terminated during his probationary period for poor performance; and

(13) His final paycheck was delayed through December 2015. (Exhibit 4)

Complainant states that all of the above reported issues discriminated against him because of his sex, race, and prior EEO activity, and limited his ability to perform the functions of his position which led to his termination during his probationary period.

Please state if you have first-hand knowledge of Complainant being harassed and/or subjected to a hostile work environment by Marie Graves and/or SI management; e.g., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, state who subjected him to harassment and/or a hostile work environment, when was he subjected, and what incidents constituted this harassment and hostility? If you have no first-hand information please so state.

**Ans: I have no first-hand knowledge of any of these items.**

Did Complainant ever report incidents of harassment and/or hostility to which he had been subjected in the summer of 2015? If so, what incidents did he report and what action did you take? Who did he report was harassing him?

**Ans: I knew from a few informal conversations that Milt felt some frustration with his work at NMAfA. He never specifically mentioned harassment to me. I would have no information as to whether Milt reported any incidents.**

Are you aware of others who were subjected to discriminatory harassment and a hostile work environment by SI management in the performance of your duties; e.g., travel not approved, denial of attendance at seminars, meetings, and/or meetings with prospective donors? If so, who subjected you to harassment and a hostile work environment? What were the incidents that were harassing and hostile in nature?

**Ans: I have no first-hand knowledge of any of these items**

9. In July 2015, Ms. Graves denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;
10. On October 20, 2015, Ms. Graves told him that he could not meet with a prospective donor that he had engaged, and did not provide any reason;
11. On October 26, 2015, he was terminated during his probationary period for poor performance; and
12. His final paycheck was delayed through December 2015.

Complainant states that all of the above reported issues limited his ability to perform the functions of his position.

Please state if you believe, and/or have first-hand knowledge of, Complainant or anyone else being harassed and/or subjected to a hostile work environment. State who subjected them to harassment and/or a hostile work environment, when were they subjected, and what incidents constituted this harassment and hostility?

**Ans:** I have no knowledge of this.

Did Complainant report his incidents of harassment to you on June 10, 2015 and why he felt he was being harassed? If so, what exactly did he report and what action was taken as a result of his reporting he was being harassed?

**Ans: N/A**

Are you aware that at a point in time working conditions, harassment, etc., were to the point that there was a discussion of filing a class action lawsuit?

**Ans: N/A**

<u>ISSUE 1</u>:

Did you attend a meeting on March 26, 2015, and observe Marie Graves become upset and leave the meeting? If so, what caused Ms. Graves to become upset?

**Ans:** I did not attend this meeting.

- Did Ms. Graves become angry because Complainant asked questions about seeking board members' contacts for potential donations? Did she call Complainant naïve and question his judgment?

<u>ISSUES 2, 3, 10, 11</u>:

Please provide any knowledge you have of Complainant being denied travel to meet with prospective donors, both locally and otherwise.

**Ans:** I have no knowledge of this.

**INTERROGATORY**
**of**
**SHADELLA DAVIS**

I, Shadella Davis, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am a (series/grade) **GS-260-13**, (title) **Equal Employment Opportunity (EEO) Specialist**, (division) **N/A**, (branch/office) **Office of Equal Employment and Minority Affairs**, (agency) **Smithsonian Institution**, (location) **600 Maryland Avenue, SW, Washington, DC.**

My telephone number is: **(202) 633-6416**

For the record my race is: **African American**
For the record my sex is: **Female**
For the record I have (**X**)/have not ( ) participated in prior EEO activity:

What was your relationship to Complainant?

**Ans: I do not have a relationship to the Complaint. During the pre-complaint/counseling stage of the EEO complaint process, I served as the EEO counselor in Complainant's EEO complaint.**

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans: Yes, I am aware of Complainant's race and sex. I do not have any knowledge of Complainant's prior EEO history. No, this awareness did not impact me because I did not make any decisions.**

Milton Jackson, Complainant, filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA) discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity based on the following issues:

(1) On March 26, 2015, during his first week, Ms. Marie Graves (RMO-1) became angry at him for asking questions concerning seeking board members' contacts for potential donations, calling him "naïve," and questioning his judgment;
(2) From March 30, 2015 to April 2015, RMO-1 delayed approving his request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event;
(3) On April 15, 2015, RMO-1 denied his request to attend a donor event in New York and seemed to take pleasure in denying the request publicly;
(4) On May 7, 2015, RMO-1 stated a prospective donor with whom he was working was "useless." RMO-1 gave similar sharp criticism of his work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015;
(5) On April 23, 2015, RMO-1 told him that he could not talk to, or associate with, more than ten of his colleagues at NMAfA because they were incompetent, and that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties;
(6) On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statement as a threat and that she felt uncomfortable in his presence;
(7) On June 3, 2015, RMO-1 asked if he and a potential donor were romantically involved, which he felt was very inappropriate;
(8) During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring him to perform 14 rewrites and then stating that it would not work;
(9) On or around July 4, 2015, after he received commitment for a large donation at the Smithsonian's 4th of July celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping him arrange receipt of the gift, which was eventually rescinded;
(10) In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;
(11) On October 20, 2015, RMO-1 told him he could not meet with a prospective donor that he had engaged, and did not provide any reason;
(12) On October 26, 2015, he was terminated during his probationary period for poor performance; and
(13) His final paycheck was delayed through December 2015. (Exhibit 4)

Complainant states that all of the above reported issues discriminated against him because of his sex, and/or race, and/or prior EEO activity, and limited his ability to perform the functions of his position which led to his termination during his probationary period.

Please state when Complainant first made you aware that he felt he was being harassed and/or discriminated against.

 Initials: [handwritten initials]

**Ans: Complainant informed me on January 14, 2016 for the first time that he felt he had been discriminated against during his employment with the Smithsonian. On that same date, Complainant acknowledged receipt of the "Request for EEO Counseling" form.**

Was management informed Complainant stated he felt he was being harassed and/or discriminated against? If so, who was informed and when?

**Ans: Complainant, through his legal counsel, returned the "Request for EEO Counseling" form to OEEMA on March 11, 2016. Management (Ms. Marie Graves, Mr. William (Bill) Homes and Dr. Johnnetta Cole) were advised of the allegations and the request for remedy (as noted on the form) during the pre-complaint/counseling phase of the EEO complaint process.**

Complainant states that you told him he had no valid claims of harassment or reprisal and you suggested he approach Dr. Cole or the Ombudsman Office for relief.

Did you make this statement and, if so, why did you believe he had no valid claim?

**Ans: No, I did not make this statement.**

I have read the above statement consisting of 3 pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

[signature]
Shadella Davis

November 22, 2016
Date

Signed at (City/State) Alexandria VA
on this 22nd day of November, 2016.

[signature] Rae Q. Eaton
Signature of Investigator/Notary/Witness

 Initials: [initials]

**INTERROGATORY**
**of**
**CHANDRA HEILMAN**
**(Typed for clarification.)**

I, Chandra Heilman, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am a (series/grade) IS-0301-14, (title) Ombudsman, (division) Office of the Ombudsman, (branch/office) Office of Under Secretary for Finance and Administration, (agency) Smithsonian Institution, (location) Washington, DC.

My telephone number is: 202-633-2010.

For the record my race is: Asian
For the record my sex is: Female
For the record I have (X)/have not ( ) participated in prior EEO activity:

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans: No.**

What was your working relationship to Complainant?

**Ans: He came to me for advice.**

Milton Jackson, Complainant, has filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA) discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity when:

(1) On March 26, 2015, during his first week, Ms. Marie Graves (RMO-1) became angry at him for asking questions concerning seeking board members' contacts for potential donations, calling him "naïve," and questioning his judgment;

(2) From March 30, 2015 to April 2015, RMO-1 delayed approving his request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event;

(3) On April 15, 2015, RMO-1 denied his request to attend a donor event in New York and seemed to take pleasure in denying the request publicly;

(4) On May 7, 2015, RMO-1 stated a prospective donor with whom he was working was "useless." RMO-1 gave similar sharp criticism of his work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015;

(5) On April 23, 2015, RMO-1 told him that he could not talk to, or associate with, more than ten of his colleagues at NMAfA because they were incompetent, and that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties;

(6) On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statement as a threat and that she felt uncomfortable in his presence;

(7) On June 3, 2015, RMO-1 asked if he and a potential donor were romantically involved, which he felt was very inappropriate;

(8) During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring him to perform 14 rewrites and then stating that it would not work;

(9) On or around July 4, 2015, after he received commitment for a large donation at the Smithsonian's 4th of July celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping him arrange receipt of the gift, which was eventually rescinded;

(10) In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;

(11) On October 20, 2015, RMO-1 told him he could not meet with a prospective donor that he had engaged, and did not provide any reason;

(12) On October 26, 2015, he was terminated during his probationary period for poor performance; and

(13) His final paycheck was delayed through December 2015. (Exhibit 4)

In regard to this complaint, please respond to the following in as much detail as possible.

Complainant has testified that on August 7, 2015, and on another date, he reported to you that he was being harassed and stated the incidents that were harassing in nature.

Did Complainant ever inform you that he was being harassed and of the incidents involved?

**Ans: I don't remember the exact date, but he did tell me that he felt his work situation was unpleasant.**

If so, what incidents did he report?

**Ans: I don't remember the specific incidents he mentioned.**

Who did he say was subjecting him to harassment?

**Ans: Marie Graves**

What action did you take when he informed you he was being subjected to harassment? If you took no action, please state why.

**Ans: He did not ask me to take any action. Information given to me by an employee is confidential unless the employee gives me permission to talk to others.**

Are you aware that at a point in time, working conditions and harassment at the Museum were to the point that there was a discussion of filing a class action lawsuit?

**Ans: No.**

I have read the above statement consisting of ____ pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

______________________________ ______________________________

Chandra Heilman Date

Signed at (City/State) ______________________________
on this _____day of ______________________, 20_____.

______________________________

Signature of Investigator/Notary/Witness

**INTERROGATORY**
**of**
**CHANDRA HEILMAN**

I, Chandra Heilman, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination that Milton Jackson has filed against the Smithsonian Institution, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of the pertinent information of which I am aware that has a bearing on the merits of this complaint.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and SI policy. Any employee who is accused of discrimination or other acts of impropriety may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record.

I am/was a/(series/grade) IS-301-14, (title) Ombudsman,

(division) Office of the Ombudsman (branch/office) Office of Under Secretary for Finance & Administration,

(agency) Smithsonian Institution (location) Washington, D.C.,

My telephone number is: 202-633-2010.

For the record my race is: Asian
For the record my sex is: Female
For the record I have (✓) have not ( ) participated in prior EEO activity:

Were you aware of Complainant's race and/or sex and/or prior EEO history? If so, did this awareness have any impact on any decision(s) you made?

**Ans:** No

What was your working relationship to Complainant?

**Ans:** He came to me for advice

Milton Jackson, Complainant, has filed a complaint of discrimination against the Smithsonian Institution stating the National Museum of African Art (NMAfA) discriminated against him and subjected him to a hostile work environment based on his sex, race, and in reprisal for prior EEO activity when:

(1) On March 26, 2015, during his first week, Ms. Marie Graves (RMO-1) became angry at him for asking questions concerning seeking board members' contacts for potential donations, calling him "naïve," and questioning his judgment;

(2) From March 30, 2015 to April 2015, RMO-1 delayed approving his request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event;

(3) On April 15, 2015, RMO-1 denied his request to attend a donor event in New York and seemed to take pleasure in denying the request publicly;

(4) On May 7, 2015, RMO-1 stated a prospective donor with whom he was working was "useless." RMO-1 gave similar sharp criticism of his work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015;

(5) On April 23, 2015, RMO-1 told him that he could not talk to, or associate with, more than ten of his colleagues at NMAfA because they were incompetent, and that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties;

(6) On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statement as a threat and that she felt uncomfortable in his presence;

(7) On June 3, 2015, RMO-1 asked if he and a potential donor were romantically involved, which he felt was very inappropriate;

(8) During the summer of 2015, RMO-1 blocked his fundraising diversity plan from reaching the Director by requiring him to perform 14 rewrites and then stating that it would not work;

(9) On or around July 4, 2015, after he received commitment for a large donation at the Smithsonian's 4th of July celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further, RMO-1 was intentionally unhelpful in helping him arrange receipt of the gift, which was eventually rescinded;

(10) In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;

(11) On October 20, 2015, RMO-1 told him he could not meet with a prospective donor that he had engaged, and did not provide any reason;

(12) On October 26, 2015, he was terminated during his probationary period for poor performance; and

(13) His final paycheck was delayed through December 2015. (Exhibit 4)

In regard to this complaint, please respond to the following in as much detail as possible.

Complainant has testified that on August 7, 2015, and on another date, he reported to you that he was being harassed and stated the incidents that were harassing in nature.

Did Complainant ever inform you that he was being harassed and of the incidents involved?

**Ans:** I don't remember the exact date, but he did tell me that he felt his work situation was unpleasant.

If so, what incidents did he report?

I don't remember the specific incidents he mentioned.

Ans:

Who did he say was subjecting him to harassment?

Ans: Marie Graves

What action did you take when he informed you he was being subjected to harassment? If you took no action, please state why.

Ans: He did not ask me to take any action. Information given to me by an employee is confidential unless the employee gives me permission to talk w/others

Are you aware that at a point in time, working conditions and harassment at the Museum were to the point that there was a discussion of filing a class action lawsuit?

Ans: No

I have read the above statement consisting of 3 pages. I declare under penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief and that I have provided any and all information of which I am aware. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

[signature]
Chandra Heilman

11/30/16
Date

Signed at (City/State) Washington, D.C
on this 30th day of November, 20 16.

[signature]
Signature of Investigator/Notary/Witness

Labor & Employee Relations (LER)

# Probationary Period

The Probationary Period (or Trial Period) for new employees is the final step of the hiring process. It is intended to provide the supervisor with the opportunity to fully assess an individual's performance and conduct to assure that the potential perceived in the interview and selection process is demonstrated by the employee on the job. In addition, it is a time for the employee to assess his/her needs and if they can be met by this job. It also provides a means for the supervisor to separate the employee if, after a fair opportunity, he or she fails to demonstrate appropriate conduct or performance.

The probationary period is generally applicable to the following:

- Federal employees who are chosen from an Office of Personnel Management or Delegated Examining Unit certificate of eligibles for a career or career-conditional appointment. The employee does **not** serve a probationary period if appointed non-competitively by reinstatement, transfer, or position change and has already completed the probationary period or served with competitive status under an appointment which did not require a probationary period.

- Federal VRA appointees who serve a 2 year trial period in the excepted service prior to conversion to competitive service.

- Trust employees who are appointed as indefinite employees. The probationary period applies to each new Trust appointment.

***Note:*** *Please contact LER for information on the probationary status of an employee.*

The length of the probationary period is 1 year. A longer period, up to 3 years, may be requested prior to recruitment for Trust positions. A Federal employee's absence in a non-pay status beyond 22 workdays, except when due to compensable injury or military duty, extends the probationary period by an equal amount of time in pay status. The employees should be informed of his/her probationary status as part of that communication by the supervisor.

To provide a framework for the employee to succeed, the supervisor's expectations - in performance and conduct - must be clearly conveyed from the start, orally and in writing. It is important for the employee to know the hours of duty, procedures for requesting leave, and similar matters, and that even such basic work behavior as reporting to work on time is expected. The written performance plan and the ensuing discussion communicating those expectations to the employee should occur within the first 60 days.

If a supervisor experiences problems with an employee during probation/trial period, the initial response should be counseling, a private meeting with the employee to identify the problem(s) and reiterate the supervisor's expectations. Coaching and

Travel Card

**Rae A. Eaton**

**From:** "Jackson, Milton L." <JacksonML@si.edu>
**Date:** Wednesday, July 08, 2015 10:59 AM
**To:** "Graves, Marie W." <GravesMW@si.edu>
**Subject:** RE: Policies: Proper Use of Travel Cards Reminder

Marie,

This is the email that I sent to Bill yesterday:

Hi Bill,

Is there a means of securing authority to use my card locally for donor expenses and official representation? If part of our fundraising focus is supposed to be in DC, then isn't it reasonable to assume that there will be donor expenses generated here?

Also, is there a means of securing a NMAfA-issued purchase card in order to rent a car locally? In the case below, it was cheaper to rent a car than take a taxi to Bethesda. Again, if part of our fundraising focus is supposed to be in DC, then isn't it reasonable to assume that there will be transportation expenses generated here?

Please advise.

If we don't have access to funds/rental cars for local use, doesn't this limit the amount of successful fundraising in the DC metro area?

Regards,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Graves, Marie W.
**Sent:** Wednesday, July 08, 2015 9:54 AM
**To:** Jackson, Milton L.
**Subject:** FW: Policies: Proper Use of Travel Cards Reminder

Milt,

Please time take to review the SI travel policies. Please pay particular attention to the rules for expensing auto rentals and paying for staff's meals.

I hope this is helpful.

Marie

**From:** SI Email Announcements
**Sent:** Wednesday, July 08, 2015 8:50 AM
**To:** SI-GEO-FtPierce, FL; SI-GEO-National Capital Region; SI-GEO-NYC All Sites; SI-GEO-NZP-SCBI Front Royal, VA; SI-GEO-Remote Locations; SI-GEO-SAO All Sites; SI-GEO-SERC Edgewater, MD; SI-GEO-STRI Panama
**Subject:** Policies: Proper Use of Travel Cards Reminder

Are you a Smithsonian travel cardholder? If so, please take a moment to review the below information on the proper use of travel cards.

The Smithsonian Institution participates in the government travel card program. Under the Federal government's contract with JPMorgan Chase, Smithsonian employees who are also government travel cardholders must meet specific requirements for properly using their assigned travel cards and paying their travel card account balances on time and in full each month.

This reminder notice is periodically issued by the Office of Contracting and Personal Property Management (OCon&PPM), to assist Smithsonian travel cardholders in fulfilling their responsibilities for understanding what constitutes proper use of their travel cards.

On average, each month fewer than five (5) Smithsonian travel cardholder accounts are considered to be delinquent (more than 30 days past due). We thank all travel cardholders for your vigilance. Delinquent payments by cardholders to JPMorgan Chase are sometimes attributed to failure by employees to submit travel vouchers timely and/or on rare occasions a delay in the processing of reimbursements. Employees and unit administrators should continue to ensure that travel vouchers are prepared, approved, and processed through Smithsonian's Electronic Travel System for reimbursement within five (5) business days after the completion of travel.

Smithsonian employees who are travel cardholders are hereby reminded that it is mandatory to use their travel cards to pay all allowable travel-related expenses they incur only when traveling on official Smithsonian business. Travel cards should also be used to pay for authorized representational expenses incurred while on official Smithsonian travel, such as meals with prospective donors, and to obtain authorized travel advances from automated teller machines (ATMs). Cardholders do not have the option of using a personal charge card to pay for travel-related expenses. The only allowable exception to the above requirements is when the contractor-issued travel card is not accepted by a vendor.

Smithsonian travel cardholders may not use their travel cards for:

- Personal expenses
- Expenses not authorized on an approved Smithsonian Travel Authorization form
- Expenses incurred by other Smithsonian travelers
- Cash advances from ATMs when the cash will not be used for officially authorized Smithsonian travel activities
- Expenses that are not travel related

Travel cardholders are also reminded that failure to pay JPMorgan Chase in a timely manner, and use of their travel cards to pay expenses not related to official Smithsonian travel, are considered abuses of travel card

privileges. These abuses are also considered a violation of the Smithsonian Standards of Conduct (Smithsonian Directive 103). SD 103 requires Smithsonian employees to pay "each just financial obligation in a proper and timely manner." Such abuses may result in one or more of the following:

- Suspension or cancellation of travel card privileges
- Employee disciplinary action such as letters of reprimand, suspension, or termination of employment
- Notification to senior leadership for appropriate action
- Investigation by the Office of the Inspector General

Cardholders are responsible for updating their mailing addresses and phone numbers with JPMorgan Chase as required. Failure to receive a statement from the bank due to an outdated address does not justify delinquent payments. Online review of travel card statements and online payment options are available through the JPMorgan Chase PaymentNet System. Instructions for accessing the system are available on the OCon&PPM Travel Cards Prism web page under Frequently Accessed Sites.

The official policy and procedures regarding travel card program oversight and the administrative actions that may be taken in instances of misuse and abuse of travel cards are contained in the SD 322, Charge Card Program, and Part 1 of the associated Desk Reference - Travel Card Program, Chapter 7.0, Management Oversight and Corrective Actions.

We very much appreciate the continued cooperation by cardholders to prevent account delinquencies and to use their travel cards only for allowable expenses incurred while on official Smithsonian travel.

This message is transmitted on behalf of Dorothy A. Leffler, Director, Office of Contracting and Personal Property Management (OCon&PPM), and Robert E. Tanner, Associate Director for Travel and Charge Card Services, OCon&PPM. This information is provided for all Smithsonian employees.

For further information on this message, contact the Charge Card Program Staff, OCon&PPM, x3- 7410 (VoIP) or 202-633- 7410 (non-VoIP), OConHelp@si.edu

---

Please do not reply to this e-mail. SI Announcements are sent from an unattended mailbox.

If you are using Outlook, you do not need to save any SI-wide announcements. All past SI-wide announcements are available in the Outlook "SI Email Announcement Archive" public folder. For directions on how to view this folder, go to http://prism2.si.edu/SIOrganization/OCIO/ITSupport/Pages/FAQ-Previous-SI-Wides.aspx

# SD 322, Charge Card Program

## Desk Reference

## Part 1 — Travel Card Program

Smithsonian Institution

Office of the Under Secretary for Finance
and Administration/Chief Financial Officer
Office of Contracting
and Personal Property Management

# WHERE TO GO FOR HELP

Office of Contracting
& Personal Property Management (OCon&PPM)

Travel Card Program — Enrollment, Charge Card Disputes, Account Inquiries, GSA On-Line Training

OCon&PPM Prism Website .................................... http://prism.si.edu/ocfo/ocon/ocon.htm
OCon&PPM Help Desk ........................................ (202) 633-7410
OCon&PPM Help Desk Email .................................... OConHelp@si.edu
OCon&PPM Help Desk Fax ........................................ (202) 633-7319
Interoffice Mail .................................... CCP, OCon&PPM, CC 350, MRC 1200
Charge Card Program Manager ........................................ (202) 633-1739
Charge Card Program Staff .................................... Vincent Shippy (202) 633-1737
Nikki Spencer (202) 633-7296

Travel Card Program and Cardholder Resources

OCon&PPM Prism Website .......................... http://prism.si.edu/ocfo/ocon/ocon_forms.htm
(Under *Travel Cards*)

- JPMC Travel Card Application w/ Individually Billed Agreement (IBA)
- Instructions for Completing JPMC IBA Travel Card Application
- JPMC Online Account Review and Payment Procedures

Travel Card Training ........................................ https://training.smartpay.gsa.gov/
(General Services Administration)

Office of the Comptroller (OC) — Accounting Information (Chartfields)

Travel Management Help Desk ........................................ (202) 633-8600
Travel Management Help Desk Email .................................... TMOHelpDesk@si.edu
GovTrip .................................... https://govtrip.com/govtrip/site/index.jsp
Accounts Payable Help Desk Email .................................... APHelp@si.edu
Travel Management Prism Website:.. http://prism2.si.edu/Support/Travel/Pages/Home.aspx
Travel Handbook .......http://prism.si.edu/ocfo/oc/docs/Travel_Handbook_version_2.2.1.pdf

JPMorgan Chase (JPMC)

Cardholder Inquiries and Customer Service .................................... Toll Free: (888) 297-0781
Collect: (847) 488-4442

Office of the Inspector General (OIG)

Main OIG Phone Number ........................................ (202) 633-7050

# TRAVEL CARD PROGRAM

## TABLE OF CONTENTS


WHERE TO GO FOR HELP

| | | |
|---|---|---|
| **CHAPTER 1.0** | **Introduction and General Information** | **4** |
| 1.1 | Travel Card Program Management | 4 |
| 1.2 | Mandatory Use of Travel Cards | 4 |
| 1.2.1 | Benefits of Using a Travel Card | 5 |
| 1.2.2 | Cardholder Rights and Protections | 6 |
| 1.3 | Cardholder Responsibilities | 6 |
| 1.4 | Exceptions/Exemptions to Application for and Use of Travel Cards | 7 |
| **CHAPTER 2.0** | **Applying for and Receiving Travel Cards** | **8** |
| 2.1 | Training and Application for Travel Cards | 8 |
| 2.1.1 | Pre-Application Training | 8 |
| 2.1.2 | Applications | 8 |
| 2.1.3 | Submitting Travel Card Applications | 9 |
| 2.2 | Receipt of a Travel Card and Card Activation | 9 |
| 2.3 | Travel Card Spending Limits | 9 |
| **CHAPTER 3.0** | **Proper Use of Travel Cards** | **10** |
| 3.1 | Supportive Smithsonian Directives | 10 |
| 3.1.1 | Smithsonian Directive 103, Standards of Conduct | 10 |
| 3.1.2 | Smithsonian Directive 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds | 10 |
| 3.2 | Authorized and Unauthorized Use of Travel Cards | 10 |
| 3.2.1 | *AUTHORIZED* Use of SI Travel Cards on Official Travel | 10 |
| 3.2.2 | *UNAUTHORIZED* Use of SI Travel Cards | 11 |
| 3.3 | Travel Authorization Procedures | 11 |
| 3.3.1 | Travel Authorization via the SI Automated Travel System (currently GovTrip) | 11 |
| 3.3.2 | Common Carrier Ticket Charges | 11 |
| 3.3.3 | Cash Advances | 12 |
| **CHAPTER 4.0** | **Travel Card Security** | **13** |
| 4.1 | Disclosure of Account Numbers | 13 |
| 4.2 | Lost, Stolen and/or Emergency Card Replacement | 13 |
| 4.3 | Surrendering Travel Cards | 13 |
| 4.3.1 | Departing Employees | 13 |
| 4.3.2 | Transferring Employees | 14 |
| 4.4 | Expired Travel Card Replacement | 14 |
| 4.5 | Travel Cardholder Recertification | 14 |
| **CHAPTER 5.0** | **Reimbursement for Travel Card Charges** | **15** |
| 5.1 | Travel Vouchers | 15 |
| 5.2 | ATM Transaction Fees | 15 |

5.3 Canceled Trips 15

**CHAPTER 6.0 Travel Card Account Management and Payments 16**

6.1 Individually Billed Accounts 16
6.1.1 Monthly Reconciliation 16
6.1.2 Payment of Valid Charges 16
6.1.3 Past Due and Delinquent Travel Card Accounts 17
6.2 Smithsonian Centrally Billed Travel Card Account 17
6.3 Disputed Charges 17
6.3.1 Merchant Service and Delivery Issues 18
6.3.2 Billing Errors 18
6.4 Cardholder Inquiries 18

**CHAPTER 7.0 Management Oversight and Corrective Actions 19**

7.1 Policies and Procedures 19
7.2 Internal Controls 19
7.3 Compliance Assessment Methodology 20
7.4 Compliance Reports 20
7.5 Misuse and/or Abuse Corrective Actions 21

**TABLE 322-1-1 — Travel Card Misuse and Abuse: Table of Management Actions 22**

# CHAPTER 1.0 Introduction and General Information

Part 1 of the Charge Card Program Desk Reference expands on the general policy cited in *Smithsonian Directive (SD) 322, Charge Card Program*. The information and procedures herein pertain to applying for, proper use, and management oversight of the government Travel Cards assigned to Smithsonian Institution (SI) employees.

The SI policies and procedures for the application and assignment of Travel Cards conform to practices of other government travel card programs and requirements of the General Services Administration (GSA) SmartPay2 contract with JPMorgan Chase (JPMC) bank. JPMC is the SI Travel Card provider.

Employees with questions concerning the use of the SI Travel Card may contact the Charge Card Program (CCP) staff in the Simplified Acquisitions Division, Office of Contracting and Personal Property Management (OCon&PPM). Questions concerning official travel policy and procedures should be directed to the Travel Management Office (TMO), in the Office of the Comptroller (OC).

## 1.1 Travel Card Program Management

The Director, OCon&PPM, is responsible for providing Travel Cards to eligible SI employees for use when traveling on official SI business. As allowed in a delegation of authority from the Secretary of the Smithsonian, the Director, OCon&PPM, has delegated the authority for day-to-day management and oversight of the Travel Card Program to the CCP Branch Manager, OCon&PPM and the authority to take all necessary actions to ensure integrity in the Travel Card program. The CCP Manager, as the designated Agency/Organization Program Coordinator (A/OPC) for the SI Charge Card program, is authorized to represent the Director at internal and interagency meetings when discussions relate to government travel card programs.

The CCP Manager is responsible for establishing, maintaining and promulgating SI Travel Card program policies and procedures and ensuring that updates are distributed SI-wide. The CCP Manager ensures that the proper internal controls for the Travel Card program are in place and conducts reviews on the use of assigned Travel Cards by Cardholders. The reviews assist the CCP Manager with assessing and reporting on compliance with policies and procedures and identifying, determining, and advising managers on appropriate corrective actions when misuse or abuse of Travel Cards is verified. Information regarding oversight and remedial action procedures are included in Chapter 7.0, Management Oversight and Corrective Actions, of this desk reference.

## 1.2 Mandatory Use of Travel Cards

Smithsonian employees who are issued a Travel Card are required to use the Travel Card for allowable and authorized expenses related to official travel to the maximum extent that merchants accept the card. SI employees who anticipate traveling on official SI business one or more times per year shall complete required training and apply for a Travel Card. The use

of a Travel Card benefits both the SI and its employees. In addition to reducing the administrative burden associated with processing common carrier ticketing and tracking travel advances, employees avoid having to use personal funds when required to travel in performance of their official duties and responsibilities.

Upon receipt and activation of a Travel Card the Cardholder shall use the Travel Card to pay for common carrier tickets (air, rail and bus), lodgings, meals, automobile rentals, and/or authorized incidental expenses incurred while traveling on official Smithsonian business. Cardholders may also obtain cash advances from an Automated Teller Machine (ATM) with their Travel Cards for authorized official travel-related business expenses (see Section 3.3.3).

### 1.2.1 Benefits of Using a Travel Card

The following list of benefits is extended to SI employees when they use a Travel Card. This coverage is in addition to statutory coverage for injury or damage to employees and their belongings on official duty (e.g., Federal Employees Compensation Act, Military Personnel and Civilian Employee Claims Act).

a. Travel accident insurance while on travel associated with traveler tickets charged to a Travel Card. This insurance also covers public conveyance to/from the airport.
b. Insurance for lost or stolen baggage while traveling on traveler tickets charged to the Travel Card.
c. Auto rental insurance.
d. Worldwide emergency Travel Card replacement within 24 hours (where practicable).
e. Automatic enrollment in the Emergency Assistance Program which provides:
    - Emergency card replacement or emergency cash
    - Emergency medical and referral assistance
    - Emergency legal referral assistance
    - Lost or stolen Travel Card reporting
    - Emergency transportation assistance
    - Emergency ticket replacement
    - Lost luggage assistance
    - Emergency message service
    - Emergency translation service
    - Prescription assistance and valuable document delivery
    - Pre-trip assistance

Additional information about Cardholder benefits is available from JPMC customer service (see *Where to Go for Help*).

In addition, since Travel Cardholders are recognized as federal government employees, using the Travel Card makes it easier for SI employees to obtain government rates for bus, rail, and airline tickets; rental cars; and hotel rooms when traveling out-of-area on official SI business.

### 1.2.2 Cardholder Rights and Protections

JPMC may not subject Cardholders to:

a. Preset expenditure limits;
b. Credit checks on SI employees designated to receive Travel Cards. **Note:** credit checks are not conducted unless otherwise specified by the SI in accordance with risk mitigation procedures;
c. Releases of Cardholder credit information to any entity or person other than authorized GSA or SI officials or the Cardholder (this includes credit information associated with suspended or canceled individually billed accounts that are delinquent fewer than 180 days);
d. The sale or other transfer of Cardholder names or addresses to other commercial interests;
e. Membership fees;
f. Commercial advertisements or other forms of solicitation with monthly billing statements;
g. Issuance or cancellation of Travel Cards without notifying the authorized SI officials, nor;
h. Liability for fraudulent charges made with a lost or stolen Travel Card provided that the Cardholder notifies JPMC immediately upon discovering the card is missing.

## 1.3 Cardholder Responsibilities

There are specific responsibilities associated with being an SI Travel Cardholder.

SI Travel Cardholders must:

a. Protect and keep safe from unauthorized use their issued Travel Cards and account numbers;
b. Use their Travel Cards only for approved and authorized expenses to be incurred while traveling on official SI business;
c. Never use their Travel Cards for personal purchases or to pay other individuals' personal or travel-related expenses, including expenses for other SI employees;
d. Submit all travel vouchers for reimbursement of expenses charged to their Travel Card accounts within five (5) business days of completion of travel or every thirty (30) calendar days when on extended travel;
e. Review the monthly statements they receive from JPMC to ensure all charges that appear are correct, and immediately notify JPMC when charges are not correct;

f. Notify JPMC customer service and the CCP staff immediately when home addresses and business and personal telephone numbers on file with JPMC change; and,
g. Pay their monthly JPMC Travel Card account bills in full and by the due date cited on the monthly statements regardless of the payment status of any outstanding travel vouchers.

The above terms are agreed to by employees when they sign the Travel Card application prior to submitting it to the Charge Card Program, OCon&PPM.

### 1.4 Exceptions/Exemptions to Application for and Use of Travel Cards

The CCP Manager is authorized to allow *exceptions* to the "mandatory use" policy for SI employees when: an employee does not have a Travel Card and there is not sufficient time to obtain a Travel Card in advance of initial required travel dates; an employee will not be required to travel at least once a year; or, ticket purchases will be made more than 30 calendar days in advance of travel. In these circumstances the TMO Manager may centrally bill costs for common carrier tickets. Employees who are provided an *exception* to the mandatory use policy may receive cash travel advances from OC.

Smithsonian employees who request to be *exempt* from the requirement to obtain and use a Travel Card when traveling on official SI business must obtain an exemption in writing from the Director, OCon&PPM. Employees and their supervisors should contact the CCP staff for advice when they propose to submit a request for *exemption* to the mandatory use policy. Employees who are allowed an *exemption* may not receive cash advances from OC, except where necessary to cover anticipated field expenses authorized on an *OCon 501, Field Expenses Review and Authorization* form (e.g., payment of local research site workers and procurement of provisions).

## CHAPTER 2.0 Applying for and Receiving Travel Cards

As expressed in Section 1.2, an SI employee is required to complete an application for a Travel Card when the employee will be required to travel on official SI business one or more times per year, so long as:

a. The employee's administrative officer/travel coordinator or supervisor recommends to the employee that they obtain a Travel Card; and,

b. The head of the museum, research center, or office (Unit Director) where the employee works authorizes participation.

### 2.1 Training and Application for Travel Cards

#### 2.1.1 Pre-Application Training

After employees secure the required approvals from their unit managers to obtain a Travel Card, GSA-sponsored online Travel Card Training must be completed. This training is accessible at https://training.smartpay.gsa.gov. Upon completing the training, employees must print one copy of the certificate to be included in the employee's Travel Card application package submitted to CCP. The CCP Manager may require Travel Cardholders to complete Travel Card training every three years (refresher), or as deemed necessary.

#### 2.1.2 Applications

After the required Travel Card training is completed, and in advance of initial travel dates, applicants must visit the OCon&PPM Prism Website (see *Where to Go for Help*) and download copies of the following from the items listed under *Travel Cards*:

- A copy of the JPMC Travel Card Application w/ Individually Billed Cardholder Agreement (IBA); and,
- Instructions for Completing the JPMC IBA Travel Card Application.

All fields on the JPMC travel card application must be completed by applicants and CCP staff. Applicants must provide the name, home/residence address, Social Security Number, and Date of Birth as reflected in their official personnel record in the Office of Human Resources (OHR).

It is important that applicants ensure that all information provided on an application is correct. Employees must understand the terms and conditions that they, the SI, and JPMC agree to for issuance of a Travel Card. Employees should contact the CCP staff with any questions regarding the application before signing and forwarding the completed application to the CCP.

#### 2.1.3 Submitting Travel Card Applications

All JPMC travel card application packages shall be submitted to the CCP staff at OCon&PPM, Attn: CCP-Travel Card Program, and include the following forms and information:

a. Cover memo from the Unit Director verifying the applicant's employment status. (This memo must include a statement confirming the employee will be required to travel in performance of official duties);

b. A properly completed and signed original JPMC Travel Card Application and the signed JPMC IBA; and,

c. A copy of the Travel Card Training Certificate received after completing the on-line GSA Travel Card Training.

The CCP staff informs applicants when application packages are received. CCP staff reviews each Travel Card application package for completeness and contacts applicants and/or unit managers when any required information is omitted by applicants. Applications accepted by the CCP staff are forwarded to the CCP Manager for signature and then sent to JPMC for processing.

### 2.2 Receipt of a Travel Card and Card Activation

Smithsonian employees receive their Travel Cards via U.S. Postal Service at their home/residence addresses, normally within two weeks from the date applications are received at CCP. Travel Cards must be activated by Cardholders prior to commencing travel by calling the toll-free telephone number on the label affixed to the Travel Card.

> **Note:** Receipt of a Travel Card is not an authorization to travel or incur expenses with the Travel Card. All travel and travel-related expenses by employees must be pre-approved on a travel authorization.

A personal identification number (PIN) shall be mailed separately to Cardholders by JPMC and will be necessary to obtain cash travel advances from financial institutions, either at an ATM or customer service counter, which can be accomplished only after the Travel Card is activated. Cardholders should memorize their PIN or keep it in a place separate from where the Travel Card is kept; *do NOT write the PIN on the Travel Card.* In the event a PIN needs to be replaced, Cardholders must contact the JPMC customer service and request a new PIN. A 24- to 48-hour activation delay may be experienced when obtaining a new PIN over the phone. During this period, Cardholders should obtain cash advance from the customer service counter (bank teller) within a financial institution.

### 2.3 Travel Card Spending Limits

The monthly spending limit for an individually billed government travel card is generally $10,000. Of this allowable monthly amount, not more than 50 percent may be in cash advances (see Section 3.3.3, Cash Advances). If a spending limit increase is required, the traveler must contact CCP prior to commencing travel. The CCP will validate the request against the approved travel authorization in GovTrip.

## CHAPTER 3.0 Proper Use of Travel Cards

Travel Cards are authorized to be used only for out-of-area expenses related to official Smithsonian business or authorized local Development, Representation, and Business (DRB) activities (see Appendix 322-1-A). Use of Travel Cards for any other purpose constitutes misuse and/or abuse of Travel Cards. Misuse and/or abuse of Travel Cards can result in Travel Card accounts being suspended or canceled and Cardholders may be subject to disciplinary action, including termination of SI employment.

At no time may Cardholders use their SI Travel Card to pay for expenses incurred by others (including fellow SI travelers) and personal expenses.

### 3.1 Supportive Smithsonian Directives

See Chapter 7.0, Management Oversight and Corrective Actions, and *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, for information on actions required to prevent misuse and abuse and actions to be taken to correct occurrences of Travel Card misuse and abuse.

#### 3.1.1 Smithsonian Directive 103, Standards of Conduct

The *SD 103, Smithsonian Standards of Conduct*, provides in part that employees: must ensure that their conduct does not compromise the integrity of, and public confidence in the SI; must avoid actions that might conflict or appear to conflict with Smithsonian interests, such as using their SI employment for private gain; and must pay their just financial obligations in a proper and timely manner.

#### 3.1.2 Smithsonian Directive 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds

The S*D 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds,* states in part, "If it is discovered that a Travel Cardholder used the Travel Card inappropriately and in a manner that is a violation of this directive [SD 323] and its accompanying *Use of Funds Handbook*, the Cardholder will be subject to the penalties and actions specified in the Institution's Travel Card policy."

### 3.2 Authorized and Unauthorized Use of Travel Cards

#### 3.2.1 *AUTHORIZED* Use of SI Travel Cards on Official Travel

- Common carrier tickets (e.g., rail, bus and airline tickets)
- Car rentals for official travel purposes
- Employee lodging, and meals, miscellaneous and incidental expenses (per diem or actual expenses) related to official travel.

- Expenses related to development, donor cultivation, and business activity expenses, to the extent that such expenses are included on a travel authorization or reviewed and approved on travel vouchers for reimbursement
- Travel cash advances from ATMs, not to exceed the amount of authorized reimbursable expenses on an approved SI Travel Authorization.

#### 3.2.2 *UNAUTHORIZED* Use of SI Travel Cards

- Expenses not approved in advance on an SI Travel Authorization or not related to official out-of-area travel.
- Personal expenses or other expenses not related to authorized SI official business travel.
- Other individuals' personal or travel-related expenses.
- Cash advances not associated with out-of-area travel and not approved on a SI Travel Authorization.

### 3.3 Travel Authorization Procedures

Travel Cardholders must abide by the SI travel policies and procedures included in *SD 312, Travel*, and additional guidance and procedures included in its accompanying *SI Travel Handbook*. All official SI travel and allowable travel-related expenses must be approved on a travel authorization prior to commencing official travel. Use of Travel Cards absent a properly completed and approved travel authorization is prohibited.

#### 3.3.1 Travel Authorization via the SI Automated Travel System (currently GovTrip)

All SI employees who travel on official SI business are required to enter anticipated travel-related expenses for planned travel in the SI automated travel system (currently GovTrip). The electronic processing capability of GovTrip shall automatically forward travel plans and anticipated expenses to the traveler's supervisor for review and approval. Upon completion of this process, SI travelers will have authorization to incur charges related to the authorized travel.

#### 3.3.2 Common Carrier Ticket Charges

##### 3.3.2.1 Airline Tickets

Most airline tickets purchased through the GovTrip system are automatically billed to the Cardholder's Travel Card account. Obtaining tickets via GovTrip or through use of the Travel Card allows the Cardholder to buy tickets at GSA contract city-pair fares. Where necessary, the TMO may use a Smithsonian centrally billed travel account.

#### 3.3.2.2 Other Means of Transportation

Rail tickets may be purchased directly from Amtrak with a Travel Card. The use of buses, other rail, and ferry services may also be purchased using a Travel Card.

#### 3.3.2.3 Unused Tickets

Travelers are responsible for resolving issues with complete and/or partially used common carrier tickets. Unused electronic tickets must be reported to the issuing carrier or travel agency to ensure a refund is processed.

#### 3.3.2.4 Lost Tickets

Cardholders are responsible for reporting lost common carrier tickets to the issuing carrier or travel agency as soon as possible. Lost ticket refunds may take up to six months to resolve. Since the refund of a lost ticket is not guaranteed, the Cardholder must pay the amount of the lost ticket as it appears on their monthly statement from JPMC.

### 3.3.3 Cash Advances

Travel Cardholders are permitted to obtain cash advances with their Travel Card only for estimated out-of-pocket travel expenses not payable with their Travel Card, (e.g., taxis, meals, allowable incidental items). Cash advances from ATMs may not be obtained more than five days before travel commences or after the last day that the Cardholder is in official travel status.

Should emergency expenses arise while a Cardholder is on official travel and additional cash above the trip cash advance dollar limit is required, Cardholders may obtain the additional required cash from an ATM. During any month that multiple trips occur and the sum of cash advances already exceeds the allowable monthly ATM transaction limit, the Cardholder may need to obtain the necessary cash inside the financial institution. In all cases when ATM cash advances exceed the allowable dollar limits, a written justification for the emergency cash advance(s) must be prepared and submitted by the Cardholder along with the travel voucher. Cardholders may include the ATM transaction fee related to approved emergency cash advances on their travel vouchers for reimbursement.

# CHAPTER 4.0 Travel Card Security

Travel Cardholders are responsible for the security of their assigned Travel Cards. When not traveling on official SI business, Cardholders are encouraged to secure their Travel Cards in a place not accessible to unauthorized users and to prevent inadvertent use in lieu of personal charge/credit cards for personal purchases.

## 4.1 Disclosure of Account Numbers

Travel Cardholders are cautioned against releasing their Travel Card or Travel Card account number to anyone other than TMO staff, contractor travel agencies, hotel or rental car companies when making reservations, individuals collecting payment for authorized travel-related expenses, or an SI staff member assisting with travel arrangements. Cardholders must never divulge the PIN associated with their Travel Cards to anyone.

## 4.2 Lost, Stolen and/or Emergency Card Replacement

Cardholders shall report lost or stolen Travel Cards immediately to the JPMC customer service center and request issuance of a replacement card. The JPMC customer service may be reached twenty-four (24) hours a day; seven (7) days a week (see *Where to Go for Help*). Replacement cards and PINs will be mailed separately and only to the Cardholder address on record at JPMC.

> **Note:** A Cardholder will not be held financially liable for fraudulent charges made with a lost or stolen card, *provided* the Cardholder immediately notifies JPMC upon discovering that the card is missing. Cardholders may be required to review any charges considered fraudulent and sign an *Affidavit of Charge Card Fraud* as a disclaimer of unauthorized charges. Failure to submit and return the Affidavit to JPMC may result in liability for charges shifting to the Travel Cardholder.

## 4.3 Surrendering Travel Cards

### 4.3.1 Departing Employees

When a Cardholder leaves SI employment,.i.e., resigns, retires, or transfers to another agency, the Cardholder must cut the Travel Card in half and surrender it to their supervisor or administrative personnel. The Smithsonian Employee Exit Clearance System (SEECS) point of contact at the unit must indicate in SEECS that the Travel Card has been surrendered by the departing employee in order for the SEECS point of contact in OCon&PPM to also clear the employee. The CCP staff will then be notified via email by the OCon&PPM point of contact for SEECS that the card has been tendered and CCP staff will contact JPMC to request that the Cardholder account be closed. The CCP staff will advise the departing employee and the unit if a balance is outstanding on the account.

#### 4.3.2 Transferring Employees

The CCP Manager is informed by the SEECS point of contact in OCon&PPM when a Cardholder transfers to another Smithsonian unit. The CCP staff will then contact the Unit Director at the museum, research center or office to which the employee is reassigned to request a memo to the CCP Manager confirming that the Cardholder is continuing SI employment and will be required to travel. The employee will retain the Travel Card; however, if the CCP Manager does not receive the required memo from the Unit Director in a timely manner the Cardholder's account shall be closed.

### 4.4 Expired Travel Card Replacement

Travel Cards with impending expiration dates will be replaced by JPMC no earlier than 40 calendar days prior to the expiration date of currently held Travel Cards. Replacement Travel Cards are mailed to home/residence addresses on file with JPMC. When a Cardholder will be on extended travel at the time his/her Travel Card will expire the CCP staff should be contacted so that a replacement Travel Card may be requested and issued before the date that travel is scheduled to commence.

### 4.5 Travel Cardholder Recertification

The CCP staff shall periodically contact unit administrative staff to determine numbers of Cardholder accounts to be continued, established or canceled.

## CHAPTER 5.0 Reimbursement for Travel Card Charges

Smithsonian management is committed to timely reimbursing SI employees for authorized and allowable travel expenses. When Travel Cardholders submit travel vouchers within the time frame required by *SD 312, Travel*, and its accompanying *Travel Handbook* and supervisors/managers timely review and approve travel vouchers. Cardholders will avoid the use of personal funds to pay Travel Card charges billed by JPMC.

### 5.1 Travel Vouchers

To facilitate timely reimbursement of authorized travel-related expenses paid with their Travel Cards, SI Travel Cardholders must complete travel vouchers in GovTrip within five (5) business days after travel is completed, or every thirty (30) calendar days when on extended travel. Travelers' supervisors/managers must ensure that travel vouchers are reviewed and approved in the SI Automated Travel System (currently GovTrip) as soon as possible after receiving notice that a travel voucher is pending review and approval.

Cardholders shall normally receive reimbursement within 10 business days from the date that a properly completed travel voucher is approved in the SI Automated Travel System (currently GovTrip).

### 5.2 ATM Transaction Fees

ATM cash advances and associated fees appear with other travel and expense transactions on Travel Cardholders' monthly bills from JPMC. The ATM transaction fees incurred by Travel Cardholders must be entered on travel vouchers. Reimbursement for ATM fees shall be limited to the fee amount applicable to the authorized cash advance amount that is reflected on the travel authorization.

> **Note:** The cash advance fee is 2.5% of the amount of each cash advance transaction with a minimum fee of $3.00, e.g., 2.5% of $100 is $2.50, but the bank will charge $3.00 for the $100 cash advance. In some cases, an additional surcharge may be imposed by the ATM operators and may be claimed on the travel voucher.

### 5.3 Canceled Trips

Travel Cardholders are required to prepare and submit travel vouchers to claim any authorized charges incurred and charged to their travel card accounts prior to cancellation of travel, e.g., carrier booking fees, ATM cash advance fees, other merchant fees. The Cardholder, upon receipt of the monthly statement, must send payment to JPMC for any undisputed charges.

# CHAPTER 6.0 Travel Card Account Management and Payments

*Smithsonian Directive 103, Smithsonian Institution Standards of Conduct*, requires SI employees to pay debts properly and in a timely manner. Smithsonian Travel Cardholders, not the SI, are personally responsible for remitting payment to JPMC for all undisputed charges reflected on the monthly bills they receive from JPMC.

## 6.1 Individually Billed Accounts

Travel Card account statements are sent monthly to SI Travel Cardholders at the home/residence addresses on file with JPMC. The statements are mailed by JPMC within five (5) business days after each billing cycle cutoff and Cardholders are responsible for reconciling charges and making payment in full to JPMC each month. Travel Cardholders are required to inform JPMC as soon as possible of an address change to avoid delays in receiving their monthly statements. Cardholders who do not receive a monthly statement within ten (10) calendar days after a billing cycle cutoff should contact JPMC customer service and request a duplicate statement or view a copy of their statement online (see *Where to Go for Help*).

### 6.1.1 Monthly Reconciliation

Travel Cardholders shall review and reconcile all charges included on the JPMC monthly statement they receive with their records of charges made to their individually billed Travel Card accounts. All erroneous charges, and disputed charges (see Section 6.3 below), must be called to the attention of JPMC customer service immediately for assistance with determining which charges may be deducted from the payment amount to be remitted. Not all merchants will bill in time for charges to appear on the monthly statement closest to the charge date; therefore, charges for which Cardholders have already received reimbursement must be held pending future monthly statement(s) on which the charges will appear and must be paid.

### 6.1.2 Payment of Valid Charges

All valid charges that appear on the JPMC monthly statements issued to a Travel Cardholder must be paid to JPMC in full and by the due dates cited on the monthly statements. Cardholders have the option of paying their bills via check to the JPMC payment address, over-the-phone with JPMC, or online through use of the JPMC Online Payment System (see *Where to Go for Help*). Employees' failure to timely pay all undisputed charges reflected on the JPMC monthly statements will result in remedial administrative action by the CCP manager, and disciplinary action by unit managers. See Chapter 7.0, Management Oversight and Corrective Actions, and *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, for the types of actions to be considered when Travel Card accounts become delinquent or other misuse or abuse of Travel Cards is verified.

**Note:** In the event of a government-wide shutdown, Cardholders may be unable to make payments. The Smithsonian will ensure that during such periods, JPMC will not age accounts, cause delinquent or suspend, or take action to cancel or close accounts. During this time, finance charges may not be assessed; however, monthly statements will continue to be generated by JPMC.

#### 6.1.3 Past Due and Delinquent Travel Card Accounts

Late payment of Travel Card accounts and Travel Card account delinquencies are considered misuse and/or abuse of Travel Cards. This type of misuse and/or abuse can result in Travel Card accounts being suspended or canceled (closed) and Cardholders may be subject to disciplinary or adverse personnel action.

Travel Card accounts are considered to be past due if payment for any undisputed account balance is not received at JPMC by the payment due dates.

Accounts are considered "delinquent" when full payment for any undisputed account balance is not received at JPMC within 61 calendar days of the statement date. Failure to pay the undisputed account balance within 60 calendar days from the statement date on which the original charge appears will result in an automatic suspension of the Travel Card account by JPMC. If an account is suspended twice during a 12-month period for delinquency and is past due again, the account may be closed by JPMC or the CCP Manager.

SI employees whose Travel Card account is suspended or closed shall be considered a Travel Card "*declinee.*" Travel Card declinees may not receive travel cash advances from OC, except for anticipated field expenses and are required to use their personal financial resources for official travel and then request reimbursement for authorized travel-related expenses.

### 6.2 Smithsonian Centrally Billed Travel Card Account

SI uses a centrally billed account to purchase tickets for non-Smithsonian employees traveling at the invitation of the SI. In addition, where necessary, the TMO may use a centrally billed account in lieu of an employee's individually billed account when determined in the best interest of the traveler and the SI (see Section 1.4). All tickets purchased using the centrally billed account entitles the ticket holder to the same benefits extended to individual Cardholders.

### 6.3 Disputed Charges

A disagreement between a Cardholder and a merchant concerning a charge that appears on the Cardholder's JPMC monthly statement is considered a dispute. It is each Cardholder's responsibility to resolve disputes with merchants or with TMO when a transportation ticket was purchased through GovTrip. Disputes are typically attributable to one of the following:

### 6.3.1 Merchant Service and Delivery Issues

Issues concerning defective or unsuitable delivery of merchant services, non-delivery of merchant services, and unresolved transactions are normally categorized as merchant service and delivery issues. Travel Cardholders are responsible for making a reasonable attempt to resolve such issues directly with the merchant as they would for charges to their personal credit or charge card accounts. This approach has the greatest potential for quick and efficient resolution. If no resolution is reached with the merchant, Cardholders should contact JPMC to report the disputed charges.

### 6.3.2 Billing Errors

Questionable charges, duplicate billings, and/or charges not authorized by Cardholders that appear on monthly statements are categorized as Billing Errors. Cardholders must immediately contact JPMC customer service when they recognize errors on the monthly statements they receive from JPMC. JPMC will issue a "temporary" credit to the Travel Card account when a charge is disputed. JPMC will investigate the disputed charges and mail the Cardholder a statement explaining its findings. If JPMC determines that a billing error *did not* occur, the transaction amount will appear on the next monthly bill to the Cardholder. If JPMC determines that a billing error *did* occur, the Cardholder will be sent a letter advising them that the error has been corrected and the credit will remain on the Cardholder's account.

In all other cases (such as possible fraud), Travel Cardholders must contact JPMC Customer Service Center to report the disputed charges. In most cases JPMC will issue an immediate credit to the account but will require the Cardholder to complete a Dispute Form to document the problem. JPMC will investigate the dispute and advise the Cardholder accordingly.

## 6.4 Cardholder Inquiries

Inquiries concerning billings or adjustments to billed amounts should be directed to JPMC Customer Service. Policy questions concerning issuance and use of the SI Travel Cards should be directed to the CCP staff. Contact information is listed on the *Where to Go for Help* page.

## CHAPTER 7.0 Management Oversight and Corrective Actions

The CCP Manager, OCon&PPM, is responsible for providing assurance to the Director of OCon&PPM, that SI Travel Card program policies and procedures, internal controls, and methods for assessing compliance with program requirements by Travel Cardholders and CCP staff are effective, efficient, and assist with ensuring integrity in program operations. Travel Card program internal controls, and the associated compliance review methodology, conforms to *SD 310, Financial Reporting and Risk Management Internal Controls*, to ensure sound business practices and safeguards exist to minimize fraud, waste, abuse and mismanagement in the use of Travel Cards. Reports on program activities are prepared by CCP staff and provided to the Director, Under Secretary for Finance and Administration/Chief Financial Officer (USF&A/CFO), and other SI managers as necessary or requested.

### 7.1 Policies and Procedures

SI Travel Card program policies and procedures are established, updated as necessary, and disseminated SI-wide by the CCP Manager through the following means:

1. *SD 322, Charge Card Program* (available on Prism), in which general policy regarding applications for, issuance, and use of government-sponsored charge cards, including the SI Travel Card, is established;
2. This *Charge Card Program Desk Reference (SD 322), Part 1 — Travel Card Program* (available of Prism);
3. SI-wide email reminders on what is *Proper Use of Travel Cards* transmitted each calendar quarter;
4. Travel Card Program ***Alerts*** (available on Prism) issued when special attention to Travel Card program policies and procedures by SI employees is determined be necessary;
5. Distribution of information from external authorities, such as GSA and the Office of Management and Budget, that may impact SI Travel Card program policy and procedures; and,
6. Addressing SI employees at unit staff meetings and SI administrative and management committees.

### 7.2 Internal Controls

The policies, procedures and program guidance promulgated by the CCP Manager and staff cover the internal controls necessary for assessing the degree of compliance with Travel Card program policies and procedures by employees at all organizational levels. The internal controls established and monitored by the CCP Manager serve to ensure that:

1. The CCP structure, functions, and staffing are organized to foster effective and efficient program administration and management oversight, liaison with JPMC, and support to SI staff.
2. Program policies, procedures, and Cardholder requirements are kept up to date and available and accessible to all SI employees.

3. Travel Card training is completed by SI employees prior to submitting applications for Travel Cards to the CCP staff.
4. Applications with other required information required from SI employees are received, reviewed and determined to be complete and correct by CCP staff prior to the CCP Manager submitting applications to JPMC.
5. All personal identifiable information and account data provided to CCP by SI employees, or of which CCP staff becomes aware (via JPMC applications, Cardholder account numbers, payment history, etc.) are treated as strictly confidential.
6. Files and records of Travel Card account activity and reports maintained by CCP staff are always secure and not accessible to anyone other than CCP staff.
7. Cardholders provide proper and timely attention to the monthly bills they receive from JPMC and pay undisputed charges in full each month.
8. Managers take appropriate and/or recommended actions to assist with resolving Travel Cardholder account delinquencies.

### 7.3 Compliance Assessment Methodology

The CCP staff monitors myriad Travel Card activities on a daily basis by reviewing JPMC reports and conducting necessary transactional data-mining.

The CCP staff is required to report to the CCP Manager any detected misuse and/or abuse of Travel Cards, such payment of expenses for which Travel Card use is not authorized, indications of late payments, and new or continued delinquent accounts. In such instances the CCP Manager is authorized to:

1. Request Cardholders submit explanations related to account delinquencies and questionable charges or patterns of Travel Card use.
2. Involve Unit Directors in resolution of issues when Cardholders do not respond to CCP requests for information within required timeframes.
3. Determine when Unit Directors, the appropriate Under Secretary, the USF&A/CFO and/or the Chief of Staff, Office of the Secretary, or the Office of the Inspector General should be notified of misuse and/or abuse.
4. Prepare memoranda from the USF&A/CFO to the appropriate Under Secretary/Director when Cardholder account reflects repeated misuse or abuse, including unresolved account delinquencies and may suggest appropriate management action as delineated in *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*.

### 7.4 Compliance Reports

In accordance with Governance Committee Recommendation No. 21, the CCP Manager provides quarterly reports to select SI senior managers. The reports reflect Card account usage and instances of misuse and abuse.

### 7.5 Misuse and/or Abuse Corrective Actions

The *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, on the following pages, lists the most frequently identified types of Travel Card misuse and abuse, and actions that shall be taken by Smithsonian employees when misuse or abuse of Travel Cards is identified.

## TABLE 322-1-1 - Travel Card Misuse and Abuse: Table of Management Actions

When misuse or abuse of Travel Cards is identified, the Table 322-1-1 displayed on the following pages shall be used as a general guide to facilitate consistent action throughout the Smithsonian for comparable cases.

Employees will always be accorded due process when disciplinary or adverse action is suggested. To ensure consistency and fairness in establishing and reviewing all facts of a case, managers must consult the Labor/Employee Relations staff in the Office of Human Resources, who will consult with staff in the Office of General Counsel as necessary. When appropriate, the Charge Card Program (CCP) Manager shall refer instances of misuse and abuse of Travel Cards to the Office of the Inspector General for investigation.

The following factors shall be considered by the CCP Manager and supervisors and managers at SI units when determining whether to take remedial, disciplinary or adverse actions for identified misuse or abuse of Travel Cards:

- Whether the employee timely submitted a properly completed travel voucher;
- Whether Smithsonian procedures contributed to a Travel Card account delinquency by improperly delaying reimbursement after receipt of a properly completed Travel Voucher;
- The nature and seriousness of the offense under review;
- Whether the conduct was intentional, technical or inadvertent; or was for personal gain; or is frequently repeated;
- The employee's record of Smithsonian employment prior to the offense under review, and previous record of payments to JPMC; and/or
- Potential, or lack thereof, for adhering to the Smithsonian Travel Card Program policies and procedures and Cardholder responsibilities in the future.

Other considerations may be taken into account as well, e.g., the interval between offenses and/or whether a combination or series of different offenses by the same employee has occurred.

**Table 322-1-1 — Travel Card Misuse and Abuse: Table of Management Actions**

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Payment not submitted and received by JPMC by payment due date<br><br>***(Account payment past due)*** | **1st Offense**<br>CCP staff sends weekly email reminders to the Cardholder until payment is made or the card becomes delinquent (31 days past payment due date), whichever occurs first. | **1st Offense**<br>No action required |
| | **Subsequent Offense**<br>Action above is repeated. When the frequency of offense becomes excessive the CCP Manager notifies the Unit Director or other manager. | **Subsequent Offense**<br>Unit director or other manager to take action as they deem appropriate. |
| Account payment identified to be more than 31 days past due and less than 60 days past payment due date.<br><br>***(Accounts delinquent 30–60 days; JPMC automatically suspends Travel Card use)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder notifying him or her that the account has been suspended and requests a written explanation for the delinquency, including the date the balance was or will be paid. A copy of the request is sent to the unit director or other manager.<br>Cardholder is required to respond in writing within five business days.<br>Cardholder must resolve delinquent account within 15 calendar days.<br>* * * * * * * * * * * * * * * *<br>When offense is not resolved within 15 calendar days, the CCP staff sends a follow-up email to the Card holder and unit director or other manager requesting a written explanation for the delinquency and a plan of resolution.<br>Cardholder is required to respond in writing within five business days.<br>Travel Card remains suspended until the matter is resolved. | **1st Offense**<br>No action required<br>* * * * * * * * * * * * * * * *<br>Unit director or other manager shall consult the Labor/Employee Relations Staff (LER) in the Office of Human Resources for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Account payment identified to be more than 31 days past due and less than 60 days past payment due date. *(continued)*<br><br>***(Accounts delinquent 30–60 days; JPMC automatically suspends Travel Card use)*** | **Subsequent Offense**<br><br>CCP Manager sends an email to the Cardholder and unit director or other manager requesting a written explanation.<br><br>Cardholder's written response is required within five business days and must include the date that payment was or will be made.<br><br>Cardholder must resolve delinquent account within 15 calendar days.<br><br>The CCP Manager may suspend the Travel Card for a period between six months to two years. CCP Manager shall consult the unit director or other manager on the proposed action or to determine if an extended suspension of the Travel Card is warranted. | **Subsequent Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Account payments identified to be 60 to 90 days delinquent past the payment due date without a payback schedule agreed to by Cardholder and the CCP Manager, or non-compliance with payback schedule by the Cardholder.<br><br>***(Accounts delinquent 60–90 days; JPMC automatically suspends Travel Card use)*** | **1st Offense**<br><br>CCP Manager sends an email to the unit director or other manager requesting intervention to resolve the delinquent account. The Cardholder receives a copy of the email.<br><br>Cardholder must resolve the delinquent account within 15 calendar days.<br><br>CCP Manager may suspend the Travel Card for a period between six months to two years and advise the unit director or other manager to consult LER staff. CCP Manager shall consult the unit director or other manager on the proposed action or to determine if an extended suspension of the Travel Card is warranted. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Account payments identified to be 60 to 90 days delinquent past the payment due date without a payback schedule agreed to by Cardholder and the CCP Manager, or non-compliance with payback schedule by the Cardholder. *(continued)*<br><br>***(CCP Manager suspends Travel Card use for a period of one to two years)*** | **Subsequent Offense**<br><br>CCP Manager suspends the Travel Card for a period of one to two years.<br><br>CCP Manager sends an email to the Cardholder and unit director or other manager notifying them of the repeat offense and resulting Travel Card suspension and advises the unit director or other manager to consult LER staff. A copy of the email is also provided to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **Subsequent Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Accounts more than 90 days delinquent past the payment due date.<br><br>***(Travel Card account is closed permanently by JPMC)*** | **1st Offense**<br><br>CCP Manager sends an email to the Cardholder and unit director or other manager notifying them of the offense and permanent closure of the card and advises the unit director or other manager to consult LER staff. A copy of the email is also provided to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of Travel Card for personal expenses, including ATM withdrawals unrelated to official travel, *less than* $500 per occurrence.<br><br>***(CCP Manager may suspend Travel Card use for six or more months when misuse or abuse is verified)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges. Cardholder is required to respond in writing within five business days. If use is determined inadvertent, the Cardholder is reminded of the policy and advised to exercise more care. If use is determined to be abuse, the CCP Manager may suspend the Travel Card for a period of not less than six months and informs the Cardholder and unit director or other manager of the suspension. | **1st Offense**<br>Unit director or other manager may consult the LER staff for advice on appropriate disciplinary or adverse action. |
| | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>Repeated inadvertent use will result in notification to the unit director or other manager, requirement for online training, and/or temporary card suspension.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager closes the card permanently.<br>An email notice of the closure is sent to the Cardholder and unit director or other manager advising them of the abuse. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br>The USF&A/CFO may contact the appropriate Under Secretary and unit director. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of Travel Card for personal expenses, including ATM withdrawals unrelated to official travel, that *exceeds* $500 per occurrence.<br><br>***(CCP Manager closes Travel Card permanently when misuse or abuse is verified)*** | **1st Offense**<br><br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br><br>Cardholder is required to respond in writing within five business days.<br><br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager closes the card permanently.<br><br>An email notice of the closure is sent to the Cardholder and unit director or other manager advising them of the abuse. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Allowing another individual to use the Travel Card for an unauthorized purchase/ATM withdrawal or using the Card on behalf of another individual.<br><br>***(CCP Manager may suspend Travel Card use for six or more months when misuse or abuse is verified)*** | **1st Offense**<br><br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br><br>Cardholder is required to respond in writing within five business days.<br><br>If use is determined to be abuse, the CCP Manager suspends the Travel Card for a period of not less than six months and advises the Cardholder and unit director or other manager of the suspension. Unit director, or other manager, has the discretion to consult with LER staff for advice on whether disciplinary or adverse action should be pursued. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Allowing another individual to use the Travel Card for an unauthorized purchase/ATM withdrawal or using the Card on behalf of another individual.<br><br>*(continued)*<br><br>***(CCP Manager cancels Travel Card permanently when misuse or abuse is verified)*** | **Subsequent Offense**<br><br>CCP Manager sends an email message to the Cardholder and the unit director or other manager. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the Under Secretary and unit director concerning the abuse. | **Subsequent Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of the Travel Card for SI business expenses not related to official travel or authorized DRB activities<br><br>***(CCP Manager may require offending Cardholder to repeat Travel Card training)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br>Cardholder is required to respond in writing within five business days.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager issues an email warning to the Cardholder and may require the Cardholder to repeat Travel Card training. | **1st Offense**<br>No action required. |
| ***(CCP Manager may suspend Travel Card use for three or more months when misuse or abuse is verified, may require offending Cardholder to repeat Travel Card training.)*** | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager suspends the Card for not less than three months and advises the Cardholder and unit director, or other manager, of the suspension. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Use of the Travel Card for SI business expenses not related to official travel or authorized DRB activities<br>*(continued)* | **Subsequent Offense**<br>Unit director or other manager is advised to consult LER staff.<br>Repeated offenses after suspension period will result in permanent closure of the Card. | **Subsequent Offense** |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of the Travel Card to pay travel expenses authorized for other SI travelers, e.g., employees or invitational travelers. | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br>Cardholder is required to respond in writing within five business days.<br>If misuse is determined to have occurred the CCP Manager sends an email warning to Cardholder and may require the Cardholder to repeat Travel Card training. | **1st Offense**<br>No action required. |
| | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>If misuse is determined to have occurred the CCP Manager sends an email warning to Cardholder and may require the Cardholder to repeat Travel Card training.<br>Repeated offenses may result in permanent closure of the Card. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

PD-Jackson

# Smithsonian Institution

## EMPLOYEE PERFORMANCE PLAN

| | | | |
|---|---|---|---|
| **Name:** | MILTON JACKSON | **Title:** | Senior Advancement Program Spe |
| **Pay Plan:** | IS | **Series:** | 1001 |
| **Grade:** | 13 | **Organization:** | 574100 |
| **Rating Period Start Date:** | 03/23/2015 | **Rating Period End Date:** | 09/30/2015 |

*If the individual for which you are initiating the plan or appraising was hired or promoted during the current fiscal year, please update the ***Rating Period Start Date*** above to reflect the correct rating period.

| | | | |
|---|---|---|---|
| **Rating Official:** | GRAVES,MARIE L | **Title:** | ASSOCIATE DIR FOR ADVANCE |
| **Reviewing Official:** | COLE,JOHNNETTA B | **Title:** | DIR, NAT'L MUS OF AFRICAN ART |

**Employee:** MILTON JACKSON

### Instructions and Definitions

Smithsonian or Program Strategic Goals - The Smithsonian and/or Unit goals that are supported by the acceptable performance of the corresponding element.

Performance Standard - A description of the accomplishments or results expected for each element. One or more standards must describe the results an employee is expected to accomplish in order to support SI or organizational goals. Each standard must describe expected performance at the Successful level.

### PLANNING, DISCUSSING AND IMPLEMENTING THE PERFORMANCE PLAN

- The rating official meets with the employee to discuss performance expectations
- The employee has the opportunity to provide input to the performance plan
- The rating official makes the final decision on performance elements and standards for the performance plan and the reviewing official approves

### PROGRESS REVIEW DISCUSSION(S)

- At a minimum, one progress review must be held during the appraisal period, generally mid way through the performance period
- The employee has the opportunity to provide work examples or accomplishments he/she has achieved over the appraisal period
- Process reviews may be given at any time during the appraisal period
- At the progress review, the rating official and employee may modify the plan if necessary

### EMPLOYEE TRAINING AND DEVELOPMENT DISCUSSION

- The rating official and employee discuss training and development needs that affect performance of assignments and responsibilities throughout the annual performance cycle.
- The employee may initiate the development of an individual development plan (IDP) that is reviewed and approved by the rating official at any time during the annual performance cycle. Information regarding IDPs can be found on Moodle, which can be accessed through PRISM.

## ELEMENT #1

**Smithsonian Goal** **Program Goal**

Enabling Our Mission Through Organizational Excellences

1.ELEMENT (Work task or responsibility that supports above goals)
Discover, Qualify, Cultivate, Solicit and Steward Prospects and Donors

Performance Standards/Expectations at the Successful Level (Mandatory)
By the end of the fiscal year:

Design and implement detailed work plan to meet or exceed this annual fundraising goal to secure support for Museum-wide priorities with special emphasis on developing high value-exchanges with our partners and evaluate plan on an ongoing basis.

Build portfolio and robust funding schedule to fulfill Museum's annual unrestricted operating needs and Capital campaign programs.

Meet with Museum¿s various departments to understand major priorities and goals, provide timely information on funding opportunities and coordinate proposal development and submissions.

Develop strategy and case statements in collaboration with various museum departments

Manage a portfolio of 100 individuals rated between $25K and $1M

Conduct a minimum of 80 face-to-face visits

Conduct 4 trips

Solicit seven (7) individuals and close 3-4

Identify fifteen (15) new major gift prospects

Close $1.5M in gifts

Performance Standards/Expectations at the Outstanding Level (Mandatory)
Conduct a minimum of 100 face-to-face visits

Conduct a total of 10 trips

Solicit 10 individuals and close 5-6

Close $$2M in gifts

Cancelled

## Document Header Information

| | | | |
|---|---|---|---|
| Document Type: | Local Voucher | Document Name: | LV00000821 |
| Travel Authorization Number: | SMRA0B1CYK | Trip Name: | LV 6/16/15 |
| TA Date: | 06/16/15 | Currency: | USD |
| Organization: | GSI57NMAFA | Current Status: | X CANCEL LOCAL VOUCH |
| Purpose: | DONOR CULTIVATION | Document Detail: | Including a light lunch with potential donor Kangni Anenounue, parking for special events, gas and rental car. |
| Type Code: | Local Voucher | | |

## Traveler Profile

| | | | |
|---|---|---|---|
| Name: | Jackson, Milton L | ID: | 1000857930 |
| TID: | 0000122064 | Organization: | GSI57NMAFA |
| Title: | | Duty Station: | |
| Security Cl: | | Card: | CARDHOLDER |
| Office Address: | 950 Independence Ave. S.W. <BR>Washington, DC 20560 | EMAIL: | jacksonml@si.edu |
| Office Phone: | (202) 633-4635 | Cell Phone: | |
| Home Phone: | (202) 633-4635 | Alternate Address: | |
| Alternate Phone: | | | |

## Profile Custom Fields

Trip Number: 1

| Label | Value |
|---|---|
| Location Code | |
| Traveler Status | Trust |

## Document Totals

| | |
|---|---|
| Total Expenses: | 74.29 |
| Reimbursable Expenses: | 67.49 |
| Non-Reimbursable Expenses: | 6.80 |
| Advance Applied: | .00 |
| Net to Traveler: | 44.00 |
| Net to Government: | 6.80 |
| Pay to Charge Card: | 23.49 |

## Document Totals by Expense Category

| Expense Category | Cost | Advance Amount |
|---|---|---|
| Misc Expense | 23.49 | .00 |
| Transportation | 44.00 | .00 |
| Transxn Fees | 6.80 | .00 |
| Total Expenses: | 74.29 | .00 |

## Trip 1 Details

### Expenses

Trip#: 1 — Total Non-Per Diem Expenses: 74.29 — Total Per Diem Expenses: .00

| Date | Description | Category | Cost | Pay Method | Per Diem |
|---|---|---|---|---|---|
| 05/29/2015 | Donor Cultivation - Meals | Misc Expense | 23.49 | IBA | |
| 06/03/2015 | Parking | Transportation | 22.00 | PAID BY TRAVELER | |
| 06/03/2015 | Parking | Transportation | 22.00 | PAID BY TRAVELER | |
| 06/16/2015 | Local Voucher Fee | Transxn Fees | 6.80 | Invoice | |

**Account Summary for the Selected Trip**

**Payment Detail Information**

| Organization | Label | Accounting String | Payment Method | Amount |
|---|---|---|---|---|

**Totals by Label**

**Totals by Payment Method**

**Attachments** No Attachments Exists

**Audits**

| Audit Name | Result | Reason |
|---|---|---|
| NO ATTACHMENTS | FAIL | Document does not have any attachments. ALL RECEIPTS AND REQUIRED DOCUMENTATION MUST BE ATTACHED BEFORE THE VOUCHER IS APPROVED. |
| | Traveler Justification: | voucher canceled |

**Document History 10/03/2016 Local Voucher: LV00000821**

**Copyright 1989-2009 Concur Government Edition: Concur Inc. Jackson, Milton L. 0000122064**

| STATUS | DATE | TIME | SIGNATURE NAME | REASON |
|---|---|---|---|---|
| CREATED | 06/16/2015 | 12:36PMEST | Esposito, Frank P | |
| X CANCEL LOCAL VOUCH | 10/09/2015 | 12:00PMEST | Esposito, Frank P | |

**I certify that the electronic signatures listed above are valid and on file**

______________________________ ____________

**SIGNED DATE**

**Document Signatures**

Traveler/Preparer Name: ____________________

Traveler/Preparer Signature: ____________________

Date: ____________________

Approver Name: ____________________

Approver Signature: ____________________

Date: ____________________

**Graves, Marie W.**

34

**From:** Jackson, Milton L.
**Sent:** Thursday, July 23, 2015 3:57 PM
**To:** Graves, Marie W.
**Subject:** RE: Following Up

Will do.

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Graves, Marie W.
**Sent:** Thursday, July 23, 2015 3:52 PM
**To:** Jackson, Milton L.
**Subject:** Following Up

Milt,

Let's meet around 4:30 to discuss the attached.

Thanks,
Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

Corrective Action

Smithsonian
*National Museum of African Art*

July 23, 2015

Dear Milt,

Soon after you joined our staff in March 2015, you and I met so that could explain the full scope of your position, and to make clear what our expectations were for your successful performance as the Major Gifts Officer for NMAfA. At that meeting, your fundraising goal was established to be $1.5 million and I emphasized the importance of clear communication with me regarding your meetings and your fundraising prospects. Over the intervening months, I met with you to reiterate my concerns regarding your lack of communication and clarity with regards to your work.

On July 7, 2015, you, Dr. Cole, and I met to discuss your performance. Specifically, we identified the following areas as being unsatisfactory and in need of improvement:

Identification and cultivation of donor prospects:

- You arranged a tour of NASM for a prospective donor - without including a tour of African Art and introducing the donor to NMAfA Director /staff;
- It was reported to me that you abruptly left a donor lunch, leaving your SI colleagues to navigate the meeting, ultimately returning after the meeting had ended;
- You failed to introduce a donor to Dr. Cole at the 4th of July Fireworks Event at NMAH;
- You pursued the solicitation of a gift for another unit without a strategy to secure funding for NMAfA;
- You sent an email regarding an in-kind-gift to our Director of Advancement and Philanthropic Giving in the SI Central Advancement Office, bypassing the chain-of-command and operating independently instead of through me;
- You have failed to adequately brief me in advance of your donor meetings, specifically with Dr. Harland, representatives of the Disney Corporation and the Tishman family, and visitors from the Italian Embassy.

Improper use of travel card:

- Submitted expense report for two unauthorized expenses
    - o Auto rental receipt for local travel
    - o Meal for SI staff listed as donor

Communication and teamwork:

- Seeking assistance from departments outside of our museum without first checking with NMAfA staff
    - Consulting with outside departments because NMAfA staff member failed to return your email is not a reason to seek outside assistance.

Corrective Actions:

Create a Work Plan for my weekly review that focuses on prospects, expense reports, communication, and teamwork. The work plan should also assess progress made toward your fundraising goal.

There are two main sources of prospects — individuals your organization already knows, and those someone close to you knows.

Data on internal prospects are found in the PANDA database, which should be used more frequently by you to identify prospective donors. External prospects are those identified by volunteers or relationship mapping.

Here are some techniques for identifying both. There are several selection criteria that you can evaluate within your portfolio for prospecting including:

- Past giving
- How recent gift was made
- Frequency of giving
- Longevity on file
- Basic biographical sketch
- Social and political affiliations
- Financial information
- Philanthropy to other organizations
- Strategy
- Does this individual have the capacity to make a gift of significance?
- From what we know of his or her interests, prior giving, and other affiliations, is this person likely to be interested in our mission? Why?
- From what we know of his or her assets and past giving patterns, how might this person be able to make a significant gift — in cash, or through some sort of planned gift? Remember - building a solid work plan is analysis not a data dump.

Expense report:

- Request a meeting with NMAfA's finance manager for a travel card tutorial
- Review Travel card manual posted on PRISM.

These policies are intended as a guide to reimburse individuals for SI-related travel, entertainment, and business expenses. The responsibility to observe the guidelines rests with the traveler. Reimbursement should be sought and authorized only for expenses that conform to SI policy, are ordinary, necessary, and reasonable both in amount and relative to its purpose. If you are not sure if an expense is authorized, please check with me.

Communication and teamwork:

Great teams result when everyone is sharing. As the result, we get better decisions. Face time is a sometimes lost but valuable asset. The next time a staff member fails to respond to an email, let's get out of the office and communicate eye-to-eye. It is important to build relationships with team members by human connection.

Your success as the Major Gifts Officer for NMAfA is the ultimate goal. However, your performance to-date is an indicator that you have not completely grasped the goals and objectives of this position and an understanding the museum's mission. I am very concerned and I would like to meet with you immediately so that we can discuss areas of improvement and a plan of action to address these deficiencies.

Sincerely,

Marie

**Graves, Marie W.**

**From:** Jackson, Milton L.
**Sent:** Tuesday, August 11, 2015 1:49 PM
**To:** Graves, Marie W.
**Subject:** RE: Following Up

Marie,

Given the issues outlined in the document you forwarded to me, after some reflection, I'd like to respond for the sake of clarity, among other things. As I mentioned to you when we spoke about these issues:

- The tour structured for Dr. Harland initially included a NMAfA tour first, however, this was scaled back, at her request, due to her personal schedule and due to the fact that she needed a wheelchair for the length of her visit. She has, however, agreed to tour NMAfA at some point when convenient in the near future.
- I did leave the lunch with Dr. Harland, after having explained to both colleagues – and Dr. Harland – the urgency and the nature of the need for my departure. It should be noted that I texted/called both colleagues during my absence and that I returned with a vehicle to pick up the wheelchair-bound Dr. Harland - which allowed us to avoid her getting wet in a pending rainstorm and which allowed her to be on time for her 1pm appointment. Finally, I find it unusual that all this was mentioned, yet there was no mention to me of my assisting the NASM docent who experienced a medical emergency following his presentation to Dr. Harland. This was a significant event that impacted everyone in the NASM lobby, including the donor, yet it hasn't come up during any of our conversations.
- Given my management and juggling of multiple advancement issues before/during the July 4th event, as I have stated multiple times to you in the past, I did not see Dr. Cole until the end of the ~300 person event – nor did I know who, if anyone, from NMAfA was going to attend the event.
- With respect to Dr. Harland, I did not pursue the solicitation of any gift to another unit without a strategy to secure funding for NMAfA. She alone determined to present the letter at the July 4th event to donate $40K in scientific equipment and my goal, all along, has been to flesh out the substance of her philanthropic efforts. Once she presented the letter to me, one of my first steps was to see if this equipment gift was attractive to our NMAfA Conservation colleagues.
- Yes, I sent an email to all parties involved in the cultivation of Dr. Harland, first and foremost to advise them of her letter indicating she wanted to gift $40K in scientific equipment and secondly to request viable next steps regarding a gift-in-kind. This, I understand now, was in error, which I regret. Suffice to say, following our conversation, I have been keeping you abreast of my advancement actions - but I have not met with the Disney or Tishman reps yet at this juncture.
- I did rent a car for NMAfA purposes and understand now that currently, as a major gifts officer for NMAfA, I do not have approval for car rentals in the future.
- I did have coffee/pastries with a Smithsonian employee – who is also an African-born immigrant from Togo; who is an accomplished artist; whose brother is an accomplished artist; who has substantial business/familial connections in the DC metro area/Togo (his country of origin) - in the interest of having him become a supporter of our diversity/outreach efforts. I understand now that I cannot have SI-paid meals with other SI employees.
- With respect to seeking external assistance for the above credit card issues, both Frank Esposito and I sent emails and Frank personally inquired internally multiple times before seeking external assistance. Given that the due date for the payment was encroaching, I simply looked to the most prudent means to get answers before the payment date was passed.

Regards,

Milt Jackson

Follow up Meeting 8/20

# Graves, Marie W.

35

**From:** Graves, Marie W.
**Sent:** Thursday, August 20, 2015 11:12 PM
**To:** Jackson, Milton L.
**Cc:** Holmes, Bill
**Subject:** Follow-up to Today's Meeting
**Attachments:** Milt Jackson 082015.doc

Dear Milt,

Please see the attached letter as follow-up from our discussion this morning.

Best,
Marie

Marie Woodward Graves
Associate Director of Advancement
Smithsonian The National Museum of African Art
202.633-4648 (office)
202-316-6943 (cell)

Smithsonian
*National Museum of African Art*

August 20, 2015

Dear Milt,

I thought it would be helpful to summarize our notes from today's meeting (August 20, 2015), which followed up on your progress and areas of improvement needed, which I outlined to you in my letter of July 23rd. In our meeting today, which was also attended by Bill Holmes, as our administrative officer, I discussed critical elements in your performance that are still unacceptable. As we explained, we looked for progress made to date on the outlined areas for improvement, but we also asked you about any impediments you perceived in making progress. Specifically, in our meeting today, we identified the following areas as still unsatisfactory and requiring improvement:

Communication and information sharing:

> To reach our campaign goal and to build and foster a collaborative team environment, it is incumbent upon you to reach out to me proactively to discuss advancement strategies and activities that you propose in your capacity as our major gifts officer. A perfect example of your need to improve your communication with me is your approach to Maurice Templeton. Rather than coming to me to discuss donor strategy, you sought advice from our museum's head of public affairs. I mention this example, but I want to emphasize that this has been your pattern—you rarely proactively come to me; instead I have to ask to meet and only then find out that you are considering a particular prospect. When I have drawn this behavior to your attention in the past, as well as today, you have noted how you don't wish to trouble me with the details—but I continue to emphasize that in building our relationship and ensuring that your efforts are well-placed to meet the advancement needs of our museum, it is important for you to discuss your strategies in advance with me.

In an effort to encourage improvement in this critical area of effective communication, we agreed at today's meeting to implement a weekly development status report you would draft that would recap your advancement activities for the week, and the status of those activities, and would look ahead by listing the goals and action items for the coming week. This report is due via email to me by noon each Friday, beginning next Friday, August 28th.

These status reports will be used by us each week as we meet to review your progress.

Of particular interest with regards to activities you have mentioned to me, I am requesting immediate closure on the following:

- Disney strategy and draft of letter to Disney CEO: due by August 26, 2015
- Schedule and appointment to meet with Dr. Harland (for the week August 31st)

- Detailed weekly work plan: Please see my letter July 23 for the elements I would like to see listed in your work plan (due by August 27, 2015)
- Weekly status report (due by August 28, 2015)

Finally, as discussed at our last weekly meeting, I am concerned that you have not generated the activity to reach your goal of $1.5 million. By your own admission, you spend an inordinate amount of time researching donors; however, I have not seen the results. Have you qualified 80 to 90 donors for your portfolio? What is the strategy for these individuals? How many meetings requests have you initiated with donors or prospects? How many asks have you made? How many proposals do you have in your pipeline? I raise these questions as ways for you to assess if you are spending your time wisely and productively or if you need to rethink your approach or reprioritize your time in order to meet your goal as our major gifts officer.

As you know, I am out on annual leave all next week, but I will be checking emails and will look forward to progress reports on the items noted above and in my letter to you of July 23rd, as well.

Best,

Marie

Smithsonian
*National Museum of African Art*

Date October 26, 2015

To Milton L. Jackson

From Marie Woodward Graves

Subject Discharge during Probationary Period

You were placed on an indefinite appointment to the position of Senior Advancement Program Specialist (Gift Officer), IS-1001-13, with the Smithsonian Institution on March 23, 2015. Under the terms of this appointment, you are required to serve a one-year probationary period.

It is my decision to separate you during your probationary period because of your poor performance. Your separation will be effective at the close of business on Thursday, November 9, 2015. You will be placed in a paid, non-duty status (administrative leave) through that date. This notice is final.

If you believe this action is being taken wholly or in part because of discrimination based on race, color, religion, sex (including sexual harassment), national origin, disability, genetic information, or age, you may file a discrimination complaint with the Smithsonian Institution Office of Equal Employment and Minority Affairs (OEEMA), 600 Maryland Avenue SW, Room 2091, Washington, D.C. 20560, within 45 calendar days of the effective date of this action. Information about filing a discrimination complaint can be found in the Smithsonian Directive, SD 214, Equal Opportunity Handbook, Chapters 6-10, or by calling OEEMA at 202-633-6430.

If you would like advice about your rights or about the procedures to follow, please contact Dania Palosky, Labor/Employee Relations Specialist, telephone number 202-633-6331 or Amy Koontz, General Attorney, telephone number 202-633-6406.

Signature below does not denote employee agreement with this action; it only represents receipt of the notice.

________________________________ ________________

Acknowledgment of Receipt Date

SMITHSONIAN INSTITUTION
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington DC 20013-7012
202.633.4600 Telephone
202.357.4879 Fax

Smithsonian
*National Museum of African Art*

Date October 26, 2015

To Milton L. Jackson

From Marie Woodward Graves

Subject Administrative Leave

This is notice that effective immediately, you are being placed in a paid non-duty status (administrative leave) through your separation date of November 5, 2015.

Since you will be in a non-duty status, please turn in your Smithsonian identification and equipment, including all Smithsonian keys.

Please note that, while on administrative leave, you may not enter the non-public areas of the Smithsonian unless you make an appointment and specific arrangements to do so by calling Bill Holmes at (202) 633-4602.

If you have any questions, please contact me at (202) 633-4648.

Signature below only represents receipt of this notice.

____________________________ ____________________

Acknowledgment of Receipt Date

SMITHSONIAN INSTITUTION
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington DC 20013-7012
202.633.4600 Telephone
202.357.4879 Fax

SI-61? Trust Fund
Rev. 10/1/87
754-036

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, Items 1,7-22,32,33,36,39 and 44)

| 1. Actions Requested | 2. Request Number |
|---|---|
| TERMINATION SEP PROBATION/TRIAL (TRUST) | |
| **3. For Additional Information Call (Name and Telephone Number)** | **4. Proposed Eff. Date** |
| HOLMES, WILLIAM H | 11/09/15 |

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, Title, Signature, and concurrence Date) |
|---|---|
| GRAVES, MARIE L<br>ASSOCIATE DIR FOR ADVANCE | COLE, JOHNNETTA B<br>DIR, NAT'L MUS OF AFRICAN ART 11/09/15 |

## PART B - For Preparation of SI 650 (Show dates in month-day-year order.)

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| JACKSON, MILTON L 113357 | [redacted] | 11/19/60 | 11/09/15 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| | |

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

**7. FROM: Position Title and Number**

SENIOR ADVANCEMENT PROGRAM SPECIALIST (GIFT OFFICER)

PD: 106681 POSITION: 20008260

**15. TO: Position Title and Number**

| 8. Pay Plan | 9. Occ. CD | 10. Grd/Lvl | 11. Step/Rate | 12. Tot. Salary | 13. Pay Basic |
|---|---|---|---|---|---|
| IS | 1001 | 13 | 05 | $102,932.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $82,863.00 | $20,069.00 | $102,932.00 | $0 |

| 16. Pay Plan | 17. Occ. CD | 18. Grd/Lvl | 19. Step/Rate | 20. Tot. Salary/Award | 21. Pay Basic |
|---|---|---|---|---|---|
| | | | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| | | | |

**14. Name and Location of Position's Organization**

SMITHSONIAN INSTITUTION TRUST
OUSHAC-UNDR SEC HSTRY, ART, CLTR
NMAFA-NATL MUSEUM AFRICAN ART
NMAFA-EDUCATION & PUBLIC PGMS
NMAFA-EXTERNAL AFFAIRS DEPT

**22. Name and Location of Position's Organization**

### EMPLOYEE DATA

| 23. Veterans Preference | Type of Appointment | 25. Agency Use | 26. Sex |
|---|---|---|---|
| 1 (1-None; 6-30% Comp) | 08 (8 - Indefinite; 9- Temporary) | | MALE |

| 27. Life Insurance | 28. Health Insurance | 29. Pay Rate Determinant |
|---|---|---|
| 1 (1 - Eligible; 2 - Ineligible) | 1 (1 - Eligible; 2 - Ineligible) | 0 REGULAR RATE |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 2 (1-CS; 2-FICA; 3-TIAA; 4-None; 5 - TIAA/FICA; 8-PanSocSec) | 02/23/05 | F (F-Full time; P-Part time; I-Intermittent) | |

| 34. NTE Date | 35. FLSA Category | 36. Organization Structure Code | 37. Bargaining Unit Status |
|---|---|---|---|
| | E (E-Exempt; N-Nonexempt) | 2257410000000000 | 2222 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON DIST OF COLUMBIA DC USA |

| 40. Agency Data | 41. | 42. | 43. | 44. Accounting Fund Number |
|---|---|---|---|---|
| | | | | |

| 45. Edu. Lvl. | 46. Yr. Degr. Attd | 47. Acad. Discipl. | 48. Func. Class | 49. Citizenship | 50. Vietnam Era Vet | 51. Supervisory Code |
|---|---|---|---|---|---|---|
| 13 | 1995 | | 00 | 1 (1-USA 8-Other) | (V-Yes N-No) | 8 ALLOTHER |

## PART C - Reviews and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | 1. Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. NMAFA-EXTERNAL AFFAIRS DEPT | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

| 2. Approval: I certify that the information entered on this form is accurate and that the proprosed action is in compliance with Trust Fund personnel policies. | Signature | Approval Date |
|---|---|---|
| | | |

CONTINUED ON REVERSE SIDE

SI 610 (Reverse) 113357

**PART D - Remarks by Requesting Office**

(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If ""YES"", please state these facts on a separate sheet and attach to SI-610). ☐ YES ☐ NO

Employee separated during probationary period due to lack of performance.

**PART E - Employee Resignation/Retirement**

**Privacy Act Statement**

You are requested to furnish a specific reason for your resignation and a forwarding address. Your reason for resigning may be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay compensation to which you are entitled.

The furnishing of the information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits.
Please be specific and avoid generalizations.
Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)
Sep Probation/Trial (Trust)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| 11/09/15 | JACKSON,MILTON L | | 3248 ARROWHEAD CIR APT D<br>FAIRFAX, VA 22030-7351 |

**PART F - Remarks for SI-650**

# EXHIBIT B

SI- 650
SI Trust Fund
Rev. 7/91

# PERSONNEL NOTIFICATION DOCUMENT

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| JACKSON, MILTON L | 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 | 11/19/60 | 03/23/15 |

## FIRST ACTION

| 5-A Code | 5-B Nature of Action |
|---|---|
| 953 | INDEFINITE APPT |

## SECOND ACTION

| 6-A Code | 6-B Nature of Action |
|---|---|
| | |

7. FROM: Position Title and Number

| 8 Pay Plan | 9 Occ Code | 10 Grade/Level | 11 Step/Rate | 12 Total Salary | 13 Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A Basic Pay | 12B Locality Adj | 12C Adj Basic Pay | 12D Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization

15. TO: Position Title and Number
Senior Advancement Program Specialist

20008260 106681

| 16 Pay Plan | 17 Occ Code | 18 Grade/Level | 19 Step/Rate | 20 Total Salary | 21 Pay Basis |
|---|---|---|---|---|---|
| IS | 1001 | 13 | 05 | 102,932.00 | PA |

| 20A Basic Pay | 20B Locality Adj | 20C Adj Basic Pay | 20D Other Pay |
|---|---|---|---|
| 82,863.00 | 20,069.00 | 102,932.00 | |

22 Name and Location of Position's Organization
SMITHSONIAN INSTITUTION (TRUST)
UNDER SECR FOR HIST ART & CULT
NAT'L MUSEUM OF AFRICAN ART
NMAFA-EXTERNAL AFFAIRS DEPT

SM 7122574100000000000 PP 06 2015

## EMPLOYEE DATA

23. Veterans Preference: 1 (1 - None; 2 - 30% Comp.)

24. Type of Appointment: 8 (8 - Indefinite; 9 - Temporary)

25. Citizenship: 1 (1 - U.S.; 8 - Other)

27. Life Insurance: 1 (1 - Eligible; 2 - Ineligible)

28. Health Insurance: 1 (1 - Eligible; 2 - Ineligible)

29. Pay Rate Determinant: 0 NOT APPLICABLE

30. Retirement Plan: 2 (1 - CS; 2 - FICA; 3 - TIAA; 4 - None; 5 - TIAA/FICA; 8 - Pan Soc Sec)

31. Service Comp. Date (Leave): 02/23/05

32. Work Schedule: F FULL TIME (F - Full time; P - Part time; I - Intermittent)

33. Part-Time Hours Per Biweekly Pay Period:

34. NTE Date:

35. FLSA Category: E (E - Exempt; N - Nonexempt)

36. Organizational Structure Code: 71-22-57-4100-00

37. Bargaining Unit Status:

38. Duty Station Code: 11-0010-001

39. Duty Station (City-County-State or Overseas Location): WASHINGTON DIST OF COLUMBIA DC

40. Supervisory Code: 8

41.

42.

43.

44. Accounting Fund Number:

45. Remarks
Appointment is subject to completion of one year initial probationary
period that began 03/23/15.
Advaced salary rate authorized by Johnnetta B. Cole, Director memo dated
03/15/15.
YOU ARE RECEIVING YRS, MOS CREDIT TOWARDS YOUR
SCD-LEAVE SHOWN IN BLOCK 31 FOR NON-FEDERAL SERVICE:
FROM MM-YYYY TO MM-YYYY. >THIS TIME IS
PERMANENTLY CREDITABLE UNLESS YOU FAIL TO
COMPLETE 1 FULL YEAR OF CONTINUOUS SERVICE WITH THIS AGENCY.

46. Employing Department or Agency: SMITHSONIAN INSTITUTION (TRUST)

47. Agency Code: SM 71

48. Personnel Office ID: 1536

49. Approval Date: 03/24/15

50. Signature/Authentication and Title of Approving Official
E/S BY: PAIGE K JONES
MANAGER, COMPENSATION AND BENEFITS

# EXHIBIT C

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
131 M Street, N.E. Room 4NW02F
Washington, D.C. 20507

--------------------------------

| | |
|---|---|
| Milton Jackson, | EEOC Case No.: |
| Complainant, | 570-2017-00087X |
| v. | SI Case No.: |
| Dr. David J. Skorton, Secretary, Smithsonian Institution, | 16-11-050316l |
| | Administrative Judge |
| Agency. | Maricia Woodham |

--------------------------------

Washington, D.C.

Monday, February 11, 2019

Deposition of:

MILTON L. JACKSON, JR.

called for examination by counsel for the Agency, pursuant to Notice, taken at the Smithsonian Institution Dillon Ripley Center, 1100 Jefferson Drive, Southwest, Room 3112, Washington, D.C. 20560, beginning at 12:14 p.m., before Lu Anne Dawson, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

**philanthropic relationship. He had offered half a million dollars for a group of explorers, and discussion could allow for other groups to benefit, as well.**

Q. The person who made the back of the bus comment, that was a board member?

**A. Board of advisors member.**

Q. Board of advisors member. Why did you think it meant more than the seat in the back where he was sitting, or what was it that tinged it racial versus a location where he was sitting down?

**A. Counselor, I wasn't on the bus. I had taken the Metro or a cab there and none of the board members had ridden to the event together.**

Q. Did you resign, or how did you depart National Geographic?

**A. I was terminated.**

Q. You were terminated. What was the termination for? Did they say the reason? Was the reason given?

**A. I can't recall exactly what the words were, but it had to do with communication issues,**

**and -- yeah, communication issues and I believe travel issues, as well.**

Q. And then what happens between October 2014 and -- I think you started at the Museum in March?

**A. Correct.**

Q. Can you describe what you were doing during that period?

**A. Looking for work.**

Q. How did you find out about the position at African Art?

**A. I believe it was advertised online.**

Q. And there was an interview process?

**A. Yes.**

Q. Who did you interview with?

**A. Dr. Cole; Eddie Burke; Maggie; one of the board members; the vice president of advancement.**

Q. Zuly?

**A. I'm sorry?**

Q. Was it Zuly Dorr?

**A. No.**

Q. No?

THE WITNESS: I have the names. Should I --

MS. WHITE: Certainly. If you need to look them up, then don't bother unless you are prompted to do that.

THE WITNESS: Marie Graves.

BY MS. STARUN:

Q. Anyone else?

**A. Chris Kreamer.**

Q. Big interview process. Anyone else?

**A. There were a number of other people. I can't recall the names now.**

Q. On the resume it says you were in American University from March 2011 to July 2013, which, when I did the math, was 16 months; does that sound about right?

**A. Yes.**

Q. Why did you leave American University?

**A. I secured a half million dollars-plus gift, artwork and cash for the Katzen Museum from a previously un-contacted alumnus and had secured a $18,000 gift, I believe, for the library.**

**provided initially and then subsequently, the worst possible work environment that ensured that no work was getting done. There wasn't a sense of professionalism or civility, and management was having meetings with us, with employee assistance and the Ombudsman's office. A mailbox was set up outside the Museum so that people could drop their complaints in there.**

**I wasn't immune from that, the experiences of some of my colleagues, and I can't recall all of them, but I've documented them ad nauseum in the documents I've already provided.**

Q. And there's nothing else? There's no additional notes that you may have taken from meetings with Ms. Graves or --

**A. I believe I provided everything.**

Q. Did you take notes when you spoke to Shadella Davis on July 31st?

**A. I believe I took notes after the conversation.**

Q. Did you provide them?

**A. I don't believe -- I think I, I think I**

prepare for the meeting. Which one of these is the preparation? Are they both your prep notes?

A. **The second page is the document that I crafted in advance of my meeting with Karin George.**

Q. And what is the first page?

A. **The first page is an email that she sent to me stating that she wanted to get to know me better, she wanted to know how things were going. Basically, the text of the email indicates her purpose for writing it and the questions that she wanted me to be prepared for.**

Q. And the handwriting, is that your handwriting, not the one in the corner, but in the line, in the email?

A. **Starting after the word works?**

Q. Yes.

A. **That is my handwriting. And between the following paragraph, that is my handwriting and in between the next paragraph, that is my handwriting.**

Q. Did you say to her that you had concerns that these things were happening because of your race or sex or because you had spoken to Shadella Davis at

one point?

**A. I believe I mentioned my race and sex, and I believe I mentioned, I believe I mentioned my attempts to speak with Ms. Davis. And I know that Frank and Eddie had also mentioned the substantial contact with not only the Ombudsman's office but that there were EEO claims filed by other people there I believe at the time that were pending, at least two, if I'm not mistaken.**

Q. You described this as a sounding by central advancement about the campaign. I guess this is happening in October. And then you had these meetings and nothing. The story line ends right there; there's nothing further that happened with Karin George or central OA?

**A. That is correct.**

Q. Thank you.

You told Chandra, you said earlier, that you attempted to file an EEO claim. Did you tell her specifically that you believe these things were happening because of your race and sex?

**A. I believe I answered that before.**

in New York?

A. **I don't know where he's living or working. I just know he was going to New York subsequently.**

Q. But he's African and from Africa or do you think he was --

A. **He's African. He's an African artist.**

**The third --**

Q. Does he have a website, do you know?

A. **I don't know.**

Q. Do you know what part of Africa he's from?

A. **No. The Museum would have those records.**

Q. Thank you.

A. **The third piece of paper is emails back and forth to Holly Laffoon. If I understand things correctly, she was an employee, a past employee of the Museum, and she was held in high regard. She was sending at least $50 to the Museum to support it because of her past experiences and such.**

**And I inquired, which is part and parcel**

of my position, of those who were friends of the Museum, those who had given to the Museum, and I was beginning to take the 30-person list which originally included the President and his wife and expand upon it.

And in order to do that, you have to connect with external resources. Ms. Laffoon was a well-respected and mature former employee. Sarah Holmes and I made contact, and she was gracious enough to come and visit and talk about some of the connections that we had lost in the past.

Q. Did Holly work in advancement or what --

A. I don't think she was in advancement. I think she was, she may have been executive assistant or something along those lines. But generally, everyone knew her and she was well respected and well liked, and so -- and she was thrilled to come in and support the Museum, again, in some way, shape or form.

Upon presenting the fact that we had met with Ms. Laffoon and that she was going to plug us

into her network, Ms. Graves dismissed her, using a disparaging term. I can't recall what right now. But this was someone that was associated with the Museum and supportive of being with the, supportive of the Museum moving forward. So I was, needless to say, quite shocked.

And this was April. You can tell from the emails that whether I believed it may have been early May or something like that, but it was early in my tenure and Ms. Graves was dismissive of her.

Q. What was her network like?

A. What was her --

Q. What was her network like? Who were the people she was talking about?

A. A seasoned major gifts officer understands that everybody's not going to be at the $50,000, $100,000 level, and generally speaking, it's people like Holly that can provide a sense of history of the Museum that can allow me to connect with others.

For instance, Maurice Tempelsman, very wealthy man, dated Jacqueline Onassis. He had given

was marked for identification.)
BY MS. STARUN:
Q. This is an email that went to senior development directors and units, development directors and units, development support staff and units, and it enclosed the attendee information. We redacted the personally identifiable information, but you can see the staff who were attending and that your attendee on 288 is listed.
**A. I'm sorry. I didn't hear you.**
Q. Dr. Barber-Harland is listed on Page 288 as your invitee along with Mr. Scott Weber, and then if you go to the third page, you'll see the staff who are attending, including Johnnetta Cole and, of course, Dr. Skorton. Do you recall looking at this beforehand?
**A. I do not recall it. That was the beginning of my tenure with the Smithsonian. I may have looked at it, but I don't recall it specifically speaking, the names and everything else.**
**And another thing I want to make sure that I stress to you is that when asking Ms. Graves**

Q. They raised it to you?

**A. When we got back, a short time after that event, I was asked to come into the vice president's office and issued a warm apology.**

Q. They apologized to you for it?

**A. Yes, on behalf of the board member, among other things.**

MS. STARUN: Can we take a quick break?

(Recess at 3:27 p.m., resuming at 3:30 p.m.)

BY MS. STARUN:

Q. One final question. While you were employed at the Smithsonian, how much funding did you raise?

**A. The $40,000 was a gift this institution should have taken advantage of. It was rescinded because of the lack of consideration, according to Dr. Harland and her family, for her husband's support, past support -- and he's deceased, by the way -- her husband's past support for the organization and her position as a long-term member of the Smithsonian Associates, I believe.**

Q. It was a $40,000 gift of microscopes?

**A. No.**

Q. What was it?

**A. It was scientific equipment.**

Q. What kind?

**A. I recall -- I'd have to re-look at it, but after I found out that she wanted to give it, I spoke with one of my colleagues, Dana, in the curatorial offices, and she said, "I've got contacts all over the campus and someone may be interested in it."**

**And she pointed us in the direction. She said, "If this museum doesn't take it, there's someone else here that will take it."**

**And so I was thrilled, as was Dr. Harland. But upon informing Ms. Graves that I was going over to get the materials from Dr. Harland's office on Howard University's campus that would indicate what equipment it was, the value of it, that sort of thing, Ms. Graves presented obstacles and barriers to me going there, as is indicated by one of the emails that I forwarded to**

**you guys.**

Q. Anything else?

**A. With respect to this specific subject or --**

Q. Any other funding raised?

**A. No. Given the circumstances, it was a miracle that came in or was offered.**

MS. STARUN: I'm finished.

MS. WHITE: I have a few things on cross.

EXAMINATION BY COUNSEL ON BEHALF OF COMPLAINANT

BY MS. WHITE:

Q. Following up on a question you were just asked about, the amount of money that you brought in during the time you were employed with the Museum, do you recall testifying earlier about leads that you generated or relationships that you resurrected based on your research?

**A. Yes. I recall providing information.**

Q. I think you specifically mentioned that there might be a connection with the Disney Corporation?

**him, incompetent, petty and vindictive, and the same words were quite frequently used for Marie Graves.**

Q. Do you have any basis to believe that Mr. Holmes was taking the actions against or the, I guess the actions and omissions based on race or based on your gender or based on reprisal?

**A. I don't have any specific evidence, but I've tried to provide everything that I could that is indicative of his lack of support for me, for the position and, by extension, for the Museum.**

Q. To your knowledge, did Mr. Holmes have any involvement in your termination?

**A. He was there. Mr. Holmes and Ms. Graves. The simple sequence is, I received a call from Laura Browender stating that there was a training going on and that she really thought I ought to attend it.**

**I inquired of Ms. Graves as to whether or not I could attend the event. She said no, and then I believe I recall her saying, "You know what? Why don't you just come to my office in about ten minutes or so?"**

**And I went to her office, and Mr. Graves and her were there, and she told me that I was being terminated because I hadn't raised any funds for the Institution. And I stated that based on my treatment there, that I was looking at legal action, and Mr. Holmes said, "Go ahead. That's your right."**

**And I told him, "Yes, it is my right, and I will pursue it with all vigor."**

Q. To your knowledge, did Mr. Holmes have any role in anything that happened after that termination meeting?

**A. Mr. Holmes' responsibilities were both accounting and human resources. It is my contention and my strong belief that he was responsible for the delay of my paycheck. The lack of response from the young lady in payroll, again, I never received a response from her and, in point of fact, did not know her full name until during the investigation, the EEO investigation that came out.**

Q. Just to make sure I understand, the discussion earlier about, I guess it was Ms. Angela --

CERTIFICATE OF NOTARY PUBLIC

I, LU ANNE DAWSON, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

LU ANNE DAWSON

Notary Public in and for
the District of Columbia

My Commission expires:
January 14, 2020

# EXHIBIT D

**Starun, Eryn**

**From:** Cole, Johnnetta
**Sent:** Thursday, February 5, 2015 3:58 PM
**To:** Graves, Marie W.; Holmes, Bill
**Subject:** Fwd: Thank you

Sharing a message from Milt Jackson.
He is a class act!
J.

Sent from my iPhone

Begin forwarded message:

**From:** "Holmes, Bill" <holmesb@si.edu>
**Date:** February 5, 2015, 10:02:58 AM MST
**To:** "Cole, Johnnetta" <ColeJB@si.edu>
**Subject: FW: Thank you**

Good morning Doc C – just forwarding as I have been requested to do...

---

**From:** m jack [mailto:ml_jacks@yahoo.com]
**Sent:** Wednesday, February 04, 2015 9:56 AM
**To:** Holmes, Bill
**Subject:** Thank you

Dr. Cole, Mr. Holmes:

First of all, my apologies for sending this missive directly to Mr. Holmes, but I couldn't locate Dr. Cole's email address. Therefore, Mr. Holmes, I would be grateful if you would please forward this message to Dr. Cole as well. Nevertheless, I wish to sincerely thank you both for the time, consideration and hospitality shown to me yesterday during my interview. I remain elated at the prospect of joining the National Museum of African Art team and my experiences yesterday confirmed my expectations and heightened my enthusiasm about your mission.

Dr. Cole, it was an honor to meet you and a privilege to have the opportunity to listen, learn and share with one of the best in the development sphere. It was inspiring to personally hear about your extensive background and successes and I very much appreciated learning more about your leadership style and expectations. I hope that I adequately outlined my professional experiences and properly addressed all of your queries. I also trust that I adequately conveyed my strong interest in assisting with the building of a world-class development operation under your aegis.

Thank you, again, for considering me for this wonderful opportunity. Please advise if I can address any other questions and continued success to you both and the team.

Warm Regards,
Milt Jackson

# EXHIBIT E

**Starun, Eryn**

---

| | |
|---|---|
| **From:** | Holmes, Bill |
| **Sent:** | Friday, March 13, 2015 11:04 AM |
| **To:** | ml_jacks@yahoo.com |
| **Cc:** | Graves, Marie W.; Cole, Johnnetta |
| **Subject:** | Annual Leave Category 6 |
| **Attachments:** | Annual Leave Accrual Form for Creditable Service.doc; Annual Leave Accrual, Crediting Non-Federal and Active Duty Service.doc |
| **Importance:** | High |

Good morning Milton- things are moving along well for your appointment with us here at NMAfA. One more document I need you to complete and return to me as soon as you can is the attached Annual Leave Accrual Form for Creditable Service.

As I explained when we spoke a few weeks ago, in addition to offering the increased "step 5" within the grade 13 series, we are also offering you the opportunity to start earning 6 hours of annual leave each pay period, rather than starting out earning 4 hours each pay period. Normally, earning 6 hours per pay period is an "earned" benefit employees have based on their length of service with either the federal government OR as a Smithsonian Trust Fund employees. Employees normally begin to earn 6 hours per pay period after 3 years of service.

In order for us to successfully get you the desired 6 hour category, you'll need to complete the Annual Leave Accrual for Creditable Service document, which documents your recent employment history. The Director of OHR will review this document and provide the necessary authorization.

Please complete this form as soon as possible and return it to me...hopefully by Monday. You should know that I have confirmed that your background investigation has been completed. OHR is ready to contact you to make the final offer, but will hold off until they can include the 6 hour annual leave category in the offer when it's made.

As you know we have a desire for you to start with us on March 23rd, which I have confirmed CAN be done, pending completion of this one additional document. Please feel free to contact me if you have any questions.

Thanks
Bill Holmes
Administrative Officer
National Museum of African Art
(202) 633-4602

# Smithsonian Institution Creditable Service for Annual Leave Accrual

Authority: Section (202) a of the Federal Workforce Flexibility Act of 2004 (Public Law 108-411, October 30, 2004) amends 5U.S.C. 6303 to provide an employee who is covered by the Federal annual and sick leave program established under chapter 63 of title 5 U.S.C. to receive credit for prior non-Federal work experience or experience in a uniformed service that otherwise would not be creditable for the purpose of determining his or her annual leave accrual rate. An employee may receive credit if the experience was obtained in a position having duties that directly relate to the duties of the position to which the employee is being appointed and if it is determined by the Director of the Office of Human Resources that the use of this authority is necessary in order to achieve an important agency mission. The Smithsonian applies the similar provisions when crediting service for employees appointed to Trust positions.

**SECTION A: TO BE COMPLETED BY APPLICANT**

***Instructions:*** *For each period of work experience you believe to be directly related to the duties of the position for which you have been selected, please enter the employer, the title of the relevant position, the periods of employment, the total length of service in years and months, and a brief descriptions of the related duties.*

| *Employer* | *Title* | *From (Month, Year* | *To (Month, Year)* | *Description of Related Duties* |
|---|---|---|---|---|
| | | | | |
| | | Total Yrs: | Total Months: | |
| *Employer* | *Title* | *From (Month, Year* | *To (Month, Year)* | *Description of Related Duties* |
| | | | | |
| | | Total Yrs: | Total Months: | |
| *Employer* | *Title* | *From (Month, Year* | *To (Month, Year)* | *Description of Related Duties* |
| | | | | |
| | | Total Yrs: | Total Months: | |
| *Employer* | *Title* | *From (Month, Year* | *To (Month, Year)* | *Description of Related Duties* |
| | | | | |
| | | Total Yrs: | Total Months: | |

APPLICANT CERTIFICATION

*Please consider the service above as creditable service to be applied towards my leave service computation date. I certify that the service recorded above accurately reflects periods of creditable non-federal service that directly relates to the duties of my position with Smithsonian.*

**Applicant Signature** **Date**

**SECTION B: TO BE COMPLETED BY UNIT**

| *Applicant Name:* | *Smithsonian Unit:* | *Date of Hire:* | *Total Yrs/Months:* | *Leave SCD:* |
|---|---|---|---|---|
| | | | | |

UNIT REVIEW AND CERTIFICATION

**Unit Director Signature (or designee)** **Date**

**SECTION C: TO BE COMPLETED BY HUMAN RESOURCES**

*I certify that the information on this form accurately reflects verifiable information contained in application records in the custody of this agency and that the non-federal service reflected is creditable in determining the employee's annual leave accrual rate.*

**Human Resources Specialist Signature** **Date**

**DECISION:**

/___/ Approved /___/ Disapproved

**Director, Human Resources (signature)** **Date**

**Rev. 10/2010** **Form is available on the OHR Website** **Completed form to be filed in OPF**

# Smithsonian Institution

# Memo

**Office of Human Resources**

Date: June 16, 2005

To: Gary Beer, Sheila Burke, David Evans, Ned Rifkin
Heads of Museums, Research Institutes, and Offices
HR Liaisons

Cc:

From: James D. Douglas, Director, Office of Human Resources

Subject: Crediting Non-Federal and Active Duty Service for Annual Leave Accrual

Provisions of the Federal Workforce Flexibility Act of 2004 permit agencies to credit non-Federal work and active duty uniform service for the purpose of adjusting the annual leave earning rate for newly appointed Federal employees. The purpose of this provision is to enable Federal agencies to attract well qualified non-Federal applicants for positions that are critical to the successful achievement of an important Smithsonian mission or performance goal. It is envisioned that this new authority could be used when filling critical positions at or above the full performance level or essential supervisory and managerial positions. This provision covers all Federal positions except those in pay plans SL and ST which already earn annual leave at 8 hours a pay period upon appointment.

The new authority permits agencies to consider the relevant non-Federal work experience of an applicant to the Federal position to which they will be appointed. Based on the number of months and years of directly related work experience, that number of months and years is added to the new employee's service computation date for the earning of annual leave. The final determination for the crediting of this additional service will be made by me based on verifiable information provided by the applicant prior to their beginning of service with the Smithsonian.

Attached is an interim amendment to Smithsonian Directive 212, chapter 630, Leave Administration, which immediately effects the use of this authority. A recommendation to implement a similar policy for Trust employees has been forwarded to the Secretary for review and approval.

Questions regarding this new authority may be directed to Ms. Julie Fortin 202-275-1063, fortiju@si.edu or JB Weilepp, 202-275-1052, weilejb@si.edu, in the Policy, Training and Development Branch.

Victor Building. MRC 912
750 9th St. NW Suite 6100
Washington DC 20560-0912
Telephone 202.275.1102
Fax 202.275.1115

# CREDITING NON-FEDERAL AND ACTIVE DUTY UNIFORMED SERVICE FOR ANNUAL LEAVE ACCRUAL

**Purpose**

It is the policy of the Smithsonian Institution (SI) to grant credit for non-Federal service or for active duty uniformed service that would not otherwise be creditable for annual leave accrual purposes if the statutory and regulatory requirements described below are met. The purpose of this policy is to enable SI to recruit well qualified candidates for mid and upper level positions.

**Coverage**

This policy applies to all positions earning leave under 5 CFR 630, (Absence and Leave), except for positions in pay plans SL and ST which earn leave under 5 CFR 630.301.

**Roles and Responsibilities**

Unit Directors or their designees will recommend granting service credit based on the following considerations:

- The skills and experience the applicant possess are essential to the new position and were acquired through performance in a non-Federal position having duties that directly relate to the position to which the applicant is being appointed, and

- The skills and experience are necessary to achieve an important Smithsonian mission or performance goal.

The Director, Office of Human Resources (OHR), will:

- Develop, administer and interpret policy and procedures for crediting non-Federal service or active duty uniformed service that would not otherwise be creditable for annual leave accrual purposes.

- Approve or disapprove requests to grant service credit and makes final determinations about the amount of credit to be granted.

- Maintain appropriate records.

Applicants selected for positions provide written documentation, acceptable to OHR, of the qualifying non-Federal or uniformed service they seek to have credited.

**Eligibility for Consideration**

In accordance with the law, this provision may be applied only to a newly appointed employee or an employee who is reappointed after a break in service of 90 calendar days or more from the date of the employee's last period of Federal civilian employment. OHR will not apply this provision to appointments that are based on the appointee's acceptance of a formal offer of employment prior to the date these guidelines are issued.

The Smithsonian must decide before the effective date of the appointment whether to grant a new employee or reappointed employee service credit and how much, if any, to grant.

**Nature of Service Credit**

Service credit granted under this provision for non-Federal service or uniformed service that would not otherwise be creditable is used to determine an employee's annual leave accrual rate.

Service granted under this provision is not creditable for any purpose other than determining annual leave accrual rates. The service is not creditable toward an employee's retirement eligibility, retirement benefits, or for establishing seniority in reduction-in-force.

Service credit is granted upon the effective date of the appointment or reappointment and is permanently credited to the employee unless the employee fails to complete 1 full year of current continuous Federal service with Smithsonian.

If the employee transfers to another Federal agency or separates from Federal service before completing 1 year of continuous service with Smithsonian, then SI must withdraw the service credit granted under this provision and establish a revised service computation date for leave. However, any annual leave accrued or accumulated by the employee remains to his or her credit. Smithsonian will provide the employee with a lump sum for such leave or transfer it to the new agency, as appropriate.

**Criteria for Granting Service Credit**

The Director of OHR has the authority to grant service credit toward annual leave accrual rates if the employee meets the following criteria:

(1) was acquired through performance in a position having duties directly related to the duties of the Smithsonian position to which the individual is being appointed;

(2) are essential to the new position; and

(3) are necessary to achieve an important Smithsonian mission or performance goal.

The Office of Human Resources determines how much of an appointee's prior non-Federal and/or uniformed service to credit for purposes of annual leave accrual. Service must meet the statutory and regulatory criteria. Service will be credited in terms of years and months; the amount of service credited may not exceed the period of service during which the employee performed duties directly related to the Smithsonian position.

There is no entitlement to service credit under this policy. Approval must be case-by-case based on Smithsonian's needs, mission and performance goals.

**Documentation**

To receive service credit for leave accrual rates, the individual selected for the position must provide acceptable written documentation to Smithsonian of his or her non-Federal service or active duty honorable uniformed service that would not otherwise be creditable. Acceptable written documentation must consist, at a minimum, of both of the following:

- A description of the nature and quality of the experience in sufficient detail to enable OHR to determine whether the experience provided skills and experience directly related to and essential for the position to which the individual will be appointed.

- Documentation of the dates of such service. This may include such documentation as a DD-214 for military service or employment paperwork, leave and earnings statements, a written statement from a prior employer, a performance appraisal specifying the actual dates covered, or other comparable documents confirming dates of non-Federal employment.

To the extent possible, information about the service to be credited should also be verifiable through references.

All documents on which service credit is based must be received and approved prior to the effective date of employment with Smithsonian.

**Recordkeeping**

OHR will record service credit granted and the calculation of service computation dates for leave purposes in accordance with U.S. Office of Personnel Management (OPM) guidelines, including noting appropriate remarks on forms for service computation date calculations and Notifications of Personnel Action.

OHR will file on the temporary side of the employee's Official Personnel Folder the recommendation and approval of as well as the supporting written documentation for the credit accrual for non-Federal service for annual leave or uniformed service that would not otherwise be creditable.

**SMITHSONIAN INSTITUTION**

**PERSONNEL APPROVAL REQUEST**

TYPE OF ACTION REQUESTED: superior qualifications appointment, and setting pay above minimum rate
(e.g., superior qualifications appointment, setting pay above minimum rate, recruitment or relocation bonuses and retention allowances)

NAME OF REQUESTOR AND SIGNATURE: Johnnetta B. Cole, Director, National Museum of African Art

DATE: 3/3/15

**RATIONALE FOR REFERRAL**

After an extensive search, the National Museum of African Art wishes to hire Milton L. Jackson because of his extensive background in fund raising, particularly for non-profit organizations. We would like to offer Mr. Jackson a starting salary of $102,932/PA, which is the step 5 of a grade IS-13. We would like to offer Mr. Jackson this salary based on his employment and educational backgrounds. In addition to the advanced step, we would also like to offer Mr. Jackson a 6 hour annual leave category.

Mr. Jackson has extensive experience in the field of fund raising, having served as Director of various Development and Advancement departments at institutions including the National Geographic Society, the American University, and Howard University. Mr. Jackson has lead teams that have attained substantial gifts and donations from corporations and individuals.

We have determined that in the midst of the Smithsonian Institution's capital campaign, without the ability to make such an offer, we will continue to have difficulty filling this very critical position at NMAfA. We are convinced that Mr. Jackson has the unique abilities, experience, and talents to accomplish the duties required of this position.

REQUEST APPROVED: ✓ REQUEST NOT APPROVED: ______ DATE: 3/3/15

NAME AND SIGNATURE OF APPROVING OFFICIAL: Johnnetta Betsch Cole

OPF: ORIGINAL COPY
ORGANIZATION FILES: XEROX COPY

**Mogollon, Janet**

| | |
|---|---|
| **From:** | Mogollon, Janet |
| **Sent:** | Wednesday, March 18, 2015 7:20 AM |
| **To:** | ml_jacks@yahoo.com |
| **Cc:** | Holmes, Bill; Meir, Carol; Butler, Sean |
| **Subject:** | Jackson: Smithsonian Institution Final Offer of Employment |
| **Attachments:** | Creditable Service for Annual Leave Accrual.pdf; EOD Forms Information Checklist TRUST.doc |

March 17, 2015

Dear Mr. Jackson:

Congratulations, and welcome to the Smithsonian Institution! We are pleased to provide you with specific information regarding your appointment below:

| | |
|---|---|
| Position Title: | **Senior Advancement Program Specialist (Gift Officer)** |
| Pay Plan-Series-Grade/Step: | **IS-1001-13, Step 5** |
| Salary/ per annum: | **$102,932.00 annual** |
| Effective Date of Appt.: | **March 23, 2015** |
| Type of Appointment: | **Trust Indefinite** |
| Date of Orientation: | **March 23, 2015** |
| Organization: | **National Museum of African Art** |
| Duty Location: | **Washington DC** |
| Others incentives: | **Placement in 6 hours leave category** |

**New Employee Orientation**:

For new employee orientation, please report to the Smithsonian Office of Human Resources, Capital Gallery West Building located at 600 Maryland Avenue, Suite 100W, Washington, DC 20024. The Metrorail subway stop is L'Enfant Plaza (yellow, green, orange or blue line); follow the exit for Maryland Ave & 7th Street. Orientation will begin promptly at 8:45 am and end no later than 4:30 pm. You will be dismissed for the day when Orientation is completed. Unless you are told differently, please report to your worksite the day following orientation according to the work schedule established by your new supervisor. If you are unsure of where to report, please contact the Business Partner referenced below.

An "Entrance on Duty (EOD) Checklist" is attached. This checklist identifies the various forms and information related to your employment. All of these forms are available at http://www.si.edu/ohr/orientation_forms . We ask that you visit this site, complete and print the required forms as indicated on the checklist, and **bring the completed forms with you when you report for duty**. If you are unable to print the required forms on the checklist, please let me know so we can mail or fax these forms to you immediately. You must bring two original forms of identification on your reporting date for required identity verification:

1) Original Federal or state-issued photo identification such as a passport or driver's license; and

2) Another identity proven document from the approved list on the INS Form I-9 Employment Eligibility Verification (form included on list).

**Additional Employment Information**:

The offer of employment is contingent upon your satisfactory completion of the pre-and/or post-employment background screening which includes a criminal record check.

You will be required to serve a one-year probationary/trial period that will begin on the effective date of your appointment. Your probationary period is a highly significant and final step in the examining process (i.e., an assessment of your actual performance on the job). Your supervisor will continually assess your performance during your probationary period and may make a determination regarding your continued employment at any time during the probationary period.

You will also be eligible to enroll in fringe benefits (e.g., health, dental, and life insurance) associated with your position. An overview of these benefits will be provided to you at the New Employee Orientation.

If you have any questions, please feel free to contact me. I look forward to welcoming you as an employee with the Smithsonian Institution. I hope your position with us is a rewarding experience. Thanks for choosing us as your employer!

# AGENDA

**Smithsonian Institution**
**New Employee Orientation**
8:45 A.M. – 4:30 P.M.

**LOCATION**
(L'Enfant Plaza Metro stop)

Office of Human Resources Career Center
Capital Gallery Building West
600 Maryland Ave. SW Suite 100W
Washington, D.C. 20024
202.633.6370 Phone
202.633.6409 TTY

| TIME | ITEM |
| --- | --- |
| **08:45** | Arrival |
| **09:00 – 10:00** | Overview of the Smithsonian |
| **10:10 - 10:40** | Forms Processing |
| **10:40 – 11:00** | Office of Protective Services (OPS) |
| **11:00 – 11:20** | Payroll |
| **11:20 – 11:35** | Office of Equal Employment & Minority Affairs (OEEMA) |

# EXHIBIT F

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Tuesday, March 3, 2015 3:16 PM
**To:** Holmes, Bill
**Subject:** Re: Jackson: Smithsonian Institution Tentative Job Offer of Employment

Outstanding! What is his start date?

Sent from my iPhone

On Mar 3, 2015, at 3:12 PM, "Holmes, Bill" <holmesb@si.edu> wrote:

FYI - Milton's official offer and acceptance.

Bill

---

**From:** Mogollon, Janet
**Sent:** Tuesday, March 03, 2015 2:57 PM
**To:** 'ml_jacks@yahoo.com'
**Cc:** Holmes, Bill; Butler, Sean; OPS-PSO
**Subject:** Jackson: Smithsonian Institution Tentative Job Offer of Employment

March 3, 2015

Milton L. Jackson
3248 Arrow Head Circle D
Fairfax, VA 22030

| For official use | | | |
|---|---|---|---|
| Risk Level | | Sensitivity (for clearances only) | |
| | Low | N/A | Nonsensitive |
| X | Moderate | N/A | Noncritical Sensitive |
| | High | N/A | Critical Sensitive |

Dear Mr. Jackson:

Thank you for accepting our tentative offer of employment with the Smithsonian Institution. We are pleased to provide you with specific information regarding your appointment below:

**Position Title:** **Senior Advancement Program Specialist (Gift Officer)**
**Grade and Salary:** **IS-1001-13 Step 5, ($102,932.00 annual)**
**Organization:** **NMAFA – External Affair Department**
**Type of Appointment:** **Trust I indefinite**
**Work Schedule:** **Full-Time**
**Duty Location:** **Smithsonian Quadrangle, Washington DC**

This tentative offer of employment is conditional, subject to your successful completion of a pre-employment background investigation (BI). Continued employment after your appointment to the Smithsonian Institution is then subject to the successful completion of an additional post-employment

background investigation. To best facilitate the pre-employment investigation, be sure to completely read and complete the attachment to this letter.

To begin the process, please schedule an appointment to be fingerprinted at the Smithsonian Office of Protection Services using our on-line scheduler at:

https://app2.timetrade.com/tc/login.do?url=smithsonian. Appointments are available only on Tuesdays, Wednesdays, and Thursdays. It is important that you schedule your appointment and complete the finger print process within a week from receipt of this notice. The OPS also accepts walk-ins on Mondays and Fridays. Their office hours are 8:00 AM to 4:30 PM.

Enclosed you will find an OF306, Declaration for Federal Employment. This form applies to appointees being considered for Federal and non-Federal employment. It is also available online at http://www.opm.gov/forms. Once you have completed the form, **please bring it along with two forms of original identification such as a U.S. Passport, Permanent Resident Card, Driver's License, State ID Card, Social Security Card, or Birth Certificate with you to your appointment.**

**YOU MUST BRING THIS LETTER WITH YOU TO:**

Smithsonian Office of Protection Services
Personnel Security and ID Office
Capital Gallery West Building
600 Maryland Avenue SW, Suite 4310
Washington, DC 20024
202-633-1598

The metro subway stop is L'Enfant Plaza; follow the exit for Maryland Avenue.

After you have completed your fingerprinting appointment you will receive an e-mail from an OPS employee with instructions and a link to the Office of Personnel Management's Electronic Background Investigation security application (e-QIP). You are required to complete e-QIP, print and return the release form and signature pages to OPS by fax (202-633-5664) or in person at least three days before you enter on duty as a Smithsonian Institution employee. Failure to complete e-QIP and return the signature pages to OPS can impact your ability to start work and delay the creation and issuance of your employee ID badge.

Once you have cleared the preliminary security process, you will receive subsequent communication from me that will contain your official offer of employment and confirmation of your entrance on duty date. Delays in scheduling the fingerprint appointment will affect your final job offer and your entrance on duty date.

Again, congratulations and we look forward to welcoming you as a new employee with the Smithsonian Institution. If you have any questions regarding the instructions or the attachments, please contact the Personnel Security Office at (202) 633-1598 or ops-pso@si.edu.

**Please Note: After you have initiated the background investigation, do not contact the Personnel Security Office regarding the status of your investigation. The Office of Human Resources will contact you when your background investigation is completed.**

**Sincerely,**

*Janet Mogollón*
Human Resources Specialist
Office of Human Resources

Attachment: OF306 Declaration of Federal Appointment

P.O. Box 37012 Capital Gallery, MRC 517
600 Maryland Ave Suite 5060
Washington, DC 20013-7012
(202) 633-6370 Phone
(202) 633-6409TDD
(202) 633-6401 Fax

*Janet Mogollón*
HR Specialist (Recruitment)
600 Maryland Avenue SW, Capital Gallery Rm 5060 MRC 517
Washington, DC 20013-7012
202.633.6336 Phone 202.312.1980 Fax
mogollonj@si.edu

*"Increase and Diffusion of Knowledge"-James Smithson"*
<image001.jpg>

<of0306.pdf>

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Thursday, March 5, 2015 2:42 PM
**To:** Cole, Johnnetta; Holmes, Bill
**Subject:** RE: Jackson: Smithsonian Institution Tentative Job Offer of Employment
**Attachments:** Milton Jackson Draft Announcement.docx

Hi Dr. Cole,

Please see my draft announcing Milton's appointment for your edits and review.

Marie

---

From: Cole, Johnnetta
Sent: Thursday, March 05, 2015 1:43 PM
To: Holmes, Bill
Cc: Graves, Marie W.
Subject: Re: Jackson: Smithsonian Institution Tentative Job Offer of Employment

Bill and Marie,

It is extremely important that I inform our NMAfA colleagues about Milton Jackson's appointment before he physically begins to work at and for our museum.

Bill--When do you anticipate he will
have his first day at our museum?

Marie-- Please give me a draft of the message I can send to our NMAfA colleagues announcing Milt's appointment.

J.

Sent from my iPhone

On Mar 3, 2015, at 3:12 PM, "Holmes, Bill" <holmesb@si.edu> wrote:

> FYI - Milton's official offer and acceptance.
>
> Bill
>
> From: Mogollon, Janet
> Sent: Tuesday, March 03, 2015 2:57 PM
> To: 'ml_jacks@yahoo.com'
> Cc: Holmes, Bill; Butler, Sean; OPS-PSO
> Subject: Jackson: Smithsonian Institution Tentative Job Offer of Employment
>
>
>
> March 3, 2015
>
>
>
> For official use
>
> Risk Level

>
> Sensitivity (for clearances only)
>
>
>
> Low
>
> N/A
>
> Nonsensitive
>
> X
>
> Moderate
>
> N/A
>
> Noncritical Sensitive
>
>
>
> High
>
> N/A
>
> Critical Sensitive
>
> Milton L. Jackson
> 3248 Arrow Head Circle D
> Fairfax, VA 22030
> Dear Mr. Jackson:
> Thank you for accepting our tentative offer of employment with the Smithsonian Institution. We are pleased to provide you with specific information regarding your appointment below:
>
>
> Position Title: Senior Advancement Program Specialist (Gift Officer)
> Grade and Salary: IS-1001-13 Step 5, ($102,932.00 annual)
> Organization: NMAFA – External Affair Department
> Type of Appointment: Trust I indefinite
> Work Schedule: Full-Time
> Duty Location: Smithsonian Quadrangle, Washington DC
>
>
> This tentative offer of employment is conditional, subject to your successful completion of a pre-employment background investigation (BI). Continued employment after your appointment to the Smithsonian Institution is then subject to the successful completion of an additional post-employment background investigation. To best facilitate the pre-employment investigation, be sure to completely read and complete the attachment to this letter.
>
> To begin the process, please schedule an appointment to be fingerprinted at the Smithsonian Office of Protection Services using our on-line scheduler at:
>
> https://app2.timetrade.com/tc/login.do?url=smithsonian. Appointments are available only on Tuesdays, Wednesdays, and Thursdays. It is important that you schedule your appointment and complete the finger print process within a week from receipt of this notice. The OPS also accepts walk-ins on Mondays and Fridays. Their office hours are 8:00 AM to 4:30 PM.
>
> Enclosed you will find an OF306, Declaration for Federal Employment. This form applies to appointees being considered for Federal and non-Federal employment. It is also available online at http://www.opm.gov/forms. Once you have completed the form, please bring it along with two forms of original identification such as a U.S. Passport, Permanent Resident Card, Driver's License, State ID Card, Social Security Card, or Birth Certificate with you to your appointment.
>
>

> YOU MUST BRING THIS LETTER WITH YOU TO:
>
> Smithsonian Office of Protection Services
> Personnel Security and ID Office
> Capital Gallery West Building
> 600 Maryland Avenue SW, Suite 4310
> Washington, DC 20024
> 202-633-1598
>
>
> The metro subway stop is L'Enfant Plaza; follow the exit for Maryland Avenue.
>
> After you have completed your fingerprinting appointment you will receive an e-mail from an OPS employee with instructions and a link to the Office of Personnel Management's Electronic Background Investigation security application (e-QIP). You are required to complete e-QIP, print and return the release form and signature pages to OPS by fax (202-633-5664) or in person at least three days before you enter on duty as a Smithsonian Institution employee. Failure to complete e-QIP and return the signature pages to OPS can impact your ability to start work and delay the creation and issuance of your employee ID badge.
>
> Once you have cleared the preliminary security process, you will receive subsequent communication from me that will contain your official offer of employment and confirmation of your entrance on duty date. Delays in scheduling the fingerprint appointment will affect your final job offer and your entrance on duty date.
>
> Again, congratulations and we look forward to welcoming you as a new employee with the Smithsonian Institution. If you have any questions regarding the instructions or the attachments, please contact the Personnel Security Office at (202) 633-1598 or ops-pso@si.edu<mailto:ops-pso@si.edu>.
>
> Please Note: After you have initiated the background investigation, do not contact the Personnel Security Office regarding the status of your investigation. The Office of Human Resources will contact you when your background investigation is completed.
>
> Sincerely,
>
>
> Janet Mogollón
> Human Resources Specialist
> Office of Human Resources
>
> Attachment: OF306 Declaration of Federal Appointment
>
>
> P.O. Box 37012 Capital Gallery, MRC 517
> 600 Maryland Ave Suite 5060
> Washington, DC 20013-7012
> (202) 633-6370 Phone
> (202) 633-6409TDD
> (202) 633-6401 Fax
>
>
> Janet Mogollón
> HR Specialist (Recruitment)
> 600 Maryland Avenue SW, Capital Gallery Rm 5060 MRC 517
> Washington, DC 20013-7012
> 202.633.6336 Phone 202.312.1980 Fax
> mogollonj@si.edu<mailto:santosm@si.edu>
>
> "Increase and Diffusion of Knowledge"-James Smithson"
> [http://www.potomac-corral.org/graphics/smithsonian_logo.gif]
>
> <of0306.pdf>
> <image001.jpg>

March

Dear Colleagues,

Please welcome Milton Jackson, our new Major Gifts Officer, to our team. I encourage you to connect with Milton and share your knowledge regarding our museum. I am asking that each of you to assist in helping him become a productive member of our team.

Milton comes to us from National Geographic Society, where he was the Director of Major Gifts for the Mid-Atlantic Region. Before that, he served as a Director of Development at American, Howard and Eastern Michigan Universities. In his free time, Milt enjoys reading, golf and spending time with his family.

Milton will begin his journey with us on Monday, March 23, 2015. You can reach him at:

- 202.633-46xx ( I will verify with Sherry)
- jacksonxx@si.edu

I am confident that Milton will be an excellent match for this position and a strong asset to the Advancement Team. Please make it a point to stop by and introduce yourself and welcome him to our museum family.

Warmly,

# EXHIBIT G

## Lauritzen, Jessica

| | |
|---|---|
| **From:** | Braun, Vincent |
| **Sent:** | Tuesday, April 14, 2015 11:18 AM |
| **To:** | Jackson, Milton L. |
| **Cc:** | Holmes, Bill; Gutter, Richard |
| **Subject:** | JPMorgan Chase Travel Card Request |
| **Attachments:** | JPMC_Online_Account_Payment_Procedures__2009-1-7.doc; SD 312 Travel Handbook October 30 2013.pdf; SD322-DeskRef Part 1 Travel Card Program.pdf |
| **Importance:** | High |

Good day Milton:

The OCon&PPM/Charge Card Program staff has processed your application for a JPMorgan Chase Government travel card. You may expect to receive your card at your home address in approximately two weeks from today. For security reasons, your ATM pin number will arrive in a separate envelope from your travel card. The travel card will arrive in a plain white envelope and can be easily mistaken for junk mail. Please check your mail carefully.

The first attachment are the instructions for accessing JPMorgan Chase's PaymentNet System online. PaymentNet allows you to review your statements and to make online payments. The second attachment is the S.I. Travel Handbook which provides excellent reference material that supplements policy guidance contained in the Federal Travel Regulation (FTR). The third attachment is the SD322 Part 1 - Travel Card Program policy guidelines in a condensed version.

**After you receive your JPMorgan Chase travel card; contact the Smithsonian Institution Travel Management Office (TMO at 633.8600) to update your Concur travel profile with your new account information. If your travel account is closed in the future (lost/stolen/fraudulent activity) and a new card is issued; you must also contact the TMO to update your travel profile with your replacement card account information. Please contact Richard Gutter or myself for your temporary password and useird to access PaymentNet online.**

Thank you,

**Vincent Shippy**
**Program Analyst**
**Smithsonian Institution**
**Office of the Chief Financial Officer**
**Office of Contracting & Personal Property Mgmt.**
**Travel & Purchase Card Program**
**P- 202.633.1737 F - 202.633.7319 shippyv@si.edu**

**Inter-Office Mail or Postal Delivery**
**PO BOX 37012**
**CC350 MRC 1200**
**Washington, DC. 20013-7012**

**Address for FedEx or UPS Delivery**
**2011 Crystal Drive**
**3rd Floor, Suite 350**
**Arlington, VA. 22202-3709**

PAYMENTNET

# Smithsonian Institution

## How to...Access JPMC Online

1. First time users should contact the Charge Card Program staff, OCon&PPM, by email to obtain your User ID and a 'one-time' login password before attempting to access online statements.

2. Login to the internet

3. In the address line type: https://gov1.paymentnet.com

4. At the JPMC Login screen enter Smith09 in the Organization ID block




5. Enter your User ID. Note: your User ID is usually the same as your SI login ID (last name and first initial). If you do not have a standard SI login ID (i.e. those at SAO), try the characters that precede the '@' symbol in your email address. If neither of these works, please contact the Charge Card Program staff, OCon&PPM, for assistance.

6. Enter your Pass Phrase (password). If you are logging in for the first time you will be asked to enter a new password. JPMC passwords must conform to the following structure:

   - Minimum length is 8 characters
   - Must be a combination of alpha and numerical digits
   - Must contain at least one special character

   Once you have entered your password and confirmed it you will now be ready to access your account and may create your online payment profile.

## How to... View Transaction Details

1. Choose **Transactions** > **Manage**.
2. On the Transaction List, find the transaction you want to view. Transactions that have not been exported from the last 30 days are listed by default.
3. Click on the transaction row to view details of the transaction. The Transaction Detail: General Information tab includes detailed transaction data, such as merchant and settlement information.
4. To return to the Transaction List, select List on the right side of the screen.

## How to... Log out of PaymentNet

1. Select the X with the circle on the right side of the menu bar. You will be logged out of PaymentNet.

## How to...Make an Online Payment

Cardholders for Individual Billed Travel programs can make direct payments online using PaymentNet.




### Set up Bank Information

1. Select the My Profile icon. This is located on the right side of the menu bar with an image of a person.
2. Select the Bank Information tab.

3. Click **Add Bank**.
4. Enter the following fields:
- ABA Routing Number
- Bank Account Type
- Bank Account Number
- Description
5. Click **Save**.

## Make a Payment

1. Choose **Payments** > **Create**.
2. On the Payment Detail screen, select the **Account Number** for which you are making the payment.
3. If more than one bank is set up, select the **Bank Description** from the drop-down list.
4. Enter the **Payment Amount**.
5. Enter the **Payment Date** (MM/DD/YYYY format).
6. Click **Submit**. A dialog box appears verifying payment information. Click **OK** to continue with the payment.




## Schedule a Recurring Payment

Users who wish to automatically pay the current amount due can use the recurring payment feature.

1. Choose **Payments** > **Manage**.
2. On the Payment List screen, select the **Recurring** tab.
3. Click **Schedule New Recurring**.
4. On the **Payment Recurring Detail** screen, select the **Account Number** for which you are scheduling the payment.

5. If more than one bank is configured, select the **Bank Description** from the drop-down list.

6. Select when the full payment will be scheduled:

- Pay in full on due date

- Pay on last day of billing cycle

7. Click **Save**. A dialog box appears verifying payments will be made on an ongoing basis. Click **OK** to continue with the scheduled payment.

**Cancel a Recurring Payment**

1. Choose **Payments** > **Manage**.
2. On the Payment List screen, select the **Recurring** tab.
3. Select the recurring payment you would like to cancel.
4. On the P**ayment Recurring Detail** screen, click **Delete**.
5. A dialog box appears stating that the pending payments associated with the recurring payment may not be impacted by canceling the recurring payment. Click **OK**.

**View Payment History**

1. Choose **Payments** > **Manage**.
2. On the History tab of the **Payment List,** a summary of past payments is listed.
3. Select the payment row to view more information regarding the payment.
4. A read-only version of the Payment Detail screen is displayed showing more information regarding the payment.

### Creating Payments

Payments can also be created from the ***Payment List***. Click ***Submit New Payment*** to create a one-time payment.

# SD 312, Travel

## Smithsonian Institution Travel Handbook

Smithsonian Institution

**Office of the Under Secretary for Finance and Administration/Chief Financial Officer**
**Office of Contracting and Personal Property Management**

# SD 312, Travel
# Smithsonian Institution Travel Handbook

## Acronyms and Initials

| | |
|---|---|
| ATM | Automated Teller Machine |
| CBA | Centrally Billed Account (government contractor-issued travel charge card billed to and paid by SI) |
| CFO | Chief Financial Officer |
| CONUS | Continental United States |
| CRV | Cash Receipt Voucher |
| FDS | Foreign Duty Station |
| EFT | Electronic Funds Transfer |
| ERP | Enterprise Resource Planning (commonly referred to as PeopleSoft) |
| FAQ | Frequently Asked Question |
| FTR | Federal Travel Regulation |
| GAO | Government Accountability Office |
| GS | General Schedule |
| GSA | General Services Administration |
| IBA | Individually Billed Account (government contractor-issued travel charge card billed to and paid by the employee) |
| IRS | Internal Revenue Service |
| M&IE | Meals and Incidental Expenses |
| OCIO | Office of the Chief Financial Officer |
| OCon&PPM | Office of Contracting and Personal Property Management |
| OCONUS | Outside the Continental United States |
| OFA | Office of Finance and Accounting |
| OGC | Office of the General Counsel |
| OHR | Office of Human Resources |
| OIG | Office of the Inspector General |
| OIR | Office of International Relations |
| OTRAT | Overseas Tour Renewal Agreement Travel |
| PO | Purchase Order |
| POV | Privately Owned Vehicle |
| SAO | Smithsonian Astrophysical Observatory |
| SMR | Smithsonian Miscellaneous Reimbursement |
| SI | Smithsonian Institution |
| STRI | Smithsonian Tropical Research Institute |
| TA | Travel Authorization |
| TDY | Temporary Duty (the government term for official travel) |
| TH | Travel Horizons |
| TQSE | Temporary Quarters Subsistence Expense |
| TMO | Travel Management Office |
| U.S. | United States |
| USF&A/CFO | Under Secretary for Finance and Administration and Chief Financial Officer |
| VRE | Virginia Railway Express |

# Smithsonian Institution Travel Handbook

## TABLE OF CONTENTS

CHAPTER 1.0: INTRODUCTION ..... 1

CHAPTER 2.0: REFERENCE INFORMATION ..... 2

2.1 SI Travel System ..... 2
2.2 Travel Management Office (TMO) ..... 3
2.3 Sato Travel ..... 3
2.4 Travel Horizons (TH) ..... 3
2.5 SAO Travel ..... 4
2.6 GovTrip ..... 4
2.7 General Services Administration (GSA) ..... 4
2.8 Travel Processing Forms ..... 5

CHAPTER 3.0: SMITHSONIAN TRAVEL GUIDANCE ..... 6

3.1 Travel Policy and Guidelines ..... 6
3.2 Travel Authorizations ..... 6
3.3 Travel Vouchers ..... 10
3.4 Electronic Records ..... 12
3.5 Travel Charge Card ..... 12
3.6 Travel Advances ..... 13
3.7 Acceptance of Gifts While on Travel ..... 14
3.8 Invitational (Non-Employee) Travelers ..... 15
3.9 Spousal and Dependent Family Member Travel ..... 16
3.10 Sponsored Travel ..... 17
3.11 No Cost Travel ..... 22
3.12 Combining Personal and Business Travel ..... 22
3.13 Local Travel ..... 24
3.14 Field Expenses ..... 25
3.15 Compensatory Time ..... 25
3.16 International Travel Support ..... 27
3.17 Large Group Travel ..... 28
3.18 Short-term Housing Lease Agreements with Commercial and Non-Commercial Lodging Providers ..... 31
3.19 Overseas Tour Renewal Agreement Travel (OTRAT) ..... 34

CHAPTER 4.0: FEDERAL TRAVEL REGULATION HIGHLIGHTS ..... 35

4.1 Per Diem ..... 35
4.2 Air Transportation ..... 36
4.3 Fly America Act ..... 36
4.4 Use of Non-Coach Travel ..... 37
4.5 Train Service ..... 39
4.6 Ship Tickets ..... 40
4.7 Travel to/from Transportation Terminal. ..... 41
4.8 Car Service ..... 41

# TABLE OF CONTENTS


4.9 Rental Vehicles ........ 41
4.10 Other Means of Travel ........ 43
4.11 Examples of Allowed Miscellaneous Expenses ........ 43
4.12 Chartered Aircraft ........ 43

CHAPTER 5.0: RELOCATION ........ 45

5.1 Employee Eligibility ........ 45
5.2 General Requirements/Documentation ........ 45
5.3 Eligible Expenses ........ 45
5.4 Authorizations ........ 46
5.5 Responsibilities ........ 47
5.6 Service Agreement ........ 48
5.7 Travel Authorizations/Chartfields ........ 48
5.8 Relocation Management Vendor ........ 48
5.9 Advances ........ 49
5.10 Tax Consequences ........ 49

APPENDIX 1 − CHOOSING A FLIGHT IN THE GOVTRIP TRAVEL SYSTEM ........ 50

APPENDIX 2 − EXCEPTIONS TO THE USE OF A CONTRACT CITY PAIR FARE ........ 56

APPENDIX 3 – MATRIX OF SI ENHANCEMENTS TO FTR ........ 57

APPENDIX 4 – LOCAL TRAVEL AREA DEFINITIONS ........ 60

APPENDIX 5 – VEHICLE RENTAL CAR INSURANCE EXCEPTIONS TO LOSS OR DAMAGE COVERAGE ........ 61

# WHERE TO GO FOR HELP

Office of Contracting & Personal Property Management (OCon&PPM) — Travel Authorizations, Travel Vouchers, Federal Travel Regulations, Relocation, GovTrip

OCon&PPM Travel Help Desk
Number ........ 202-966-8600
Fax ........ 202-966-8830
Email ........ TMOHelpDesk@si.edu
Web Access (Prism) ........ http://prism2.si.edu/SUPPORT/TRAVEL/Pages/Home.aspx

OCon&PPM Help Desk ........ (202) 633-7410
OCon&PPM Help Desk Email ........ OConHelp@si.edu
OCon&PPM Forms ........ http://prism.si.edu/ocfo/ocon/ocon_forms.htm
Main OCon&PPM Phone Number (for all OCon&PPM staff) ........ (202) 633-7290

Office of Finance and Accounting (OFA) — Vendor File Maintenance, Risk Management, Payment

Vendor Maintenance ........ (202) 633-7320
Vendor Maintenance Email ........ VendorHelp@si.edu
Web Access (Prism) ........ http://prism2.si.edu/SIOrganization/OCFO/OC/Pages/Home.aspx
Vendor Enrollment Forms http://prism2.si.edu/SIOrganization/OCFO/OC/pages/OCFormsRef.aspx
Financial Policies and Procedures ........ http://prism.si.edu/ocfo/oc/FPPD/FPPD.htm
Accounts Payable ........ (202) 633-7160
Accounts Payable Email ........ APHelp@si.edu
Risk Management ........ (202) 633-7146
Web Access (Prism) .... http://prism2.si.edu/SIOrganization/OCFO/OC/Pages/Insur_RiskMgmt.aspx

Office of the Chief Information Officer (OCIO) — SI ERP (*PeopleSoft*) Issues

ERP Support ........ (202) 633-4000
ERP Support Email ........ OCIOHelpDesk@si.edu

Office of General Counsel (OGC)

Main OGC Phone Number ........ (202) 633-5115
OGC Prism Website ........ http://prism.si.edu/ogc/index.html

Smithsonian Astrophysical Observatory (SAO) Travel

Number ........ (617) 495-7220
Fax Number ........ (617) 496-7608
Email (Travel Help) ........ tr@cfa.harvard.edu
Email (for GovTrip and PeopleSoft support) ........ erphelp@cfa.harvard.edu

Sato Travel

Main Phone Number ........ (866) 848-3831

GovTrip

Web Access (GovTrip) ........ http://www.govtrip.com

# REVISION HISTORY

| Change No. | Section | Revision |
|---|---|---|
| **1** | 2.1 | Changed DC travel agent to Connoisseur Travel |
| **2** | 2.4 | Added note that Travel Horizons is part of Connoisseur Travel |
| **3** | 3.3 | Added to indicate that a travel voucher approver must ensure the voucher is properly completed before it is approved for payment |
| **4** | 3.3 | Added the word "either" to clarify the sentence |
| **5** | 3.3 | Added phrase indicating credit card statements should be used to show currency conversion fees for foreign travel |
| **6** | 3.3 | Added to indicate that a credit card statement may be used to claim expenses |
| **7** | 3.5 | Updated the link to the GSA travel card training |
| **8** | 3.6 | Added to indicate that a traveler with a suspended travel card cannot be given a cash travel advance |
| **9** | 3.8 | Changed to indicate that a Smithsonian contractor cannot be treated as an invitational traveler by any unit in the Institution |
| **10** | 3.12 | Added "dates" to clarify TA requirements |
| **11** | 3.13 | Added comment that VRE, Metro and Marc tickets do not require a TA |
| **12** | 3.13 | Added additional reference information |
| **13** | 4.1 | Deleted District of Columbia as a tax exempt location for official travel. Updated link to GSA tax exempt site |
| **14** | 4.2 | Reference changed to section 3.12 |
| **15** | 4.2 | Added to indicate when the central billed credit card can be used for air travel |
| **16** | 4.3 | Added a reference to Open Skies agreements |
| **17** | 4.5 | Added to indicate when the central billed credit card can be used for rail travel |
| **18** | 3.15 | Added comments defining number of hours for domestic and international travel earned as compensatory time off. |
| **19** | 3.2.1 | Added special approval requirement for certain Senior Executives' travel |
| **20** | 2.1 | Added when it is appropriate to create purchase orders directly in ERP PeopleSoft and that prior approval of Manager, Travel Management Office (TMO), Office of Contracting & Personal Property Management (OCon&PPM) is required |
| **21** | 3.17 | Added Large Group Travel procedures |
| **22** | 3.18 | Added new policy and guidance for Short-Term Leasing Agreements |
| **23** | 3.19 | Added new policy and guidance for Overseas Tour Renewal Agreement Travel |
| **24** | 4.5 | Revised Amtrak policy to include additional guidance when reserving Acela trains |
| **25** | 4.9 | Added new Rental Vehicle Policy |
| **26** | 4.11 | Guidelines for reasonable tips for taxi, shuttle service, courtesy transportation driver, or valet parking attendants transportation driver, or valet parking attendants |
| **27** | Appendix 5 | Added Vehicle Rental Car Insurance Exceptions to Loss or Damage Coverage |

# CHAPTER 1.0: INTRODUCTION

All Smithsonian Institution (SI) travel policies and procedures conform to the provisions of the General Services Administration (GSA) Federal Travel Regulation (FTR), Presidential executive orders, appropriate statutes, and decisions of the Comptroller General of the United States (U.S.) and the Secretary of SI. Please refer to the SI Travel Requirements section of this Handbook for specific information.

The purpose of this handbook is to provide SI-specific guidance that supplements the FTR, along with a reference listing of travel-related SI addresses, links to online information, and highlights from the FTR.

With the exception of the information contained in the Local Travel section, the provisions of this handbook address only Temporary Duty (TDY)/non-local travel.

# CHAPTER 2.0: REFERENCE INFORMATION

## 2.1 SI Travel System

The Smithsonian travel system consists of three integrated but separate parts:

2.1.1. **GovTrip** is a web-based travel system created, operated and supported by Northrop Grumman Mission Systems Corporation. It provides the ability to create a travel authorization; book airline, hotel and rental cars through an on-line booking engine; and create a voucher at the end of the trip. GovTrip is one of three on-line travel systems approved for use by federal agencies and was procured under a master contract issued and administered by the General Services Administration. GovTrip is the most widely deployed of the three systems and serves more than 60% of the federal government travelers.

2.1.2. The Smithsonian **travel agents** utilize the actual travel reservation systems used by the travel service providers (airlines, hotels, rental car companies). The process of actually reserving travel resources (airline seats, rental cars, hotel rooms) and issuing tickets is called "fulfillment". Fulfillment can be performed by the GovTrip travel agent partner based on information automatically passed from the system (via the on-line booking engine) or by direct calls from the traveler to the travel agent. In some cases, the travel agent employs an automated system to exchange data with GovTrip which provides the automatic entry of travel costs into the GovTrip travel authorization. The alternate travel agents (currently Klassic Travel in Panama and Connoisseur Travel in Washington) make the reservations directly in the reservation system and provide the cost information (via an electronic itinerary) to a traveler or travel preparer who enters it into the GovTrip record. Smithsonian currently uses three travel agents but could use as many as necessary to provide the best possible service.

2.1.3. The **PeopleSoft ERP system** processes data from the GovTrip system to obligate and pay travel expenses. Each traveler in the GovTrip system must have a valid accounts payable vendor number because this is the link between GovTrip and the PeopleSoft system. When a GovTrip authorization is approved, information from it (including the traveler's vendor number) is used to create a purchase order in the PeopleSoft accounts payable system. This purchase order identifies the vendor (traveler), the chart fields to be used for the trip and obligates the funds based on the charges contained in the travel authorization. When an authorization is changed and approved, the changes are automatically applied to the purchase order. Because funds are obligated by the travel authorization, it should reflect the best estimate for the cost of a trip.

Occasionally, there is a need for a unit to create a purchase order directly in the PeopleSoft ERP system to procure air and lodging for large group travel (see Section 3.17) for invitational travelers (individuals traveling on behalf of the Smithsonian who are not employees). Under some circumstances, this alternate method of arranging and

paying for travel for employees may be used upon obtaining advance approval from the Manager, Travel Management Office, Office of Contracting & Personal Property Management (OCon&PPM).

Regardless of the procurement method used, all travel purchases must comply with the travel policies and procedures as prescribed in Chapter 1.0, and related Smithsonian's procurement policies where applicable.

## 2.2 Travel Management Office (TMO)

The Travel Management Office (TMO) manages all aspects of official temporary duty travel at the Smithsonian. TMO manages the GovTrip help desk, the configuration of the travel system, the addition and deletion of traveler records and the compilation and interpretation of SI travel policy. TMO serves as the liaison between SI and travel vendors and participates in government-wide travel groups. TMO provides expert assistance for all travel-related issues. The TMO is part of the Office of the Contracting and Personal Property Management (OCon&PPM) in Crystal City.

Help Desk Hours of Operation: 8:30 a.m. to 4:30 p.m. Eastern Time
Phone number: 202-633-8600
Fax number: 202-633-8830
E-mail: TMOHelpDesk@si.edu

Address: 2011 Crystal Drive
Suite 350, MRC 1200
Arlington, VA 22202

## 2.3 Sato Travel

Sato Travel is the travel agent partner for the GovTrip system. Reservations made through the GovTrip online booking engine are passed electronically to Sato for ticketing. Reservations made with the online booking engine and directly with Sato by phone are automatically reflected in a GovTrip authorization.

For travel reservation or ticketing assistance, call Sato Travel at 1-866-848-3831
Reservation and ticketing assistance for GovTrip through Sato Travel is available 8 a.m. to 8 p.m. Eastern Time, Monday through Friday, excluding Federal holidays. Assistance for **emergency travel** is available 24 hours a day, 7 days a week.

## 2.4 Travel Horizons (TH)

Travel Horizons (a division of Connoisseur Travel) is an alternative travel agent that may be used in place of Sato Travel for reservations and ticketing. Travel Horizons' pricing and procedures are different from Sato Travel and are fully described on the PRISM/Travel web page. Information is also available by calling the TMO help desk. Reservations made with Travel Horizons must be manually entered into a GovTrip authorization.

### 2.5 SAO Travel

Smithsonian Astrophysical Observatory (SAO) operates its own travel agency, SAO Travel, which provides reservation and ticketing assistance for SAO staff only. SAO reservations are automatically entered into GovTrip authorizations.

Phone number: 617-495-7220
Fax number: 617-496-7608
Email: tr@cfa.harvard.edu (travel help)
Email: erphelp@cfa.harvard.edu (for GovTrip and PeopleSoft support)

### 2.6 GovTrip

GovTrip is a web-based system for the creation and processing of Smithsonian travel authorizations and vouchers. It can be accessed by both individual travelers and those that prepare travel for others.
GovTrip web address: http://www.govtrip.com

### 2.7 General Services Administration (GSA)

GSA is the federal government agency responsible for the creation and administration of federal travel policy. GSA is also responsible for developing and administering discount contracts for air travel and lodging.
GSA web address: GSA Home

The following travel-related information is available on the GSA website:

- Federal Travel Regulation (FTR): Federal Travel Regulation (FTR)
- Per Diem Rates: Per Diem Rates
- Airfares: City Pair Program: Airline CityPairs
- Lodging Programs: GSALodging®
- POV Mileage Reimbursement Rates: Privately Owned Vehicle (POV) Mileage Reimbursement Rates
- Travel Charge Card: Travel Charge Cards
- GSA Travel Training: Travel Training
- State and Local tax exemption program: State Tax Exempt Forms Library
- Reference for contract airfares and per diem rates: http://www.fedtravel.com

## 2.8 Travel Processing Forms

The following travel-related forms are available on the Travel page of Prism:

a. **OCon 500** (Interim Authorization of Travel) – this form is used to document travel that must be arranged for someone not yet in the GovTrip system. A GovTrip travel authorization (TA) must be created as soon as possible

b. **OCon 501** (Field Expenses Review and Authorization) – this form documents field expenses and records the appropriate signatures. [This form is found in the OCon&PPM Forms section of the OCFO web page.]

c. **OCon 710** (Additional Pre-Approval for Senior Executive Travel) – this form is used to obtain pre-approval from the immediate supervisor for some Senior Executives if it is anticipated that the trip duration will be ten (10) calendar days or more, or the cost of the trip will exceed $6,000.

d. **OGC Travel Authorization Clearance Form** – this form is used to obtain OGC clearance for travel sponsored by a for-profit entity or a foreign government

e. **OGC Direct Reimbursement Clearance Form** – this form is used to obtain OGC clearance to allow a travel reimbursement to be paid directly to an employee (state or local government or US non-profit only)

f. **SF 1012** (Travel Voucher) – this form is used if a traveler is unable to electronically sign the travel voucher in GovTrip.

g. **SI-3345** (Request for Use of Foreign Carrier) – this form must be submitted to and approved by the TMO prior to the use of a foreign flag carrier to fly to or from the U.S.

h. **SI-3381** (Invitational Traveler Vendor Enrollment Form) – this form is required to enroll an invitational traveler in the SI Vendor system for travel reimbursements

i. **STM 001** (GovTrip Add User) – this form is used to add a new user to GovTrip

j. **STM 002** (GovTrip System Settings Change) – this form is used to change user permissions in GovTrip (also to delete a user)

k. **SI Short-term Housing Lease Agreement** – this template may be used to obtain temporary lodging for SI employees and affiliated persons not to exceed sixty (60) calendar days during periods of TDY on official Smithsonian business when a commercial lodgings provider does not provide its own lease agreement

l. **Occupant Responsibility for Damage and Loss** – this template may be used as an attachment to the SI Short-term Housing Lease Agreement and is signed by each employee and/or affiliated person who will occupy the leased property

# CHAPTER 3.0: SMITHSONIAN TRAVEL GUIDANCE

The following section contains specific SI travel policies that supplement general Federal Travel Regulation (FTR) guidelines as they apply to common SI travel activities.

## 3.1 Travel Policy and Guidelines

All travel must comply with the FTR issued by GSA and/or SI policy. The SI Board of Regents has delegated to the Secretary the right to authorize travel on behalf of SI. The Secretary has delegated authority to the unit directors, who in turn may delegate to unit staff as needed to carry out the mission and operations of the unit. As with any delegation of authority, officials delegating travel authority to subordinates remain responsible for the proper execution of their organization's travel activity in compliance with the FTR and SI policy.

Failure to comply with SI travel policies and procedures may result in one or more of the following:

- Withdrawal of the unit's authority to authorize travel
- Withdrawal of an individual's authority to authorize travel
- Cancellation of the non-compliant TA
- Delay in, or denial of, processing the travel reimbursement
- Employee disciplinary action, such as letter of reprimand, suspension and/or termination of employment
- Investigation by the Inspector General
- SI TAs, vouchers, and related documents are subject to audit by OFA, OIG, GSA, and the Government Accountability Office (GAO).
- SI travel policy is established by SD 312, *Travel* and this Travel Handbook.
- In accordance with SD 931, *Use of Computers & Networks*, an authorized GovTrip user may not share his/her user ID, password and/or electronic signature. An individual using the GovTrip system must log-in using his/her own user ID and password to process or approve travel documents.

## 3.2 Travel Authorizations

All SI employees must have a pre-approved travel authorization (TA) for any official travel. An invitational traveler using SI funds for travel expenses will usually require a pre-approved TA. Travel authorizations are estimates of the cost of a trip. For international travel, a miscellaneous expense item should be added to account for fluctuations in currency exchange rates.

### 3.2.1 Travel Authorization Approval

a. A TA requires the following approvals from one or more individuals – with some additional approvals required, depending on the circumstance:

- Authorization to travel in support of a given mission or purpose
- Availability of funds – the certifier of funds must complete ERP training on Reporting and Commitment Control
- Special approval for some Senior executive travel – temporary duty travel must be pre-approved by their immediate supervisor (may not be delegated to a subordinate) if:

  1) The trip duration is 10 calendar days or longer, or,
  2) The cost of the trip is projected to exceed $6000.

  A list of senior management executives subject to the special approval is maintained by the Office of Human Resources and updated quarterly. The Special Approval for Senior Executive Travel form (OCon 710) is located on the SI Travel Forms & Policy Documents page at: http://prism2.si.edu/Support/Travel/Pages/TravelForms-Docs.aspx. Questions related to this policy should be directed to the Travel Management Office.

  **Note**: If, after a trip is complete and the number of days or the cost of the trip now requires special approval, an OCon 710 form must be approved by the traveler's immediate supervisor, and uploaded to the GovTrip voucher before the payment is approved.

- Compliance with the FTR and/or SI policy

b. The approving official for a TA is the traveler's immediate supervisor (or the supervisor of the organization providing travel for an invitational traveler). The immediate supervisor may delegate the approval authority to a peer of the immediate supervisor, a second level (or higher) supervisor, or a designated management official - **never a subordinate of the traveler.**

c. In addition, if applicable, the unit director (or a designee) must approve relocation-related expenses in advance, and the traveler/preparer must electronically attach the pen-and-ink signed approval form to the TA in GovTrip, and note in the comments section of the TA the form has been electronically attached.

d. All use of a car service other than that to/from a transportation terminal requires prior approval. This includes use of a car service for transportation in the user's designated local travel area. The approvals required are as follows:

   - If the traveler is a unit director but not a designated senior executive, car service use must be approved in advance by the appropriate Under Secretary
   - All other travelers, car service use must be approved in advance by the Unit Director

e. A unit may use a paper document to record one or more of the signatures required (rather than using the GovTrip electronic routing and stamping process) for a TA. TA's must receive an electronic Approval stamp to authorize travel. The signed paper document must be electronically attached to the TA before the document is APPROVED electronically. The approving official designated to electronically

stamp the document "APPROVED" in GovTrip is responsible for confirming the hard-copy documentation is properly completed, reflecting the required signature of the approving official(s), and is electronically attached to the GovTrip document.

f. In order to ensure all pertinent travel information is presented to the approving official (s), the SI unit must use either the standard GSA Form 87 (Official TDY Travel Authorization) printed from the GovTrip system or a unit-developed paper form approved in writing by the TMO to capture the required signature(s). Effective January 1, 2008, no other paper forms will be accepted as the official paper record for travel approval. If travel is to be approved with a pen-and-ink signature, a separate form must be printed and signed by the appropriate approving official(s) for each trip or amended trip.

g. Prior to the start of a trip, if the starting or ending date changes by more than five days and/or the departure or destination location changes, the traveler/preparer must create and process an amended TA. If these types of changes occur after the start of the trip, the changes can be made in the voucher.

***Table 312-A-1: Authorization Approvals***

| | TRAVELER OR TRAVEL PREPARER | APPROVER | OGC | UNIT DIRECTOR | UNDER SECRETARY | USF&A/ CFO |
|---|---|---|---|---|---|---|
| Travel | X | X | | | | |
| Sponsored travel will require additional approvals described in 3.10 | | X | X (depending on sponsor type) | | | |
| Emergency travel | | X | | X | | |
| Ex post facto authorization | | X | | X | | |
| Car service (not simple trip) (See d above) | | X | | X | X (if Unit Director) | |
| Spousal and dependent family member travel | | X | X | X | X | X |
| Chartered Aircraft | | X | X | X | X | X |

### 3.2.2 Travel Authorization Attachments

The traveler/preparer must electronically attach the following documentation to the GovTrip TA:

a. A copy of the pen-and-ink approved TA if the electronic approver is not the immediate supervisor or designated management official
b. A copy of the approved OCon 501 form if field expenses will be incurred on the trip
c. A copy of the offer of sponsorship if some or all of the travel will be paid by an outside entity
d. A copy of any higher level (OGC or Under Secretary) approval required for a trip

***Table 312-A-2: Authorization Attachments***

| | Paper Signed Authorization | Sponsored Travel Agreement | OGC Approval Document | Completed OCon 501 |
|---|---|---|---|---|
| **Approver not signing electronically** | X | | | |
| **Sponsored Travel:** | | | | |
| 1) U.S. non-profit 501(c)3 or state or local government no direct reimbursement | | X | | |
| 2) Federal agency reimbursement to SI or employee | | X | | |
| 3) U.S non-profit 501(c)3 or state or local government direct reimbursement to employee | | X | X | |
| 4) Foreign Government, individual, or for-profit sponsor (see section 3.10 for detailed information) | | X | X | |
| **Field Expenses over $500** | | | | X |

See Chapter 5.0, Relocation for the required approvals for relocation expenses.

### 3.3 Travel Vouchers

A travel voucher must be submitted, with receipts electronically attached, **within five workdays after completion of travel, or every 30 days if on long-term or continuous travel**. Partial vouchers are not available in GovTrip. If a reimbursement is required before the end of travel, please call the TMO Help Desk for assistance.

Each traveler, whether staff or invitational, must sign a travel voucher. If the traveler does not electronically sign in GovTrip, the traveler must pen-and-ink sign a printed copy of the GovTrip voucher (Standard Form 1012, *Travel Voucher*). This signed travel voucher must be electronically attached to the GovTrip record. The designated unit employee may then (and only then) electronically "sign" the travel voucher in his/her own name in GovTrip using the T-ENTERED stamp.

The approving official for a voucher is the traveler's immediate supervisor (or the supervisor of the organization providing travel for an invitational traveler). The immediate supervisor may delegate the approval authority to a peer of the immediate supervisor, a second level (or higher) supervisor, or a designated management official **- never a subordinate of the traveler.**

The approving official must ensure that a voucher is properly completed and all necessary receipts and other required documentation are attached before applying the "Approved" stamp. The approver must work with the traveler, travel preparer or the traveler's supervisor (if necessary) to correct any deficiencies in the voucher before approving it.

#### 3.3.1 Travel Expenses Requiring Unit Director Approval

A voucher for the following events requires the additional approval from a unit director:

a. Travel expenses related to emergency travel for reasons such as illness, injury, natural disaster, etc.
b. An ex post facto TA (occurs when travel expenses (other than conference registration) are incurred before a GovTrip travel authorization is created and approved)

***Table 312-A-3: Voucher Approvals***

| | Traveler (electronic or paper) | Approver | Unit Director |
|---|---|---|---|
| Voucher | X | X | |
| Emergency Travel | X | X | X |
| Ex post facto TA | X | X | X |

### 3.3.2 Travel Voucher Attachments

The traveler/preparer must electronically attach the following documentation to the GovTrip voucher:

a. A copy of the pen-and-ink signed voucher, if the traveler does not sign it electronically
b. If travel to a conference, a copy of the conference description which shows the dates, purpose, fees and meals provided
c. A copy of the ticketed transportation invoice showing the commercial carrier name, fare code and charges (do not include boarding passes)
d. A copy of any vehicle rental receipt
e. A complete copy of any lodging receipts
f. A copy of the receipt for any single expense over $75 US
g. Receipts for business development, donor cultivation or any other meal when the traveler is paying for others need to include the business purpose of the meal and names of those attending in addition to the date and location
h. Each use of ground transportation must be either itemized in the voucher or documented with a receipt regardless of amount
i. A copy of an offer of sponsorship if one was received during travel
j. For travel in a remote area where receipts are not available, the traveler should maintain a journal of the trip indicating what expenses were paid on which day including the name of the payee, a description of the payment and the amount including the exchange rate if the payment was in a foreign currency
k. All receipts from international travel should include the exchange rate for the TDY location or a copy of the credit card bill showing the US dollar amount of the expense and any currency conversion fees
l. Under some circumstances the statement from the government issued travel card can be used to substantiate expenses (but not lodging charges). Contact the TMO help desk for information

*Table 312-A-4: Travel Voucher Attachments*

| | Paper Signed Voucher | Transportation Invoice | Vehicle Rental Receipt | Lodging Receipt | Itemized Ground Transportation or Receipts | Expense Receipts | Sponsor Agreement | Conference Description |
|---|---|---|---|---|---|---|---|---|
| Traveler not signing electronically | X | | | | | | | |
| Approver not signing electronically | X | | | | | | | |
| Air or Rail | | X | | | | | | |
| Vehicle Rental | | | X | | | | | |
| Lodging costs | | | | X | | | | |
| Taxi, shuttle car service | | | | | X | | | |
| Other expense over $75 | | | | | | X | | |
| Sponsor agreement during travel | | | | | | | X | |
| Conference Attendance | | | | | | | | X |

### 3.4 Electronic Records

The GovTrip system will retain all electronic records (including those faxed or scanned/uploaded into a TA or voucher) for six years and three months, and will be the system of record for travel. A unit may, at its discretion, also retain a copy of travel records for its files.

### 3.5 Travel Charge Card

Each SI employee with a government contractor-issued travel charge card (IBA) is required to use it for all authorized expenses incurred while in travel status. The cardholder is personally responsible for the debt incurred.

The travel charge card may only be used for official travel and official travel-related expenses connected with temporary duty (TDY) travel or relocation. For example:

- Transportation (i.e., air and rail) travel costs for non-local travel
- Per Diem -- employee lodging, meals and incidental expenses
- Allowable miscellaneous expenses
- Representational expenses, including business development and donor cultivation
- Field expenses

A traveler may use the travel charge card to obtain an ATM cash advance for anticipated out-of-pocket travel expenses that **cannot be purchased with the travel charge card** (e.g. taxi and meals) and for which a cost can be estimated.

The travel charge card may **not** be used for, among other things, the following:

- Personal expenses – **including personal travel**
- Expenses incurred by other travelers
- ATM cash advances when the cash will not be used for expenses incurred while on official travel

Failure to pay the balance on the travel charge card statement in full before it becomes delinquent and/or using a travel charge card to pay expenses not related to official travel is considered abuse of travel charge card privileges. Such abuse constitutes a violation of SD 103, *Smithsonian Institution Standards of Conduct*. SD 103, Section 14 (Financial Responsibility) requires that the SI "employee shall pay debts properly and timely". Such abuse may result in one or more of the following:

a. Suspension or cancellation of travel charge card privileges
b. Employee disciplinary action, such as letter of reprimand, suspension and/or termination of employment
c. Notification of senior leadership for other appropriate action
d. Investigation by the Office of the Inspector General

All new travel charge card applicants are required to complete GSA's Government Travel Charge Card Training Program online course prior to receiving a travel charge card. This training is required to educate new cardholders and remind long-time cardholders on the proper use of the travel charge card and the FTR. The Government Travel Charge Card Training Program may be accessed using the following link: https://training.smartpay.gsa.gov/

## 3.6 Travel Advances

### 3.6.1 ATM Cash Advance:

The travel charge card allows for ATM withdrawals for cash advances to cover anticipated out-of-pocket travel expenses that **cannot be purchased with the travel charge card** and must be paid using cash or a cash equivalent, and for which a cost can be estimated.

ATM cash advances are limited to not more than 100% of the estimated reimbursable expenses that **cannot be purchased with the travel charge card.**

The service fee(s) charged by the vendor(s) – travel charge card bank and/or ATM bank - should be added by the traveler/preparer to the GovTrip document as a non-mileage expense (ATM Advance Fee), and will be charged to the chartfield on the TA.

### 3.6.2 SI Cash Advance:

Please note that in those **limited situations** in which OFA issues a cash advance:

a. The advance cannot exceed 100% of the estimated reimbursable expenses in the authorization
b. A traveler whose travel card has been suspended or closed may not be given a travel advance except to cover anticipated field expenses. No travel advance is permitted for transportation, per diem or miscellaneous expenses
c. The advance is scheduled to be issued 30 calendar days prior to the travel departure date. In GovTrip, the approving official applying the APPROVED stamp can request earlier issuance of the travel advance by checking the "Allow advances to be paid to the traveler immediately" box on the Route/Sign Digital Signature screen of the GovTrip TA
d. The traveler's approving official is responsible for collecting any unused advance amounts due to SI after the official travel has been completed
e. The traveler must immediately refund any unused advance amounts via check payable to SI and annotated with the applicable TA number

SI Cash Advance Uses. SI cash advances issued by OFA can be used for:

a. Invitational travelers who need a cash advance (they will not have a government contractor-issued travel charge card)
b. SI employees who do not have government travel cards
c. Travelers who must prepay expenses prior to the start of the trip; for example: conference registration, conference hotel advance reservation or, in some cases, non-refundable air tickets that must be purchased in advance
d. SI employees on travel exceeding 30 continuous days

## 3.7 Acceptance of Gifts While on Travel

Acceptance of any gift, gratuity, or benefit from a private source by an SI employee on travel must not violate SD 103, *Smithsonian Institution Standards of Conduct* which includes a comprehensive statement on gifts and appropriate action to be taken by the employee. The employee should avoid even **the appearance** of a conflict of interest. In addition, promotional materials or payments received are the property of SI, and may not be retained by the employee. These materials or benefits include, but are not limited to, cash, gifts, merchandise, bonus flights, reduced-fare coupons, credits toward future expenses or future car rentals, free tickets, and free accommodations.

There are two exceptions to this policy:

1. The traveler may keep compensation from an airline for a seat the traveler has voluntarily given up because of overbooking. In this situation, the traveler must use annual leave for delays during official hours, and may not charge additional per diem or expenses to SI.
2. The traveler may keep frequent flier mileage credits for personal use.

### 3.8 Invitational (Non-Employee) Travelers

A non-employee traveling at the invitation of SI is subject to the FTR and SI travel policy. The invitational traveler must be acting in a capacity directly connected with official SI activities:

a. **U.S. Citizens.** If the invitational traveler is a U.S. citizen, has a U.S. tax identification number, or will receive a direct payment (travel advance, honorarium, or reimbursement),

   1) He/she must complete the appropriate invitational traveler enrollment package (SI-3881, *Invitational Traveler Vendor Enrollment Form)* so that the sponsoring unit can enroll him/her in the PeopleSoft vendor system.

   2) The sponsoring unit must normally process travel documents through the GovTrip system on behalf of the invitational traveler – including spousal travel when authorized, or for members of SI Boards, Commissions, or Councils. This requirement is waived for travelers in item d.3) below.

b. **Non- U.S. Citizens.** If the traveler is not a U.S. citizen, and will not receive a direct reimbursement, or is a member of a group of 10 or more travelers invited to an SI-sponsored event, special travel arrangements may be available. Please contact the TMO for information.

   1) The travel preparer in the sponsoring unit will create and process the TA.

   2) At the completion of the trip the traveler will be required to pen-and-ink sign a paper copy of the travel voucher attesting to the validity of the claimed reimbursable expenses.

   3) The signed travel voucher must be electronically attached to the GovTrip record prior to the preparer electronically signing (with the T-ENTERED stamp) the voucher.

c. **Large Group Invitational Travelers.** When invitational travelers are part of a large group, see section 3.17

d. **Non-employee individuals** who may qualify for invitational traveler status are:

   1) Speakers at SI events, program experts and advisors

   2) Interns, fellows, research associates, and volunteers [family members?]

   3) Students, post docs, or other individuals collaborating on an SI program or research project

   4) Employees of Federal agencies whose travel is solely for SI business

   5) Persons providing personal assistance to employees with special needs who are authorized to travel

   6) Employment applicants traveling at the request of SI

   7) Contractors

**Note:** All of the non-employees listed above are eligible to travel using City Pair fares while on official SI business. Contractors are not eligible for government contract fares and their travel cannot be processed in GovTrip. Contact the TMO help desk for questions about supporting contractor travel.

#### 3.8.1 Board of Regents

Travel expense reimbursement may be provided to members of the Board of Regents in accordance with the Regents Reimbursement Policy as published by the Office of the Board of Regents.

### 3.9 Spousal and Dependent Family Member Travel

**Note:** The guidance below does not pertain to spouse or family members that hold official appointments in SI including registered volunteers. They should be treated as invitational travelers with no OGC or USF&A/CFO clearance required.

SI will authorize a spouse or dependent family member to travel on official travel at SI expense in limited, exceptional cases. The presence of a spouse or dependent family member on official travel is considered a bona fide business purpose where the spouse or dependent family member conducts official and substantive business-related functions on behalf of SI.

Spousal or dependent family member travel may be authorized only upon written approval **in advance** from the OGC and the USF&A/CFO. The unit must submit a request for approval of spousal or dependent family member travel **prior to the proposed travel** through the approving official to the OGC and the USF&A/CFO. The CFO will review all requests for approval of spousal or dependent family member travel submitted by the Secretary.

Such requests must demonstrate in writing the bona fide business purpose for the travel and the manner in which such travel furthers the mission of SI. Mere attendance at an event or the performance of incidental services as a spouse or dependent family member does not qualify as a bona fide business purpose. In addition, the table below provides some guidance in determining whether a spouse's or dependent family member's presence on SI travel serves a bona fide business purpose:

*Table 312-A-5: Spouse/FamilyTravel – Bona fide Business Purposes*

| Presence is less likely to be "bona fide" when: | Presence is more likely to be "bona fide" when: |
|---|---|
| No formal request for spouse or dependent family member to attend function | Formal or official written correspondence requests spouse or dependent family member to attend event |
| Spouse or dependent family member is not required to attend meetings, be given advance assignments, or make presentations at the event | Spouse or dependent family member is required to attend meetings, be given advance assignments, or make presentations at the event |
| Spouse or dependent family member will attend only social functions | Spouse or dependent family member will attend business-related meetings or events |
| Spouse or dependent family member will perform only "helpful" services (e.g., note taking, secretarial services) | Spouse or dependent family member will perform "necessary" services by acting as a representative of the SI in a significant manner |
| Only SI employees and spouses or dependent family members of SI employees will attend event | Third parties (i.e. non-SI employees) will attend event |
| Spouse or dependent family member will participate in substantial tourist activities (shopping, sightseeing, etc.) | Spouse or dependent family member will not participate in tourist activities |
| Children or other family members will attend | Children and other family members will not attend |
| | Spouse's or dependent family member's presence is dictated by tradition or protocol |
| | The duties and responsibilities performed by the spouse or dependent family member would have been performed by another SI employee had the spouse or dependent family member not attended the event. |

**Note:** The unit must electronically attach the approved request to the TA in GovTrip.

Travel for the spouse or dependent family member of a director must use the same GovTrip routing list as the director's travel.

## 3.10 Sponsored Travel

### 3.10.1 Definition of terms

**Smithsonian Employee –** an individual paid through the Smithsonian Payroll system with federal or trust funds. Interns, fellows and research associates are not Smithsonian employees.

**Sponsored travel** – occurs when any Smithsonian employee accepts financial support from a Federal or non-Federal source to fund travel expenses for a meeting. This section describes the policies and procedures that govern an employee's use of sponsorship. These sponsored travel rules do not apply to interns, fellows or research associates whose travel expenses are entirely funded by a non-SI source. They may accept any level support offered by the sponsor. In those instances when the travel for an intern, fellow or research associate is partially paid by SI and partially by a non-SI source, the intern, fellow or research associate must follow SI invitational travel policies and procedures for those expenses paid for by SI.

**Meeting** – is a conference, seminar, speaking engagement, symposium, training course or similar event that takes place away from the traveler's official station. For Smithsonian travelers, donor cultivation events qualify as meetings.

**Direct reimbursement** – a payment made directly to an employee for reimbursement of travel expenses. For domestic travel, a direct reimbursement must be check, money order or a direct deposit to the traveler's bank account, never cash. OFA will audit 100% of direct reimbursements requiring the OGC Direct Reimbursement form.

**Cash Payments** – Some foreign sponsors may offer to reimburse travel expenses with a cash payment either at the beginning or end of a trip. Travelers should make every attempt to avoid cash payments. Federal law allows SI employees to accept cash from a foreign government or governmental entity, but such payments must be handled as follows to prevent problems:

a. If cash is received at the end of a trip –
   - Obtain a written receipt from the sponsor attesting to the amount paid
   - Submit cash for deposit in a Smithsonian account
   - Attach receipts and deposit information to the travel voucher
b. If cash is received at the beginning of the trip for payment of local expenses such as lodging, meals and local transportation –
   - Obtain a written receipt from the sponsor attesting to the amount paid
   - Provide receipts or a log documenting every penny spent
   - Deposit any remaining funds in a Smithsonian account

**Honorarium** – remuneration made to acknowledge or "reward" participation in an event; often given in recognition of a speech or presentation.

**Payment** – remuneration made for service rendered such as participation on a review board or panel, and, sometimes, participation in an event as a speaker or presenter.

### 3.10.2 Sponsored travel made by in-kind payments

**In-kind payments** occur when the sponsor directly arranges and pays for travel arrangements including transportation, hotels, meals, etc., and the traveler does not incur out-of-pocket expenses.

Generally, an employee may only be provided with sponsored travel arrangements at the same level as would otherwise be permitted if the SI were paying for the arrangements with two exceptions:

a. traveler may use a non-U.S. flag carrier and
b. Traveler may use non-coach class travel if authorized by the sponsor.

Sponsored travel arrangements which exceed standard levels (such as first class airline tickets, transportation on a chartered or private jet or deluxe hotel accommodations), must be approved in advance by a supervisor and OGC regardless of the sponsor. Acceptance of such arrangements may be permitted on a case by case basis so long as such arrangements are not lavish and do not raise a conflict of interest or appearance of a conflict of interest.

A sponsor may fund all or part of a trip in advance or upon completion of the specified travel. For employee sponsored travel only, the sponsor's commitment letter must be received prior to the trip and must be addressed to the SI organization in addition to the traveler.

- For employees, the external sponsorship must be noted in the Trip Details box of the GovTrip TA. GovTrip TAs is not to be used for sponsored travel for interns, fellows and research associates.
- For employees, the TA must identify the funding source and any conditions
- For employees, the commitment letter must be electronically attached to the TA in GovTrip
- For employees, unit administrative personnel are responsible for ensuring that sponsored travel transactions are properly structured, documented and processed within GovTrip and the ERP financial system.
- For employees, a payment received from a sponsor must be recorded on a Cash Receipt Voucher (CRV). The unit must confirm the CRV has the proper travel chartfield coding and must attach a copy of the travel voucher

### 3.10.3 If the sponsor is a US Government agency (such as NOAA, NSF or NASA)

- No OGC Travel Authorization Clearance form is required for any traveler
- Employee travelers may receive a direct reimbursement (no OGC Direct Reimbursement Clearance form is required)
- Sponsor may pay some or all expenses on behalf of traveler (see in-kind payment definition above)
- For employees, sponsor may reimburse the Smithsonian directly rather than pay the traveler
- Employee travelers may not accept an honorarium or payment for anything other than actual travel expenses. Honoraria or non-travel payments may be made directly to the employee's unit or Smithsonian. An employee traveler may not accept a check in his/her name and turn it over to SI (See more about these kinds of payments below)

- Employee travelers must electronically attach a copy of the payment document (check, money order or electronic funds transfer (EFT) advice) and all travel receipts to the travel voucher

### 3.10.4 If the sponsor is a state or local government or a US non-profit entity (an organization that qualifies under section 501(c)(3))

- No OGC Travel Authorization Clearance is required for any traveler
- Employee traveler may receive a direct reimbursement if an OGC Direct Reimbursement Clearance form is approved by OGC in advance
- Sponsor may pay some or all expenses on behalf of traveler (see in-kind payment definition above)
- For employees, sponsor may reimburse the Smithsonian directly rather than pay the traveler
- Employee travelers may not accept an honorarium or payment for anything other than actual travel expenses. Honoraria or non-travel payments may be made directly to the employee's unit or Smithsonian. An employee traveler may not accept a check in his/her name and turn it over to SI (See more about these kinds of payments below)
- Employee travelers must electronically attach a copy of the payment document (check, money order or EFT advice), all travel receipts and the OGC Direct Reimbursement Clearance form to the travel voucher

### 3.10.5 If the sponsor is a foreign non-profit entity

- No OGC Travel Authorization Clearance is required for any traveler
- Employee travelers may not receive a direct reimbursement
- Sponsor may pay some or all expenses on behalf of traveler (see in-kind payment definition above)
- For employees, sponsor must reimburse the Smithsonian directly rather than pay the traveler
- Employee travelers may not accept an honorarium or payment. Honoraria or non-travel payments may be made directly to the traveler's unit or Smithsonian. Traveler may not accept a check in his/her name and turn it over to SI (See more about these kinds of payments below)

### 3.10.6 If the sponsor is a US or foreign for-profit entity

- Employee travelers must submit an OGC Travel Authorization Clearance form which must be approved prior to travel
- Employee travelers may not receive a direct reimbursement
- Sponsor may pay some or all expenses on behalf of traveler (see in-kind payment definition above)
- For employees, sponsor must reimburse the Smithsonian directly rather than pay the traveler

- Employee travelers may not accept an honorarium or payment. Honoraria or non-travel payments may be made directly to the traveler's unit or Smithsonian. Traveler may not accept a check in his/her name and turn it over to SI (See more about these kinds of payments in 3.10.9 below)

### 3.10.7 If the sponsor is a foreign government or foreign governmental entity (generally, a foreign public university is a foreign governmental entity)

- Employee travelers must submit an OGC Travel Authorization Clearance form which must be approved prior to travel
- Employee travelers may accept cash if no other form of payment is available from the sponsor (see procedures in 3.10.1 above)
- Sponsor may pay some or all expenses on behalf of traveler (see in-kind payment definition above)
- For employees, sponsor must reimburse the Smithsonian directly rather than pay the traveler if the reimbursement is in the form of a check or wire transfer
- Employee travelers may not accept an honorarium or payment. Honoraria or non-travel payments may be made directly to the traveler's unit or Smithsonian. Traveler may not accept a check in his/her name and turn it over to SI (see more about these kinds of payments in 3.10.9 below)

### 3.10.8 If the sponsor is an individual

- No OGC Travel Authorization Clearance is required for any traveler
- Employee travelers must provide detailed information about sponsor, sponsor's affiliation with Smithsonian, purpose of travel, and the details of the offer in travel authorization form for the travel approver
- For offers of hospitality that arise after travel has already commenced, employee must, upon return, disclose the details and nature of the hospitality to the travel preparer for inclusion in the voucher
- USF&A/CFO will perform compliance reviews of travel authorizations containing offers of free hospitality

### 3.10.9 Payments and Honoraria (other than travel reimbursements)

Employee travelers on official business can never accept payments and honoraria other than travel reimbursements. Payments must always be made to the unit or the Smithsonian. Contact the OGC ethics office for additional information.

#### Sponsorship Questions

If the unit has any question about the type of entity or the propriety of accepting sponsorship or direct reimbursements, contact the OGC ethics office.

### 3.11 No Cost Travel

A no-cost TA and voucher must be prepared and processed by the unit:

- When a sponsor handles the arrangements for an employee traveling on SI business and directly pays all related expenses (such as transportation, lodging, and meals). Interns, fellows and research associate travel should not be recorded on a TA
- If an employee attends a conference at his/her own expense. In this case, the unit and employee must document the agreement about what travel expenses will be paid and not paid. This document must be electronically attached to the TA in GovTrip. A comment must also be entered in the Trip Details box describing the portion(s) of the trip that will be paid by the employee

### 3.12 Combining Personal and Business Travel

- The traveler must annotate the TA to specify the details of the personal travel s/he intends to take during the trip.
- The traveler must mark non-business days as annual leave – no lodging or M&IE will be paid.
- The traveler may not purchase travel to or from a non-business location through GovTrip or using the government travel card.
- The traveler may purchase the business portion of travel through the GovTrip system using the government travel card or he/she may purchase the entire roundtrip ticket outside of GovTrip. In either case, the traveler will only be reimbursed the round trip government fare or the actual cost of his/her ticket whichever is less.

#### 3.12.1 Leave at destination.

A traveler plans to take leave prior to, during, or following completion of official travel at a TDY location, in conjunction with official travel. For example:

a. Official travel is scheduled from Monday through Friday and the traveler decides to stay for personal reasons until the following Wednesday, the traveler must create the TA with the Departure Date as Monday and the return date as the following Wednesday

b. The traveler may not claim lodging or meals and incidental expenses (M&IE) on non-business days, and is required to adjust the TA accordingly. In addition, any leave days must be clearly identified on the TA

#### 3.12.2 Side trip from business destination.

If personal travel is from a TDY location returning to the same TDY location (for example, business trip is to Los Angeles and traveler goes to San Francisco for personal reasons and then back to Los Angeles):

a. The traveler's TA must show only the itinerary from the duty station to the TDY location and return (do not show the personal destinations), but must show the entire duration of the trip including leave days
b. The traveler can book the travel to and from the TDY location using the GovTrip online booking tool or an SI travel agent

**3.12.3 Non-business destination departure or return.**

If non-business travel originates at a TDY location but requires the return to the duty station to be from a non-business destination (for example, traveler goes from Washington, D.C. to Los Angeles on business and then goes to Seattle to visit family and wishes to return from Seattle to Washington, D.C.):

a. The traveler must complete a TA showing only the itinerary from the duty station to the TDY location and return (the TA dates must cover the entire trip including leave days)
b. The traveler cannot use the travel charge card to buy the portion of the ticket that includes a non-business departure or destination, and must use his/her personal funds. Travel from the duty station directly to the TDY location or from the TDY location to the duty station can be procured through the GovTrip system or from an SI travel agent. In this example, the ticket from Washington, D.C. to Los Angeles can be procured through GovTrip using government fares, but the Los Angeles to Seattle to Washington, D.C. ticket must be procured outside the system. Alternatively, a traveler may purchase a roundtrip ticket for the entire trip to take advantage of lower roundtrip fares. This may make the total cost of the airfare less than the round trip government fare to and from the business destination
c. The traveler will only be reimbursed for the actual cost of the ticket, not to exceed the government contract round trip airfare to the TDY location

**3.12.4 Accompanied by unofficial travelers.**

If the traveler wishes to take family members on an official trip:

a. The traveler must complete a TA showing only the itinerary from the duty station to the TDY location and return to the duty station
b. The traveler may book official travel through the GovTrip system or with an SI travel agent
c. Travel for family members must be arranged outside the GovTrip system
d. No lodging or M&IE expenses for family members will be paid or reimbursed to the traveler. Family members can share a room with the traveler at the TDY location. Any additional room charges (such as additional guest fees) are not reimbursable to the traveler.

#### 3.12.5 Official travel during leave.

If a traveler is called upon to travel to a TDY location when the traveler is already on annual leave or annual leave has already been scheduled when the requirement for official travel becomes known:

a. The traveler or travel preparer must complete a TA showing the itinerary from the leave location to the TDY location and back to the leave location. Traveler can also travel from the leave location to the TDY location and return to the duty station or leave from the duty station, travel to the TDY location and then continue to the leave destination.
b. Traveler will receive lodging and M&IE for the official business days including ¾ per diem for the first and last days of official travel.

### 3.13 Local Travel

There are two kinds of local travel as defined by the geographical area in which the travel takes place:

#### 3.13.1 Official Local Travel

a. Official Local Travel is travel in the “official local travel area” defined in Appendix 4.
b. Official Local Travel is not recorded on a GovTrip Travel Authorization
c. Lodging and per diem reimbursements are not allowed

#### 3.13.2 Day Trip Travel

Day Trip Travel is travel in the geographical area in which a round trip from a traveler’s home or office can be completed in less than 12 hours.

a. Normally travel outside of the Institution’s “official local travel area” requires a GovTrip Travel Authorization but a TA is NOT REQUIRED if:
   - The total travel time is less than 12 hours; and
   - No air, Amtrak or bus reservations are required (VRE, Metro and MARC tickets excepted); and
   - No overnight stay is required.
b. Any local travel expenses normally authorized by a unit (mileage, taxi, tolls, rental car, VRE, Marc, Metro tickets and parking) can also be paid for “day trip” travel using the Smithsonian Miscellaneous Reimbursement process (SMR Reference Guide).
c. Unit directors in locations other than the Washington Metropolitan region may allow day trips in their areas at their discretion.

**Note:** Without specific authorization, a traveler shall not use his/her individual government travel card to pay for local travel expenses, including those incurred on day trips (especially rental cars). Without specific authorization, travel cards can only be used for travel covered by a GovTrip Travel Authorization. The only exception for the usage of a government travel card in the local area is authorized in *SD 322 Charge Card Program Appendix A Use of Travel Cards for Development, Official Representation, and Business Activity Expenses*.

Additional local travel information can be found in the FAQ section on the OCFO/OC/FPPD web page on Prism.

### 3.14 Field Expenses

Travel documents may include field expense items, such as supplies for a research project. Prior to the trip, the unit is required to complete an OCon 501 form to authorize the purchase of any personal property and/or supplies or any other non-personal property when the total amount may exceed $500.

The traveler/preparer must electronically attach the completed OCon 501 form to the TA. All field expenses must be:

- Approved by OCon&PPM or a unit official with delegated procurement authority specifically for field expenses
- Identified in the Non-Mileage Expenses section of the TA
- Charged to the correct non-travel chartfield codes

### 3.15 Compensatory Time

The compensatory time discussed below is only for time spent during transportation to a TDY location. Once a traveler has arrived at the TDY location, time at the TDY location during non-working hours is subject to the employee’s unit’s normal overtime rules.

Compensatory time off for travel may be earned by a salaried (not hourly) employee without regard to whether the employee is exempt from or covered by the overtime pay provisions of the Fair Labor Standards Act of 1938, as amended. This includes SI Federal employees in the General Schedule (GS), prevailing rate (WG) employees, and scientific or professional (ST) positions, Trust employees in the Institution Schedule (IS), and senior-level employees in Federal (SL) and Trust (IL) positions, but does not include prevailing rate (wage) employees, either Federal or Trust. An SI Federal or Trust wage employee who is required to travel outside his/her regular duty hours earns overtime pay.

For travel time to be creditable under this provision, travel must be officially authorized, i.e., travel must be for work purposes and must be approved by an authorized SI official or otherwise authorized under established SI policies. To minimize the accrual of excessive compensatory time off for travel, a unit may require the employee to schedule travel to occur during normal working hours whenever and wherever possible.

For the purpose of compensatory time off for travel, time in a travel status includes:

a. Time spent traveling between the official duty station and a temporary duty station.

b. Time spent traveling between two temporary duty stations.

c. The "usual waiting time" preceding or interrupting such travel (e.g., waiting at an airport or train station prior to departure). SI has the sole and exclusive discretion to determine what is creditable as "usual waiting time." OHR has determined the creditable "usual waiting time" shall be up to two hours for a domestic flight, up to three hours for an international flight or up to 30 minutes prior to travel using other modes of transportation (bus, train, etc.). Please see the Time and Attendance Handbook for additional details. An "extended" waiting period—i.e., an unusually long wait during which the employee is free to rest, sleep, or otherwise use the time for his or her own purposes—is usually not considered time in a travel status.

**Note:** Time spent traveling on union business is excluded.

### 3.15.1 Alternate mode of travel

An employee may choose any mode of travel and route, but may earn only the compensatory time off that would have resulted from the mode of travel and route offered to the employee by the unit.

### 3.15.2 Travel involving two or more time zones

When travel involves two or more time zones, the time zone from the point of first departure must be used to determine how many hours the employee actually spent in a travel status for the purpose of accruing compensatory time off.

### 3.15.3 Commuting Time

- Travel outside regular working hours between an employee's home and a temporary duty station or transportation terminal outside the limits of his or her official duty station is considered creditable travel time. However, SI must deduct the employee's normal home-to-work/work-to-home commuting time from the creditable travel time.
- Travel outside regular working hours between a worksite and a transportation terminal is creditable travel time, and no commuting time offset applies.
- Travel outside regular working hours to or from a transportation terminal within the limits of the employee's official duty station is considered equivalent to commuting time and is not creditable travel time.

### 3.15.4 Crediting and Use

- Compensatory time off for travel is credited and used in increments of one-quarter of an hour (15 minutes).

- The employee must comply with his/her unit's procedures for requesting credit within the time period required by SI.
- The employee must comply with his/her unit's policies and procedures for scheduling and using earned compensatory time off for travel.

Under no circumstances may an employee, whether non-exempt or exempt, receive payment for unused compensatory time off for travel. Compensatory time off for travel is forfeited—

a. If not used by the end of the 26th pay period after the pay period during which it was earned. (Exception: SI may authorize an extension of up to 26 additional pay periods if the forfeiture is the result of an exigency of the unit or SI. Exceptions require the approval of the Office of Human Resources.)

b. Upon voluntary transfer to another agency (if a Federal employee); or

c. Upon separation from SI (if either a Trust or Federal employee)

### 3.16 International Travel Support

The Office of International Relations (OIR) provides passport, visa and research permit services and advice on travel and shipping for SI travelers who are traveling abroad on official business. The OIR is designated by the Passport Office of the U.S. Department of State to request, process, and monitor official passports for Federal employees of SI who are proceeding abroad on official business, as well as spouses and dependent children accompanying the SI traveler to duty stations abroad. The OIR is also able to process regular passports for non-Federal SI travelers on official business through the Special Issuance Unit of the Passport Office. The OIR also assists in the planning for and management of visits of foreign scholars and dignitaries to SI, including the processing of entry documents appropriate for the purpose of the visit. The OIR is authorized by the U.S. Department of State to certify eligibility for exchange visitor (J-1) status allowing foreign visitors to pursue programs at SI and other institutions as appropriate for specified periods of time.

All international travel requires the use of a passport issued by the country of citizenship. As of 2008, no U.S. citizen may re-enter the U.S. from any country abroad, except U.S. territories, without a valid passport. A number of countries have a requirement that the traveler's passport be valid for a number of months, usually 3 or 6 months, beyond the traveler's departure date from that country. Many countries also require pre-issued visas before a traveler is allowed entry. Airlines will not allow a traveler to board an airplane if the traveler is not in possession of the required entry documents.

Visas are endorsements entered onto a traveler's passport by an authority of the country to be visited, usually the embassy or consulate of that country in the U.S. Different types of visas may be required, depending on the purpose of the visit. Not all countries require visas. This will vary by country of citizenship, type of passport, and purpose of travel. The OIR will advise the SI traveler of the entry requirements for any foreign destination, as well as the passport validity requirement, and will process the visa application(s) on behalf of the

traveler, as well as provide the often-required endorsement letter of the organization (SI) the traveler represents.

Any traveler visiting a foreign country should visit the SI Health Unit to confer on immunization requirements and quarantine regulations. The SI Health Unit will provide the necessary inoculations at a cost reimbursable by the traveler's unit. Additional health information for travelers may be found at the Centers for Disease Control "Travelers' Health" website: http://wwwn.cdc.gov/travel/default.aspx.

## 3.17 Large Group Travel

Normally, any travel funded by Smithsonian Institution (SI) should be recorded and processed using the GovTrip system. However, under some specific circumstances, an alternate method of arranging and paying for travel for invitational travelers (individuals traveling on behalf of SI, who are not employees) may be authorized upon obtaining prior written approval from the Manager, Travel Management Office (TMO), Simplified Acquisitions Division, OCon&PPM.

Large Group Travel Procedures (used for securing and paying for travel expenses) is intended for invitational travelers only. All employee travel must be administered within the Smithsonian's electronic travel system (GovTrip) unless the Manager, TMO has given prior written approval for use of a Purchase Order (PO) to satisfy a specific circumstance related to employee travel that cannot be reasonably administered within GovTrip. The below scenarios in section 3.17.1 and 3.17.2 provide guidance for large group travel.

### 3.17.1 Purchase of Air Tickets Only

Travelers will receive no direct reimbursements or payments of any kind. Air tickets, lodging and other expenses will be procured by PO. Travelers will not be entered into GovTrip or the vendor system. Air tickets will be charged to the central billed travel card and then reconciled to the expense chartfield on the air ticket PO as outlined below:

a. Unit will contact the Manager, TMO via email and describe the event, location, number of participants and how travel will be funded.

b. Unit will create a vendor for the event (see the procedures for *Adding a Vendor for Large Group Travel PO* in section 3.17.3 below.)

c. All reservations must be secured through Travel Horizons using the central billed credit card.

d. Unit will create a purchase order for the centrally-billed tickets (see *Central Billed Air Ticket PO Format* guidelines in section 3.17.4 below) using the vendor created in b) above. Enter the appropriate chartfield(s) to fund the tickets in the "PO Distribution" section. Unit must "Approve" and "Budget Check" the PO.

e. Provide a copy of the approved PO (including all travel itineraries) to the Manager, TMO.



SI00196

f. Travel Management staff will review the Travel Horizons ticket reservations to ensure fares and itineraries are in accordance with SI travel policy and that the PO number is included in the Passenger Name Record (PNR).

g. Upon review, Travel Management staff will authorize Travel Horizons to release the tickets billed on SI Centrally–billed account.

h. Unit will create any other POs required for other travel expenses, such as lodging, referencing the air ticket PO, to include the event name, dates, and purpose.

i. After ticket purchase, the central billed charges will be applied to the chartfield(s) in the air ticket PO by the central credit card reconciliation process.

### 3.17.2 Purchase of Air Tickets that include Honoraria

When invitational travelers receive an air ticket and an honorarium, travelers must be added to the vendor system but not to GovTrip. Air tickets will be charged to the central billed travel card and then reconciled to the expense chartfield on the air ticket PO created below:

a. Since an honorarium will be paid to the travelers, each traveler must be entered into the vendor system. **Honorarium payments are taxable to U.S. citizens and non-U.S. citizens with tax identification numbers. Honorarium payments may be taxable to non-U.S. citizens who are residents of a country with a tax treaty with the U.S.**

b. Unit will contact the Manager, TMO via email and describe the event, location, number of participants and how travel will be funded.

c. Unit will create a vendor for the event (see the procedures for *Adding a Vendor for Large Group Travel PO* in section 3.17.3 below.)

d. All reservations must be secured through Travel Horizons using the central billed credit card.

e. Unit will create a purchase order for the centrally-billed tickets (see *Central Billed Air Ticket PO Format* guidelines in section 3.17.4 below) using the vendor created in c) above. Enter the appropriate chartfield(s) to fund the tickets in the PO Distribution section. Unit must "Approve" and "Budget Check" the PO.

f. Provide a copy of the approved PO (including all travel itineraries) to the Manager, TMO.

g. Travel Management staff will review the Travel Horizons reservations to ensure all fares and itineraries are in accordance with SI travel policy and that the PO number is included in the PNR.

h. Upon review, Travel Management staff will authorize Travel Horizons to release the tickets billed to SI Centrally –billed account.

i. Unit will create any other POs required for other travel expenses, such as lodging, referencing the air ticket PO, to include the event name, dates, and purpose. A PO for

Honoraria may only include one recipient (see the *Honoraria PO Format* guidelines in section 3.17.5 below.)

j. After ticket purchase, the central billed charges will be applied to the chartfield(s) in the air ticket PO by the central credit card reconciliation process.

k. Unit will create a PO using the vendor created in c) above and follow the *Honoraria PO Format* guidelines in section 3.17.5 below. Provide the PO number to the Manager once approved.

l. Unit will create any other PO's required for other travel expenses.

m. Depending on the number of participants, unit may be required to fund a voucher processing resource for the honorarium payments.

### 3.17.3 Adding a Vendor for a Large Group Travel PO

a. Create an invitational traveler vendor form (SI-3881-Travel) with a vendor last name that begins with SI – followed by the name of the event; e.g. SI – NY NMAI Film Festival

b. For Date of Birth (DOB) use the first day of the current fiscal year

c. Gender – male

d. Use the Smithsonian Tax ID Number (TIN): 53-0206027

e. Use the sponsoring unit address, phone number and contact

f. Use the vendor name and vendor number created with this process to create the air ticket PO (and any other POs required for the event)

### 3.17.4 Central Billed Air Ticket PO Format:

a. The PO Type must be "TA" for travel and

b. PO Line category must be "Central_Bill_Trans" (Category Code '00018'). Only one Central_Bill_Trans line is allowed on any PO

c. Item description: Centrally-billed travel including the event name, date, and purpose

d. When setting up the Distribution for this line make sure "*Distribute by:" is set to Amount

The PO Line details must include the event name, event dates, and the number of tickets and the dollar amount. Where practical, traveler names should appear on the PO with specific traveler itineraries (name, dates of travel, cost) provided as an attachment to the PO.

### 3.17.5 Honoraria PO Format:

a. The PO Type should be "PO"

b. PO Line category must be "HONORARIA"

c. Item description: Honoraria/Speaker Fees

d. When setting up the Distribution for this line make sure "*Distribute by:" is set to "Amount"

**Note:** An Honoraria PO's may only include one recipient.

### 3.18 Short-term Housing Lease Agreements with Commercial and Non-Commercial Lodging Providers

A *Short-term Housing Lease Agreement* may be used to obtain temporary lodging for SI employees and affiliated persons not to exceed sixty (60) calendar days during periods of TDY on official Smithsonian business.

- **Short-term Lease Agreements** are contractual agreements with commercial and non-commercial lodgings providers allowable when it is determined that conventional and commonly used accommodations are not available and/or obtaining lodging via lease agreement presents a best value for the Smithsonian.

- **Daily Lodgings Rates** pursuant to short-term lease agreements may not exceed the daily lodgings rate allowed per employee by the Federal Travel Regulation. To calculate daily lodgings costs allowable per traveler, divide the daily cost for a short-term rental equally among all travelers to be accommodated by a short-term lease agreement.

Typical facilities include apartment or condominium type properties, or furnished vacation rental properties that may be furnished with all the amenities of a regular home. These facilities may be either commercial or non-commercial.

- **Commercial Lodgings Providers** are motels, hotels (including Bed and Breakfast inns not independently-owned and operated), non-conventional commercial lodgings providers such as educational institutions and other public or private agencies and organizations, and property management companies that manage and rent or lease privately-owned properties.
- **Non-commercial Lodgings Providers** are individuals who rent or lease their privately-owned properties directly. Examples of non-commercial lodging are: single family homes and multi-unit properties such as townhomes, apartments and condominium-type properties, including rooms therein; furnished vacation rental properties, including rooms therein; and rooms in independently-owned and operated Bed and Breakfast inns, which are not properties that are managed and rented or leased by property management companies.

Travelers, travel approving officials, and unit procurement officers must ensure the following requirements are met when authorizing short-term housing lease agreements:

a. The person renting assumes all responsibility and liability for injury or any damage to, or loss of, personal property owned by either party if the damage is a result of negligence by the occupant or guest(s) of the occupant.
b. A signed lease agreement is required before occupancy begins.
c. Requirements for lodging greater than sixty calendar days must be processed by OCon&PPM.
d. When setting up the Distribution for this line make sure "*Distribute by:" is set to "Amount"

### 3.18.1 Obtaining and Paying for Short-term Lease Agreements

#### 3.18.1.1 Credit/Charge Cards:

The method to obtain and pay for short-term leases with commercial lodgings providers only may be by Travel Card when the following requirements are completed prior to travel commencing:

a. A lease agreement presented by the commercial lodgings provider is accepted and approved by the SI, or,

b. When a commercial lodgings provider does not provide its own lease agreement, it accepts and signs an *SI Short-term Housing Lease Agreement;*

c. Domestic (U.S.) commercial lodgings providers present proof of $300,000 minimum liability insurance coverage required by the Smithsonian for all employees and affiliated persons who will occupy the leased property and from lodgings providers in foreign countries when it is available;

d. A copy of a completed *Occupant Responsibility for Damage and Loss*, is signed by each employee and/or affiliated person who will occupy the leased property and is attached to the executed lease agreement; and,

e. One traveler includes the cost for the commercial rental/leased property on a reviewed and approved form OCon 501, *Field Expenses Review and Authorization* containing a list of all individuals who will occupy the leased property. (The reviewed and approved OCon 501 must be attached to the employee's travel authorization with a copy of the lease agreement forms and lodging provider's proof of insurance.)

When a commercial lodgings provider will not accept payment by travel card, the requirements for issuing a purchase order (PO) or contract to obtain and pay for short-term lease agreements with non-commercial providers (see below) shall apply. In such instances, travel approvers and procurement officers do not need to include short-term lease agreement info on an otherwise required OCon 501, *Field Expenses Review and Authorization* form.



SI00200

#### 3.18.1.2 Purchase Order (PO) or Contract:

A purchase order (PO) or contract is required to execute and pay for all short-term lease agreements with **non-commercial lodgings providers**, *and* when **commercial lodgings providers** do not accept payment by travel card. All documents required in Section 3.18.1.1 (a-e) above must be obtained from lodgings providers with whom a PO or contract must be executed, and these lodgings providers must accept the SI order of precedence clause that is part of the PO or contract. When a PO is necessary to obtain and pay for short-term lease agreements, an OCon 501 form does not need to include short-term lease agreement information. Travelers and procurement officers are responsible for ensuring all requirements are met prior to issuing a PO or contract and travel commencing.

Purchase orders issued to obtain and pay for short-term lease agreements may then be reviewed and budget checked in accordance with Section 3.18.3 below.

### 3.18.2 Renter's Insurance

It is highly recommended that employees and affiliated persons purchase renter's insurance in the event their personal belongings are damaged or loss by the occurrence of fire, other damage, or theft during the periods short-term lease agreements are in effect.

The SI does have personal property insurance that would cover the property of employees; however, the deductible is very high and would require unit funds to cover the loss should a claim arise. If the occupant(s) or lodging provider, determine that renters insurance is necessary, advance approval in writing must be obtained from the Approving Official and may be subject to reimbursement.

Some non-commercial rental properties require occupants to purchase such insurance. If renters insurance is desired by employees, a separate PO will need to be created to cover the authorized expense; non-SI employees who will occupy the leased property must purchase their own insurance if they desire this coverage.

### 3.18.3 Purchase Order Review and Budget Checking

a. **Unit procurement officers** may review and budget check POs required for short-term lease agreements when all requirements in Section 3.18.1.1 (a-e) above are met and the dollar amount of the short-term lease does not exceed the purchasing authority delegated to the procurement officer who will execute the required PO.

b. **OCon&PPM** must review and budget check POs required for short-term lease agreements when any of the following exists:

- A selected lodgings provider does not accept the order of precedence clause; and/or,

- The dollar amount involved with entering a short-term lease agreement exceeds the purchasing authority to the unit procurement officer who must execute the required PO or contract.

All required documents to effect a short-term lease agreement must accompany requests to OCon&PPM for review and budget checking. When budget checking is completed at OCon&PPM the transmitting unit procurement officer will be informed and all documentation must be included in the unit PO file.

#### 3.18.4 Travelers' GovTrip Documentation

Employees who use their individually-billed travel cards to pay for short-term rentals must attach a copy of the signed lease agreement, receipt for lodging payment, receipt for payment of rental insurance for employees to their travel vouchers, and a copy of the approved OCon 501 form.

When short term lodgings are paid for via PO, the travel vouchers for each employee and/or affiliated persons who occupied the leased property must not include any lodgings expenses for reimbursement. These travel vouchers must include:

a. a copy of the PO for the short-term lease agreement;
b. reference to the PO number in the Trip Details of the travel documentation;
c. copy of the PO for reimbursable renters insurance (for employees only); and
d. a copy of each document listed in Section 3.18.1.1.(a-e), whichever is applicable.

### 3.19 Overseas Tour Renewal Agreement Travel (OTRAT)

OTRAT is an allowance that is reimbursed to an eligible employee who is assigned to a Foreign Duty Station (FDS). The allowance covers only airfare expenses for the employee and his/her immediate family members as defined by FTR Chapter §300-3.1 to the employee's declared place of residence or alternate location. To qualify for OTRAT, immediate family members must reside with the employee for at least six months during a year.

To be eligible, an employee must:

a. Satisfactorily complete at least two years of continued service at the FDS;
b. Sign a Service Agreement to remain in service for at least 12 months;
c. Have at least a "Successful" performance rating; and
d. Not have any financial indebtedness to the Institution.

For more information about the procedures for requesting this benefit and the travel rules that apply to this type of travel, please refer to Smithsonian Directives (SD) 212 and 213; Chapter 591, Allowances and Differentials, Office of Human Resources (OHR), Allowances and Differentials Handbook.

## CHAPTER 4.0: FEDERAL TRAVEL REGULATION HIGHLIGHTS

The Federal Travel Regulation Highlights section provides an overview of key provisions of the FTR to provide additional clarification for SI travelers. Specific travel guidance is available at GSA's official website GSA Home.

### 4.1 Per Diem

a. GSA establishes the CONUS/domestic per diem rates; the Department of Defense establishes the per diem rates for Hawaii, Alaska, U.S. territories and possessions (OCONUS); and the U.S. Department of State establishes the foreign per diem rates for travel destinations.

b. An employee is paid the per diem allowance only if the traveler is in official travel status more than 12 hours. Status starts when the traveler departs from home or office to begin the trip and ends when the traveler returns to home or office at the end of the trip, excluding stops made for personal reasons.

c. Lodging-plus per diem is the most common per diem calculation method. Reimbursement is for the actual lodging rate, up to the maximum allowed for the TDY location, plus a meals and incidental expenses (M&IE) allowance.

d. Incidental expenses include fees and tips given to porters, baggage carriers, bellhops, hotel maids, etc.

e. In some states and occasionally cities, SI is exempt from paying lodging occupancy and sales taxes. The requirements vary by location. Tax-exempt forms and additional information can be found at the GSA website: State Tax Information | GSA SmartPay®

f. Actual meal or lodging expenses that exceed per diem are allowed, but must be pre-approved in the authorization and thoroughly explained and justified in the GovTrip record using either an attached document or the Trip Details box. Lodging and M&IE over per diem are only permitted when:

- Lodging and/or meals are procured at a prearranged place such as a hotel where a meeting, conference or training session is held. **Justification** - attach a copy of conference information to the authorization and mention conference attendance in the pre-audit justification box
- Costs have escalated because of special events (e.g., missile launching periods, sporting events, World's Fair, conventions, natural disasters); lodging and meal expenses within prescribed allowances cannot be obtained nearby; and costs to commute to/from the nearby location consume most or all of the savings achieved from occupying less expensive lodging. **Justification** - explain the unusual event in the pre-audit justification box and provide any additional information required by the approving official
- Because of mission requirements. **Justification** - describe the mission requirement. For example, "travel was scheduled at the last minute to meet with donor (supply a name) and no hotel rooms were available at the lodging rate"; or

- Other unusual circumstances may be considered on a case-by-case basis. Justification for these circumstances must be thorough and reasonable.

g. Approving officials are the best judge of the appropriateness of actual expenses, and we ask that you be mindful to ensure that proper justification is provided in those instances where it is necessary to exceed the per diem rate. Actual meal and incidental expenses (M&IE) can also be used when a traveler wants to spend less than the allowable per diem. Lodging below the per diem lodging limit is always permissible without justification.

h. The maximum amount reimbursable for actual expenses is **limited to 300% of the per diem rate for the TDY location (lodging limit plus M&IE times 300%).**

i. A reduced per diem allowance may be authorized when the unit can determine in advance that lodging and/or M&IE costs will be lower than the per diem rate for the TDY location.

## 4.2 Air Transportation

a. The traveler should use the GovTrip online booking engine or an SI travel agent to make reservations and purchase airline tickets, including restricted fare tickets. See Appendix 1 for help in determining what air travel to select for government travel.

b. SI is contractually obligated to use one of its contracted travel agents for official travel airline reservations and ticketing. A traveler may purchase airline tickets outside the GovTrip system **only for emergency travel and/or last minute changes if GovTrip is not available and calling an SI travel agent is not feasible or practical** (i.e., the traveler is in a remote location where there is limited access to the Internet and phone service)**.** See section 3.12 "Combining Personal and Business Travel" in this Handbook for additional exceptions to ticket purchases

c. The traveler must use the contract carrier when available unless there is a lower priced non-refundable fare from a non-contract carrier. A non-contract carrier may be used, but any travel on a non-contract carrier must be approved in advance and must be justified by one of the exceptions listed in the FTR (these are attached as Appendix 2 to this Handbook)

d. A central billed credit card may be used to purchase and air ticket if:

- The traveler does not have a travel card (includes invitational travelers)
- The trip will end more than 30 days after the date of ticket purchase

## 4.3 Fly America Act

Travelers are required to use U.S. carriers in accordance with the FTR. The FTR lists some conditions that permit a traveler to use a non-U.S. flag carrier (including Open Skies agreements – contact the TMO Help Desk for assistance). In addition, travelers may use non-U.S. flag carriers if all of the following conditions are met:

a. Travel is being funded by a gift, contract or grant received from a third party other than a federal government source, and

b. The gift, contract or non-federal grant contains a separate travel budget with a specific amount identified to be used for transportation costs, and

c. There are demonstrated mission-related or cost-savings reasons to use a non-U.S. flag carrier.

d. Requests for use of a non-U.S. flag carrier will be evaluated on a case by case basis and must be approved in advance. Traveler must submit an SI 3345 form with a detailed explanation describing the requirement to use a non-U.S. flag carrier to the TMO or SAO Travel for SAO staff. If the travel is approved, the approved SI 3345 must be electronically attached to the authorization. See Appendix 1 for additional information.

### 4.4 Use of Non-Coach Travel

a. Normally a traveler should select coach class unless non-coach (business or first) class accommodation is specifically authorized.

1) Any use of non-coach class travel must be approved by the traveler's approving official based on the criteria outlined below. All non-coach travel reservations will be reviewed by the TMO for conformance with FTR and Smithsonian policy. TMO may request appropriate justification from a unit if that is not included with the authorization
2) All non-coach class tickets must be purchased through the SI alternate travel agent, SAO travel or the STRI travel agent (they may not be purchased through Sato or GovTrip)
3) Units may authorize and reimburse the use of a coach class preferred seat (such as Economy Plus, Coach Plus, etc.) at their discretion. Preferred coach seating programs are not considered an upgrade to non-coach class

b. The FTR currently allows non-coach travel (business class or first class if the conveyance has only two classes of service) under the following circumstances:

1) If traveler provides a doctor's statement specifying that non-coach class accommodations are required due to a medical condition, or
2) If the traveler's total flight time to or from a non-U.S. destination will exceed 14 hours the traveler is permitted either:

- The use of non-coach class, or
- A rest period either during or at the end of the travel

Note: Total flight time includes the time from initial take-off to landing at the final destination, as well as layover time at interchange points, but not time spent waiting at the departure airport.

c. If the use of non-coach travel is required by mission considerations as defined by SI.

d. The specific requirements for each of these circumstances are documented in the following paragraphs.

### 4.4.1 Medical condition

a. Requires a written statement by a competent medical authority that special accommodation is necessary and describing
   1) Approximate duration of the special accommodation
   2) Recommendation as to the suitable class of transportation accommodations based on the condition

b. Statements of temporary and permanent medical conditions will be maintained by the SI Occupational Health Services Office

c. Non-permanent medical conditions must be re-verified annually by the traveler. The Occupational Health Services Office will review and maintain employee- provided personal physician documentation for non-permanent conditions annually.

d. Permanent medical conditions need only be documented once

e. The Trip Details section in an authorization must be annotated with a comment that a medical waiver is on file at the Occupational Health Services Office

### 4.4.2 Normal Start Times:

Normal Start Times are the expected time for a traveler to start work if travel time to the business destination is less than 14 hours (or the traveler uses a non-coach fare on a trip of 14 hours or more). These are not considered rest periods.

- Traveler arrives between 12:00 midnight - 6:00 pm on the 1st day at the TDY location – start work by 9:00 am the 2nd day
- Traveler arrives between 6:00 pm – 12:00 midnight on the 1st day at the TDY location – start work by 12:00 noon the 2nd day
- These are the maximum allowable times between arrival and start of work

### 4.4.3 Rest Periods:

Rest periods are permitted for trips utilizing coach class travel if travel time exceeds 14 hours (these guidelines also apply if the traveler pays for an upgrade to a higher class of service with their own funds or frequent flyer miles)

- Traveler is allowed up to a 24 hour rest period before start of work at the TDY location
- Arrive 12:00 midnight – 6:00 pm on the 1st day at the TDY location – start work by 9:00 am the 3rd day
- Arrive 6:00 pm – 12:00 midnight on the 1st day at the TDY location – start work by 12:00 noon the 3rd day
- These are the maximum allowable times between arrival and start of work

#### 4.4.4 Mission Requirements:

Mission requirements may justify the use of non-coach travel. To be considered a necessary expense the non-coach travel must meet both of the following rules:

a. The non-coach travel furthers the Smithsonian mission. The Institution's mission is defined in documents such as, but not limited to, the annual appropriations, enabling legislation, the Smithsonian Strategic Plan, the Smithsonian annual performance plans, the Institution's annual goals and objectives, the federal budget request to Congress, and other lower-level (unit-specific and functional) supporting strategic and performance plans

b. The expense must be allowable:

- A **federal expense** is allowable when it is reasonably related to the purpose that Congress intended the appropriation to fulfill, not prohibited by law, and not within the scope of another appropriation
- A Smithsonian **trust expense** is allowable when *at least one* of the following conditions is met:
  1) Federal funds can be used for the same purpose
  2) The expense represents an ordinary cost commonly incurred by nonprofit organizations with missions similar to the Smithsonian, including activities such as but not limited to advisory boards; development and fund raising; official representation; and special events
  3) For businesses operated by the Smithsonian, the expense represents an ordinary cost commonly incurred by that type of business activity in the commercial, federal or nonprofit sector

c. Some examples of mission requirements are:

- Travel is accompanying an artifact that requires special handling
- Invitational traveler for whom non-coach travel is a condition of traveler's participation in a Smithsonian event and that participation is critical to the success of the event
- Traveler must reach his/her destination at a time when no coach class seats are available for the transportation (e.g. coach class sold out on required flight)
- Other situations that meet the criteria listed above. The final decision for these other mission required non-coach travel situations will be made by the Under Secretary for Finance & Administration and Chief Financial Officer (USF&A/CFO)

### 4.5 Train Service

For train service along the Northeast Corridor, SI employees and affiliated persons who will travel on official Smithsonian business, may use:

- Amtrak Regional trains (Coach Class or Business Class fare) with service in the Northeast, e.g. between Washington, DC and Boston, MA, or
- Acela Express trains (Government Business Class fare) for travel between Washington, DC and New York City only.

No additional justification or approval is required for use of Business Class. There is no government fare available on Amtrak's Regional trains; Amtrak only provides a government rate for travel on its Acela Express trains.

### 4.5.1 Official Travel on Regional Trains

Use one of the following options to book Coach Class or authorized Business Class fare:

a. Book online through the Amtrak website at www.amtrak.com.

b. Book online through your GovTrip authorization.

c. Purchase from an Amtrak Ticket Agent by calling Amtrak at 1-800-USA-RAIL.

d. Call SATO Travel* [1-866-848-3831] or Travel Horizons* [202-469-8920] to purchase.

### 4.5.2 Official Travel on Acela Express Trains

Use one of the following options to book the authorized Government Business Class fare:

a. If Amtrak's discounted Acela Express fare available to the general public is less than the official government rate travelers may book online through the Amtrak website at www.amtrak.com. Travelers are responsible for verifying the current Acela Express government rate with the Travel Management Office (TMO).

b. Book online through GovTrip and electronically sign the document. Immediately call SATO to verify the Acela Express Government Business Class rate was reserved.

c. Purchase from an Amtrak Ticket Agent by calling Amtrak at 1-800-USA-RAIL.

d. Call SATO Travel* [1-866-848-3831] or Travel Horizons* [202-469-8920] to purchase.

* Use of GovTrip, SATO, or Travel Horizons to book the train travel will result in ticketing and handling fees that may be avoided by contacting Amtrak directly.

## 4.6 Ship Tickets

The traveler must use a U.S. flag ship unless the necessity of the mission requires a foreign ship.

## 4.7 Travel to/from Transportation Terminal.

Reimbursement for travel to and from a transportation terminal (airport, train station, etc.) will be either the sum of the private vehicle mileage and airport parking expense or the cost of a roundtrip taxi, whichever is less. If a traveler is "dropped off" at the airport, the traveler may claim the roundtrip mileage to the airport for both the departure drop off and the return pickup.

## 4.8 Car Service

All use of a car service other than that to/from a transportation terminal requires prior approval. This includes use of a car service for transportation in the user's designated local travel area. The approvals required are as follows (see section 3.2.5 above):

- If the traveler is a unit director but not a designated senior executive, car service use must be approved in advance by the appropriate Under Secretary
- All other travelers, car service use must be approved in advance by the Unit Director

The traveler must demonstrate that the use of a car service to or from a transportation terminal in lieu of taxi or shuttle service is advantageous to SI.

## 4.9 Rental Vehicles

When it is determined that a rental vehicle is necessary to perform official duties or will be more cost effective than other forms of local transportation (taxi, bus, subway, light rail, etc.) a rental car may be requested. Prior to commencing official travel, travelers must request approval for a rental vehicle on the travel authorization from their Approving Official. Vehicle rentals should be limited to situations where other means of transportation are not practical, economical or available, and in emergency situations. Whenever practical, the most economical means of transportation to and from hotels and terminals should be used.

- Travelers are authorized to rent a compact or intermediate sized car, unless transporting a large amount of government property that requires a larger vehicle, or if the traveler is providing transportation for more than two SI travelers who are also on official travel.
- Travelers are expected to refuel all rental vehicles prior to returning them to vehicle rental companies. Only when it is deemed advantageous to SI, vehicle rental companies' refueling charges may be allowed, if their refueling cost per gallon is less than the cost at local filling stations, or when time constraints, to avoid increases in other travel-related costs, prevents refueling before returning a rental vehicle.

### 4.9.1 Obtaining a Rental Vehicle at the Government Rental Rate

It is the responsibility of the traveler on official travel to ensure the government rental rate is obtained and reflected on the rental contract before signing. Rental companies may require the traveler to authenticate their travel status by providing a copy of their Travel Authorization, or presenting their government travel charge card. The

government rental rate is advantageous to the government and includes Collision Damage Waiver (CDW) insurance and Personal Accident Insurance.

- The terms and conditions of the agreement apply only when the traveler obtains the government rental rate for the vehicle. If you rent a vehicle, as required, using government rates, you should decline any request for additional types of insurance. Failure to rent under the government rental rate waives your right to the negotiated government coverage and you (or you Unit) will be personally liable for any damages to the rental vehicle.
- Employees are also protected from personal injury loss in the case of an accident by the Federal Employees Compensation Act against losses due to personal injuries received while operating rental vehicles on official business.

### 4.9.2 Purchasing Insurance When Government Rental Rates are Not Available

When the government vehicle rental rate is not available within the continental United States, the traveler may not purchase CDW insurance. Travelers will not be reimbursed for any costs incurred for purchasing any type of insurance. Any claims for loss or damage will be handled through SI. CDW fees will not be reimbursed for any vehicle rental in the continental United States.

Travelers may purchase insurance and be reimbursed when:

a. Traveling in Hawaii or Alaska, and no government rate is available;

b. Traveling in some foreign locations, the traveler may be required to purchase CDW and other additional insurance coverage depending on the country in which the rental is made.

### 4.9.3 Rental Vehicle Accident Reporting Requirements

If the traveler has an accident while using the rental vehicle on official business, the traveler should notify the police and have an accident report prepared. A copy of the accident report must be provided to the rental car company. The rental car company may not bill the employee for damages incurred to a rental car used for official business purposes.

The rental car company must bill SI for any damages for which they believe the employee is responsible. If an investigation reveals the damage was incurred through negligence or improper use of the vehicle (see Appendix 5), the employee's Unit will be responsible for collecting the cost of damages from the employee.

If a rental car company tries to bill the employee directly or requests the name of the employee's personal insurance company, the employee should notify the Smithsonian's Office of Insurance & Risk Management. The employee should **not** provide personal insurance policy information.

### 4.10 Other Means of Travel

- A traveler may also use a government car or plane; personal vehicle (with reimbursement based on mileage); rental car; or taxi
- The FTR permits a traveler to use a taxi from home to the duty station when the traveler is leaving on official travel from the duty station. Similarly, a traveler may take a taxi from the duty station to home the day s/he returns to the duty station from official travel
- The traveler will not be reimbursed for any costs incurred solely for the convenience of the traveler

### 4.11 Examples of Allowed Miscellaneous Expenses

See FTR part 301-12.1 for additional information:

- Fees for passports/visas, passport photos, birth/health certificates
- Fees for travelers checks, ATMs, and foreign currency conversion
- Any entrance/exit fees for travel to a foreign country
- Services of guides, interpreters, drivers while on international travel
- Tips for taxis, shuttles or other for-hire conveyance, or handling of government property carried by the traveler. Tips for a taxi, shuttle service, courtesy transportation driver, or valet parking attendants are recommended to not exceed 20%, subject to availability of funds
- Charges for conference centers/hotel rooms for official meetings
- Official phone calls (government-provided services should be used when possible)
- Charges for faxes, telegrams, cables
- Charges for internet access fees
- Charges for laundry service if the traveler has incurred a minimum of 4 consecutive nights lodging on official travel in the CONUS. Laundry service is included in the per diem for OCONUS/foreign locations
- Charges for checking, storing, transferring baggage
- The traveler is allowed one personal phone call per day (must be itemized as a separate non-mileage expense on the voucher).

### 4.12 Chartered Aircraft

a. FTR permits the use of chartered aircraft as a “special conveyance” when no scheduled commercial airline service is reasonably available or the use of such a fare is cost effective. SI policy requires that both the OGC and the USF&A/CFO approve the use of a chartered aircraft in advance in writing. SI leadership will review each request on a case-by-case basis. Please note that SI will not pay or reimburse the cost of travel on chartered aircraft in the absence of an advance written approval, as outlined above.

b. For each use of a chartered aircraft, the requesting employee must prepare a written justification that sets forth the reasons for using the chartered aircraft. The traveler employing the charter and the TA approving official both must sign the justification before submitting it to the USF&A/CFO and the OGC for review. The traveler or

travel preparer must electronically attach the approved justification to the TA in the GovTrip system.

c. The only exception to the approval process is if a unit director has received a written delegation of authority from the USF&A/CFO and the OGC to approve the use of chartered aircraft to address specific circumstances, such as:

d. To conduct scientific research in remote areas that are not accessible via a regularly scheduled commercial service

  1) To conduct time-sensitive scientific research in non-remote areas when waiting for a regularly scheduled commercial service could compromise the value of the research
  2) To address health, safety and security emergencies

e. Delegations will remain in effect for one year. The unit director must request and justify a new delegation annually from the USF&A/CFO and the OGC.

# CHAPTER 5.0: RELOCATION

A relocation allowance is essentially a reimbursement to an employee for relocation-related costs. The provisions of FTR Chapter 302 (Relocation Allowances) govern relocation allowances to SI employees. The payments addressed in this Handbook include payments made to, or on behalf of, an employee for relocation-related expenses that SI leadership has expressly authorized **in advance**. Please note this material does not cover relocation incentives or bonuses.

## 5.1 Employee Eligibility

Only current SI employees who transfer duty stations at the request of management are eligible to receive relocation allowances. **SI does <u>not</u> offer relocation allowances to new employees, except in very limited circumstances.** A unit director may request a waiver to include a relocation allowance in a vacancy announcement by submitting a justification for approval by the OHR Director, the unit's Under Secretary and the USF&A/CFO.

## 5.2 General Requirements/Documentation

The unit director or his/her designee must authorize and approve relocation allowances and ensure that all required approvals, as outlined below in the Authorizations/Approvals section, are obtained in advance, and:

- The move must be more than 50 miles
- A **Service Agreement**—approved in advance by the OHR Director—and an **approved TA** is required for a relocation allowance to be paid. An employment letter cannot be substituted in lieu of a Service Agreement
- No binding commitment can be made to the employee until the Service Agreement has been approved
- SI will not reimburse an employee for any relocation-related expenses incurred before both the Service Agreement and the TA are approved
- The TA must state the specific expense items authorized as part of the allowance and the amount of any advance. Premium class travel (business or first class) is not authorized unless the individual must report for duty in one day
- The relocation should be completed within two years
- If a waiver is granted to offer an allowance to a new appointee (see Employee Eligibility), the related **vacancy announcement** must state that relocation expenses may be paid

## 5.3 Eligible Expenses

The FTR defines relocation allowance expense items as Mandatory (the unit must pay these items to the transferring employee) and Discretionary. A relocation allowance may only include those expenses specifically mentioned in the FTR.

The mandatory components of a relocation allowance for an employee transferring to/from a CONUS location include those items listed below. Please refer to FTR Chapter 302 for explanations of these expense items, the related limitations, and information on OCONUS relocations:

- Transportation of the employee and his/her immediate family members
- Per diem for the employee and immediate family members
- Transportation and temporary storage of household goods
- Extended storage of household goods
- Transportation of a mobile home or boat used as a primary residence in lieu of the transportation of household goods
- Relocation income tax allowances (RITA)
- Miscellaneous moving expenses
- Sell or buy residence transactions or lease termination expenses

The discretionary components of a relocation allowance for a transferring employee include the following items:

- House hunting per diem & transportation, employee & spouse only
- Temporary quarters subsistence expense (TQSE)
- Shipment of privately owned vehicle (POV)
- Use of a relocation services company
- Property management services
- Home marketing incentives

Because of the complexity of relocation transactions, a unit choosing to pay a relocation allowance is required to use and fund a relocation management vendor. The FTR relocation regulations are complex and can involve extended oversight for up to two years after the relocation date. In addition, there can be tax implications for both SI and the employee who benefits from relocation allowance payments.

## 5.4 Authorizations

***Table 312-A-6: Relocation Authorizations***

| Document | Unit Director | OHR Director | Under Secretary | Other |
|---|---|---|---|---|
| Vacancy Announcement | X | X | | USF&A/CFO |
| Service Agreement: | | | | |
| Amounts up to $10,000 | X | X | | |
| Amounts over $10,000 | X | X | X | |
| Amounts over $20,000 | X | X | X | USF&A/CFO |
| Travel Authorization | X | | | |
| Advance | X | | | OFA |

## 5.5 Responsibilities

The following roles and responsibilities have been assigned:

### 5.5.1 Unit Director or above

a. Ensures the required authorizations (outlined above) are obtained in advance and provides a copy of all approved relocation documents to OFA

b. Approves the Service Agreement between the unit and the eligible employee

c. Approves advances

d. Assumes responsibility to fund the relocation payments, the relocation management vendor, and any SI tax liability resulting from the transactions

e. With unit administrative staff, ensures the relocation allowance is properly documented, processed, and recorded in SI's financial system

f. Submits a justification for approval (see Employee Eligibility) if the unit wants a waiver to offer a relocation allowance to a new appointee

g. If a waiver has been granted (see Employee Eligibility), approves the vacancy announcement that offers the relocation allowance

### 5.5.2 Office of Human Resources

a. Approves the Service Agreement and provides a copy to OFA

b. Maintains the Service Agreement and related records in the employee's personnel file

c. Ensures compliance with additional rules, regulations and guidance from the Office of Personnel Management and SI policies, as appropriate and applicable

d. Approves the unit waiver request to offer a relocation allowance to a new employee

e. If a waiver has been granted (see Employee Eligibility), approves the vacancy announcement that offers the relocation allowance

### 5.5.3 Office of Finance and Accounting (OFA)

a. Retains a copy of the authorization to pay the relocation allowance

b. Retains a copy of the approved Service Agreement

c. Approves advances

d. Notifies the unit travel approving official of any budget/chartfield irregularities

e. Issues timely disbursements as directed by the unit authority

f. Provides the employee and the IRS with tax documentation using either IRS form 1099 or W-2, as appropriate, for all tax years affected

#### 5.5.4 Unit's Under Secretary

a. Approves a Service Agreement for over $10,000
b. Approves the unit waiver request to offer a relocation allowance to a new employee

#### 5.5.5 Under Secretary for Finance and Administration/Chief Financial Officer

a. Approves a Service Agreement for over $20,000
b. Approves the unit waiver request to offer a relocation allowance to a new employee

### 5.6 Service Agreement

An approved Service Agreement must in place before a binding commitment may be extended to pay a relocation allowance to an employee:

- All required SI approving officials (see Authorizations) must approve the Service Agreement in order for it to be considered approved
- The employee must also sign the Service Agreement to be eligible to receive a relocation allowance
- SI will reimburse only those authorized expenses incurred after the Service Agreement approval date
- The Service Agreement must state that the candidate will remain in the service of SI for a minimum of 12 months following the effective hire date
- Repayment of the allowance must be consistent with the terms of the Service Agreement
- The Service Agreement must disclose that potential tax consequences are the responsibility of the employee benefiting from direct or indirect relocation payments

### 5.7 Travel Authorizations/Chartfields

A TA is required to process a relocation allowance. SI will reimburse only those authorized expenses incurred after the TA approval date. The candidate must provide receipts to the approving official (s) to support the voucher for all reimbursable expenses. The unit approving official is responsible for compliance with FTR and SI policy, obtaining all necessary approvals, and ensuring budget availability and chartfield validity.

Please note that the relocation allowance is not to be coded as travel. For direct reimbursements to employees, please use class code **1284**. Direct payments to moving companies (Mayflower, etc.) should be charged to class code **2215**.

### 5.8 Relocation Management Vendor

Management of an approved relocation allowance is not a standard financial service provided by SI's OHR and OFA. GSA travel authorities and the FTR recognize that relocation issues can be very diverse, long in duration and complex for normal travel approvers.

GSA has approved several companies that are available on the GSA schedule to assist with these transactions. An SI unit choosing to give a relocation allowance is required to use and fund a relocation management vendor to provide the necessary services to ensure that employee payments receive the proper tax treatment and that relocation expenses and reimbursements are properly documented and reconciled. Cost estimates for the services of the relocation management vendor will vary depending upon the complexity of the move.

## 5.9 Advances

- Relocation-related advances should be discouraged except in hardship situations.
- Advances must be approved by the unit director and OFA.
- Reconciliation of an advance to the actual expenses incurred is the responsibility of the unit director, the travel voucher approver, and the unit fund manager in concert with the contracted relocation management vendor.
- If an advance is not reconciled to actual expenses within the same tax year, SI will report the entire advance to the IRS as taxable income to the employee.

## 5.10 Tax Consequences

- All relocation allowance payments are reportable to the IRS and some may be taxable.
- It is very important to account for relocation payments properly to ensure that all amounts are correctly reflected on the employee’s W-2.
- The employee should be encouraged to consult his/her tax advisor regarding any potential tax implications.
- SI does not provide tax advice.
- The unit is responsible for properly coding and recording all expenses in SI financial system.
- The unit is also responsible for any SI tax liability resulting from relocation-related payments.

## APPENDIX 1 − CHOOSING A FLIGHT IN THE GOVTRIP TRAVEL SYSTEM

**General guidelines for choosing flights for SI travel.**

1. Travelers can choose between government city pair fares, government "me too" fares (under some specific circumstances) and non-government (restricted) fares
   a. Government city pair fares are only available to government employees (or SI invitational travelers) on official business. Government city pair fares provide the ultimate flexibility <u>if travel plans are uncertain</u>.
      1) Government city pair tickets are fully refundable and changeable without penalties or fare increases and can be ticketed up to and including the day of departure
      2) Domestic government city pair fares can be higher than restricted fares on some routes
      3) International government city pair fares usually offer significant savings, even when compared to restricted fares
   b. Government "me too" fares are fares offered by a non-contract airline to government travelers only. These fares cannot be used except in certain specific circumstances described in Glossary item 6 below.
   c. Restricted (or excursion) fares are available to all travelers and usually have many restrictions. They may be less expensive than government fares and may offer a good alternative <u>if travel plans are firm</u>.
      1) Restricted fare tickets are non-refundable and changes will incur a change fee – usually $100 or more
      2) Changes may also result in additional airfare if the fare has changed since the ticket was purchased. For example, if the ticket is purchased with the special 14-day advanced fare then is changed 7 days prior to departure, the total increased charges would include the change fee plus the difference between the original fare and the fare on the day the ticket is changed. In some cases this can result in a substantial increase in the ticket cost
      3) Restricted tickets normally have to be purchased within 24 hours of making the reservation
      4) If a traveler is considering a restricted fare on a route covered by a government contract city-pair fare, the traveler must choose the government contract airline's restricted fare unless it is higher than the lowest fare available

2. No matter what type of fare is chosen, tickets must be purchased using either GovTrip or an SI travel agent, except for the following situations :
   a. Traveler is at the airport and needs to purchase a ticket immediately
   b. Traveler is on travel and needs to make a sudden change in travel plans

c. Traveler intends to combine business and leisure travel on one trip when the departure or return city is not the business destination

3. There are a few airlines that have been designated as "exception carriers" by GSA. A list of these carriers can be found in Glossary item 5 at the end of this appendix. Exception carriers do not accept the same electronic booking as other airlines (such as United, American, US Air, Northwest and Delta). Even though some of their flights appear in the GovTrip online booking engine, they cannot be booked without a travel agent's direct correspondence with the airline. Therefore if a traveler chooses one of these airlines, the reservation fee (the TMC fee) will be the full service fee of $28.50 rather than the $4.35 online booking fee. Travelers are not permitted to buy tickets on these airlines directly from the airline's web site to avoid paying the full service fee.

Follow the decision tree below to determine how to choose flights that conform to the FTR and SI travel policies using the GovTrip travel system

**Flights from one US location to another US location (see page 53 for foreign destinations):**

1. Enter departure and destination airports and travel dates at internet travel and/or airline site(s) and determine low fare options and restrictions
2. Enter departure and destination airports in GovTrip and search for flights
3. Is there a government city-pair fare (green bar in GovTrip) that meets your schedule?
   a. If yes go to 4
   b. If no go to 9
4. Use GovTrip to price city-pair flight. Is there a capacity controlled city-pair fare (yellow bar in GovTrip)?
   a. If yes go to 5
   b. If no go to 7
5. Is the capacity controlled price acceptable?
   a. If yes go to 6
   b. If no go to 12
6. Select and save the capacity controlled flight in GovTrip. Go to 15
7. No capacity controlled city-pair fare. Is the city-pair price acceptable?
   a. If yes go to 8
   b. If no go to 12
8. Select and save the city-pair flight in GovTrip. Go to 15

9. No city-pair fare - is there a government ("me too") fare (blue bar in GovTrip) **(Me too fares cannot be used if there is a city pair fare available even if the city pair fare is higher)**?
    a. If yes go to 10
    b. If no go to 12
10. Is the price acceptable?
    a. If yes go to 11
    b. If no go to 12
11. Select and save the flight in GovTrip. **Me too fares cannot be used if there is a city pair fare available even if the city pair fare is higher.** Go to 15
12. Government fare is not available or price is unsatisfactory. Does the contract carrier have a fare equal to the lowest fare found?
    a. If yes go to 13
    b. If no go to 14
13. Use the GovTrip **Non-Government** tab or call an SI travel agent to book the contract carrier flight. FTR provides that you must use the contract carrier if its price is equal to the lowest price found. **FTR does not permit use of an internet site to make flight reservations unless one of the conditions under paragraph 2, page 36 applies.** Go to 15
14. Contract carrier fare not equal to the lowest price - use GovTrip **Non-government** tab or call an SI travel agent to book the lower cost flight. **FTR does not permit use of an internet site to make flight reservations unless one of the conditions under paragraph 2, page 36 applies.** Go to 15
15. Have all needed flights been reserved?
    a. If yes you are done
    b. If no go to 1 and repeat steps

You may repeat the above steps for alternate origin and destination airports to find government fares. Washington, D.C.-based travelers may choose to fly from Dulles, National or Baltimore Washington International at their discretion.

**Flights from/to a U.S. location from/to a non-U.S. location (International Travel):**

The basic rule for international travel is that trips originating from or terminating in the U.S. must be flown on a U.S. flag carrier for as much of the trip as possible in accordance with the rules in the FTR. The FTR also specifies that if a US Flag carrier provides non-stop or direct service from one non-US location to another non-US location, the US carrier must be used (these are provisions of the Fly America Act).

Travel may occur on non-U.S. flag carriers if all of the following conditions are met: (1) travel is being funded by a gift, contract or grant received from a third party other than a federal government source, and; (2) a specific amount is identified in the gift, contract or non-federal grant to be used for transportation costs, and (3) there are demonstrated mission-related or cost-savings reasons to use a non-U.S. flag carrier. Form SI 3345 must still be submitted and approved by the TMO (or SAO Travel) prior to authorization approval.

16. Enter departure and destination airports and travel dates at internet travel and/or airline site(s) and determine low fare options and restrictions
17. Is trip to a single non-US major city (such as Paris, London, Beijing or Tokyo)?
    a. If yes go to 18
    b. If no go to 25
18. Enter departure and destination airports in GovTrip. Is there a government city-pair fare available (green bar in GovTrip)?
    a. If yes go to 19
    b. If no go to 24
19. Use GovTrip to price city-pair flight. Is there a capacity controlled city-pair fare available (yellow bar in GovTrip)?
    a. If yes go to 20
    b. If no go to 22
20. Is the price acceptable?
    a. If yes go to 21
    b. If no go to 24
21. Select the capacity controlled flight in GovTrip. Go to 28
22. No capacity controlled fare available. Is the city-pair fare acceptable?
    a. If yes go to 23
    b. If no go to 24
23. Select the city-pair flight in GovTrip. Go to 28
24. Call the TMO help desk (or SAO Travel if SAO staff) for travel planning assistance. You may be asked to submit form **SI 3345** to the TMO or SAO Travel identifying the flight and the reason(s) why you must take it. **You may not use a foreign flag carrier to fly to or from the U.S. without the prior written permission of the TMO or SAO Travel (this includes grant, contract or gift funded travel mentioned above).** Go to 28
25. Does the trip include multiple foreign stops from a U.S. departure or a trip from the U.S. to a non-U.S. location other than a major city (no city-pair flights)?
    a. If yes go to 26

b. If no go to 27

26. Call the TMO help desk for travel planning assistance

a. You may be required to submit form SI 3345 to the TMO or SAO Travel for SAO staff identifying the flight and the reason(s) why you must take it. **You may not use a foreign flag carrier to fly to or from the U.S. without the prior written permission of the TMO or SAO Travel (this includes grant, contract or gift funded travel mentioned above).**

b. Go to 28

27. For trips from one foreign location to another foreign location:

Call the TMO help desk for travel planning assistance. Go to 28

28. You are done

**Glossary of air travel terms**

a. **Capacity Controlled City-Pair Fare** – a special fare priced below the regular city pare fare for a given route. Only a limited number of seats are available

b. **City-Pair Fare** – the fare charged by the airline that has been awarded a GSA contract between two airports (either the departure or arrival airport will be in the continental U.S.). There is only one contract airline between any two airports

c. **Code Share** – two airlines agree to share the sale of space on a flight and each airline will book travel under its own flight number. In the case where a U.S. Flag carrier has a code share arrangement with a foreign flag carrier, a government traveler may make reservations using the U.S. Flag carrier's flight number but not the foreign flag carrier's flight number. The carrier name and flight number are printed on the ticket invoice

d. **Contract Carrier** – the U.S. airline awarded the city-pair contract between two locations

e. **Exception Carriers** – carriers that do not allow direct booking of their flights through GovTrip. Travel agent must call the airline directly to make reservations. Exception carriers include but are not limited to the following airlines:

- **AIR NORTH**
- **BERING AIR INC**
- **BIG SKY**
- **CAPE AIR**
- **ERA AVIATION**
- **FRONTIER AIRLINES – In conjunction with another carrier**
- **FRONTIER FLYING SERVICE**
- **GREAT LAKES AVIATION**
- **GREAT PLAINS/OZARK AIR LINES INC**
- **HAGLAND AIRLINES**
- **HORIZON AIR**
- **KENMORE AIR HARBOUR INC**

- **MESA AIRLINES**
- **OLYMPIC AIRLINES**
- **PAN AM CLIPPER CONNECT**
- **PENAIR/PENISULA AIR**
- **RIO GRANDE AIR/EDELWEISS HOLDING INC**
- **SOUTHWEST AIRLINES**
- **SPIRIT AIRLINES**
- **WINGS OF ALASKA**

f. **Government "Me Too" Fare –** a fare offered by a carrier that is not the contract carrier for a city-pair, but matches the city-pair fare and restrictions. **These fares are not available to the general public and cannot be used by SI travelers unless there are no seats on the contract carrier or the contract carrier does not offer flights that meet the traveler's schedule**

g. **Restricted Fare –** usually the lowest airfare available to the public. Usually has restrictions on changes and refunds

h. **SI travel agent** – any of the official designated travel agents including Sato Travel, Klassic Travel (STRI only), SAO Travel (SAO only) and any other travel agents under contract to SI

i. **U.S. Flag Carrier –** any airline based in the U.S. that flies routes to destinations outside the U.S., including American carriers that have a code share relationship with a foreign carrier

## APPENDIX 2 − EXCEPTIONS TO THE USE OF A CONTRACT CITY PAIR FARE

1. Space on a scheduled contract flight is not available in time to accomplish the purpose of your travel, or use of contract service would require you to incur unnecessary overnight lodging costs which would increase the total cost of the trip;
2. The contractor's flight schedule is inconsistent with explicit policies of SI with regard to scheduling travel during normal working hours;
3. A non-contract carrier offers a lower fare to the general public that, if used, will result in a lower total trip cost to SI (the combined costs of transportation, lodging, meals, and related expenses considered);
4. Note to paragraph (3): This exception does not apply if the contract carrier offers the same or lower fare and has seats available at that fare, or if the fare offered by the non-contract carrier is restricted to government and military travelers performing official business and may be purchased only with a contractor-issued charge card, centrally billed account (*e.g.*, YDG, MDG, QDG, VDG, and similar fares) or GTR where the two previous options are not available;
5. Cost-effective rail service is available and is consistent with mission requirements; or
6. Smoking is permitted on the contract air carrier and the nonsmoking section of the contract aircraft is not acceptable to you.

**Note:**

1. If the non-contract fare is non-refundable, restricted, or has specific eligibility requirements, you must know or reasonably anticipate, based on your planned trip, that you will use the ticket; and
2. SI must determine that the proposed non-contract transportation is practical and cost-effective for SI

## APPENDIX 3 – MATRIX OF SI ENHANCEMENTS TO FTR

| Travel Event | FTR Guidance | SI | SI Documentation | SI Approval Process |
|---|---|---|---|---|
| Purchase of Rail tickets | All tickets must be purchased through Agency's TMC (online or via an SI travel agent). **§301-50.3** | Rail tickets can be purchased directly from Amtrak if traveler has a government credit card. Amtrak does not accept electronic ticketing so all rail tickets purchased through GovTrip require travel agent intervention with the higher fee and at least a 3 day delay. | Travel Handbook | Prior approval by approving official |
| Combining personal and official travel | FTR does not address personal travel (only talks about official business) | Traveler can add personal travel to an official trip. Personal funds must be used for trip segments originating or terminating at a non-business destination. SI procedures ensure that the combined official and personal travel conform to the FTR | Travel Handbook | Prior approval by approving official |
| Employees traveling at his/her own expense on official business | FTR has a broad definition of travel sponsorship that can be applied to employee's paying for their own travel (in-kind sponsorship). **§304-2.1** | Employee can travel on official business at their own expense with documentation of what expenses will be covered by the employee, SI or other sponsor. | Travel Handbook | Prior approval by approving official |
| Field Expenses | FTR specifies that travel authorizations should only be used for travel expenses. **§301-2.2** | If travel includes field expenses, traveler must include them on the authorization and voucher with proper documentation and accounting. Field expenses are an integral part of research travel | Travel Handbook | Prior approval by appropriate levels in accordance with form OCON 501 (go to PRISM/OCFO then OCON Forms; look in Procurement Information) |
| Spouse, Dependent or other Family Member Travel | FTR does not make any mention of travel by spouses, dependents and other family members | Spouse, dependent, or other family member travel is a special case of invitational travel when such traveler is conducting official business | Travel Handbook | Advance written approval from the General Counsel and the Under Secretary for Finance & Administration/ Chief Financial Officer will approve Secretary's spouse or dependent family member travel |

| Travel Event | FTR Guidance | SI | SI Documentation | SI Approval Process |
|---|---|---|---|---|
| Travel Sponsored by a non-federal source | FTR describes policies and requirements that apply to all travel payments from a non-federal source without regard to the organization providing the payment | Payment from a for-profit organization or a foreign government or unit thereof (such as a national university or research center), requires additional approval | Travel Handbook | Advance written approval is required from the, traveler's supervisor, the unit head, and OGC |
| Chartered Aircraft | FTR permits the use of a chartered aircraft as a "special conveyance" under **§301-10.3; §301-10.400.** Agency needs to develop a procedure for authorization/approval | Smithsonian has a procedure to approve the use of a chartered aircraft that covers both unique mission-related needs and use in lieu of a scheduled commercial carrier for cost savings. Annual delegation of approval can be made to unit director who can approve chartered aircraft to:<br>• **Conduct scientific research in remote areas that are not accessible via a regularly scheduled commercial service**<br>• **Conduct time-sensitive scientific research in non-remote areas when waiting for a regularly scheduled commercial service could compromise the value of the research**<br>• Address health, safety and security emergencies | Travel Handbook | Advance written approval from the General Counsel and USF&A/CFO |
| Foreign Flag Carriers | FTR allows the use of a foreign flag carrier under specific circumstances | Travel on a foreign flag carrier using trust funds may be permitted if the grant, contract or gift has specific funds identified for transportation. | Travel Handbook | SI -3345 form signed by TMO in advance of making reservations. TMO will obtain additional approvals as necessary |
| Ground Transportation | FTR does not require a receipt for any ground transportation expense under $75 | Smithsonian requires daily itemization of any ground transportation charges in the voucher | Travel Handbook | Approving official to verify each use of ground transportation |

| Travel Event | FTR Guidance | SI | SI Documentation | SI Approval Process |
|---|---|---|---|---|
| Sponsored Travel<br>(see section 3.10 for complete information) | Sponsorship for meeting or conference attendance is allowed | Smithsonian requires the sponsorship agreement to be attached to the authorization. Sponsor letter must be addressed to the Smithsonian Institution, as well as the individual traveler. Traveler can accept direct non-cash reimbursement if the sponsor is a 501(c)(3) non-profit or another Federal agency. | Travel<br>Handbook | For profit or foreign government sponsorship must be approved in advance by the General Counsel |
| Invitational Travel | FTR allows travel payments to individuals Smithsonian designates as invitational travelers | Invitational travelers must be set up in the *PeopleSoft* vendor system and added to the GovTrip system using the STM 001 form | Travel<br>Handbook | Prior approval by the approving official of the unit extending the invitation |

# APPENDIX 4 – LOCAL TRAVEL AREA DEFINITIONS

| Location | Local Travel Area |
|---|---|
| D. C. Area Units | District of Columbia, the cities of Alexandria, Fairfax and Falls Church, the counties of Arlington, Loudoun and Fairfax in Virginia, Prince George's and Montgomery Counties in Maryland. Local travel also includes travel between offices in these locations and the National Zoo's Conservation and Research Center (CRC) and the Smithsonian Environmental Research Center (SERC) unless the trip is over 12 hours in duration or requires an overnight stay, in which case it is no longer deemed local travel, and a TA is required |
| Smithsonian Tropical Research Institute | Any destination within 200 kilometers (124 miles) from the traveler's work place |
| Smithsonian Enterprises, NY | All destinations in New York, New Jersey or Connecticut with trip length less than 12 hours and no overnight stay |
| Fort Pierce, FL | Any destination within 120 miles of the station where travel is less than 12 hours and no overnight stay |
| Cooper Hewitt, NY | The 5 boroughs (Manhattan, Queens, Staten Island, Brooklyn and Bronx) and Newark, NJ |
| AAA, New York | The 5 boroughs (Manhattan, Queens, Staten Island, Brooklyn and Bronx) and Newark, NJ |
| NMAI, NY | 5 boroughs of New York plus the following counties: Nassau, Suffolk, Westchester, Rockland, Fairfield, Hudson, Bergen, Union, and Essex |
| Smithsonian Astrophysical Observatory, MA | 50 mile radius from Cambridge, MA. Also 50 mile radius from Whipple Observatory, AZ and Hilo, HI facility |

## APPENDIX 5 – VEHICLE RENTAL CAR INSURANCE EXCEPTIONS TO LOSS OR DAMAGE COVERAGE

The term 'vehicle' in this appendix refers to passenger cars, sport utility vehicles (SUV), station wagons, passenger vans, or small pick-up trucks.

1. When travelers on official business rent vehicles under the government rental rate, the vehicle rental company, and not the traveler or U.S. Government, hereby assumes and shall bear the entire risk of loss of or damage to the rented vehicles (including costs of towing, administrative costs, loss of use, and replacements) except where the loss or damage is caused by one or more of the following:

    a. Obtaining the vehicle through fraud or misrepresentation;

    b. Damage or loss is caused intentionally by an authorized drive;

    c. Operation of the vehicle by a driver who is under the influence of intoxicants or any prohibited drugs;

    d. Use of the vehicle for any illegal purpose;

    e. Use of the vehicle in pushing or towing another vehicle;

    f. Operation of the vehicle in live artillery fire exercises, or used in training for tactical maneuvers;

    g. For law enforcement purposes that are likely to expose the vehicle, the driver or passengers or other persons or property of others to a risk of damage or injury above that of routine travel;

    h. Operation of the vehicle in a test, race or contest;

    i. Operation of the vehicle with the consent of an authorized driver by a person other than the authorized driver;

    j. Operation across international boundaries unless specifically authorized at the time of rental;

    k. Theft of the rented vehicle and the renter cannot produce the vehicles keys, unless the renter can show the keys were stolen through theft or robbery;

    l. Operation of the vehicle off paved, graded, state or professionally maintained roads, or driveways, except when the Smithsonian has agreed to this in writing beforehand;

m. Loss of vehicle keys. The traveler's and/or Government's liability for loss of vehicle keys shall be limited to the cost of replacing the keys and associated labor and towing charges unless the rented vehicle is stolen as set forth in (k) above;

n. Adding improper fuel to a vehicle when the required vehicle fuel type is clearly and obviously marked; or

o. Any damage to a rented vehicle caused by a Government employee, not the renter or authorized driver of a vehicle rented under this Agreement, but acting within the scope of employment.

2. **When loss or damage is due to an exception stated above,** the vehicle rental company will submit bills directly to the Government agency employing the renter. If the renter's employing Government agency denies liability on the basis that the renter or other authorized driver was not operating the vehicle for official travel at the time of the loss, the Company may handle the matter directly with the renter.

3. **If an accident occurs,** report the accident to the vehicle rental company
   a. If you have rented the vehicle under the government contract rate, you should not have to do anything more.
   b. If the rental agency advises you are responsible for any of the loss, refer them to the Smithsonian Office of Risk Management at 202-633-7146.

4. Protect employees from the risk of personal liability. When the type of vehicle or vehicle use cannot be covered under the U.S. Government Car Rental Agreement, the vehicle(s) should be rented through the procurement process (ERP, BPA). In that case, any damage that occurs to the vehicle is handled by the government under the terms of that agreement. In those cases, the agreement is not with the individual employee, but rather, is with the government.

# SD 322, Charge Card Program

## Desk Reference

## Part 1 — Travel Card Program

Smithsonian Institution

**Office of the Under Secretary for Finance and Administration/Chief Financial Officer**
**Office of Contracting and Personal Property Management**

# WHERE TO GO FOR HELP

Office of Contracting
& Personal Property Management (OCon&PPM)

Travel Card Program — Enrollment, Charge Card Disputes, Account Inquiries, GSA On-Line Training

OCon&PPM Prism Website .................................... http://prism.si.edu/ocfo/ocon/ocon.htm
OCon&PPM Help Desk ...........................................................................(202) 633-7410
OCon&PPM Help Desk Email ................................................................ OConHelp@si.edu
OCon&PPM Help Desk Fax ...................................................................(202) 633-7319
Interoffice Mail ..................................................... CCP, OCon&PPM, CC 350, MRC 1200
Charge Card Program Manager ..........................................................(202) 633-1739
Charge Card Program Staff .................................................. Vincent Shippy (202) 633-1737
Nikki Spencer (202) 633-7296

Travel Card Program and Cardholder Resources

OCon&PPM Prism Website ........................... http://prism.si.edu/ocfo/ocon/ocon_forms.htm
(Under *Travel Cards*)

- JPMC Travel Card Application w/ Individually Billed Agreement (IBA)
- Instructions for Completing JPMC IBA Travel Card Application
- JPMC Online Account Review and Payment Procedures

Travel Card Training ......................................................... https://training.smartpay.gsa.gov/
(General Services Administration)

Office of the Comptroller (OC) — Accounting Information (Chartfields)

Travel Management Help Desk .............................................................(202) 633-8600
Travel Management Help Desk Email ............................................. TMOHelpDesk@si.edu
GovTrip ............................................................... https://govtrip.com/govtrip/site/index.jsp
Accounts Payable Help Desk Email ......................................................... APHelp@si.edu
Travel Management Prism Website:.. http://prism2.si.edu/Support/Travel/Pages/Home.aspx
Travel Handbook .......http://prism.si.edu/ocfo/oc/docs/Travel_Handbook_version_2.2.1.pdf

JPMorgan Chase (JPMC)

Cardholder Inquiries and Customer Service .................................. Toll Free: (888) 297-0781
Collect: (847) 488-4442

Office of the Inspector General (OIG)

Main OIG Phone Number .......................................................................(202) 633-7050

# TRAVEL CARD PROGRAM

## TABLE OF CONTENTS


**WHERE TO GO FOR HELP**

**CHAPTER 1.0 Introduction and General Information 4**

1.1 Travel Card Program Management 4
1.2 Mandatory Use of Travel Cards 4
1.2.1 Benefits of Using a Travel Card 5
1.2.2 Cardholder Rights and Protections 6
1.3 Cardholder Responsibilities 6
1.4 Exceptions/Exemptions to Application for and Use of Travel Cards 7

**CHAPTER 2.0 Applying for and Receiving Travel Cards 8**

2.1 Training and Application for Travel Cards 8
2.1.1 Pre-Application Training 8
2.1.2 Applications 8
2.1.3 Submitting Travel Card Applications 9
2.2 Receipt of a Travel Card and Card Activation 9
2.3 Travel Card Spending Limits 9

**CHAPTER 3.0 Proper Use of Travel Cards 10**

3.1 Supportive Smithsonian Directives 10
3.1.1 Smithsonian Directive 103, Standards of Conduct 10
3.1.2 Smithsonian Directive 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds 10
3.2 Authorized and Unauthorized Use of Travel Cards 10
3.2.1 *AUTHORIZED* Use of SI Travel Cards on Official Travel 10
3.2.2 *UNAUTHORIZED* Use of SI Travel Cards 11
3.3 Travel Authorization Procedures 11
3.3.1 Travel Authorization via the SI Automated Travel System (currently GovTrip) 11
3.3.2 Common Carrier Ticket Charges 11
3.3.3 Cash Advances 12

**CHAPTER 4.0 Travel Card Security 13**

4.1 Disclosure of Account Numbers 13
4.2 Lost, Stolen and/or Emergency Card Replacement 13
4.3 Surrendering Travel Cards 13
4.3.1 Departing Employees 13
4.3.2 Transferring Employees 14
4.4 Expired Travel Card Replacement 14
4.5 Travel Cardholder Recertification 14

**CHAPTER 5.0 Reimbursement for Travel Card Charges 15**

5.1 Travel Vouchers 15
5.2 ATM Transaction Fees 15

5.3 Canceled Trips 15

**CHAPTER 6.0 Travel Card Account Management and Payments 16**

6.1 Individually Billed Accounts 16
6.1.1 Monthly Reconciliation 16
6.1.2 Payment of Valid Charges 16
6.1.3 Past Due and Delinquent Travel Card Accounts 17
6.2 Smithsonian Centrally Billed Travel Card Account 17
6.3 Disputed Charges 17
6.3.1 Merchant Service and Delivery Issues 18
6.3.2 Billing Errors 18
6.4 Cardholder Inquiries 18

**CHAPTER 7.0 Management Oversight and Corrective Actions 19**

7.1 Policies and Procedures 19
7.2 Internal Controls 19
7.3 Compliance Assessment Methodology 20
7.4 Compliance Reports 20
7.5 Misuse and/or Abuse Corrective Actions 21

**TABLE 322-1-1 — Travel Card Misuse and Abuse: Table of Management Actions 22**

# CHAPTER 1.0 Introduction and General Information

Part 1 of the Charge Card Program Desk Reference expands on the general policy cited in *Smithsonian Directive (SD) 322, Charge Card Program*. The information and procedures herein pertain to applying for, proper use, and management oversight of the government Travel Cards assigned to Smithsonian Institution (SI) employees.

The SI policies and procedures for the application and assignment of Travel Cards conform to practices of other government travel card programs and requirements of the General Services Administration (GSA) SmartPay2 contract with JPMorgan Chase (JPMC) bank. JPMC is the SI Travel Card provider.

Employees with questions concerning the use of the SI Travel Card may contact the Charge Card Program (CCP) staff in the Simplified Acquisitions Division, Office of Contracting and Personal Property Management (OCon&PPM). Questions concerning official travel policy and procedures should be directed to the Travel Management Office (TMO), in the Office of the Comptroller (OC).

## 1.1 Travel Card Program Management

The Director, OCon&PPM, is responsible for providing Travel Cards to eligible SI employees for use when traveling on official SI business. As allowed in a delegation of authority from the Secretary of the Smithsonian, the Director, OCon&PPM, has delegated the authority for day-to-day management and oversight of the Travel Card Program to the CCP Branch Manager, OCon&PPM and the authority to take all necessary actions to ensure integrity in the Travel Card program. The CCP Manager, as the designated Agency/Organization Program Coordinator (A/OPC) for the SI Charge Card program, is authorized to represent the Director at internal and interagency meetings when discussions relate to government travel card programs.

The CCP Manager is responsible for establishing, maintaining and promulgating SI Travel Card program policies and procedures and ensuring that updates are distributed SI-wide. The CCP Manager ensures that the proper internal controls for the Travel Card program are in place and conducts reviews on the use of assigned Travel Cards by Cardholders. The reviews assist the CCP Manager with assessing and reporting on compliance with policies and procedures and identifying, determining, and advising managers on appropriate corrective actions when misuse or abuse of Travel Cards is verified. Information regarding oversight and remedial action procedures are included in Chapter 7.0, Management Oversight and Corrective Actions, of this desk reference.

## 1.2 Mandatory Use of Travel Cards

Smithsonian employees who are issued a Travel Card are required to use the Travel Card for allowable and authorized expenses related to official travel to the maximum extent that merchants accept the card. SI employees who anticipate traveling on official SI business one or more times per year shall complete required training and apply for a Travel Card. The use

of a Travel Card benefits both the SI and its employees. In addition to reducing the administrative burden associated with processing common carrier ticketing and tracking travel advances, employees avoid having to use personal funds when required to travel in performance of their official duties and responsibilities.

Upon receipt and activation of a Travel Card the Cardholder shall use the Travel Card to pay for common carrier tickets (air, rail and bus), lodgings, meals, automobile rentals, and/or authorized incidental expenses incurred while traveling on official Smithsonian business. Cardholders may also obtain cash advances from an Automated Teller Machine (ATM) with their Travel Cards for authorized official travel-related business expenses (see Section 3.3.3).

### 1.2.1 Benefits of Using a Travel Card

The following list of benefits is extended to SI employees when they use a Travel Card. This coverage is in addition to statutory coverage for injury or damage to employees and their belongings on official duty (e.g., Federal Employees Compensation Act, Military Personnel and Civilian Employee Claims Act).

a. Travel accident insurance while on travel associated with traveler tickets charged to a Travel Card. This insurance also covers public conveyance to/from the airport.
b. Insurance for lost or stolen baggage while traveling on traveler tickets charged to the Travel Card.
c. Auto rental insurance.
d. Worldwide emergency Travel Card replacement within 24 hours (where practicable).
e. Automatic enrollment in the Emergency Assistance Program which provides:
    - Emergency card replacement or emergency cash
    - Emergency medical and referral assistance
    - Emergency legal referral assistance
    - Lost or stolen Travel Card reporting
    - Emergency transportation assistance
    - Emergency ticket replacement
    - Lost luggage assistance
    - Emergency message service
    - Emergency translation service
    - Prescription assistance and valuable document delivery
    - Pre-trip assistance

Additional information about Cardholder benefits is available from JPMC customer service (see *Where to Go for Help*).

In addition, since Travel Cardholders are recognized as federal government employees, using the Travel Card makes it easier for SI employees to obtain government rates for bus, rail, and airline tickets; rental cars; and hotel rooms when traveling out-of-area on official SI business.

### 1.2.2 Cardholder Rights and Protections

JPMC may not subject Cardholders to:

a. Preset expenditure limits;
b. Credit checks on SI employees designated to receive Travel Cards. **Note:** credit checks are not conducted unless otherwise specified by the SI in accordance with risk mitigation procedures;
c. Releases of Cardholder credit information to any entity or person other than authorized GSA or SI officials or the Cardholder (this includes credit information associated with suspended or canceled individually billed accounts that are delinquent fewer than 180 days);
d. The sale or other transfer of Cardholder names or addresses to other commercial interests;
e. Membership fees;
f. Commercial advertisements or other forms of solicitation with monthly billing statements;
g. Issuance or cancellation of Travel Cards without notifying the authorized SI officials, nor;
h. Liability for fraudulent charges made with a lost or stolen Travel Card provided that the Cardholder notifies JPMC immediately upon discovering the card is missing.

## 1.3 Cardholder Responsibilities

There are specific responsibilities associated with being an SI Travel Cardholder.

SI Travel Cardholders must:

a. Protect and keep safe from unauthorized use their issued Travel Cards and account numbers;
b. Use their Travel Cards only for approved and authorized expenses to be incurred while traveling on official SI business;
c. Never use their Travel Cards for personal purchases or to pay other individuals' personal or travel-related expenses, including expenses for other SI employees;
d. Submit all travel vouchers for reimbursement of expenses charged to their Travel Card accounts within five (5) business days of completion of travel or every thirty (30) calendar days when on extended travel;
e. Review the monthly statements they receive from JPMC to ensure all charges that appear are correct, and immediately notify JPMC when charges are not correct;

f. Notify JPMC customer service and the CCP staff immediately when home addresses and business and personal telephone numbers on file with JPMC change; and,
g. Pay their monthly JPMC Travel Card account bills in full and by the due date cited on the monthly statements regardless of the payment status of any outstanding travel vouchers.

The above terms are agreed to by employees when they sign the Travel Card application prior to submitting it to the Charge Card Program, OCon&PPM.

### 1.4 Exceptions/Exemptions to Application for and Use of Travel Cards

The CCP Manager is authorized to allow *exceptions* to the “mandatory use” policy for SI employees when: an employee does not have a Travel Card and there is not sufficient time to obtain a Travel Card in advance of initial required travel dates; an employee will not be required to travel at least once a year; or, ticket purchases will be made more than 30 calendar days in advance of travel. In these circumstances the TMO Manager may centrally bill costs for common carrier tickets. Employees who are provided an *exception* to the mandatory use policy may receive cash travel advances from OC.

Smithsonian employees who request to be *exempt* from the requirement to obtain and use a Travel Card when traveling on official SI business must obtain an exemption in writing from the Director, OCon&PPM. Employees and their supervisors should contact the CCP staff for advice when they propose to submit a request for *exemption* to the mandatory use policy. Employees who are allowed an *exemption* may not receive cash advances from OC, except where necessary to cover anticipated field expenses authorized on an *OCon 501, Field Expenses Review and Authorization* form (e.g., payment of local research site workers and procurement of provisions).

# CHAPTER 2.0 Applying for and Receiving Travel Cards

As expressed in Section 1.2, an SI employee is required to complete an application for a Travel Card when the employee will be required to travel on official SI business one or more times per year, so long as:

a. The employee's administrative officer/travel coordinator or supervisor recommends to the employee that they obtain a Travel Card; and,

b. The head of the museum, research center, or office (Unit Director) where the employee works authorizes participation.

## 2.1 Training and Application for Travel Cards

### 2.1.1 Pre-Application Training

After employees secure the required approvals from their unit managers to obtain a Travel Card, GSA-sponsored online Travel Card Training must be completed. This training is accessible at https://training.smartpay.gsa.gov. Upon completing the training, employees must print one copy of the certificate to be included in the employee's Travel Card application package submitted to CCP. The CCP Manager may require Travel Cardholders to complete Travel Card training every three years (refresher), or as deemed necessary.

### 2.1.2 Applications

After the required Travel Card training is completed, and in advance of initial travel dates, applicants must visit the OCon&PPM Prism Website (see *Where to Go for Help*) and download copies of the following from the items listed under *Travel Cards*:

- A copy of the JPMC Travel Card Application w/ Individually Billed Cardholder Agreement (IBA); and,
- Instructions for Completing the JPMC IBA Travel Card Application.

All fields on the JPMC travel card application must be completed by applicants and CCP staff. Applicants must provide the name, home/residence address, Social Security Number, and Date of Birth as reflected in their official personnel record in the Office of Human Resources (OHR).

It is important that applicants ensure that all information provided on an application is correct. Employees must understand the terms and conditions that they, the SI, and JPMC agree to for issuance of a Travel Card. Employees should contact the CCP staff with any questions regarding the application before signing and forwarding the completed application to the CCP.

### 2.1.3 Submitting Travel Card Applications

All JPMC travel card application packages shall be submitted to the CCP staff at OCon&PPM, Attn: CCP-Travel Card Program, and include the following forms and information:

a. Cover memo from the Unit Director verifying the applicant's employment status. (This memo must include a statement confirming the employee will be required to travel in performance of official duties);
b. A properly completed and signed original JPMC Travel Card Application and the signed JPMC IBA; and,
c. A copy of the Travel Card Training Certificate received after completing the on-line GSA Travel Card Training.

The CCP staff informs applicants when application packages are received. CCP staff reviews each Travel Card application package for completeness and contacts applicants and/or unit managers when any required information is omitted by applicants. Applications accepted by the CCP staff are forwarded to the CCP Manager for signature and then sent to JPMC for processing.

## 2.2 Receipt of a Travel Card and Card Activation

Smithsonian employees receive their Travel Cards via U.S. Postal Service at their home/residence addresses, normally within two weeks from the date applications are received at CCP. Travel Cards must be activated by Cardholders prior to commencing travel by calling the toll-free telephone number on the label affixed to the Travel Card.

> **Note:** Receipt of a Travel Card is not an authorization to travel or incur expenses with the Travel Card. All travel and travel-related expenses by employees must be pre-approved on a travel authorization.

A personal identification number (PIN) shall be mailed separately to Cardholders by JPMC and will be necessary to obtain cash travel advances from financial institutions, either at an ATM or customer service counter, which can be accomplished only after the Travel Card is activated. Cardholders should memorize their PIN or keep it in a place separate from where the Travel Card is kept; *do NOT write the PIN on the Travel Card*. In the event a PIN needs to be replaced, Cardholders must contact the JPMC customer service and request a new PIN. A 24- to 48-hour activation delay may be experienced when obtaining a new PIN over the phone. During this period, Cardholders should obtain cash advance from the customer service counter (bank teller) within a financial institution.

## 2.3 Travel Card Spending Limits

The monthly spending limit for an individually billed government travel card is generally $10,000. Of this allowable monthly amount, not more than 50 percent may be in cash advances (see Section 3.3.3, Cash Advances). If a spending limit increase is required, the traveler must contact CCP prior to commencing travel. The CCP will validate the request against the approved travel authorization in GovTrip.

# CHAPTER 3.0 Proper Use of Travel Cards

Travel Cards are authorized to be used only for out-of-area expenses related to official Smithsonian business or authorized local Development, Representation, and Business (DRB) activities (see Appendix 322-1-A). Use of Travel Cards for any other purpose constitutes misuse and/or abuse of Travel Cards. Misuse and/or abuse of Travel Cards can result in Travel Card accounts being suspended or canceled and Cardholders may be subject to disciplinary action, including termination of SI employment.

At no time may Cardholders use their SI Travel Card to pay for expenses incurred by others (including fellow SI travelers) and personal expenses.

## 3.1 Supportive Smithsonian Directives

See Chapter 7.0, Management Oversight and Corrective Actions, and *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, for information on actions required to prevent misuse and abuse and actions to be taken to correct occurrences of Travel Card misuse and abuse.

### 3.1.1 Smithsonian Directive 103, Standards of Conduct

The *SD 103, Smithsonian Standards of Conduct*, provides in part that employees: must ensure that their conduct does not compromise the integrity of, and public confidence in the SI; must avoid actions that might conflict or appear to conflict with Smithsonian interests, such as using their SI employment for private gain; and must pay their just financial obligations in a proper and timely manner.

### 3.1.2 Smithsonian Directive 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds

The S*D 323, Smithsonian Institution Spending Policy for Federal Appropriations and Trust Funds,* states in part, "If it is discovered that a Travel Cardholder used the Travel Card inappropriately and in a manner that is a violation of this directive [SD 323] and its accompanying *Use of Funds Handbook*, the Cardholder will be subject to the penalties and actions specified in the Institution's Travel Card policy."

## 3.2 Authorized and Unauthorized Use of Travel Cards

### 3.2.1 *AUTHORIZED* Use of SI Travel Cards on Official Travel

- Common carrier tickets (e.g., rail, bus and airline tickets)
- Car rentals for official travel purposes
- Employee lodging, and meals, miscellaneous and incidental expenses (per diem or actual expenses) related to official travel.

- Expenses related to development, donor cultivation, and business activity expenses, to the extent that such expenses are included on a travel authorization or reviewed and approved on travel vouchers for reimbursement
- Travel cash advances from ATMs, not to exceed the amount of authorized reimbursable expenses on an approved SI Travel Authorization.

#### 3.2.2 *UNAUTHORIZED* Use of SI Travel Cards

- Expenses not approved in advance on an SI Travel Authorization or not related to official out-of-area travel.
- Personal expenses or other expenses not related to authorized SI official business travel.
- Other individuals' personal or travel-related expenses.
- Cash advances not associated with out-of-area travel and not approved on a SI Travel Authorization.

### 3.3 Travel Authorization Procedures

Travel Cardholders must abide by the SI travel policies and procedures included in *SD 312, Travel*, and additional guidance and procedures included in its accompanying *SI Travel Handbook*. All official SI travel and allowable travel-related expenses must be approved on a travel authorization prior to commencing official travel. Use of Travel Cards absent a properly completed and approved travel authorization is prohibited.

#### 3.3.1 Travel Authorization via the SI Automated Travel System (currently GovTrip)

All SI employees who travel on official SI business are required to enter anticipated travel-related expenses for planned travel in the SI automated travel system (currently GovTrip). The electronic processing capability of GovTrip shall automatically forward travel plans and anticipated expenses to the traveler's supervisor for review and approval. Upon completion of this process, SI travelers will have authorization to incur charges related to the authorized travel.

#### 3.3.2 Common Carrier Ticket Charges

##### 3.3.2.1 Airline Tickets

Most airline tickets purchased through the GovTrip system are automatically billed to the Cardholder's Travel Card account. Obtaining tickets via GovTrip or through use of the Travel Card allows the Cardholder to buy tickets at GSA contract city-pair fares. Where necessary, the TMO may use a Smithsonian centrally billed travel account.

#### 3.3.2.2 Other Means of Transportation

Rail tickets may be purchased directly from Amtrak with a Travel Card. The use of buses, other rail, and ferry services may also be purchased using a Travel Card.

#### 3.3.2.3 Unused Tickets

Travelers are responsible for resolving issues with complete and/or partially used common carrier tickets. Unused electronic tickets must be reported to the issuing carrier or travel agency to ensure a refund is processed.

#### 3.3.2.4 Lost Tickets

Cardholders are responsible for reporting lost common carrier tickets to the issuing carrier or travel agency as soon as possible. Lost ticket refunds may take up to six months to resolve. Since the refund of a lost ticket is not guaranteed, the Cardholder must pay the amount of the lost ticket as it appears on their monthly statement from JPMC.

### 3.3.3 Cash Advances

Travel Cardholders are permitted to obtain cash advances with their Travel Card only for estimated out-of-pocket travel expenses not payable with their Travel Card, (e.g., taxis, meals, allowable incidental items). Cash advances from ATMs may not be obtained more than five days before travel commences or after the last day that the Cardholder is in official travel status.

Should emergency expenses arise while a Cardholder is on official travel and additional cash above the trip cash advance dollar limit is required, Cardholders may obtain the additional required cash from an ATM. During any month that multiple trips occur and the sum of cash advances already exceeds the allowable monthly ATM transaction limit, the Cardholder may need to obtain the necessary cash inside the financial institution. In all cases when ATM cash advances exceed the allowable dollar limits, a written justification for the emergency cash advance(s) must be prepared and submitted by the Cardholder along with the travel voucher. Cardholders may include the ATM transaction fee related to approved emergency cash advances on their travel vouchers for reimbursement.

# CHAPTER 4.0 Travel Card Security

Travel Cardholders are responsible for the security of their assigned Travel Cards. When not traveling on official SI business, Cardholders are encouraged to secure their Travel Cards in a place not accessible to unauthorized users and to prevent inadvertent use in lieu of personal charge/credit cards for personal purchases.

## 4.1 Disclosure of Account Numbers

Travel Cardholders are cautioned against releasing their Travel Card or Travel Card account number to anyone other than TMO staff, contractor travel agencies, hotel or rental car companies when making reservations, individuals collecting payment for authorized travel-related expenses, or an SI staff member assisting with travel arrangements. Cardholders must never divulge the PIN associated with their Travel Cards to anyone.

## 4.2 Lost, Stolen and/or Emergency Card Replacement

Cardholders shall report lost or stolen Travel Cards immediately to the JPMC customer service center and request issuance of a replacement card. The JPMC customer service may be reached twenty-four (24) hours a day; seven (7) days a week (see *Where to Go for Help*). Replacement cards and PINs will be mailed separately and only to the Cardholder address on record at JPMC.

> **Note:** A Cardholder will not be held financially liable for fraudulent charges made with a lost or stolen card, *provided* the Cardholder immediately notifies JPMC upon discovering that the card is missing. Cardholders may be required to review any charges considered fraudulent and sign an *Affidavit of Charge Card Fraud* as a disclaimer of unauthorized charges. Failure to submit and return the Affidavit to JPMC may result in liability for charges shifting to the Travel Cardholder.

## 4.3 Surrendering Travel Cards

### 4.3.1 Departing Employees

When a Cardholder leaves SI employment, i.e., resigns, retires, or transfers to another agency, the Cardholder must cut the Travel Card in half and surrender it to their supervisor or administrative personnel. The Smithsonian Employee Exit Clearance System (SEECS) point of contact at the unit must indicate in SEECS that the Travel Card has been surrendered by the departing employee in order for the SEECS point of contact in OCon&PPM to also clear the employee. The CCP staff will then be notified via email by the OCon&PPM point of contact for SEECS that the card has been tendered and CCP staff will contact JPMC to request that the Cardholder account be closed. The CCP staff will advise the departing employee and the unit if a balance is outstanding on the account.



SI00244

#### 4.3.2 Transferring Employees

The CCP Manager is informed by the SEECS point of contact in OCon&PPM when a Cardholder transfers to another Smithsonian unit. The CCP staff will then contact the Unit Director at the museum, research center or office to which the employee is reassigned to request a memo to the CCP Manager confirming that the Cardholder is continuing SI employment and will be required to travel. The employee will retain the Travel Card; however, if the CCP Manager does not receive the required memo from the Unit Director in a timely manner the Cardholder's account shall be closed.

### 4.4 Expired Travel Card Replacement

Travel Cards with impending expiration dates will be replaced by JPMC no earlier than 40 calendar days prior to the expiration date of currently held Travel Cards. Replacement Travel Cards are mailed to home/residence addresses on file with JPMC. When a Cardholder will be on extended travel at the time his/her Travel Card will expire the CCP staff should be contacted so that a replacement Travel Card may be requested and issued before the date that travel is scheduled to commence.

### 4.5 Travel Cardholder Recertification

The CCP staff shall periodically contact unit administrative staff to determine numbers of Cardholder accounts to be continued, established or canceled.

## CHAPTER 5.0 Reimbursement for Travel Card Charges

Smithsonian management is committed to timely reimbursing SI employees for authorized and allowable travel expenses. When Travel Cardholders submit travel vouchers within the time frame required by *SD 312, Travel*, and its accompanying *Travel Handbook* and supervisors/managers timely review and approve travel vouchers. Cardholders will avoid the use of personal funds to pay Travel Card charges billed by JPMC.

### 5.1 Travel Vouchers

To facilitate timely reimbursement of authorized travel-related expenses paid with their Travel Cards, SI Travel Cardholders must complete travel vouchers in GovTrip within five (5) business days after travel is completed, or every thirty (30) calendar days when on extended travel. Travelers' supervisors/managers must ensure that travel vouchers are reviewed and approved in the SI Automated Travel System (currently GovTrip) as soon as possible after receiving notice that a travel voucher is pending review and approval.

Cardholders shall normally receive reimbursement within 10 business days from the date that a properly completed travel voucher is approved in the SI Automated Travel System (currently GovTrip).

### 5.2 ATM Transaction Fees

ATM cash advances and associated fees appear with other travel and expense transactions on Travel Cardholders' monthly bills from JPMC. The ATM transaction fees incurred by Travel Cardholders must be entered on travel vouchers. Reimbursement for ATM fees shall be limited to the fee amount applicable to the authorized cash advance amount that is reflected on the travel authorization.

> **Note:** The cash advance fee is 2.5% of the amount of each cash advance transaction with a minimum fee of $3.00, e.g., 2.5% of $100 is $2.50, but the bank will charge $3.00 for the $100 cash advance. In some cases, an additional surcharge may be imposed by the ATM operators and may be claimed on the travel voucher.

### 5.3 Canceled Trips

Travel Cardholders are required to prepare and submit travel vouchers to claim any authorized charges incurred and charged to their travel card accounts prior to cancellation of travel, e.g., carrier booking fees, ATM cash advance fees, other merchant fees. The Cardholder, upon receipt of the monthly statement, must send payment to JPMC for any undisputed charges.

# CHAPTER 6.0 Travel Card Account Management and Payments

*Smithsonian Directive 103, Smithsonian Institution Standards of Conduct*, requires SI employees to pay debts properly and in a timely manner. Smithsonian Travel Cardholders, not the SI, are personally responsible for remitting payment to JPMC for all undisputed charges reflected on the monthly bills they receive from JPMC.

## 6.1 Individually Billed Accounts

Travel Card account statements are sent monthly to SI Travel Cardholders at the home/residence addresses on file with JPMC. The statements are mailed by JPMC within five (5) business days after each billing cycle cutoff and Cardholders are responsible for reconciling charges and making payment in full to JPMC each month. Travel Cardholders are required to inform JPMC as soon as possible of an address change to avoid delays in receiving their monthly statements. Cardholders who do not receive a monthly statement within ten (10) calendar days after a billing cycle cutoff should contact JPMC customer service and request a duplicate statement or view a copy of their statement online (see *Where to Go for Help*).

### 6.1.1 Monthly Reconciliation

Travel Cardholders shall review and reconcile all charges included on the JPMC monthly statement they receive with their records of charges made to their individually billed Travel Card accounts. All erroneous charges, and disputed charges (see Section 6.3 below), must be called to the attention of JPMC customer service immediately for assistance with determining which charges may be deducted from the payment amount to be remitted. Not all merchants will bill in time for charges to appear on the monthly statement closest to the charge date; therefore, charges for which Cardholders have already received reimbursement must be held pending future monthly statement(s) on which the charges will appear and must be paid.

### 6.1.2 Payment of Valid Charges

All valid charges that appear on the JPMC monthly statements issued to a Travel Cardholder must be paid to JPMC in full and by the due dates cited on the monthly statements. Cardholders have the option of paying their bills via check to the JPMC payment address, over-the-phone with JPMC, or online through use of the JPMC Online Payment System (see *Where to Go for Help*). Employees' failure to timely pay all undisputed charges reflected on the JPMC monthly statements will result in remedial administrative action by the CCP manager, and disciplinary action by unit managers. See Chapter 7.0, Management Oversight and Corrective Actions, and *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, for the types of actions to be considered when Travel Card accounts become delinquent or other misuse or abuse of Travel Cards is verified.

**Note:** In the event of a government-wide shutdown, Cardholders may be unable to make payments. The Smithsonian will ensure that during such periods, JPMC will not age accounts, cause delinquent or suspend, or take action to cancel or close accounts. During this time, finance charges may not be assessed; however, monthly statements will continue to be generated by JPMC.

#### 6.1.3 Past Due and Delinquent Travel Card Accounts

Late payment of Travel Card accounts and Travel Card account delinquencies are considered misuse and/or abuse of Travel Cards. This type of misuse and/or abuse can result in Travel Card accounts being suspended or canceled (closed) and Cardholders may be subject to disciplinary or adverse personnel action.

Travel Card accounts are considered to be past due if payment for any undisputed account balance is not received at JPMC by the payment due dates.

Accounts are considered “delinquent” when full payment for any undisputed account balance is not received at JPMC within 61 calendar days of the statement date. Failure to pay the undisputed account balance within 60 calendar days from the statement date on which the original charge appears will result in an automatic suspension of the Travel Card account by JPMC. If an account is suspended twice during a 12-month period for delinquency and is past due again, the account may be closed by JPMC or the CCP Manager.

SI employees whose Travel Card account is suspended or closed shall be considered a Travel Card “*declinee.”* Travel Card declinees may not receive travel cash advances from OC, except for anticipated field expenses and are required to use their personal financial resources for official travel and then request reimbursement for authorized travel-related expenses.

### 6.2 Smithsonian Centrally Billed Travel Card Account

SI uses a centrally billed account to purchase tickets for non-Smithsonian employees traveling at the invitation of the SI**.** In addition, where necessary, the TMO may use a centrally billed account in lieu of an employee’s individually billed account when determined in the best interest of the traveler and the SI (see Section 1.4). All tickets purchased using the centrally billed account entitles the ticket holder to the same benefits extended to individual Cardholders.

### 6.3 Disputed Charges

A disagreement between a Cardholder and a merchant concerning a charge that appears on the Cardholder’s JPMC monthly statement is considered a dispute. It is each Cardholder’s responsibility to resolve disputes with merchants or with TMO when a transportation ticket was purchased through GovTrip. Disputes are typically attributable to one of the following:

#### 6.3.1 Merchant Service and Delivery Issues

Issues concerning defective or unsuitable delivery of merchant services, non-delivery of merchant services, and unresolved transactions are normally categorized as merchant service and delivery issues. Travel Cardholders are responsible for making a reasonable attempt to resolve such issues directly with the merchant as they would for charges to their personal credit or charge card accounts. This approach has the greatest potential for quick and efficient resolution. If no resolution is reached with the merchant, Cardholders should contact JPMC to report the disputed charges.

#### 6.3.2 Billing Errors

Questionable charges, duplicate billings, and/or charges not authorized by Cardholders that appear on monthly statements are categorized as Billing Errors. Cardholders must immediately contact JPMC customer service when they recognize errors on the monthly statements they receive from JPMC. JPMC will issue a “temporary” credit to the Travel Card account when a charge is disputed. JPMC will investigate the disputed charges and mail the Cardholder a statement explaining its findings. If JPMC determines that a billing error *did not* occur, the transaction amount will appear on the next monthly bill to the Cardholder. If JPMC determines that a billing error *did* occur, the Cardholder will be sent a letter advising them that the error has been corrected and the credit will remain on the Cardholder’s account.

In all other cases (such as possible fraud), Travel Cardholders must contact JPMC Customer Service Center to report the disputed charges. In most cases JPMC will issue an immediate credit to the account but will require the Cardholder to complete a Dispute Form to document the problem. JPMC will investigate the dispute and advise the Cardholder accordingly.

### 6.4 Cardholder Inquiries

Inquiries concerning billings or adjustments to billed amounts should be directed to JPMC Customer Service. Policy questions concerning issuance and use of the SI Travel Cards should be directed to the CCP staff. Contact information is listed on the *Where to Go for Help* page.

# CHAPTER 7.0 Management Oversight and Corrective Actions

The CCP Manager, OCon&PPM, is responsible for providing assurance to the Director of OCon&PPM, that SI Travel Card program policies and procedures, internal controls, and methods for assessing compliance with program requirements by Travel Cardholders and CCP staff are effective, efficient, and assist with ensuring integrity in program operations. Travel Card program internal controls, and the associated compliance review methodology, conforms to *SD 310, Financial Reporting and Risk Management Internal Controls*, to ensure sound business practices and safeguards exist to minimize fraud, waste, abuse and mismanagement in the use of Travel Cards. Reports on program activities are prepared by CCP staff and provided to the Director, Under Secretary for Finance and Administration/Chief Financial Officer (USF&A/CFO), and other SI managers as necessary or requested.

## 7.1 Policies and Procedures

SI Travel Card program policies and procedures are established, updated as necessary, and disseminated SI-wide by the CCP Manager through the following means:

1. *SD 322, Charge Card Program* (available on Prism), in which general policy regarding applications for, issuance, and use of government-sponsored charge cards, including the SI Travel Card, is established;
2. This *Charge Card Program Desk Reference (SD 322), Part 1 — Travel Card Program* (available of Prism)*;*
3. SI-wide email reminders on what is *Proper Use of Travel Cards* transmitted each calendar quarter;
4. Travel Card Program ***Alerts*** (available on Prism) issued when special attention to Travel Card program policies and procedures by SI employees is determined be necessary;
5. Distribution of information from external authorities, such as GSA and the Office of Management and Budget, that may impact SI Travel Card program policy and procedures; and,
6. Addressing SI employees at unit staff meetings and SI administrative and management committees.

## 7.2 Internal Controls

The policies, procedures and program guidance promulgated by the CCP Manager and staff cover the internal controls necessary for assessing the degree of compliance with Travel Card program policies and procedures by employees at all organizational levels. The internal controls established and monitored by the CCP Manager serve to ensure that:

1. The CCP structure, functions, and staffing are organized to foster effective and efficient program administration and management oversight, liaison with JPMC, and support to SI staff.
2. Program policies, procedures, and Cardholder requirements are kept up to date and available and accessible to all SI employees.

3. Travel Card training is completed by SI employees prior to submitting applications for Travel Cards to the CCP staff.
4. Applications with other required information required from SI employees are received, reviewed and determined to be complete and correct by CCP staff prior to the CCP Manager submitting applications to JPMC.
5. All personal identifiable information and account data provided to CCP by SI employees, or of which CCP staff becomes aware (via JPMC applications, Cardholder account numbers, payment history, etc.) are treated as strictly confidential.
6. Files and records of Travel Card account activity and reports maintained by CCP staff are always secure and not accessible to anyone other than CCP staff.
7. Cardholders provide proper and timely attention to the monthly bills they receive from JPMC and pay undisputed charges in full each month.
8. Managers take appropriate and/or recommended actions to assist with resolving Travel Cardholder account delinquencies.

### 7.3 Compliance Assessment Methodology

The CCP staff monitors myriad Travel Card activities on a daily basis by reviewing JPMC reports and conducting necessary transactional data-mining.

The CCP staff is required to report to the CCP Manager any detected misuse and/or abuse of Travel Cards, such payment of expenses for which Travel Card use is not authorized, indications of late payments, and new or continued delinquent accounts. In such instances the CCP Manager is authorized to:

1. Request Cardholders submit explanations related to account delinquencies and questionable charges or patterns of Travel Card use.
2. Involve Unit Directors in resolution of issues when Cardholders do not respond to CCP requests for information within required timeframes.
3. Determine when Unit Directors, the appropriate Under Secretary, the USF&A/CFO and/or the Chief of Staff, Office of the Secretary, or the Office of the Inspector General should be notified of misuse and/or abuse.
4. Prepare memoranda from the USF&A/CFO to the appropriate Under Secretary/Director when Cardholder account reflects repeated misuse or abuse, including unresolved account delinquencies and may suggest appropriate management action as delineated in *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*.

### 7.4 Compliance Reports

In accordance with Governance Committee Recommendation No. 21, the CCP Manager provides quarterly reports to select SI senior managers. The reports reflect Card account usage and instances of misuse and abuse.

### 7.5 Misuse and/or Abuse Corrective Actions

The *Table 322-1-1, Travel Card Misuse and Abuse: Table of Management Actions*, on the following pages, lists the most frequently identified types of Travel Card misuse and abuse, and actions that shall be taken by Smithsonian employees when misuse or abuse of Travel Cards is identified.

## TABLE 322-1-1 - Travel Card Misuse and Abuse: Table of Management Actions

When misuse or abuse of Travel Cards is identified, the Table 322-1-1 displayed on the following pages shall be used as a general guide to facilitate consistent action throughout the Smithsonian for comparable cases.

Employees will always be accorded due process when disciplinary or adverse action is suggested. To ensure consistency and fairness in establishing and reviewing all facts of a case, managers must consult the Labor/Employee Relations staff in the Office of Human Resources, who will consult with staff in the Office of General Counsel as necessary. When appropriate, the Charge Card Program (CCP) Manager shall refer instances of misuse and abuse of Travel Cards to the Office of the Inspector General for investigation.

The following factors shall be considered by the CCP Manager and supervisors and managers at SI units when determining whether to take remedial, disciplinary or adverse actions for identified misuse or abuse of Travel Cards:

- Whether the employee timely submitted a properly completed travel voucher;
- Whether Smithsonian procedures contributed to a Travel Card account delinquency by improperly delaying reimbursement after receipt of a properly completed Travel Voucher;
- The nature and seriousness of the offense under review;
- Whether the conduct was intentional, technical or inadvertent; or was for personal gain; or is frequently repeated;
- The employee’s record of Smithsonian employment prior to the offense under review, and previous record of payments to JPMC; and/or
- Potential, or lack thereof, for adhering to the Smithsonian Travel Card Program policies and procedures and Cardholder responsibilities in the future.

Other considerations may be taken into account as well, e.g., the interval between offenses and/or whether a combination or series of different offenses by the same employee has occurred.

## Table 322-1-1 — Travel Card Misuse and Abuse: Table of Management Actions

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Payment not submitted and received by JPMC by payment due date<br><br>***(Account payment past due)*** | **1st Offense**<br>CCP staff sends weekly email reminders to the Cardholder until payment is made or the card becomes delinquent (31 days past payment due date), whichever occurs first. | **1st Offense**<br>No action required |
| | **Subsequent Offense**<br>Action above is repeated. When the frequency of offense becomes excessive the CCP Manager notifies the Unit Director or other manager. | **Subsequent Offense**<br>Unit director or other manager to take action as they deem appropriate. |
| Account payment identified to be more than 31 days past due and less than 60 days past payment due date.<br><br>***(Accounts delinquent 30–60 days; JPMC automatically suspends Travel Card use)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder notifying him or her that the account has been suspended and requests a written explanation for the delinquency, including the date the balance was or will be paid. A copy of the request is sent to the unit director or other manager.<br>Cardholder is required to respond in writing within five business days.<br>Cardholder must resolve delinquent account within 15 calendar days.<br>* * * * * * * * * * * * * * * *<br>When offense is not resolved within 15 calendar days, the CCP staff sends a follow-up email to the Card holder and unit director or other manager requesting a written explanation for the delinquency and a plan of resolution.<br>Cardholder is required to respond in writing within five business days.<br>Travel Card remains suspended until the matter is resolved. | **1st Offense**<br>No action required<br>* * * * * * * * * * * * * * * *<br>Unit director or other manager shall consult the Labor/Employee Relations Staff (LER) in the Office of Human Resources for advice on appropriate disciplinary or adverse action. |



SI00254

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Account payment identified to be more than 31 days past due and less than 60 days past payment due date. *(continued)*<br><br>***(Accounts delinquent 30–60 days; JPMC automatically suspends Travel Card use)*** | **Subsequent Offense**<br><br>CCP Manager sends an email to the Cardholder and unit director or other manager requesting a written explanation.<br><br>Cardholder's written response is required within five business days and must include the date that payment was or will be made.<br><br>Cardholder must resolve delinquent account within 15 calendar days.<br><br>The CCP Manager may suspend the Travel Card for a period between six months to two years. CCP Manager shall consult the unit director or other manager on the proposed action or to determine if an extended suspension of the Travel Card is warranted. | **Subsequent Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Account payments identified to be 60 to 90 days delinquent past the payment due date without a payback schedule agreed to by Cardholder and the CCP Manager, or non-compliance with payback schedule by the Cardholder.<br><br>***(Accounts delinquent 60–90 days; JPMC automatically suspends Travel Card use)*** | **1st Offense**<br><br>CCP Manager sends an email to the unit director or other manager requesting intervention to resolve the delinquent account. The Cardholder receives a copy of the email.<br><br>Cardholder must resolve the delinquent account within 15 calendar days.<br><br>CCP Manager may suspend the Travel Card for a period between six months to two years and advise the unit director or other manager to consult LER staff. CCP Manager shall consult the unit director or other manager on the proposed action or to determine if an extended suspension of the Travel Card is warranted. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Account payments identified to be 60 to 90 days delinquent past the payment due date without a payback schedule agreed to by Cardholder and the CCP Manager, or non-compliance with payback schedule by the Cardholder. *(continued)* ***(CCP Manager suspends Travel Card use for a period of one to two years)*** | **Subsequent Offense** CCP Manager suspends the Travel Card for a period of one to two years. CCP Manager sends an email to the Cardholder and unit director or other manager notifying them of the repeat offense and resulting Travel Card suspension and advises the unit director or other manager to consult LER staff. A copy of the email is also provided to the USF&A/CFO and the LER staff. The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **Subsequent Offense** Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Accounts more than 90 days delinquent past the payment due date. ***(Travel Card account is closed permanently by JPMC)*** | **1st Offense** CCP Manager sends an email to the Cardholder and unit director or other manager notifying them of the offense and permanent closure of the card and advises the unit director or other manager to consult LER staff. A copy of the email is also provided to the USF&A/CFO and the LER staff. The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **1st Offense** Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of Travel Card for personal expenses, including ATM withdrawals unrelated to official travel, *less than* $500 per occurrence.<br><br>***(CCP Manager may suspend Travel Card use for six or more months when misuse or abuse is verified)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges. Cardholder is required to respond in writing within five business days. If use is determined inadvertent, the Cardholder is reminded of the policy and advised to exercise more care. If use is determined to be abuse, the CCP Manager may suspend the Travel Card for a period of not less than six months and informs the Cardholder and unit director or other manager of the suspension. | **1st Offense**<br>Unit director or other manager may consult the LER staff for advice on appropriate disciplinary or adverse action. |
| | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>Repeated inadvertent use will result in notification to the unit director or other manager, requirement for online training, and/or temporary card suspension.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager closes the card permanently.<br>An email notice of the closure is sent to the Cardholder and unit director or other manager advising them of the abuse. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br>The USF&A/CFO may contact the appropriate Under Secretary and unit director. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of Travel Card for personal expenses, including ATM withdrawals unrelated to official travel, that *exceeds* $500 per occurrence.<br><br>***(CCP Manager closes Travel Card permanently when misuse or abuse is verified)*** | **1st Offense**<br><br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br><br>Cardholder is required to respond in writing within five business days.<br><br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager closes the card permanently.<br><br>An email notice of the closure is sent to the Cardholder and unit director or other manager advising them of the abuse. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the appropriate Under Secretary and unit director concerning the abuse. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Allowing another individual to use the Travel Card for an unauthorized purchase/ATM withdrawal or using the Card on behalf of another individual.<br><br>***(CCP Manager may suspend Travel Card use for six or more months when misuse or abuse is verified)*** | **1st Offense**<br><br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br><br>Cardholder is required to respond in writing within five business days.<br><br>If use is determined to be abuse, the CCP Manager suspends the Travel Card for a period of not less than six months and advises the Cardholder and unit director or other manager of the suspension. Unit director, or other manager, has the discretion to consult with LER staff for advice on whether disciplinary or adverse action should be pursued. | **1st Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Allowing another individual to use the Travel Card for an unauthorized purchase/ATM withdrawal or using the Card on behalf of another individual.<br><br>*(continued)*<br><br>***(CCP Manager cancels Travel Card permanently when misuse or abuse is verified)*** | **Subsequent Offense**<br><br>CCP Manager sends an email message to the Cardholder and the unit director or other manager. Unit director or other manager is advised to consult LER staff. A copy of the email is sent to the USF&A/CFO and the LER staff.<br><br>The USF&A/CFO may contact the Under Secretary and unit director concerning the abuse. | **Subsequent Offense**<br><br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of the Travel Card for SI business expenses not related to official travel or authorized DRB activities<br><br>***(CCP Manager may require offending Cardholder to repeat Travel Card training)*** | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br>Cardholder is required to respond in writing within five business days.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager issues an email warning to the Cardholder and may require the Cardholder to repeat Travel Card training. | **1st Offense**<br>No action required. |
| ***(CCP Manager may suspend Travel Card use for three or more months when misuse or abuse is verified, may require offending Cardholder to repeat Travel Card training.)*** | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>If it is determined that a pattern of inadvertent use or intentional misuse exists, the CCP Manager suspends the Card for not less than three months and advises the Cardholder and unit director, or other manager, of the suspension. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action. |
| Use of the Travel Card for SI business expenses not related to official travel or authorized DRB activities<br>*(continued)* | **Subsequent Offense**<br>Unit director or other manager is advised to consult LER staff.<br>Repeated offenses after suspension period will result in permanent closure of the Card. | **Subsequent Offense** |

| Identified Misuse or Abuse | Charge Card Program (CCP) Manager Action | Unit Management Action |
|---|---|---|
| Use of the Travel Card to pay travel expenses authorized for other SI travelers, e.g., employees or invitational travelers. | **1st Offense**<br>CCP staff sends an email to the Cardholder requesting a written explanation of the charges.<br>Cardholder is required to respond in writing within five business days.<br>If misuse is determined to have occurred the CCP Manager sends an email warning to Cardholder and may require the Cardholder to repeat Travel Card training. | **1st Offense**<br>No action required. |
| | **Subsequent Offense**<br>CCP Manager sends an email to the Cardholder requesting an explanation of charges.<br>Cardholder is required to respond in writing within five business days.<br>If misuse is determined to have occurred the CCP Manager sends an email warning to Cardholder and may require the Cardholder to repeat Travel Card training.<br>Repeated offenses may result in permanent closure of the Card. | **Subsequent Offense**<br>Unit director or other manager shall consult the LER staff for advice on appropriate disciplinary or adverse action |

# EXHIBIT H

SI00097

| Receipt Date | Purpose | Approved | Not Approved | |
|---|---|---|---|---|
| 6/3/2015 | Car rental - Barbara Harland meeting | | $ 41.96 | |
| 6/3/2015 | Parking - Barbara Harland meeting | | $ 22.00 | |
| 6/3/2015 | Parking - Barbara Harland meeting | | $ 22.00 | |
| 6/3/2015 | Gas - Barbara Harland meeting | | $ 9.80 | |
| | | | **$ 95.76** | Will not be reimbursed. Not authorized to rent vehicle. |
| | | | | |
| | | | | |
| 6/16/2015 | Gifts for Ed Bergassi | $ 40.75 | | Reimbursement pending report from outreach |
| 5/29/2015 | Lunch with Kangi (?) | | $ 23.49 | This will not be reimbursed because the guest is an SI employee |
| 6/18/2015 | Lunch with Christine Cox | $ 69.20 | | Reimbursement pending report from outreach. NEED ORIGINAL RECEIPT |
| **Total to be reimbursed - pending outreach reports** | | **$ 109.95** | | |

2015 411

## Document Header Information

| | | | |
|---|---|---|---|
| Document Type: | Local Voucher | Document Name: | LV00000951 |
| Travel Authorization Number: | SMRA0B1D26 | Trip Name: | Kangni/Bergassi etc |
| TA Date: | 06/30/15 | Currency: | USD |
| Organization: | GSI57NMAFA | Current Status: | CREATED |
| Purpose: | DONOR CULTIVATION | Document Detail: | Receipts include meals with Kangni Anenounve, Christine Cox, parking receipts and rental car. |
| Type Code: | Local Voucher | | |

## Traveler Profile

| | | | |
|---|---|---|---|
| Name: | Jackson, Milton L | ID: | 1000857930 |
| TID: | 0000122064 | Organization: | GSI57NMAFA |
| Title: | | Duty Station: | |
| Security Cl: | | Card: | CARDHOLDER |
| Office Address: | 950 Independence Ave. S.W. <BR>Washington, DC 20560 | EMAIL: | jacksonml@si.edu |
| Office Phone: | (202) 633-4635 | Cell Phone: | |
| Home Phone: | (202) 633-4635 | Alternate Address: | |
| Alternate Phone: | | | |

## Profile Custom Fields

Trip Number: 1

| Label | Value |
|---|---|
| Location Code | |
| Traveler Status | Trust |

## Document Totals

| | |
|---|---|
| Total Expenses: | 236.00 |
| Reimbursable Expenses: | 229.20 |
| Non-Reimbursable Expenses: | 6.80 |
| Advance Applied: | .00 |
| Net to Traveler: | 44.00 |
| Net to Government: | 6.80 |
| Pay to Charge Card: | 185.20 |

## Document Totals by Expense Category

| Expense Category | Cost | Advance Amount |
|---|---|---|
| Misc Expense | 185.20 | .00 |
| Transportation | 44.00 | .00 |
| Transxn Fees | 6.80 | .00 |
| Total Expenses: | 236.00 | .00 |

## Trip 1 Details

### Expenses

Trip#: 1 Total Non-Per Diem Expenses: 236.00 Total Per Diem Expenses: .00

| Date | Description | Category | Cost | Pay Method | Per Diem |
|---|---|---|---|---|---|
| 05/29/2015 | Donor Cultivation - Meals | Misc Expense | 23.49 | IBA | |
| 06/03/2015 | Misc Expense | Misc Expense | 9.80 | IBA | |
| 06/03/2015 | Misc Expense | Misc Expense | 41.96 | IBA | |
| 06/03/2015 | Parking | Transportation | 22.00 | PAID BY TRAVELER | |
| 06/03/2015 | Parking | Transportation | 22.00 | PAID BY TRAVELER | |
| 06/16/2015 | Donor Cultivation - Other | Misc Expense | 40.75 | IBA | |
| 06/18/2015 | Donor Cultivation - Meals | Misc Expense | 69.20 | IBA | |

| 06/30/2015 | Local Voucher Fee | Transxn Fees | 6.80 | Invoice |
|---|---|---|---|---|

**Account Summary for the Selected Trip**

**Payment Detail Information**

| Organization | Label | Accounting String | Payment Method | Amount |
|---|---|---|---|---|

**Totals by Label**

**Totals by Payment Method**

**Attachments** No Attachments Exists

**Audits**

| Audit Name | Result | Reason |
|---|---|---|

**Document History 06/30/2015 Local Voucher: LV00000951**

**Copyright 1989-2009 Concur Government Edition: Concur Inc. Jackson, Milton L. 0000122064**

| STATUS | DATE | TIME | SIGNATURE NAME | REASON |
|---|---|---|---|---|
| CREATED | 06/30/2015 | 6:14AMEST | Esposito, Frank P | |

**I certify that the electronic signatures listed above are valid and on file**

**SIGNED DATE**

**Document Signatures**

Traveler/Preparer Name: Milt Jackson
Traveler/Preparer Signature: [signature]
Date: 6/30/15
Approver Name: Bill Holmes
Approver Signature: [signature]
Date: 6/30/15

Milt Jackson
Kangni Anenounve

STARBUCKS Store #13673
10930 Fairfax Blvd.
Fairfax, VA (703) 218-5403

CHK 659643
05/29/2015 09:04 AM
2115879 Drawer: 1 Reg: 2

| | |
|---|---|
| Gr Wht Mocha | 4.45 |
| Rf Trky Bacon Sand | 3.75 |
| Gr Carml Macchiato | 4.45 |
| Iced Lemon Poundck | 2.75 |
| Ham Swiss Pan | 5.95 |
| Mastercard | 23.49 |
| XXXXXXXXXXXX3064 | |
| Subtotal | $21.35 |
| Tax 10% - Food & Beverage | $2.14 |
| Total | $23.49 |
| **Change Due** | **$0.00** |

Check Closed
05/29/2015 09:04 AM

New members get a FREE DRINK
Join our loyalty program
My Starbucks Rewards (R)
Sign up for promotional emails
Visit Starbucks.com/rewards
Or download our app
At participating stores
Some restrictions apply

801 380022
25

Central Parking System
Barbara Harland
Main Exit 06/03/15 11:24
Receipt 030070

Short-term parking tkt
1 - No. 023296
06/03/15 09:07
06/03/15 11:24
Period 0d2h18'

| | |
|---|---|
| (Tax) | $22.00 |
| Total | $22.00 |

Payment Received
MC $22.00
XXXXXXXXXXXX3064
Merch:43866452108099
Auth:062852
Type: Swiped

Sub Total $22.00

All Amounts in USD.
Date=Receipt Date
326394 Milt Jackson

801 380022
2120

Central Parking System
Barbara Harland
Main Exit 06/03/15 16:44
Receipt 030403

Short-term parking tkt
1 - No. 023365
06/03/15 14:25
06/03/15 16:44
Period 0d2h20'

| | |
|---|---|
| (Tax) | $22.00 |
| Total | $22.00 |

Payment Received
MC $22.00
XXXXXXXXXXXX3064
Merch:43866452108099
Auth:081104
Type: Swiped

Sub Total $22.00

All Amounts in USD.
Date=Receipt Date
326446 Milt Jackson

801 380022
2120

SCHMITZ EXXON
8526 LEESBURG PIKE
VIENNA, VA 22182
Barbara Harland
EXXON EXPRESS PAY

SCHMITZ SERVICE INC
FG511265509001
8526 LEESBURG PIKE
VIENNA , VA
22182
06/03/2015 541051193
05:40:00 PM

XXXXXXXXXXXX3064
Mastercard F
JACKSON/MILTON L
INVOICE 073061
AUTH 078487

PUMP# 2
Regular 3.502G
PRICE/GAL $2.799

FUEL TOTAL $ 9.80

CREDIT $ 9.80

Customer-activated Purchase/Capture
Site #: 0000000004784864
Shift Number 1
Sequence Number 52154
APP# 978487

703-827-0611

801 380022

## Holmes, Bill

**From:** Shippy, Vincent
**Sent:** Tuesday, July 07, 2015 11:43 AM
**To:** Jackson, Milton L.
**Cc:** Holmes, Bill; Tanner, Robert; Gutter, Richard
**Subject:** Monthly Review of Travel Card Transactions - June 2015

**Importance:** High

In reviewing your June travel card statement ending in (3064), there is activity on your travel account. Based on a review of Concur travel data, I was unable to locate an authorization to support use of your travel card relative to the dates below. You are currently only authorized to use your government travel card and when an approved travel authorization exists in Concur. You have not been not been delegated you authority to use your government travel card locally for donor expenses and officially representation on behalf of S.I. Additionally, your travel may not be used to obtain a car rental service for local travel at any given time. You must use an NMAFA unit issued purchase card if and when a car rental is need for local travel. Contact your NMAFA Administrative Officer, Bill Holmes on that process. A written response is requested regarding the transactional activity that has taken place and this must transpire in 5 business days to close out this review.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ************3064 | JACKSON, MILTON | 06/01/2015 | 05/29/2015 | STARBUCKS #13673 FAIRF | 23.49 | FAIRFAX | VA | 5814 |
| ************3064 | JACKSON, MILTON | 06/04/2015 | 06/03/2015 | EXXONMOBIL 47848643 | 9.80 | VIENNA | VA | 5542 |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON | DC | 7523 |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON | DC | 7523 |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/04/2015 | ENTERPRISE RENT-A-CAR | 41.96 | MCLEAN | VA | 3405 |
| ************3064 | JACKSON, MILTON | 06/17/2015 | 06/16/2015 | SIM STORE AFA | 40.75 | WASHINGTON | DC | 5947 |
| ************3064 | JACKSON, MILTON | 06/22/2015 | 06/18/2015 | DC COAST RESTAURANT | 69.20 | WASHINGTON | DC | 5812 |

Thank you,

**Vincent Shippy**
**Program Analyst**
**Smithsonian Institution**
**Office of the Chief Financial Officer**
**Office of Contracting & Personal Property Mgmt (OCon&PPM)**
**Charge Card Services**
**P- 202.633.1737 F - 202.633.7319** shippyv@si.edu

**Inter-Office Mail or Postal Delivery**
**PO BOX 37012**
**CC350 MRC 1200**
**Washington, DC. 20013-7012**

**Address for FedEx or UPS Delivery**
**2011 Crystal Drive**
**3rd Floor, Suite 350**
**Arlington, VA. 22202-3709**

Central Parking System
Barbara Harland

Main Exit 06/03/15 11:24
Receipt 030070

Short-term parking tkt
1 - No. 023296
06/03/15 09:07
06/03/15 11:24
Period 0d2h18'
(Tax) $22.00

Total $22.00

Payment Received
MC $22.00
XXXXXXXXXXXX3064
Merch:43866452108099
Auth:062852
Type: Swiped

Sub Total $22.00

All Amounts in USD.
Delivery Date=Receipt Date

326394 M/H Jackson

Central Parking System
Barbara Harland

Main Exit 06/03/15 16:44
Receipt 030403

Short-term parking tkt
1 - No. 023365
06/03/15 14:25
06/03/15 16:44
Period 0d2h20'
(Tax) $22.00

Total $22.00

Payment Received
MC $22.00
XXXXXXXXXXXX3064
Merch:43866452108099
Auth:081104
Type: Swiped

Sub Total $22.00

All Amounts in USD.
Delivery Date=Receipt Date

326446 M/H Jackson

SCHMITZ EXXON
8526 LEESBURG PIKE
VIENNA, VA 22182
Barbara Harland
EXXON EXPRESS PAY

SCHMITZ SERVICE INC
FG511265 09 001
8526 LEESBURG PIKE
VIENNA , VA
22182
06/03/2015 541051193
05:40:00 PM

XXXXXXXXXXXX3064
Mastercard F
JACKSON/MILTON L
INVOICE 073061
AUTH 078487

PUMP# 2
Regular 3.502G
PRICE/GAL $2.799

FUEL TOTAL $ 9.80

CREDIT $ 9.80

Customer-activated Purchase/Capture
Site #: 0000000004784864
Shift Number 1
Sequence Number 52154
APPROVED 078487

703-827-0611

Milt Jackson
Kangni Anenouvue

SI employee

STARBUCKS Store #13673
10930 Fairfax Blvd.
Fairfax, VA (703) 218-5403

CHK 659643
05/29/2015 09:04 AM
2115879 Drawer: 1 Reg: 2

| | |
|---|---|
| Gr Wht Mocha | 4.45 |
| Rf Trky Bacon Sand | 3.75 |
| Gr Carml Macchiato | 4.45 |
| Iced Lemon Poundck | 2.75 |
| Ham Swiss Pan | 5.95 |
| Mastercard | 23.49 |
| XXXXXXXXXXXX3064 | |

| | |
|---|---|
| Subtotal | $21.35 |
| Tax 10% - Food & Beverage | $2.14 |
| Total | $23.49 |
| **Change Due** | **$0.00** |

---- Check Closed ----
05/29/2015 09:04 AM

New members get a FREE DRINK
Join our loyalty program
My Starbucks Rewards (R)
Sign up for promotional emails
Visit Starbucks.com/rewards
Or download our app
At participating stores
Some restrictions apply

Gifts for Ed Bergassi

African Art Museum Store
202-633-0030

| | | |
|---|---|---|
| TAGINE MINI HONEY | 4714358 | 8.99 |
| SMITHSONIAN EMPLOYEE 18469 | | 1.79- |
| TAGINE MINI HONEY | 4714358 | 8.99 |
| SMITHSONIAN EMPLOYEE 18469 | | 1.80- |
| TAGINE SABRINE MINI | 4818779 | 8.99 |
| SMITHSONIAN EMPLOYEE 18469 | | 1.80- |
| TAGINE SABRINE MINI | 4818779 | 8.99 |
| SMITHSONIAN EMPLOYEE 18469 | | 1.80- |
| STONE ABSTRACT HEAD | 5023841 | 14.98 |
| SMITHSONIAN EMPLOYEE 18469 | | 3.00- |

| | |
|---|---|
| **TOTAL** | $40.75 |
| **MASTERCARD** | $40.75 |

PURCHASE $40.75
************3064 MC
REF#: 027414 APPROVED

Thank you for shopping with us.
Your purchase helps support the
educational mission of the
Smithsonian Institution

**CUSTOMER COPY**

ITEMS 5
06-16-2015 01:04:37PM
000009 02 000261 016595

Shop hundreds of new products at
smithsonianstore.com! Find unique gifts,
jewelry, home decor, books and more
Join our mailing list for sneak previews
and special discount offers.

1.1.9 With advance written approval, an employee working for the Unit hosting a local board activity or event is authorized to invite one or more personal guests to participate in the event. The use of SI funds to purchase food for these individuals is authorized when these costs represent a necessary expense.

1.1.9.1 The Unit Director is the approving official for guests invited by employees assigned to his/her unit.

1.1.9.2 A separate Use of Funds approval is not required when the employee's guest is otherwise included in a Smithsonian-funded Special Event approval document.

1.1.10 Only Smithsonian trust funds may be used to purchase meals or light refreshments for personal guests. The participation of a guest at a local board activity is considered more likely to be a "necessary expense" when:

1.1.10.1 The individual has a role in the activity, such as host or hostess at a dinner in his/her home

1.1.10.2 The guest's presence is dictated by tradition or protocol. For example, an employee's spouse may be included in a Smithsonian local board activity when spouses of invitees are expected to attend.

1.1.11 For purposes of this *Handbook*, a personal guest of the employee may include (but is not limited to): his/her spouse, domestic partner, parent, child, family member, business colleague, or friend.

## *1.2 Development*

1.2.1 Development is the activity associated with efforts that engage individuals, corporations, and foundations in a philanthropic relationship with an organization. Development activities are an essential part of non-profit organizations and are the basis for establishing longstanding relationships with benefactors and non-government sponsors and grantors. To be designated a donor activity, at least one donor or prospective donor must be present.

1.2.2 For the purpose of this *Handbook*, a donor is an individual, corporation or organization engaged in a philanthropic relationship with the Smithsonian.

1.2.3 Employee participation in development activities and the type, amount and cost of food, light refreshments or beverages (including alcoholic beverages) will be reasonable, appropriate, and consistent with the Institution's development practices and associated special events guidelines.

1.2.3.1 Please refer to *Food for Individuals Other Than Employees, page 45* for additional guidance.

1.2.4 In the absence of legislation authorizing the use of federal appropriations for development and fundraising activities, only trust funds may be used to pay for development activities.

1.2.4.1 Expenses should be financed with unrestricted trust funds or with other trust funds if the conditions of a gift, grant or contract allow for the purchase of these items.

1.2.5 When hosting a development activity or event, a Unit Director, member of the Secretary's Cabinet, and the Secretary are authorized to invite one or more personal guests to participate in the event or activity, and the use of SI funds to purchase food for these individuals is authorized when these costs represent a necessary expense.

1.2.6 With advance written approval, an employee working for the Unit hosting an event or activity is authorized to invite one or more personal guests to participate in the event. The use of SI funds to purchase food for these individuals is authorized when these costs represent a necessary expense.

1.2.6.1 The Unit Director is the approving official for guests invited by employees assigned to his/her unit.

1.2.6.2 A separate Use of Funds approval is not required when the employee's guest is otherwise included in a Smithsonian-funded Special Event approval document.

1.2.7 Only Smithsonian trust funds may be used to purchase meals or light refreshments for personal guests.

1.2.8 The participation of a guest is considered more likely to be a "necessary expense" when:

1.2.8.1 The individual has a role in the development activity, such as the host or hostess at a dinner in his/her home

1.2.8.2 The guest's presence is dictated by tradition or protocol. For example, an employee's spouse may be included in a Smithsonian activity when spouses of donors are expected to attend.

1.2.9 For purposes of this *Handbook*, a personal guest of the employee may include (but is not limited to): his/her spouse, domestic partner, parent, child, family member, business colleague, or friend.

## 1.3 Official Representation

1.3.1 Official representation of the Smithsonian is an activity or event that is characterized by a mixed ceremonial, social and business purpose, and is formally hosted by a Smithsonian employee. Official representational activities are those required to fulfill etiquette and social responsibilities directly associated with the standing and prestige of the Smithsonian Institution. To be considered an official representation activity, the presence of at least one non-Smithsonian employee is required.

1.3.2 Examples of official representation activities or events include:

1.3.2.1 A Museum Director hosts a lunch for his/her counterpart from another U.S. or international museum

1.3.2.2 Special tours of new exhibits, including light refreshments, for congressional members and their families, hosted by a senior Smithsonian official

1.3.2.3 Exchange of gifts (or hosting of meals) between the Smithsonian and a foreign government or other foreign organization that is hosting Smithsonian research or public programming in its country

1.3.2.4 The Secretary and the Folklife Festival curator hosting a dinner for the Ambassador and other foreign dignitaries of a Festival participant country

1.3.2.5 A Smithsonian astrophysicist invites a researcher to lunch at a local restaurant to discuss a research proposal the two organizations are preparing.

1.3.2.6 A Smithsonian Director invites a potential future job applicant to lunch at a local restaurant to promote interest in upcoming employment opportunities at the Institution.

1.3.3 Reimbursement for staff meals is authorized up to the meal component of the GSA per diem rate, as detailed in the GSA per diem schedules for meals. (Please see *Food For Employees, page* 35 and following, for further information.)

1.3.4 For the purpose of this *Handbook*, official representation activities do not include the Smithsonian activities that are separately addressed in this *Handbook*:

1.3.4.1 Statutory Boards & Committees, Advisory Board, and Board Support (Sec 1.1)

1.3.4.2 Development and Fund Raising (Sec 1.2)

1.3.4.3 Business activities (Sec 1.4)

1.3.4.4 Special events (Sec 1.5)

1.3.5 The Smithsonian does not have statutory authority to use federal funds for any form of official representation. Therefore, the Institution's policy is to use unrestricted trust funds for this purpose, unless the conditions of gift funds, grants, or contracts also permit this type of expenditure.

1.3.6 Official representation does not include meetings with any congressional government official for the purpose of influencing the official. The statute that is commonly referred to as the Anti-Lobbying Act (18 U.S.C. § 1913 ) prohibits any use of federal funds to pay for any item or device that is intended to seek favor, adoption, or opposition to any legislation or appropriation. In addition, because the Smithsonian is a tax-exempt. 501(c)(3) organization, the use of trust funds for lobbying activities is limited statutorily. Please see *SD 300, Use of Funds for Lobbying Purposes,* for further information about the use of trust funds when dealing with government officials.

1.3.7 As part of an official representation activity, a Unit Director, member of the Secretary's Cabinet, and the Secretary are authorized to invite one or more guests to participate in the official representation, and the use of SI funds to purchase food for these individuals is authorized when these costs represent a necessary expense.

1.3.8 With advance written approval, an employee (other than the individuals listed in *1.3.6* above) conducting official representation activities is authorized to invite one or more guests to participate in the activity or event. The use of SI funds to purchase food for these individuals is authorized when these costs represent a necessary expense.

1.3.8.1 The Unit Director is the approving official for guests invited by employees assigned to his/her unit.

1.3.9 When official representation gifts are given to foreign individuals, the Institution must use trust funds because it has no authority to use federal appropriations for this purpose. The Institution has elected to use the spending limits established by Section 515(b) of Public Law 95-105 for gifts for foreign individuals.

1.3.9.1 The spending limit is set by the General Services Administration. For fiscal year 2011, the limit is $335 for a gift given as a souvenir or mark of courtesy.

1.3.9.2 Any gifts with a value greater than $335 given by the Smithsonian to a foreign individual are to be reported to the Department of State, including those gifts purchased with trust funds.

| | ***2.8 Food for Individuals Other Than Employees*** | ***SI Policy*** |
|---|---|---|
| C | Development and fundraising activities | 1. Smithsonian funds may be used to purchase food and beverages for individuals other than Smithsonian employees as part of SI development activities, as defined by Section 1.2, Development, page 9.<br>2. Employees, volunteers, and academic appointees (interns, Fellows, and research associates) attending these events (as guests or working staff) are authorized to consume food and beverages available to all event participants. |
| | | Funding Sources: Federal funds can be used for these expenses only when specific statutory authorization exists to use SI appropriations for development/fundraising activities. Otherwise, only trust funds can be used for this purpose. |
| D | Business activities | 1. Smithsonian funds may be used to purchase food and beverages for individuals other than Smithsonian employees as part of Smithsonian business activities, as defined by Section1.4, Business Activities, page 13.<br>2. Employees, volunteers and academic appointees, including interns, Fellows, and research associates, attending these events (as guests or working staff) are authorized to consume food and beverages available to all event participants. |
| | | Funding Sources: Only trust funds can be used for the expenses to purchase food and beverages for business activities. |
| E | Official Representation activities | 1. Please refer to *Section 1.3, page 11,* of the *Handbook* for a definition of Official Representation.<br>2. Official Representation does not include meetings with any congressional government official for the purpose of influencing the official. The statute that is commonly referred to as the Anti-Lobbying Act (18 U.S.C. § 1913) prohibits any use of federal funds to pay for any item or device that is intended to seek favor, adoption, or opposition to any legislation or appropriation. In addition, because the Smithsonian is a tax-exempt, 501(c)(3) organization, the use of trust funds for lobbying activities is limited statutorily . Please see *SD 300, Use of Funds for Lobbying Purposes,* for further information about the use of trust funds when dealing with government officials. |

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Wednesday, July 1, 2015 9:39 AM
**To:** Jackson, Milton L.
**Subject:** Follow-up to Our Meeting

Milt,

I did not like the way our meeting ended today and I wanted to follow-up in an email.

I had Bill confirm that we are not authorized to pay for car rentals and related expenses or reimburse for meals with SI staff. We can pay you for the gifts and donor cultivation dinner. In the future, I ask that you give donors/prospects copies of our exhibition catalogues to share NMAfA's story. The link to SI travel card guidelines is listed on PRISM and I am recommending that you review the document to avoid confusion in the future. I have also asked Bill to review allowable reimbursable items with you as it relates to donor visits, gifts, and other travel related expenses.

I (we) am here as resource to you and it is important that we all work together. When you walked out of my office today and stated that you would check with other development officers, it raised a red flag. Your relationships outside of our museum are excellent for limited mentoring. We are here to help and guide you.

Moving forward, I need to see improvement in how you share information and collaborate with me. It is important that we meet weekly to review detailed work plans, share information, set goals and yes, celebrate outcomes. We can use this time together to discuss prospects, priorities, donor strategies, and begin to engage others on staff with our fundraising efforts. Please send me a calendar invite for next Tuesday.

Marie

Sent from my MAC, please excuse formatting.

Marie Woodward Graves
Associate Director of Advancement
Smithsonian The National Museum of African Art
202.633-4648 (office)
202-316-6943 (cell)

## Starun, Eryn

**From:** Shippy, Vincent
**Sent:** Tuesday, July 7, 2015 11:43 AM
**To:** Jackson, Milton L.
**Cc:** Holmes, Bill; Tanner, Robert; Gutter, Richard
**Subject:** Monthly Review of Travel Card Transactions - June 2015

**Importance:** High

In reviewing your June travel card statement ending in (3064), there is activity on your travel account. Based on a review of Concur travel data, I was unable to locate an authorization to support use of your travel card relative to the dates below. You are currently only authorized to use your government travel card and when an approved travel authorization exists in Concur. You have not been not been delegated you authority to use your government travel card locally for donor expenses and officially representation on behalf of S.I. Additionally, your travel may not be used to obtain a car rental service for local travel at any given time. You must use an NMAFA unit issued purchase card if and when a car rental is need for local travel. Contact your NMAFA Administrative Officer, Bill Holmes on that process. A written response is requested regarding the transactional activity that has taken place and this must transpire in 5 business days to close out this review.

| | | | | | | |
|---|---|---|---|---|---|---|
| ************3064 | JACKSON, MILTON | 06/01/2015 | 05/29/2015 | STARBUCKS #13673 FAIRF | 23.49 | FAIRFAX |
| ************3064 | JACKSON, MILTON | 06/04/2015 | 06/03/2015 | EXXONMOBIL 47848643 | 9.80 | VIENNA |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/04/2015 | ENTERPRISE RENT-A-CAR | 41.96 | MCLEAN |
| ************3064 | JACKSON, MILTON | 06/17/2015 | 06/16/2015 | SIM STORE AFA | 40.75 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/22/2015 | 06/18/2015 | DC COAST RESTAURANT | 69.20 | WASHINGTON |

Thank you,

**Vincent Shippy**
**Program Analyst**
**Smithsonian Institution**
**Office of the Chief Financial Officer**
**Office of Contracting & Personal Property Mgmt (OCon&PPM)**
**Charge Card Services**
**P- 202.633.1737 F - 202.633.7319** shippyv@si.edu

Inter-Office Mail or Postal Delivery
**PO BOX 37012**
**CC350 MRC 1200**
**Washington, DC. 20013-7012**

Address for FedEx or UPS Delivery
**2011 Crystal Drive**
**3rd Floor, Suite 350**
**Arlington, VA. 22202-3709**

## Starun, Eryn

|  |  |
|---|---|
| **From:** | Shippy, Vincent |
| **Sent:** | Wednesday, July 15, 2015 10:34 AM |
| **To:** | Jackson, Milton L. |
| **Cc:** | Holmes, Bill; Tanner, Robert; Gutter, Richard |
| **Subject:** | RE: Monthly Review of Travel Card Transactions - June 2015 |
| **Importance:** | High |

I have yet to receive response on this email sent. Has this been overlooked in error?

**From:** Shippy, Vincent
**Sent:** Tuesday, July 07, 2015 11:43 AM
**To:** Jackson, Milton L.
**Cc:** Holmes, Bill; Tanner, Robert; Gutter, Richard
**Subject:** Monthly Review of Travel Card Transactions - June 2015
**Importance:** High

In reviewing your June travel card statement ending in (3064), there is activity on your travel account. Based on a review of Concur travel data, I was unable to locate an authorization to support use of your travel card relative to the dates below. You are currently only authorized to use your government travel card and when an approved travel authorization exists in Concur. You have not been not been delegated you authority to use your government travel card locally for donor expenses and officially representation on behalf of S.I. Additionally, your travel may not be used to obtain a car rental service for local travel at any given time. You must use an NMAFA unit issued purchase card if and when a car rental is need for local travel. Contact your NMAFA Administrative Officer, Bill Holmes on that process. A written response is requested regarding the transactional activity that has taken place and this must transpire in 5 business days to close out this review.

| | | | | | | |
|---|---|---|---|---|---|---|
| ************3064 | JACKSON, MILTON | 06/01/2015 | 05/29/2015 | STARBUCKS #13673 FAIRF | 23.49 | FAIRFAX |
| ************3064 | JACKSON, MILTON | 06/04/2015 | 06/03/2015 | EXXONMOBIL 47848643 | 9.80 | VIENNA |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/03/2015 | PORTALS III | 22.00 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/05/2015 | 06/04/2015 | ENTERPRISE RENT-A-CAR | 41.96 | MCLEAN |
| ************3064 | JACKSON, MILTON | 06/17/2015 | 06/16/2015 | SIM STORE AFA | 40.75 | WASHINGTON |
| ************3064 | JACKSON, MILTON | 06/22/2015 | 06/18/2015 | DC COAST RESTAURANT | 69.20 | WASHINGTON |

Thank you,

**Vincent Shippy**
**Program Analyst**
**Smithsonian Institution**
**Office of the Chief Financial Officer**
**Office of Contracting & Personal Property Mgmt (OCon&PPM)**
**Charge Card Services**
**P- 202.633.1737 F - 202.633.7319** shippyv@si.edu

Inter-Office Mail or Postal Delivery
**PO BOX 37012**
**CC350 MRC 1200**

Washington, DC. 20013-7012

Address for FedEx or UPS Delivery
2011 Crystal Drive
3rd Floor, Suite 350
Arlington, VA. 22202-3709

**Starun, Eryn**

---

**From:** Shippy, Vincent
**Sent:** Tuesday, August 18, 2015 2:46 PM
**To:** Graves, Marie W.
**Subject:** RE: Monthly Review of Travel Card Transactions - July 2015

Hi Marie:

This is Vincent and the issue at hand is noted below.

1. Milton does not have authority to use his travel card locally, may not do so in the future and regardless if he pays is bill
2. The employee must respond after meeting with you regarding this matter. I have been associated with the travel card for program since 1998 and avoidance of email sent by the Travel Program staff is clearly negligent on behalf of the employee. This problem is not going to go away because buy avoiding emails.

Thank you,
Vince

---

**From:** Graves, Marie W.
**Sent:** Tuesday, August 18, 2015 2:32 PM
**To:** Shippy, Vincent
**Subject:** RE: Monthly Review of Travel Card Transactions - July 2015

Robert,

You are welcome. Is the 14.29 the only charge that needs payment immediately?

Many thanks,
Marie

---

**From:** Shippy, Vincent
**Sent:** Tuesday, August 18, 2015 2:31 PM
**To:** Graves, Marie W.
**Cc:** Tanner, Robert
**Subject:** RE: Monthly Review of Travel Card Transactions - July 2015
**Importance:** High

Marie:

This issue must be resolved immediately and thank you for your prompt action.

Vince

---

**From:** Graves, Marie W.
**Sent:** Tuesday, August 18, 2015 2:30 PM

**To:** Shippy, Vincent; Jackson, Milton L.
**Cc:** Tanner, Robert; Holmes, Bill
**Subject:** RE: Monthly Review of Travel Card Transactions - July 2015

Milt,

Let's discuss. I will send you a calendar invite for today at 4:00pm.

Thanks,
Marie

---

**From:** Shippy, Vincent
**Sent:** Tuesday, August 18, 2015 2:09 PM
**To:** Jackson, Milton L.
**Cc:** Graves, Marie W.; Tanner, Robert; Holmes, Bill
**Subject:** Monthly Review of Travel Card Transactions - July 2015
**Importance:** High

Mr. Jackson

In reviewing your travel card account (ending in 3064), it was noted you have recent activity on your travel account. Based on a review of Concur travel data, I was unable to locate an approved travel authorization to support use of your travel card relative to the date below. At this time; you do not have the authority to use your government travel card locally for donor related expenses or official representation on behalf of S.I. It highly irregular to not respond to any email sent regarding your travel account that is sent by a staff member. You neglected not respond to my previous monthly review sent in June 2015. You made several locally purchases last month that were not authorized and were not reimbursed per my information provided by Bill Holmes. This issue must be resolved immediately for using your travel card in an unauthorized manner and not being reimbursed by your unit. I have included your immediate supervisor on this issue because if this card usage continues; administrative action may be taken on your travel account by the Associate Director of Charge Card Services, Robert Tanner.

| | | | | |
|---|---|---|---|---|
| **06/26/2015** | **SMITHSONIAN CA11136967** | **14.29** | **WASHINGTON** | **DC** |

Thank you,
Vince

**Vincent Shippy**
**Program Analyst**
**Smithsonian Institution**
**Charge Card Services**
**Office of the Chief Financial Officer**
**Office of Contracting & Personal Property Mgmt (OCon&PPM)**
**Charge Card Services**
**P- 202.633.1737 F - 202.633.7319** shippyv@si.edu

**Inter-Office Mail or Postal Delivery**
**PO BOX 37012**
**CC350 MRC 1200**
**Washington, DC. 20013-7012**

**<u>Address for FedEx or UPS Delivery</u>**
**2011 Crystal Drive**
**3rd Floor, Suite 350**
**Arlington, VA. 22202-3709**

# EXHIBIT I

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Friday, July 24, 2015 2:06 PM
**To:** Jackson, Milton L.
**Subject:** FW: July 4th Celebration Update
**Attachments:** July 4 Attendance Report_6.30.2015.xlsx; Local Invitees_July 4 2015.xlsx

Milt,

I see that you were included on this email; therefore, the logistical assumption was that you knew Dr. Cole was attending the 4th of July event.

Marie

---

**From:** Barat, Rebecca
**Sent:** Tuesday, June 30, 2015 10:34 AM
**To:** OA-Senior Development Directors in units; OA-Senior Dev Dir OD ONLY; OA-Development Officers in units; OA-Development Support Staff in units
**Cc:** Feldmann, Emily; Sverdlov, Molly; Gobbi, Laura
**Subject:** July 4th Celebration Update

Good morning everyone,

The proliferation of red, white, and blue on the Mall means that July 4th is here! We still have spots available at our celebration this Saturday – a current attendance list is attached. Please take a look and follow up with any unlisted guests that may be interested in joining us. We want to be as full as possible for Secretary Skorton's first event!

As a resource, a list of local invitees is attached. At this late hour, our local guests are the most likely to attend. Browse through and see if there are any households that would like to celebrate.

We're happy to provide your unit with complimentary tickets for guests; I'll be in touch after the 4th with inter-unit transfer information.

As always, I'm here if you have any questions. Your excellent follow up has helped us get this far – thank you for making this year the best July 4th yet!

Happy early Independence Day,
Becky

Becky Barat
Programming and Stewardship, Office of Advancement
202.633.8037 (o)
703.489.2151 (c)

---

**From:** Barat, Rebecca
**Sent:** Tuesday, June 23, 2015 12:09 PM
**To:** OA-Senior Development Directors in units; OA-Senior Dev Dir OD ONLY; OA-Development Officers in units; OA-Development Support Staff in units

**Cc:** Feldmann, Emily; Sverdlov, Molly; Gobbi, Laura
**Subject:** July 4th Celebration Follow Up

Good afternoon everyone,

Hope you had a nice weekend! We're in the homestretch before the 4th, and are hoping to bump up our numbers. This is one of our keystone events, and we want to share it with as many of our donors as possible. It's also Secretary Skorton's first big event, and we want a packed house – it's a great opportunity for your donors to meet the new Secretary and show him what the Smithsonian's all about. The more, the merrier on the 4th!

Attached please find the current attendance list. Take a look and follow up with any guests that would be interested in attending our event. We do still have complimentary tickets that your unit can provide, so do not let the ticket price hold you back from reaching out to any parties you think may be interested. Contact me if you would like to offer these tickets.

An invitation is also attached for easier follow up. You are welcome to give out my information in case your guests have questions.

As always, I'm here to provide any information you may need. Thank you for your continued help!

Best,
Becky

Becky Barat
Programming and Stewardship, Office of Advancement
202.633.8037 (o)
703.489.2151 (c)

July 4, 2015 Attendance Report
As of 6/30/2015

**Donors (and guests) Attending**

| Alpha | Address Name | Unit | Relationship Lead | Adults | Kids |
|---|---|---|---|---|---|
| Redacted [redacted] | [redacted] | NMAAHC | (none assigned) | 2 | |
| [redacted] | [redacted] | OA | Anna Barber | 2 | |
| [redacted] | [redacted] | NMNH | Loretta Cooper | 3 | |
| [redacted] | [redacted] | NZP | Lesli Creedon | 2 | |
| [redacted] | [redacted] | OA | Lindsay Burkholder | 2 | |
| [redacted] | [redacted] | SLC | Gina Flores | 2 | |
| [redacted] | [redacted] | NMAH | Lauren Collette | 5 | 5 |
| [redacted] | [redacted] | FSGA | Katie Ziglar | 2 | |
| [redacted] | [redacted] | SL | Tina Muracco | 5 | |
| [redacted] | [redacted] | NMAfA | Marie Graves | 2 | |
| [redacted] | [redacted] | NMAH | Maggie Webster | 4 | |
| [redacted] | [redacted] | NMAAHC | Eva Headley | 2 | |
| [redacted] | [redacted] | OA | JJ van Haelewyn | 4 | |
| [redacted] | [redacted] | NPG | Lindsay Gabryzak | 1 | |
| [redacted] | [redacted] | CFCH | Cynthia Jacobs Carter | 4 | 1 |
| [redacted] | [redacted] | TSA | (none assigned) | 2 | |
| Harland | Dr. **Barbara Harland** and Mr. Scott Webber | NMAfA | Milton Jackson | 2 | |
| Redacted [redacted] | [redacted] | OA | JJ van Haelewyn | 2 | |
| [redacted] | [redacted] | OA | Laura Brouse-Long | 2 | |
| [redacted] | [redacted] | NZP | (none assigned) | 2 | |
| [redacted] | [redacted] | NASM | *Prospect* | 2 | |
| [redacted] | [redacted] | OA | Jasmine Goodrich | 2 | |
| [redacted] | [redacted] | OA | Jasmine Goodrich | 2 | |
| [redacted] | [redacted] | SL | Tina Muracco | 3 | |
| [redacted] | [redacted] | NMAfA | Marie Graves | 2 | |
| [redacted] | [redacted] | SERC | Brian Magness | 4 | 3 |
| [redacted] | [redacted] | FSGA | Katie Ziglar | 5 | 2 |
| [redacted] | [redacted] | NZP | Lesli Creedon | 4 | |
| [redacted] | [redacted] | FSGA | Katie Ziglar | 2 | |
| [redacted] | [redacted] | FSGA | Katie Ziglar | 2 | |
| [redacted] | [redacted] | CFCH | Cynthia Jacobs Carter | 1 | |
| [redacted] | [redacted] | OA | Jasmine Goodrich | 2 | |
| [redacted] | [redacted] | OA | Laura Brouse-Long | 6 | 1 |
| [redacted] | [redacted] | OA | Laura Brouse-Long | 2 | |
| [redacted] | [redacted] | NMAAHC | Margaret Turner | 2 | |



SI00288

July 4, 2015 Attendance Report
As of 6/30/2015

Redacted

[redacted]

| | | | |
|---|---|---|---|
| OA | Laura Brouse-Long | 2 | |
| NMNH | (none assigned) | 5 | |
| NASM | (none assigned) | 4 | 1 |
| OA | Amy Kardon | 2 | |
| FSGA | Katie Ziglar | 1 | |
| FSGA | Katie Ziglar | 1 | |
| NMAH | Maggie Webster | 6 | |
| NZP | Andrew Portocarrero | 2 | |
| SSEC/NMNH | Eric Nastasi | 2 | 2 |
| SLC | Gina Flores | 5 | |
| OA/NMNH | Ginny Clark | 4 | 2 |
| CFCH | Cynthia Jacobs Carter | 1 | |
| STRI | Lisa Barnett | 2 | |
| SAO | Sharon Allen | 1 | |
| SL | Tina Muracco | 2 | 2 |
| STRI | Prospect | 5 | |
| OA | Lindsay Burkholder | 4 | |
| OA/NMAH | Ginny Clark | 25 | |
| NASM | Laura Gleason | 4 | 2 |
| ACM | *(none assigned)* | 2 | |
| NMAH | Rachel Wood | 2 | |
| OA | Anna Barber | 3 | |
| NZP | Lesli Creedon | 5 | 2 |
| FSGA | Katie Ziglar | 2 | |
| OA | Laura Brouse-Long | 2 | |
| OA | JJ van Haelewyn | 2 | |
| OA | Scott Robinson | 2 | |



SI00289

July 4, 2015 Attendance Report
As of 6/30/2015

| | | | | | |
|---|---|---|---|---|---|
| Redacted | | OA | JJ van Haelewyn | 4 | |
| | | | **Subtotal (Guests)** | **195** | **23** |

**Regents (and guests) Attending**

| Alpha | Address Name | Unit | Relationship Lead | Adults | Kids |
|---|---|---|---|---|---|
| Redacted | | OREG | Staff | 2 | |
| | | OREG | Staff | 2 | |
| | | | **Subtotal (Regents)** | **4** | **0** |

**SI Staff (and guests) Attending**

| Alpha | Address Name | Unit | Relationship Lead | Adults | Kids |
|---|---|---|---|---|---|
| Brandt Stover | **Dr. Cynthia Brandt Stover** and Redacted | OA | Staff | 2 | |
| Brooks | Ms. **Adrienne Brooks** and Redacted | NMAAHC | Staff | 2 | |
| Carter | Dr. **Cynthia Jacobs Carter** and Redacted | CFCH | Staff | 2 | |
| Clark | **Ms. Virginia Clark** | OA | Staff | 1 | |
| Cole | **Dr. Johnnetta Cole** and Redacted | NMAfA | Staff | 2 | |
| Diaz | **Mr. Eduardo Diaz,** Redacted | SLC | Staff | 3 | |
| Gradwohl | Ms. **Judy Gradwohl** and Redacted | NMAH | Staff | 2 | |
| Gray | **Mr. John L. Gray,** Redacted | NMAH | Staff | 3 | 2 |
| Gwinn | **Dr. Nancy Gwinn** and Redacted | SL | Staff | 2 | |
| Johnson | Dr. **Kirk Johnson** and Redacted | NMNH | Staff | 2 | |
| Kress | Dr. **John Kress** and Redacted | OUSS | Staff | 2 | |
| Kurin | Dr. **Richard Kurin** and Redacted | OUSHAC | Staff | 2 | |
| Larsen | Dr. and Mrs. **Matt Larsen** Redacted | STRI | Staff | 2 | |
| Leonard | **Ms. Judith Leonard** and Redacted | OGC | Staff | 2 | |
| Miller | Mr. **Scott Miller** and Redacted | OUSS | Staff | 2 | |
| Parker | Ms. **Rachel Parker** and Redacted | OREG | Staff | 2 | |
| Salinger | **Mr. Noel Salinger** and Redacted | OA | Staff | 2 | |
| Webster | **Ms. Maggie Webster** | NMAH | Staff | 1 | |
| Wilkinson | **Ms. Porter Wilkinson** and Redacted | OREG | Staff | 2 | |
| Ziglar | **Ms. Katie Ziglar** and Redacted | FSGA | Staff | 2 | |
| Skorton | **Dr. David Skorton and Dr. Robin Davisson,** Redacted | OS | Staff | 8 | |
| | | | **Subtotal (Staff)** | **48** | **2** |

| | | |
|---|---|---|
| **Subtotal** | **247** | **25** |
| **Grand Total Attending** | **272** | |
| ***Working Staff (MGOs, Event, etc.)*** | ***32*** | |
| ***Total Rooftop Number*** | ***304*** | |



SI00290

# EXHIBIT J

**Starun, Eryn**

---

**From:** Jackson, Milton L.
**Sent:** Monday, July 6, 2015 7:59 PM
**To:** Graves, Marie W.
**Subject:** Re: 4th of July

I'm still trying to work out the gift parameters and will keep you abreast as things progress. And please replace "others" with "her" as I was proofreading in a rush! -Milt

Sent from my iPhone

On Jul 6, 2015, at 5:26 PM, Graves, Marie W. <GravesMW@si.edu> wrote:

Milt,

Is this a gift to NMAfA? When you say engage others, specifically who are your referring to?

Marie

---

**From:** Jackson, Milton L.
**Sent:** Monday, July 06, 2015 5:19 PM
**To:** Graves, Marie W.
**Subject:** RE: 4th of July

Marie,

In point of fact, given all that was going on, I did not see Dr. Cole until after the fireworks. Do know that I always try to introduce her to whomever I'm engaged with as is proper with a director of her standing.

From a philanthropic standpoint, Barbara had a wonderful time and is thrilled at the prospect of further engagement with us. At the event, she presented me with a letter stating that she wishes to give $40K in scientific instrumentation to the Smithsonian. Given my efforts to advance our relationship with her, as well as to concurrently learn more and engage others with our mission at the event, I see her letter as a very positive indication that things are progressing well!

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Graves, Marie W.
**Sent:** Monday, July 06, 2015 4:47 PM
**To:** Jackson, Milton L.
**Subject:** 4th of July

Milt,

It is my understanding that you attended the SI 4th of July event and served as a host to Dr. Harland. What effort did you make to introduce Dr. Harland to Dr. Cole? Please advise.

Thanks,
Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

# EXHIBIT K

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 2:35 PM
**To:** Jackson, Milton L.
**Subject:** RE: dr visit today

I am confused. Please help me understand. You left yesterday afternoon to meet and discuss Dr. Harland's gift with another SI unit. If I am reading your email correctly, you had previously contacted MCI and are awaiting their response. Who is Jean Kim? What SI unit does she work in? I would like to know where we are with this gift. What was the outcome of your meeting with Jean Kim?

Milt, I shouldn't have to email you multiple times to ask who you met with yesterday and the outcome of the meeting.

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 2:04 PM
**To:** Graves, Marie W.
**Subject:** RE: dr visit today

Not trying to express a lack of communication or an unwillingness to share. As I mentioned in email below, contacting MCI is the outcome (which I have already done) – and I met with Jean Kim. I am awaiting a response from MCI.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 12:15 PM
**To:** Jackson, Milton L.
**Subject:** RE: dr visit today

Milt,

This another example of your lack of communication and unwillingness to share information. Why can't you tell me the outcome your meeting? Who did you meet with yesterday? Please advise.

Thanks,
Marie

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 11:58 AM

**To:** Graves, Marie W.
**Subject:** Re: dr visit today

Contact Materials Conservation Institute, which I have done. They use this type of equipment all the time.

Sent from my iPhone

On Jul 28, 2015, at 11:53 AM, Graves, Marie W. <GravesMW@si.edu> wrote:

Hi Milt,

You left the office yesterday to meet with another unit in hopes that they could find use for Dr. Harland's in-kind gift. What was the outcome of that meeting? Please advise.

Thanks,
Marie

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 11:46 AM
**To:** Graves, Marie W.
**Subject:** RE: dr visit today

Marie,

To re-iterate, I am not pursuing Dr. Harland's gift, I am simply looking for the best person internally to hand this in-kind gift off to. As Barbara is adamant about contributing the equipment; and as securing a cash and/or planned gift from her in the future is a possibility, it makes sense to ensure that her first substantial gift experience goes well.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 10:09 AM
**To:** Jackson, Milton L.
**Subject:** RE: dr visit today

Hi Milt,

I am wondering about the outcome of your meeting yesterday. I am surprised that you are still pursuing Dr. Harland's in-kind gift in light of our conversation last week. Dr. Cole and I have expressed to you that this is not the best use of your time and the museum's limited resources. What did you learn yesterday from your meeting? Let's discuss a strategy to refocus your efforts

on securing the cash and planned gift that your first mentioned as a strategy for Dr. Harland when we have our weekly meeting on Friday.

Best,
Marie

---

**From:** Jackson, Milton L.
**Sent:** Monday, July 27, 2015 4:21 PM
**To:** Graves, Marie W.
**Subject:** RE: dr visit today

Hopefully, all is correct now.

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Monday, July 27, 2015 4:11 PM
**To:** Jackson, Milton L.
**Subject:** RE: dr visit today

Shouldn't your sick leave read 4 ½ hours if your left at noon?

---

**From:** Jackson, Milton L.
**Sent:** Monday, July 27, 2015 4:09 PM
**To:** Graves, Marie W.
**Subject:** RE: dr visit today

Marie: I believe everything on the timesheet is correct now, let me know if this is not the case.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

**From:** Graves, Marie W.
**Sent:** Monday, July 27, 2015 3:53 PM
**To:** Jackson, Milton L.
**Subject:** RE: dr visit today

Milt,

I was unable to certify your timecard for pay period 14. Please add your sick leave for Wednesday.

Thanks,
Marie

---

**From:** Jackson, Milton L.
**Sent:** Wednesday, July 22, 2015 11:28 AM
**To:** Graves, Marie W.; Holmes, Sarah L.
**Subject:** dr visit today

Hi Marie, Sarah: I need to go to the dr for my achilles. I will leave at noon and will likely be out the remainder of the afternoon, but available by phone/email.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

# EXHIBIT L

## Starun, Eryn

**From:** Jackson, Milton L.
**Sent:** Tuesday, August 11, 2015 10:17 AM
**To:** Graves, Marie W.
**Subject:** RE: Harland's In-kind Gift update

Marie: Agreed, I will set it up.

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, August 11, 2015 10:06 AM
**To:** Jackson, Milton L.
**Subject:** RE: Harland's In-kind Gift update

Milt,

It is best that we advise Dr. Harland of our decision; please schedule a meeting with her for next week. My calendar is wide open and I can accompany you to deliver the news.

Marie

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, August 11, 2015 9:24 AM
**To:** Graves, Marie W.
**Subject:** Harland's In-kind Gift update

Marie,

I called MCI last month, after receiving contact info from Steve, and they have not yet returned my call. The next response I received was from Dana, who indicated that MCI is likely interested in only one of the two pieces to be donated.

As Barbara is interested in contributing both pieces of equipment; as MCI has not yet responded directly to my call; and as MCI (via Dana) seems interested in obtaining only one piece of equipment, my inclination is to diplomatically drop the GIK and continue to pursue an unrestricted cash gift. Your thoughts?

Milt Jackson
Senior Advancement Program Specialist

Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Monday, August 10, 2015 11:04 PM
**To:** Jackson, Milton L.
**Subject:** RE: Dr. Harland's In-kind Gift

Milt,

Please send me a status report on MCI and Dr. Harland's in-kind gift?

Thanks,
Marie

Marie Woodward Graves
Associate Director of Advancement
Smithsonian The National Museum of African Art
202.633-4648 (office)
202-316-6943 (cell)

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 4:06 PM
**To:** Graves, Marie W.
**Subject:** RE: Dr. Harland's In-kind Gift

Marie: We are in agreement. Thank you for your time and consideration.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 4:00 PM
**To:** Jackson, Milton L.
**Subject:** Dr. Harland's In-kind Gift

Hi Milt,

I thought it best to summarize our discussion. We agreed should MCI turn down Dr. Harland's gift and you will inform her that we are unable to accept her generous offer. In the end, gifts that we cannot spend or use isn't a gift—it's a bill. I prefer to turn down the gift than accept something that is going to put staff under pressure to do the impossible.

Thanks,
Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

# EXHIBIT M

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Monday, July 6, 2015 3:35 PM
**To:** Jackson, Milton L.
**Subject:** Leave and Hours of Duty

Milt,

A week ago, we discussed at length your leave and hours of duty. It was the day you met with Dr. Harland and you failed to notify me that you were going to be out of the office for most of the day. There are other instances where you have left the office for extended periods of time and ran late without explanation.

I am writing to reiterate the procedures for requesting and receiving approval for annual/sick leave, and the policy concerning tardiness in reporting for duty. Currently you are on the following schedule:

- Our core hours are Monday through Friday from 9:00am to 5:00pm. You are expected to work an eight hour day.

I hold you responsible for knowing what your duty hours are and for being ready for work at the start of your shift. Additionally, I must know your whereabouts at all times. If you leave the work area during duty hours without my permission, you may be charged absence without leave (AWOL) and disciplinary action, up to and including removal may be taken against you.

Leave Procedures

You are responsible for advising me that you are running late and if you need to leave the work area. Please request sick and/or annual leave through Web Tools in advance and of course, emergency leave requests will be considered for approval on an individual basis.

If you do not understand the procedures described in this email or if you would like to discuss your leave situation further, please feel free talk to me.

Thanks,
Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

# EXHIBIT N

**Starun, Eryn**

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 1:12 PM
**To:** Graves, Marie W.
**Subject:** RE: Milt Jackson

Marie: I only spoke with Bill about the donor meeting/golfing in LA and he basically nixed presenting the golf idea. I agreed. I hope he mentioned that to you.

Best,

Milt Jackson

Senior Advancement Program Specialist

Smithsonian Institution

National Museum of African Art

950 Independence Avenue SW

MRC 708 PO Box 37012

Washington, DC 20013

Office: 202-633-4635

Cell: 202-679-7894

JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 1:05 PM
**To:** Jackson, Milton L.
**Subject:** RE: Milt Jackson

We can meet separately and first decide if it is a good use of the regional team's time.

Last week, you asked to visit a donor in LA and it has come to my attention that you plan to travel across the country and play golf with him. When you first arrived here at the museum, you asked to attend a golf tournament in North Carolina. I shared with you that I was uncomfortable approving a golf trip and networking breakfast. Milt, please think about this from a donor's prospective. If a donor feels we'll travel 3,000 miles to play golf, I worry that he may feel we will fail to proper steward their gift or even worse, that we do not need their money and that is not the image we wish to convey to our donors.

Thanks,

Marie

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 11:48 AM
**To:** Graves, Marie W.
**Subject:** RE: Milt Jackson

Does this mean someone from the regional team will be joining us Friday?...Hopefully!

Milt Jackson

Senior Advancement Program Specialist

Smithsonian Institution

National Museum of African Art

950 Independence Avenue SW

MRC 708 PO Box 37012

Washington, DC 20013

Office: 202-633-4635

Cell: 202-679-7894

JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 11:28 AM
**To:** Jackson, Milton L.
**Subject:** RE: Milt Jackson

Hi Milt,

This is true that you have been asked to focus on the Washington area. However, as we discussed, we can utilize the regional team with our cultivation efforts.

Best,

Marie

---

**From:** Jackson, Milton L.
**Sent:** Tuesday, July 28, 2015 10:41 AM
**To:** Graves, Marie W.
**Subject:** RE: Milt Jackson

Hi Marie: I look forward to speaking with you about both the work plan and the diversity initiative.

As far as the strategy for Dallas and the Italian Embassy folks, given your directive last week that I not travel outside the DC metro area – or that I travel outside the DC metro area on a case-by-case basis - I have focused instead on getting meetings with local prospects from my portfolio and local prospects known to me/colleagues. Is this not the correct course of action?

Best,

Milt Jackson

Senior Advancement Program Specialist

Smithsonian Institution

National Museum of African Art

950 Independence Avenue SW

MRC 708 PO Box 37012

Washington, DC 20013

Office: 202-633-4635

Cell: 202-679-7894

JacksonML@si.edu

-----Original Appointment-----
**From:** Graves, Marie W.
**Sent:** Tuesday, July 28, 2015 10:13 AM
**To:** Jackson, Milton L.
**Subject:** Milt Jackson
**When:** Occurs every Friday effective 7/31/2015 from 11:00 AM to 12:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** my office

Hi Milt,

Please come prepared to discuss your work plan and diversity initiative. Also, can you include a strategy for the prospects that you met in Dallas, Italian Embassy folks, and the individuals you recently met for dinner.

Thanks,

Marie

# EXHIBIT O

**Starun, Eryn**

**From:** Graves, Marie W.
**Sent:** Friday, July 10, 2015 4:56 PM
**To:** Holmes, Bill
**Subject:** FW: Lunch meeting

FYI…when Milt returned from lunch, I was told he ran into Margaret after his lunch. Now, the "friend" is a colleague…

---

**From:** Jackson, Milton L.
**Sent:** Friday, July 10, 2015 4:00 PM
**To:** Graves, Marie W.
**Subject:** RE: Lunch meeting

Hi Marie,

Please forgive my delay in returning, but I had lunch with a NMAAHAC colleague, Margaret Turner.

During/after lunch, among other things, we discussed NMAAHAC's existing relationship with Harry Belafonte (who is in my portfolio) and Stedman Graham (also in my portfolio). As you and I discussed before I left for lunch, NMAfA pursuing both of these individuals at this juncture might not be fruitful given that Harry is discussing an artifacts gifts with NMAAHAC and that Stedman's philanthropic profile is very much intertwined with Oprah's – so our gut was right. Thus, our lunch became a meeting, and again, sorry for the delay in returning but the time was very well spent. Let me know if anything more can be addressed.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

---

**From:** Graves, Marie W.
**Sent:** Friday, July 10, 2015 2:48 PM
**To:** Jackson, Milton L.
**Subject:** RE: Lunch meeting

Milt,

FYI…we are allotted 30 minutes for lunch. This is excessive considering it is now 2:45pm.

Marie

**From:** Jackson, Milton L.
**Sent:** Friday, July 10, 2015 1:09 PM
**To:** Graves, Marie W.; Holmes, Sarah L.
**Subject:** Lunch meeting

Marie, Sarah: FYI, am going to lunch with a friend offsite and will be back afterward.

Best,

Milt Jackson
Senior Advancement Program Specialist
Smithsonian Institution
National Museum of African Art
950 Independence Avenue SW
MRC 708 PO Box 37012
Washington, DC 20013
Office: 202-633-4635
Cell: 202-679-7894
JacksonML@si.edu

## Starun, Eryn

**From:** Jackson, Milton L.
**Sent:** Monday, July 13, 2015 12:59 PM
**To:** Graves, Marie W.; Holmes, Sarah L.
**Subject:** Lunch mtg

Hi: an at an informational lunch with Steve Alpert, one of our friends from the Italian Embassy, will be delayed returning, but will make our meeting.

Sent from my iPhone

**Starun, Eryn**

**From:** Jackson, Milton L.
**Sent:** Thursday, July 16, 2015 9:34 AM
**To:** Graves, Marie W.
**Subject:** Re: Today

I arrived at 8:45, ate and had a very pleasant conversation with Steve. Do let me know if anything is needed. -Milt

Sent from my iPhone

On Jul 16, 2015, at 9:24 AM, Graves, Marie W. <GravesMW@si.edu> wrote:

> Milt,
>
> Your lights are off in your office and I wondering if you are coming in today since I have not heard from you. Please advise.
>
> Thanks,
>
> Marie
>
> Marie Woodward Graves
> Associate Director for Advancement
> The National Museum of African Art
> 950 Independence Avenue, SW
> MRC 708 PO Box 37012
> Washington, DC 20013-7012
> 202.633.4648 (office)
> 202.316.6943 (cell)

## Starun, Eryn

**From:** Jackson, Milton L.
**Sent:** Thursday, July 16, 2015 9:55 AM
**To:** Graves, Marie W.
**Subject:** Re: Today

PS: going to hear Skorton and speaking with colleagues afterward!

Sent from my iPhone

On Jul 16, 2015, at 9:24 AM, Graves, Marie W. <GravesMW@si.edu> wrote:

Milt,

Your lights are off in your office and I wondering if you are coming in today since I have not heard from you. Please advise.

Thanks,

Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

**Starun, Eryn**

---

**From:** Graves, Marie W.
**Sent:** Wednesday, July 29, 2015 4:03 PM
**To:** Jackson, Milton L.
**Subject:** This Afternoon

Milt,

Shall I assume that you are returning to the office this afternoon? I would like to discuss the woodworking initiative? Please advise.

Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

## Starun, Eryn

**From:** Graves, Marie W.
**Sent:** Friday, July 31, 2015 4:24 PM
**To:** Jackson, Milton L.
**Subject:** This Afternoon

Hi Milt,

When I returned to the office, I noticed that your lights are out and the door is locked. I am assuming you have left for the day. As the result you are be charged with two hours of leave without pay.

Best,
Marie

Marie Woodward Graves
Associate Director for Advancement
The National Museum of African Art
950 Independence Avenue, SW
MRC 708 PO Box 37012
Washington, DC 20013-7012
202.633.4648 (office)
202.316.6943 (cell)

# EXHIBIT P

Sign In | Help | Feedback

PRISM Search

Advanced Search

PRISM Home News & Events SI Organization Documents & Forms Support Collaboration

Prism Home > Systems > HRMS > Exit Clearance

Staff Directory Systems & DBs Links webTA

# ERP Human Resources Management System (HRMS)

HRMS Home Security Documentation Reports Training Exit Clearance AIRS Self-Service

## Automated Exit Clearance

Before an employee leaves the Smithsonian and receives a final paycheck and/or lump sum leave payout, he or she must be cleared through various departments to ensure that all Smithsonian property has been returned and all debts settled or acknowledged. The process for obtaining this clearance from the various departments is the Automated Exit Clearance process.

The Automated Exit Clearance process is performed online in the ERP Human Resources Management System (HRMS). An abbreviated form of this process is used when an employee transfers to another unit within SI. Use the tabbed sections below to review the available information for authorized clearers and for exiting employees.

For Exiting Employees | For Administrative Officers | For Authorized Clearers | FAQs | Documentation

Your Administrative Officer (AO) is your point of contact for questions about your exit clearance. Following are resources you may need when going through the exit clearance process:
- You can review a sample exit clearance to see the sections that will need to be cleared on your exit clearance.
- Benefits information: For exiting Federal employees (contact your for exiting Trust employees (contact your Benefits Specialist)
- Contact the OPS Personnel Security and ID Office (202-633-1598) for information on returning (badges).
- Contact the OPS Locksmith Office (202-633-2265) for information on returning keys.

If your AO has let you know that your exit clearance has been generated, you can view it by going to the HRMS Self-Service page and clicking on the **Go to HRMS Self-Service** button. From there, enter your SI network ID and password, followed by your full birth date (*all items are required for login*). See Reviewing Your Exit Clearance for more information.

## I Need Help

For technical and/or account-related HRMS issues, contact OCIO:
**Email** - OCIOHelpdesk@si.edu
**Phone** - x34000 or 202-633-4000
**Prism** - OCIO IT Support
**Heat Self-Service** - Heat Self-Service

For functional and/or policy issues related to the HRMS, please contact OHR or your unit's Business Partner:
**Phone** - x36370 or 202-633-6370
**Prism** - OHR website or Business Partners

Search this site

## Related Links

- OHR - Benefits Exit Clearance Information
- OC - Exit Clearance Page
- OFEO - Exit Clearance Procedures
- OPS - Returning Credentials and Keys
- NMNH - Exit Clearance Procedures
- Standard Form 8 - Unemployment Compensation Form

**Explore Prism**

A-Z | Sitemap | Help | Feedback

Home | News & Events | Support | Collaboration
Staff Directory | Systems | webTA

Security Emergency Numbers | Privacy | Terms of Use | Contact

ORACLE

Home Worklist Add to Favorites Sign out

Menu

Search:

- My Favorites
- Smithsonian Reports
- Employee Exit Clearance
  - Employee Exit Clearance
- Worklist
- Tree Manager
- Reporting Tools
- My Personalizations
- My System Profile
- My Dictionary
- My Feeds

Exit Clearance Checklist

**General Information**

Empl ID: 113357 Name: JACKSON,MILTON L Trust Separation Seprtn/Transfer Date: 11/09/2015

Dept ID: 574100 Org: NMAFA-EXTERNAL AFFAIRS DEPT Work Schedule: F-Full Time

Checklist Status: CLEARED Checklist Log

**Standard Clearance Units**

Office of Protection Services - SI Keys

Primary Contact: Locksmith Office 202/633-2260 CLEARED

Operating Hours: 8AM-4:30PM

Please note that any unreturned SI keys may result in a bill for repayment or a debit from the final paycheck for up to $200.

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return SI keys to OPS Locksmith Office. See h | Required | key returned | ☑ | donaldc | 12/16/2015 8:27:22AM |

**Special Instructions**

Include any information or instructions pertaining to this exit clearance. For example, is the employee changing status from Trust to Fed or Fed to Trust?

| ID | Description | Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Special Instructions | Optional | | ☑ | holmesb | 11/20/2015 8:42:01AM |
| 2 | Special Instructions | Optional | | ☑ | holmesb | 11/20/2015 8:42:01AM |

Save | Return to Search | Previous in List | Next in List | Notify | Update/Display | Correct History

# EXHIBIT Q

**Starun, Eryn**

**From:** White, Sherrie
**Sent:** Sunday, November 15, 2015 9:02 AM
**To:** Holmes, Bill
**Subject:** Fwd: Separation Checklist for EmplID 113357, MILTON L JACKSON

Hey Bill

I turned in Milt's keys, ID, Citrix token and I have his phone and laptop. Can you clear him or can it wait until I come in on Wednesday?

Sherrie

Sent from my iPhone

Begin forwarded message:

> **From:** <SI_HRMS@si.edu>
> **Date:** November 14, 2015 8:00:53 AM CST
> **To:** <musolinom@si.edu>, <OCon&PPOBProperty@si.edu>, <sherrie@si.edu>, <holmesb@si.edu>, <musolinom@si.edu>
> **Subject: Separation Checklist for EmplID 113357, MILTON L JACKSON**
>
> Please review and clear this checklist at your earliest convenience. The effective date of the separation is 11/09/2015.
>
> The NMAfA administrative office contact for this employee is Bill Holmes, 202/633-4602.
>
> Please click on the link below to access this employee (login to ERP HRMS required):
> https://sierppa3.si.edu/psp/hprd/EMPLOYEE/HRMS/c/SI_CUSTOM_MENU.SI_EECHKLST.GBL?Page=SI_EECHKLST&EMPLID=113357&SI_TERM_EFFDT=2015-11-09
>
> OFEO Administrative Officers/Assistants:
> Please click the link below to obtain Exit Clearance Documents that must be provided to each OFEO Employee when they are departing from your office:
> http://ofeo.si.edu/offices/rm/exit_clearance.asp
>
> Administrative Officers/Assistants from all Other Units:
> Please click on the link below describing the Automated Exit Clearance process:
> http://prism2.si.edu/systems/hrms/pages/exitclearance.aspx
>
> For information on how to return SI credentials and keys to the Office of Protection Services, see http://ops.si.edu/exitclearance.html. Please note that any unreturned keys or SI credentials may result in a bill for repayment or a debit from the final paycheck for up to $200.

To contact the OPS Personnel Security and ID Office regarding return of SI Credentials: ops-psioexit@si.edu

To contact the OPS Locksmith Office regarding return of SI Keys: LocksmithKeyRequests@si.edu

**Starun, Eryn**

**From:** White, Sherrie
**Sent:** Wednesday, December 16, 2015 11:57 AM
**To:** Holmes, Bill
**Subject:** FW: Exit Clearance

FYI......

**From:** Donald, Charles
**Sent:** Wednesday, December 16, 2015 8:35 AM
**To:** White, Sherrie <Sherrie@si.edu>
**Subject:** RE: Exit Clearance

GM, its done.

**From:** White, Sherrie
**Sent:** Wednesday, December 16, 2015 8:15 AM
**To:** Donald, Charles <DONALDC@si.edu>
**Cc:** Holmes, Bill <holmesb@si.edu>
**Subject:** Fwd: Exit Clearance

Good morning Donald

We spoke about this last week. Can you check your records to make sure you cleared the account for Milton Jackson. When I returned the key last month you were out of the return form and said you would take care of it.

Let me know the status.

Thanks
Sherrie

Sent from my iPhone

Begin forwarded message:

> **From:** "Holmes, Bill" <holmesb@si.edu>
> **Date:** December 16, 2015 8:08:19 AM EST
> **To:** "White, Sherrie" <Sherrie@si.edu>
> **Subject: FW: Exit Clearance**
>
> Sherrie – can you please follow up on this?
>
> Thanks

Bill

---

**From:** Williams, Cheryl
**Sent:** Tuesday, December 15, 2015 5:07 PM
**To:** Holmes, Bill <holmesb@si.edu>
**Subject:** Exit Clearance

*Hi Bill*

*I was check on the Exit Clearance for Milton Jackson keys for the locksmith. The Locksmith Office did not*

*Cleared the exit clearance for his key. Mr. Jackson is waiting on his annual leave payment. Thank you*

Cheryl Williams, Payroll Supervisor

Office of Finance and Accounting

2011 Crystal Drive, Suite 452

Arlington, VA 22202

T-202-633-7260 F- 202-312-1994

# EXHIBIT R

ORACLE

Home Worklist Add to Favorites Sign out

Menu
Search:

- My Favorites
- Recruiting
- Workforce Administration
- Smithsonian Reports
- OPF Tracking
- Benefits
- Payroll Documents
- Compensation
- Workforce Development
- Organizational Development
- Enterprise Learning
- Employee Exit Clearance
  - Checklist Templates & Tables
  - Employee Exit Clearance
  - Checklist Delete
- SI Interfaces
- Set Up HRMS
- Worklist
- Tree Manager
- Reporting Tools
- PeopleTools
- SI Utilities
- Usage Monitoring
- Change My Password
- My Personalizations
- My System Profile
- My Dictionary
- My Feeds

Exit Clearance Checklist

General Information

**Empl ID:** 113357 **Name:** **JACKSON,MILTON L** **Trust** **Separation** **Seprtn/Transfer Date:** 11/09/2015

**Dept ID:** 574100 **Org:** NMAFA-EXTERNAL AFFAIRS DEPT **Work Schedule:** F-Full Time

**Checklist Status:** **CLEARED** Checklist Log

Standard Clearance Units

Smithsonian Institution Libraries

**Primary Contact:** Polly Lasker 202/633-1702 **CLEARED**

**Operating Hours:** 8:30AM - 5PM Mon - Fri

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Library Materials may be returned to any SI Li | Required | | ✔ | worshamb | 11/09/2015 10:40:05AM |

Smithsonian Archives

**Primary Contact:** Anne VanCamp 202/633-5908 **CLEARED**

**Operating Hours:** Monday - Friday 9AM - 5PM

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return charged-out items to SI Archives. | Required | | ✔ | bennicofft | 11/09/2015 11:31:33AM |

Office of International Relations

**Primary Contact:** Stephanie Wezowiczs 202/633-2083 **CLEARED**

**Operating Hours:** 8:30AM - 5PM Mon - Fri

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return Official Smithsonian Passport. | Required | Employee does not have | ✔ | wezowiczs2 | 11/12/2015 10:02:51AM |

Office of the General Counsel

**Primary Contact** Fernando Arce 202/633-5103 **CLEARED**

**Operating Hours:** Monday - Friday 9AM - 3PM **1085 Filer:** **1085 Reason:**

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return Financial Disclosure Statement to Offic | Not Appl | | ✔ | arcef | 11/10/2015 11:53:10AM |

Office of the Comptroller - Disbursement

**Primary Contact** Haresh Vayal 202/633-7201 **CLEARED**

**Operating Hours:** Monday - Friday 9AM - 4PM

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Petty Cash Bank / Funds | Required | | ✔ | mershas | 11/09/2015 3:28:57PM |

Office of the Comptroller - Travel

**Primary Contact:** Cynthia Robinson 202/633-8600 **CLEARED**

**Operating Hours:**

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Travel Vouchers | Required | | ✔ | robinsonc | 11/10/2015 9:02:56AM |
| 2 | Travel Advances | Required | | ✔ | robinsonc | 11/10/2015 9:02:56AM |

Office of the Comptroller - Payroll

**Primary Contact:** Yessenia Roque 202/633-7224 **CLEARED**

**Operating Hours:** 8AM - 4PM Monday thru Friday

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Annual Leave | Required | | ✔ | roquey | 12/16/2015 8:29:19AM |
| 2 | Sick Leave | Required | | ✔ | roquey | 12/16/2015 8:29:19AM |
| 3 | Emergency Salary Payment | Optional | | ✔ | roquey | 12/16/2015 8:29:19AM |
| 4 | Check ABCO | Required | | ✔ | roquey | 12/16/2015 8:29:19AM |
| 5 | Employee Assistance Loans at USDA Credit U | Required | | ✔ | roquey | 12/16/2015 8:29:19AM |

Office of Contracting & Personal Property Management

Office of Contracting & Personal Property Management

**Primary Contact:** Natascha Syre 202/633-7269 **CLEARED**

**Operating Hours:** Monday - Friday 9:30am-3:30pm

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Cancel Delegation of Procurement Authority | Not Appl | | ✔ | syren | 11/20/2015 9:36:03AM |
| 2 | Cancel Travel Card | Required | Travel card account closed | ✔ | syren | 11/20/2015 9:36:03AM |
| 3 | Cancel Purchase Card | Not Appl | | ✔ | syren | 11/20/2015 9:36:03AM |
| 4 | Confirm Property Management Clearance | Required | | ✔ | syren | 11/20/2015 9:36:03AM |

Office of Protection Services - SI Credentials

**Primary Contact:** Shirley Gilliam 202/633-5609 **CLEARED**

**Operating Hours:** 8AM-4:30PM

Please note that any unreturned SI credentials may result in a bill for repayment or a debit from the final paycheck for up to $200.

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return SI credential to OPS Personnel Security | Required | | ✔ | gilliams | 12/01/2015 9:39:23AM |

Office of Protection Services - SI Keys

**Primary Contact:** Locksmith Office 202/633-2260 **CLEARED**

**Operating Hours:** 8AM-4:30PM

Please note that any unreturned SI keys may result in a bill for repayment or a debit from the final paycheck for up to $200.

| *ID | Description | *Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Return SI keys to OPS Locksmith Office. See h | Required | key returned | ✔ | donaldc | 12/16/2015 8:27:22AM |

Accountable Property Officer

**NMAfA Property Officer** **CLEARED**

**Primary Contact:** Sherrie White 202/633-4611

**Operating Hours:** 8:30AM - 5PM Mon - Fri

The Accountable Property Officer section can only be cleared by the Accountable Property Officer for the unit. The Administrative Officer may be able to clear, but only with prior OCON approval.

| ID | Description | Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | All Personal property assets that were assigr | Required | | ✔ | sherrie | 11/18/2015 11:11:54AM |
| 2 | Notify Office of Contracting and Personal Prc | Required | | ✔ | sherrie | 11/18/2015 11:11:54AM |

Employee's Unit

**NMAfA** **CLEARED**

**Primary Contact:** Bill Holmes 202/633-4602

**Operating Hours:** 8:30AM - 5PM Mon - Fri

| ID | Description | Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | AO - Provide Employee with the one page Exi | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 2 | AO - Notify timekeeper to place timecard on h | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 3 | AO - Verify Signed Service Agreements have I | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 4 | AO - Distribute OHR Information on Benefits (: | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 5 | AO - Ensure that employee is aware of OPS p | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 6 | AO - Collect Parking Pass: Send parking pass | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 7 | AO - Remind employee to contact OSHEM H | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 8 | AO - Ensure that employee is aware of OPS p | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 9 | AO - Collect Govt Passport & Return to OIR | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 10 | AO - Collect / Destroy (and/or) Return Travel | Required | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 11 | AO - Collect / Destroy (and/or) Return Purcha | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 12 | AO - Collect / Destroy (and/or) Return Shippi | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 13 | AO - Check with employee to see if they have | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 14 | AO - Check with employee for Collections/spe | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 15 | AO - Provide employee with Exit Survey | Not Appl | | ✔ | holmesb | 11/20/2015 8:42:01AM |

8:42:01AM

| | | | | | | |
|---|---|---|---|---|---|---|
| 16 | AO - If named as a Principal Investigator on a | Not Appl ▼ | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 17 | AO - Contact Payroll Helpdesk at x37260 if lur | Required ▼ | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 18 | AO - Email NMAfA's administrator for The Mus | Not Appl ▼ | | ✔ | holmesb | 11/20/2015 8:42:01AM |

OCIO Help Desk tickets will be automatically generated three days before the employee's separation or transfer to disable or transfer the employee's Network/Email account and ERP Financial, / ERP HRMS accounts (if applicable). All change or extension requests must be submitted to the OCIO Help Desk with accompanying forms, including all required signatures, to support the request. A manual OCIO Help Desk request must be submitted to disable or transfer the employee's VoIP and Blackberry/cell phone. To contact the OCIO Help Desk, call 202-633-4000 or send an email to

Special Instructions

Include any information or instructions pertaining to this exit clearance. For example, is the employee changing status from Trust to Fed or Fed to Trust?

| ID | Description | Checklist Type | Comments | Cleared? | Last UserID | Date/Time |
|---|---|---|---|---|---|---|
| 1 | Special Instructions | Optional ▼ | | ✔ | holmesb | 11/20/2015 8:42:01AM |
| 2 | Special Instructions | Optional ▼ | | ✔ | holmesb | 11/20/2015 8:42:01AM |

Employee Certification

I certify that I have accounted for all property issued to me and I owe no money and possess no property belonging to the United States or the Smithsonian Institution. I also understand that falsification of this form may constitute a violation of Federal Law.
Please sign and date this form or, if online, click on the eSignature button.

Employee eSignature

Employee Not Available

Employee's Signature     Date

EE Refuses to Sign

EE Signed Form

To view Exit Clearance Report, click here first    Generate PDF

Wait at least 45 seconds, then click here    View and Print PDF

Save | Return to Search | Previous in List | Next in List | Notify | Update/Display | Correct History

# EXHIBIT S

**NMAfA senior management team's**

**response to staff and reflections for change for the future**

**Meeting: April 23, 2015**

**1:00pm**

## <u>Can-Do Actions:</u>

- In the interest of improving our work, after every exhibition opening and major program, conduct a "post-mortem" meeting to discuss what went wrong and what went right.
- Embrace a culture of "no" with regard to adding un-scheduled projects to the museum calendar. What are we benchmarking unscheduled events against? What does our museum calendar look like?
- Share minutes from senior staff meetings.
- Encourage staff to propose topics for discussion, decision or clarification at senior staff meetings and all-staff meetings.
- Improve processes at the museum, through a revised exhibition development process, editorial, design, and public affairs schedules and deadlines, Vision Statements for programs and special events, etc. Produce exhibition "rules of the road" guidance.
- Encourage a culture of civility and respect in email correspondence, correcting typos and checking for tone before hitting the SEND button ... and consider the health and collegiality benefits to walking down the hall or up the stairs to speak directly with a colleague.
- At mid-year and end-of-year performance reviews, managers should ask "what can I do to be a better manager and to assist you in your work and in achieving your career goals?"

**Long Term Changes:**

- Give serious consideration to a Museum Project Manager position in an effort to improve the exhibition development and implementation process. Is the project manager limited to exhibitions? Staff mentioned a "true administrative manager".
- Establish and disseminate operational priorities that are linked to the museum's mission and vision.
- Align yearly operational priorities to performance plans, with particular attention paid to Advancement goals, Educational programming, and Exhibitions. Articulate operational priorities that guide the remaining months of FY2015.
- Take a look at staffing/organizational structure to be certain it suits our needs for future.
- Improve physical spaces in the museum to create a more collaborative/pleasant environment.

**Successes to Date:**

- Vacancies filled: Assistant Registrar, Exhibit Specialist (cabinet shop), Collections Assistant, Major Gifts Officer.
- Vacancies in the pipeline: Docent Coordinator, Museum Curator, Youth Engagement Coordinator.
- Re-vamped performance appraisals with goals that encourage highly successful and/or outstanding performance.

# DIRECTOR'S REPORT
# TO THE NATIONAL ADVISORY BOARD OF THE NATIONAL MUSEUM OF AFRICAN ART
## JOHNNETTA BETSCH COLE
## MAY 7, 2015

Since the last meeting of the National Advisory Board, our museum has responded to challenges and celebrated a number of accomplishments. In this report, I will address these "ups and downs" and offer my perspective on the state of our museum.

## NMAfA'S NATIONAL ADVISORY BOARD

As you know, the mission of this museum is to inspire conservations about the beauty, power, and diversity of African arts and cultures worldwide. In order to carry out this mission our small, but mighty staff of 35 museum professionals, supported by fellows, interns and volunteers depend on your good counsel and generous material support. Over the course of the six years that I have served as the director of this museum, the National Advisory Board has changed significantly; and today, under Stu Bohart's chairship, you are a diverse and distinguished group of women and men who are

effective ambassadors for and generous donors to our nation's premier museum for the collection, conservation, and study of the traditional and contemporary arts of Africa.

At this meeting, it is a privilege and a joy to welcome three new board members: Professor Rowland Abiodun, George Levert, and Peter Pham.

NEW NMAfA STAFF

Since you last met, we have also welcomed new staff to our NMAfA family:
Laura Hovenac, Assistant Registrar; Milton Jackson, Major Gifts Officer and Graham Kopp, Supervisory Exhibit Specialist. We have also welcomed Makeba Clay, who is a Contract Consultant, is serving in the position of Chief Diversity Officer.

NEW SECRETARY OF THE SMITHSONIAN

As you are no doubt aware, the Board of Regents has selected Dr. David Skorton as the next Secretary of the Smithsonian. Dr. Skorton is a professor of medicine and engineering, and a practicing cardiologist who has served as the president of the University of Iowa. He will complete his presidency at Cornell University before he assumes the position of the

Smithsonian's 13th Secretary this July.

To give you an insight into what we can expect from the new head of the Smithsonian, I want to share with you Dr. Skorton's response to a question I posed to him when he met with the directors of the Smithsonian shortly after the Board of Regents announced his appointment. I prefaced my question by sharing with Dr. Skorton that I was aware that at a certain period in his life he had made his living as a jazz musician, and he was once the disc jockey for a Latino jazz radio program. Then I posed this question: What has jazz taught you that might be useful in your new position as the Secretary of the Smithsonian?

Dr. Skorton responded that jazz has taught him what it feels like to be a minority because he was always "the white guy" in the band. He went on to say that he would bring that sensitivity with him when he is our Secretary. Dr. Skorton then said that he would also bring with him to the Smithsonian a second lesson that jazz has taught him. Namely, to appreciate the valuable contribution of a soloist; but to applaud the importance of everyone in the band playing together.

EXHIBITIONS

While our museum continues its tradition of

presenting stellar exhibitions of African art, it is my view that we have never before presented to our visitors such a stunning array of shows. At this time, in every gallery throughout the museum, we have these phenomenal exhibitions:

*The Divine Comedy: Heaven, Purgatory, and Hell Revisited by Contemporary African Artists.*

*Conversations: African and African American Artworks in Dialogue.*

*Chief S.O. Alonge: Photographer to the Royal Court of Benin, Nigeria.*

*African Mosaic: Selections from the Permanent Collection.*

*African Mosaic: 50th Anniversary room.*

*Walt Disney-Tishman African Art Collection Highlights.*

And how proud we are to have opened our first ever-online exhibition---*Sailors and Daughters: Early Photography and the Indian Ocean.*

This online exhibit is made possible by a gift we received from the Sultan Qaboos Cultural Center here in Washington for a three year educational program entitled, "Connecting the Gems of the Indian Ocean: From Oman to East Africa. The exhibition reveals the expansive

maritime societies of Zanzibar, the east African coast, and the Persian Gulf.

As you all know, in connection with the celebration of the 50th anniversary of our museum, on November 9, 2014, we opened *Conversations,* a truly remarkable exhibition of masterworks from our permanent collection of African art in dialogue with masterworks from the private collection of Drs. Camille and Bill Cosby. With the exception of one work by Henry O. Tanner, the
Cosby collection had never before been viewed by the public. The exhibition is curated by the distinguished art historian, curator and author, Dr. David Driskell; our own Deputy Director and Chief curator, Dr. Christine Mullen Kreamer; Dr. Adrienne Childs, an independent curator; and NMAfA Senior curator Bryna Fryer.

At the very time of the opening of this history-making exhibition, a controversy around Bill Cosby became headline news. In response to that controversy, we received some negative messages from the public, and there were a few articles in the press that said we should close the *Conversations* exhibition. We issued a statement indicating that our museum adheres to the position that art speaks for itself, not for its owners, and the exhibition would remain open

until it is scheduled to close in January, 2016.

My colleagues at the museum and I deeply appreciate the support for our position that we received from colleagues throughout the art world; from central administrators at the Smithsonian, including acting Secretary Al Hovarth and Under Secretary Richard Kurin; from directors of Smithsonian museums, centers, and the Zoo; and from many people from across the United States. I want to especially acknowledge the assistance of Evelyn Lieberman and Linda St. Thomas of the Smithsonian's central communications office; and Eddie Burke, head of communications at our museum. By following the professional counsel of these three colleagues, there was limited negative press about the *Conversations* exhibition at our museum.

I remain grateful to board member Dr. Camille Cosby and Dr. Bill Cosby for their generosity that has allowed us to present a truly stellar exhibition that is centered on masterworks from their collection of African American art in dialogue with masterworks from our museum's collection of traditional and contemporary African art.

VISITORSHIP

From the opening of *Conversations* in

November, and continuing, with no indication of a let up, this exhibition has drawn record numbers of visitors.

- **November 2014 was an exceptionally good month for NMAfA with 23,155 visitors - - - clearly driven by "Conversations." Compare those 23,155 visitors to 14,998 visitors in November, 2013 ---a 54.4% increase.**
- **December 2014** was also a record month for NMAfA with **18,804** visitor's. By comparison, in December 2013, we had **12,347 visitors**.
- **In January 2015** there were **13,554** visitors to NMAfA. This figure should be compared to **10,062** visitors in January 2014.
- **February 2015** saw an increase with **13,315** visitors compared with **11,645**.visitors in February, 2014.
- **In March, 2015,** we welcomed **19,133** visitors--- an increase of over **6,000** from the previous year.

- The **26,343** visitors to our museum in April, 2015, gave us the largest number of visitors in the month of April since 2012.

We recently learned that the *Conversations* catalogue has won two design awards in the

Washington Book Publishers Design Competition. It tied for first place in the illustrated Text category, and it won Best in Show, and will be featured prominently in the awards ceremony that will take place in a couple of weeks.

*Divine Comedy,* curated by internationally renowned curator Simon Njami, in collaboration with NMAfA curator Dr. Karen Milbourne, opened to the public on April 8th and is continuing to contribute to the record number of visitors who are coming to our museum. Those of you who toured this exhibition last evening know why this show of works by 40 contemporary African artists from 18 African countries is being so well received.

PROGRAMS AND EVENTS

Since your last meeting, we have launched, or are in the planning stage to present an unprecedented number of exciting and important programs. In the interest of time, I will describe just two of these programs.

The Teen Ambassadors Program. This program is a youth development opportunity for teens in the DC metro area with an interest in the arts, culture and history of Africa. The youngsters become involved in the non-profit world and learn techniques for looking at and talking about art. And they learn skills that can

be applied to any future career. At the end of their training, these Teen Ambassadors will be ready to serve as gallery guides and offer Teen tours that will involve engaging visitors with hands-on materials through our museum's Art Cart program.

An initiative on Diversity.

In October, 2014, we received a $500,000 grant from the Ford Foundation to fund our museum's efforts to increase diversity among our staff, and in our exhibitions and our educational and outreach programs. We are primarily focusing on racial, ethnic, and gender diversity.

This grant from the Ford Foundation will enable us to create a model for diversity and inclusion in art museums in the United States, and it will assist us in encouraging colleagues throughout the art museum world to do the same. In more specific terms, we are using this half million-dollar grant to:

*support a contract senior diversity officer,

*host conferences on increasing diversity in art museums,

*support exhibitions that highlight diversity and inclusion,

*bring greater diversity to our educational programs, and

*enable our museum's professional staff to do outreach locally, nationally, and internationally in the interest of increasing diversity in our staff and in our programs.

As I indicated earlier, Ms. Makeba Clay has joined us as our museum's contract senior diversity officer. After serving as the Director of the Fields Center for Equality and Cultural Understanding at Princeton University, she assumed the position of Executive Director for Diversity and Equal Opportunity at the College of Southern Maryland. She is currently the Associate Vice President for Institutional Equity and Diversity at the College of Southern Maryland.

One example of how we are using this grant to support diversity efforts in our own museum and at other museums at the Smithsonian is the initiative I am co-leading with Dr. Kimberlynn Leary of Harvard University. Dr. Leary is currently a Robert Wood Johnson fellow at the White House, assigned to President Obama's Council on Women and Girls. The focus of her work over the coming months is on women and girls of color.

On April 15, Dr. Leary and I invited Dr. Richard Kurin, Smithsonian Under Secretary for History, Art and Culture, and Dr. John Kress,

Interim Under Secretary for Science, along with a number of directors of Smithsonian museums to attend a meeting at the White House. At that meeting, we discussed the Smithsonian's strategic vision to leverage its considerable resources to better represent the diversity of America, including women and girls of color, and to inspire global citizenry and inclusive participation.

Following our meeting at the White House, we are now in discussions to choose a project that this group of Smithsonian directors wish to commit to in the interest of contributing to the empowerment of women and girls of color and bringing more women of color into professional roles in American museums.

As the director of our museum, I am also working on diversity issues in the two major organizations for museum professionals: the Association of Art Museum Directors, and the American Alliance of Museums (AAM). In my keynote address before 5,000 participants at the 2015 conference of the American Alliance of Museums, held in Atlanta last week, I spoke on the need for far greater diversity in American museums. Along with others in the Association of Art Museum Directors, I have consistently issued this same call; and when I assume the

presidency of this organization in June of this year; I will be able to focus even more attention on the critical issue of diversity in art museums.

## FUNDRAISING AND OUR NATIONAL CAMPAIGN

When we turn to the report of the Development committee, you will be briefed on the strategies we are using in our fundraising efforts--- all of which count toward completing our 15 million dollar campaign. However, there are two points that I wish to make.

First, I want to acknowledge the enormous amount of work that went into planning and carrying out our 50th anniversary gala. We are all deeply grateful to board member Marcella Jones for all of the work that she did as the chair of the Gala committee. It is customary to measure the success of a gala in terms of the amount of money raised. However, an even more important index of success is the number of new relationships that are initiated and the number of new donors that are a direct result of a gala. A huge thank you to Marcella for connecting us with individuals and corporations with whom we did not have a relationship.

While all board members made contributions to the success of the Gala, let me say a special thanks to the board members who

served on the gala committee: Asif Shaikh. Maggie Johnson Obaji and Christine Warnke.

A second point that I want to make is this: Associate Director for Advancement, Marie Woodard Graves, and I took time to do an assessment of how, where and when we can successfully engage in fundraising and complete our fifteen million dollar national campaign. With that work behind us, we are now ”on the road,” systematically carrying out a strategy in six key cities: Atlanta, Chicago, Jacksonville, Los Angeles, New York, and Washington. Board member George Levert is working closely with us in Atlanta. We are calling on all board members in New York to assist us in that city, and Marcella Jones and Christine Warnke will be particularly helpful as we continue our efforts in Chicago.

Here in DC we will count on all of our local board members to help with our fundraising efforts. We are also systematically pursuing our “Africa strategy” a strategy that former Associate Director for Advancement Anita Henri and I created. Marie Graves and I are meeting with Ambassadors, business people and thought leaders based in Washington who are helping us frame the specific fundraising strategy we will use in each of the following African countries:

Angola, Gabon, Kenya, Morocco, Nigeria, Senegal, and South Africa. We are working very closely with board member Maggie Johnson Obaji in carrying out our Africa strategy and we look forward to board chair Stu Bohart joining Maggie, Marie and me this summer on a fundraising trip to Angola. Thanks to board member Christine Warnke for inviting Marie Graves to travel with her to Senegal where Marie will be able to take advantage of Christine's contacts to jump start fundraising for our museum.

Completing our 15 million dollar campaign is well within site! When Marie Graves makes her report you will be pleased to see how close we are to victory. It is conceivable that with extra effort on the part of each of us, we could complete our campaign by October 1, 2015. If not, we will surely complete the campaign by October 1, 2016, a year earler than the closing of the Smithsonian campaign in 2017.

A PRICE PAID FOR SUCCESS

I have shared with you some of the many successes we have had at our museum since your last board meeting that includ an unprecedented number of exhibition openings, important new initiatives and programs, a 50th anniversary Gala, the completion of plans, and

now the carrying out of those plans for how we will complete our national campaign.

All of this success has come with a price, a price that is reflected in our staff being highly stressed, over-worked, and critical of the museum's leadership team. To help us work through this situation, we sought assistance from Chandra Heilman, the Smithsonian's Ombudsman, and Tim Hollaman, Employee Assistance Program Manager. They collected information from and interviewed NMAfA colleagues, and shared their findings with our leadership team. They also interviewed our leadership team. Last week at an all staff meeting, as the leadership team at our museum, we listened to the concerns of our colleagues and presented a "social contract" that sets out when and how we will work with our colleagues on their specific issues and concerns --- all in the interest of creating an environment in which we do the work that must be done, but without so much stress and with far more joy.

ONWARD!

I want to conclude this report by expressing my profound gratitude to all of my colleagues at our museum, to colleagues throughout the Smithsonian, and certainly to you our National Advisory Board Members for all that you have

done and will continue to do to help the National Museum of African Art soar toward the height of her possibilities.

At a time in our nation and our world when there is such bitter divisiveness, the work of our museum is more important than ever. Warren Robbins, our founder, spoke to our work when he said that African Art has the power to encourage cross-cultural communication.

# EXHIBIT T

October 1, 2014

PERSONAL & CONFIDENTIAL

Milton Jackson
8113 Dumont Drive
Vienna, VA 22180

Dear Milton:

It is with regret that I must inform you that your employment with the Society will end as of today, October 7, 2014**,** your "Termination Date." National Geographic will pay you for all outstanding salary and expenses accrued through the Termination Date, in accordance with National Geographic policy and procedure and applicable law.

In view of your service with National Geographic, a separation package (the "Separation Agreement and Release"), which is consistent with practice, has been prepared for you. In order to accept this package, you will be required to agree to the release as well as certain other terms described in this letter by signing in the space at the bottom. The details of the package are set out below, as are your obligations. You may have a period of twenty-one (21) days to consider whether to agree to these terms. If you do not accept the separation package within that period, it will be withdrawn. You may revoke your agreement within seven (7) days of signing this letter. National Geographic advises you to consult an attorney before signing below.

The National Geographic separation package consists of the following:

1. Severance Payment. National Geographic agrees to pay you a lump-sum severance payment. The severance amount shall be equal to approximately 1 week of base pay for every completed year of continuous service on the National Geographic payroll (minimum of 2 weeks) up to a maximum of twelve weeks, or 2 weeks (i.e., $3,825.76) subject to applicable taxes and withholdings as required "by law". National Geographic will issue the lump sum severance payment on or about the next payroll date after the expiration of seven days following your signing of this Agreement. Your release of claims must become irrevocable before the payment date. You agree that National Geographic has no obligation for any pay or benefit, including severance, not provided in this document, provided that benefits will be terminated in accordance with plan terms normally applicable to terminating employees.

2. The following are conditions that you agree to in order to take advantage of the severance package described above:

   a. National Geographic Property. You are obligated to return all company property in your possession prior to your last day of work. National Geographic property includes, by way of example only, computer equipment, computer files, passwords, peripherals, software, credit cards, security key cards, telephone cards, cell phone, keys, parking passes, car service cards, company identification cards, National Geographic records and copies of records, correspondence and copies of correspondence and other books or manuals issued to you by National Geographic, or its affiliates. The value of any National Geographic property that is not returned in a timely manner will be deducted from your separation pay. Destruction of any National Geographic property will void the Society's obligation to provide any of the benefits in this Agreement.

   b. Confidentiality Agreement. You are reminded of your obligations both at law and under National Geographic's Policy on Confidential Information and Trade Secrets to not disclose any of National Geographic's confidential information or trade secrets including but not limited to customer names, business plans, contacts, revenues, forthcoming projects or products, pricing information, personnel information and commission rates. This information is National Geographic property and of significant value to National Geographic, which will take any legal steps required to protect its proprietary information. National Geographic acknowledges, however, that you are free to use in a lawful way the experience you have obtained during your years of employment with National Geographic and with prior employers.

   c. Release. You, for and in consideration of the foregoing, hereby voluntarily agree to release and hold harmless National Geographic and its affiliated corporations and bodies, and their present, future and former directors, trustees, officers, agents, servants and employees, (collectively "the Releasees"), from any claims or liabilities that have arisen, or may have arisen, whether known or unknown, from any act done or not done in connection with or relating in any way to your employment by National Geographic, at any time through the date of this Agreement and including the continuing effects of such acts done or not done, including but not limited to the severance of your employment and any events surrounding the severance of your employment. You agree that the benefits provided in this Agreement are in excess of any amounts owed to you by National Geographic under its normal policies and procedures.

   This Agreement shall specifically include the release of any claims, whether at

law or in equity, that you might bring against any of the Releasees, under any federal, state, District of Columbia, or local law or regulation of any kind whatever, or under the common law, specifically including any claims under laws prohibiting employment discrimination such as the Age Discrimination in Employment Act, as amended, 29 U.S.C. Section 621, et seq., Title VII of the



Civil Rights Act of 1964 and 1990, as amended, 42 U.S.C. sec. 2000e et seq., the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. Section 12101 et seq., the Employee Retirement Income Security Act of 1974, as amended, 26 U.S.C. Sections 1001-2008 et seq., the District of Columbia Human Rights Act, and any other federal, state, District of Columbia or local statute, rule or regulation regarding employment, as well as any claims for negligent or intentional infliction of emotional distress, pain and suffering, breach of contract, fraud, or any other unlawful behavior, as well as any claim under any express or implied employment or personal contract, whether such claims might arise in contract or in tort.

You further agree, promise, and covenant that neither you, nor any other person acting on your behalf, will bring an action for damages or other relief (including injunctive, declaratory, monetary relief or other) against the Releasees, relating to any claims or liabilities lawfully released in this Agreement. You agree not to seek damages or any relief based on claims released herein.

3. You are advised of your right to have this Agreement reviewed by a representative of your own choosing, whether attorney, accountant or advisor. You acknowledge that you are entering into this Agreement with full knowledge of your right to obtain such advice, and that you are entering into this Agreement on a voluntary basis and have relied upon no promises or representations by anyone except as contained in this document.

4. You acknowledge and agree that you are a participant in the National Geographic Society and Affiliates Alternative Dispute Resolution Program.

5. You and National Geographic jointly agree that:

a. This Agreement is not intended to be and shall not be construed as an admission of wrongdoing or a violation of any legal or contractual duty by National Geographic. National Geographic Society hereby denies any wrongdoing in connection with your employment, and specifically with regard to the severance of your employment.

b. You and National Geographic agree that this Agreement shall be and shall remain strictly confidential, and any necessary dialogue regarding this Agreement should be conducted with Human Resources.

c. You and National Geographic recognize that each party must maintain continuous harmonious relations with the public and the business community. You agree not to malign or otherwise make negative statements about National Geographic and agree that you will not state that you were treated unfairly or illegally by National Geographic. National Geographic senior management agrees not to malign or otherwise make negative statements about you. National Geographic further agrees that in accordance with its standard employment reference policy, employment references will not be provided on former employees but that Human Resources will confirm employment dates, job title and salary information.

d. This Separation Agreement and Release entered into by you and National Geographic sets forth the entire Agreement between the parties and fully supersedes any and all prior agreements or understandings between the parties pertaining to the subject matter thereof. If any portion of this Separation Agreement and Release is deemed unenforceable for any reason, the remaining portions will survive and control the parties hereto. The parties acknowledge that this Agreement is a joint product and shall not be construed for or against any party on the ground of sole authorship.

e. With respect to the general release in Section 2(c) hereof, you agree and understand that you are specifically releasing all claims and rights under the Age Discrimination in Employment Act, as amended, 29 U.S.C. Section 621 *et seq*. You acknowledge that you have read and understand the foregoing Agreement and execute it voluntarily and without coercion. You are advised to consult with an attorney prior to executing this Agreement, and you are provided a period of twenty-one days within which to consider and execute this Agreement, unless you voluntarily choose to execute this Agreement before the end of the twenty-one day period. You understand that you have seven days following your execution of this Agreement to revoke it in writing, and that this Agreement is not effective or enforceable until after this seven day period has expired without revocation. For such revocation to be effective, written notice must be received by Yvonne Perry, HR Director at 1145 17th Street, NW, Washington, DC 20036 by no later than 12:01 a.m. on the eighth calendar day after the date by which you have signed this Agreement. You expressly agree that, in the event you revoke this Agreement, the Agreement shall be null and void and have no legal or binding effect whatsoever.

f. Counterpart Execution; Facsimile Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document. In place of the transmittal of original documents, and where permitted by applicable law, such executions may be transmitted to the other parties by facsimile, portable document format (pdf) or similar electronic image-based format (collectively, "Facsimile") and such Facsimile execution shall have the full force and effect of an original signature. All fully executed counterparts, whether original executions or Facsimile executions or a combination, shall be construed together and shall constitute one and the same agreement. In addition, neither party will repudiate the meaning of an electronic signature(s) or claim an electronic signature(s) is not legally binding.

I wish to thank you sincerely for your service to National Geographic. If you have any questions or require clarification on any of these matters please contact Human Resources at your convenience.

Please sign and return this Agreement indicating your understanding and acceptance of the terms outlined above. A copy will be provided to you.

Sincerely,

Bill Warren
SVP of Development

Agreed and Accepted:
**Milton Jackson**

______________________ ______________________
Signature Date