**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MILTON L. JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>LONNIE G. BUNCH, III,<br>Secretary of the Smithsonian Institution,<br><br>Defendant. | Civil Action No. 1:22-cv-02240 (BAH) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


I. INTRODUCTION……………………………………………………………...1

II. STANDARD OF REVIEW……………………………………….……3

III. COUNTERSTATEMENT OF MATERIAL FACTS……………….…....4

A. Jackson Was Hired, With Confidence, Into a Position That Required Travel, Donor Contact, and Board Engagement…………………………………….…....…4

B. Management Forbade Jackson from Performing the Core Duties of His Position — Then Faulted Him for the Predictable Result………………………………….………5

C. Jackson Was Treated Worse Than His White, Female Colleagues — and Replaced by One………………….…………7

D. Jackson Opposed the Discriminatory Conditions and Was Branded a "Threat"…………………….….............8

E. The "Counseling" Defendant Recites Was the Mechanism of Sabotage, Not Evidence of Poor Performance……………………..9

F. The Broader Record Confirms a Pattern of Discrimination at the Museum………………………………………..............10

IV. ARGUMENT………………………………………………………10

A. Genuine Disputes of Material Fact Preclude Summary Judgment on Every Claim………………………………..…..10

B. Jackson's Claims Are Timely and Properly Exhausted……………..11

(i) The forty-five-day period was equitably extended as a matter of regulation……………………………………11

(ii) Defendant waived timeliness defense by adjudicating the complaint on the merits……………………………......12

(iii) The hostile-work-environment claim is timely in its entirety…...12

(iv) Discrete acts at the end of Jackson's employment are independently actionable………………………………...13

(v) The challenged conduct was administratively exhausted…..……13

C. A Reasonable Jury Could Find Race and Sex Discrimination……….13

D. A Reasonable Jury Could Find Unlawful Retaliation………………..16

E. A Reasonable Jury Could Find a Hostile Work Environment……….17

V. CONCLUSION………………………………………………………..18

CERTIFICATE OF SERVICE…………………………….……….....19

## TABLE OF AUTHORITIES

### Cases

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)……………… *passim*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………………………………………… 3

*Bowden v. United States*, 106 F.3d 433 (D.C. Cir. 1997) ……………………………… 11, 12

*Brady v. Off. of Sergeant at Arms,* 520 F.3d 490 (D.C. Cir. 2008)………………………………*passim*

*Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006)……………………………………………16

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)…………………………………………16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………………………………………………3

*Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc)…………………………14

*Currier v. Radio Free Europe/Radio Liberty, Inc.,* 159 F.3d 1363 (D.C. Cir. 1998)……………11

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007)……………………………………………………3

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005)……………………………………………………17

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012)……………………………………………14, 16

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)……………………………………………………14

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)………………………………………12, 13

*Park v. Howard Univ.,* 71 F.3d 904 (D.C. Cir. 1995)…………………………………………………13

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)……………………………3, 4, 14

*Scott v. Harris*, 550 U.S. 372 (2007)……………………………………………………………1, 3, 11

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)………………………………………10

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)…………………………………………………………15

*Stella v. Mineta,* 284 F.3d 135 (D.C. Cir. 2002)………………………………………………………14

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002)…………………………………15

*Wheeler v. Georgetown Univ. Hosp.,* 812 F.3d 1109 (D.C. Cir. 2016)………………………………7

**Other Authorities**

Federal Rule of Civil Procedure 56……………………………………………………………3

29 C.F.R. § 1614.105(a)..........................................................................................11, 12

Local Civil Rule 7(h)(1)..........................................................................................................4

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Defendant's motion rests on a single, tidy narrative: that Milton Jackson — an experienced, GS-13-equivalent Major Gifts Officer — failed to raise money during his probationary period and was separated for that reason and that reason alone. The motion presents thirty-two paragraphs of "counseling" and declined travel requests as though they were the neutral, good-faith supervision of an underperforming employee. That narrative is "blatantly contradicted by the record," so the "court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Viewed in the light most favorable to Plaintiff, as it must be, the record tells a fundamentally different story and makes clear that Defendant's motion for summary judgment should be denied.

From his first week at the National Museum of African Art ("NMAfA" or the "Museum"), Jackson — the only Black man in the fundraising operation — was forbidden by his supervisor and senior management from doing the very things his External Affairs position required. He was told to stay at his desk and not to speak with his colleagues. He was barred from contacting the Advisory Board. His donor travel was delayed, denied, or cancelled and reassigned to others. His expense and purchase-card requests were ignored or recast as misconduct. His donor prospects were disparaged — and then, after his termination, solicited by the very managers who had forbidden him to pursue them. And when he objected that these restrictions made his job impossible, his supervisor branded him a "threat," an accusation she did not even relay to the Director until after he was gone, and which appears nowhere in his termination letter.

This is not attorney argument. It is sworn testimony from multiple Museum employees of different races and both sexes. A senior manager, Dr. LaNisa Kitchiner, attests that management

told her Jackson would not survive probation because a white, female colleague had been pre-selected to replace him and that a white, female probationary employee with documented misconduct and a recommended discharge was nonetheless retained and "accommodated" because the Museum was supposedly a place where "employees should be allowed to grow into their positions." (DSUMF 89). The Museum's Travel Coordinator, Frank Esposito, attests that Marie Graves created a hostile environment for Jackson, "cancelled his travel and went in his place," and forced him to rewrite his diversity-fundraising plan again and again. (DSUMF 65). Public Affairs Specialist Edward Burke and others corroborate the disparate treatment. Likewise, a curatorial employee, Sarah Holmes, attests that the donors Graves disparaged were in fact legitimate Museum prospects. (DSUMF ¶ 7).

Defendant's motion never grapples with this evidence. It cannot, because the governing question on summary judgment is not whether the Court finds the Smithsonian's explanation plausible, but whether a reasonable jury could find it pretextual. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). A jury crediting the affidavits and contemporaneous documents in this record could readily find that the "poor performance" explanation is a cover for race and sex discrimination and retaliation, and that the conditions Jackson endured amounted to a hostile work environment.

Because genuine disputes of material fact pervade every element on which Defendant moves — and because resolving them would require the Court to weigh credibility and choose between competing sworn accounts, a task reserved exclusively for the jury — the motion should be denied in its entirety.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant, and a fact is "material" if it might affect the outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on the motion, the Court must view the evidence "in the light most favorable" to Jackson and draw "all justifiable inferences" in his favor. *Id.* at 255, 261 n. 2. Critically, it is settled that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* The Court "may not make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and where "two different stories" are told, the non-movant's version controls unless it is "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. Defendant's repeated invitation to accept its managers' characterizations of contested events — over the sworn accounts of multiple percipient witnesses — asks the Court to do precisely what Rule 56 forbids.

These principles carry special force in employment-discrimination cases. Because an employer's unlawful motive is rarely admitted and is difficult to establish by "direct evidence," the D.C. Circuit has instructed that circumstantial evidence of employer mendacity may be sufficient for a jury to "infer discrimination." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1293, 1295 (D.C. Cir. 1998) (en banc); *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Where an employer offers a non-discriminatory explanation, the plaintiff may defeat summary judgment with evidence of "the falsity of the explanation" such that a reasonable jury could infer

that "the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. 133 at 147; *see also Brady*, 520 F.3d at 495. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147.

## III. COUNTERSTATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 7(h)(1), Plaintiff submits herewith a separate Statement of Genuine Issues responding to each numbered paragraph of Defendant's Statement of Undisputed Material Facts ("DSUMF"), both of which are incorporated by reference. The following counterstatement summarizes the evidence that creates genuine disputes for trial.

### A. Jackson Was Hired, With Confidence, Into a Position That Required Travel, Donor Contact, and Board Engagement.

Jackson, an African-American man, was hired effective March 23, 2015 as the Museum's Senior Advancement Program Specialist — the Major Gifts Officer ("MGO"). (DSUMF ¶¶ 1, 9.) He was the Museum's sole major-gifts fundraiser. (DSUMF ¶ 50.) The Museum thought enough of him to exercise its discretion to offer him an elevated starting step and enhanced leave accrual (DSUMF ¶ 7), and his supervisors "expressed confidence about his selection," with Graves writing that she was "confident that Milton will be an excellent match for this position and a strong asset to the Advancement team." (DSUMF ¶ 8.) Defendant's present portrayal of Jackson as a poor fit cannot be reconciled with its own contemporaneous enthusiasm.

The MGO position was, by Defendant's own description, focused on cultivating high-capacity donors. (DSUMF ¶ 10.) Jackson's position description — an External Affairs role — required him to leave his office frequently and to travel locally, nationally, and internationally to identify, cultivate, and solicit major donors, and to engage volunteers and Advisory Board members in that effort. (Jackson Position Description; ROI 331, 340, 342.) Both Graves's own

2014 Development Plan and Director Cole's 2015 Board Report identified Washington, Atlanta, New York, Chicago, Los Angeles, and Dallas as targeted fundraising markets, and Graves's plan expressly called for "involv[ing] Board members in fundraising" and increasing Board members' "participation in fundraising through collaboration with staff." (Development Plan 6, 8; Cole Board Report 13.) Defendant's assertion that Jackson's duties "did not involve communicating with the Board or traveling across the country" (Mot. 14) is contradicted by these documents and is itself a genuinely disputed material fact.

### B. Management Forbade Jackson from Performing the Core Duties of His Position — Then Faulted Him for the Predictable Result.

From his first days, Graves instructed Jackson to remain in his office and not to speak with or interact with his colleagues — a directive he, a seasoned fundraiser, recognized as both unusual and self-defeating, given the basic premise of the profession that "one can't fundraise from one's desk." (ROI 278, 331; Berry Aff. 3.) On Jackson's own account, by April 23, 2015 Graves told him he could not associate with more than ten of his NMAfA colleagues and had to route all questions and needs through her — a restriction he immediately reported would "substantially limit[] his ability to perform his duties." (ROI 128-129; DSUMF ¶ 65, Claim 5.) The same prohibition extended to contact with the Advisory Board (Kitchiner Aff. 4), directly contradicting Jackson's job description and Graves's own written fundraising objectives.

Most consequentially, Graves repeatedly delayed, denied, or cancelled the donor travel and expense funding that Jackson's position required — including for prospects he had researched in Dallas, Atlanta, New York, and Los Angeles. (Esposito Aff.; Burke Aff. 9; Kitchiner Aff. 3–5, 9–10; S. Holmes Aff.; Holmes Aff. 3–7; ROI 128–129.) The Travel Coordinator, Frank Esposito, has sworn that Graves "created obstacles" for Jackson, "cancelled his travel and went in his place," and made him "unnecessarily rewrite his diversity plans multiple times." (Esposito Aff.)

Curatorial Assistant Sarah Holmes has sworn that Graves denied Jackson approval to travel and meet donors both nationally and locally, and that prospects Graves disparaged — including donors in Los Angeles and Maryland — were in fact NMAfA donors. (S. Holmes Aff.) Defendant's own evidence confirms the same pattern: Graves "did not immediately approve" the Texas trip (DSUMF ¶ 35), "denied" the New York request (DSUMF ¶ 37), and "denied" the L.A. request and "assigned a different employee to manage the relationship" (DSUMF ¶ 38; ¶ 65, Claim 10).

The pretextual character of these restrictions is laid bare by what happened next. Shortly after Jackson was terminated, Director Cole and Jackson's white, female replacement traveled to California to solicit the very Disney leadership Jackson had identified as a prospect and been forbidden to pursue. (Cole Aff. 10; Esposito Aff. 4; Burke Aff. 5.) The conduct that was "poor performance" when Jackson proposed it became sound strategy when his replacement executed it. A reasonable jury could find that the travel "concerns" Graves invoked were not neutral business judgments but instruments of sabotage. *See Aka*, 156 F.3d at 1298 (jury may infer pretext where the employer's explanation is internally inconsistent or contradicted by its own conduct).

Defendant's charge-card allegations (DSUMF ¶¶ 24–25, 31) are likewise disputed. Jackson was issued a Smithsonian travel card to cover non-local travel and donor expenses (2015 Jackson Travel Card record), and used it for that purpose, including in connection with cultivating a prospective donor. That a single rental-car or meal expense was later recast as "unauthorized" — while colleagues with comparable questions about local travel-card use were not blamed — is evidence of disparate, pretextual enforcement, not misconduct. (Esposito 7/2/15 Email to Shippy; Holmes Aff. 3–7.) Jackson also completed an OCON-420 form that would have authorized local travel funding, but management simply ignored the request. (RFA7f-8-27-15 OCON-420 Email; RFA7c-8-27-15 OCON-420 Request.)

### C. Jackson Was Treated Worse Than His White, Female Colleagues — and Replaced by One.

Jackson has adduced evidence that two white, female fundraising colleagues "were given career opportunities and made privy to conversations about operational business" that he was denied. (Burke Aff. 2, 4, 8; Kitchiner Aff. 9; Holmes Aff. 3–7.) More pointedly, Dr. Kitchiner attests that Jackson's own management informed her that he would not complete his probationary period because a white, female colleague, Colleen Morith, had been pre-selected by senior management (Drs. Cole and Kreamer) to replace him — with Graves and the Administrative Officer serving as the instruments to carry out that plan. (Kitchiner Aff. 8–9; Compl.) Morith, described as less qualified, did in fact assume Jackson's responsibilities, and no Black male has held the MGO position since.

The most probative comparator evidence concerns discipline. Dr. Kitchiner attests that a white, female probationary subordinate, Allison Hartley, received six counseling sessions for disruptive behavior and subpar performance and, after a disruptive public episode in the Museum, was the subject of a discharge recommendation by the agency's own labor-relations attorney — yet was retained because management considered NMAfA an "accommodating space where employees should be allowed to grow into their positions." (Kitchiner Aff. 6.) Jackson, by contrast, was afforded no such accommodation: he was subjected to a relentless paper trail of "counseling" and separated within months. A reasonable jury could find that two probationary employees engaged in comparable conduct were treated in conspicuously and concretely different ways on the basis of race and sex. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115-16 (D.C. Cir. 2016) (comparator evidence creates a triable pretext question).

Defendant's effort to substitute its own comparators — Anchin and Morith (DSUMF ¶¶ 50–53) — only deepens the dispute. Defendant argues those employees were not probationary and

had not sought to travel. But that is precisely the point: the relevant comparison is to a similarly situated probationary employee facing discipline (Hartley), not to non-probationary employees in different job series who were never asked to fundraise nationally. Whether Hartley or Anchin/Morith are the apt comparators is a quintessential jury question.

**D. Jackson Opposed the Discriminatory Conditions and Was Branded a "Threat."**

On April 15, 2015 — less than a month after his hire — the Smithsonian's Ombudsman, Human Resources, and Employee Assistance Offices convened a mandatory all-staff meeting (one of a series) in response to "significant and ongoing staff complaints against management." (Kitchiner Aff. 9–10; Cole Advisory Board Report 14–15.) Jackson observed colleagues describe the discriminatory, toxic environment created by senior management, and he asked the moderators whether such conditions were universal across the Smithsonian campus. (Compl.; Kitchiner Aff. 9–10.) On May 8, 2015, Jackson reported to Graves that he believed he was being harassed and requested relief. (Graves Aff. 6.)

Rather than address that report, Graves accused Jackson of having "threatened" her. (DSUMF ¶ 65, Claim 6.) The record permits a finding that this accusation was fabricated and weaponized: it was not relayed to Director Cole until after Jackson's termination (Cole Aff. 2); it appears nowhere in his termination letter (ROI 515); no investigation of the supposed "threat" was ever undertaken; and no responsive action was taken at the time by HR, the Ombudsman, or anyone else. A reasonable jury could find that the false "threat" narrative — deployed against the only Black man in the unit immediately after he complained — is potent evidence of both pretext and discriminatory and retaliatory animus.

Jackson also contacted EEO official Shadella Davis on July 31, 2015 to report his hostile workplace. (ROI 186.) Davis told him he had no valid claims and could not file — the same tactic

the record reflects she used with other Smithsonian complainants, including "Angie" and Mr. Burke. Defendant now relies on the absence of a Smithsonian "record" of that contact (DSUMF ¶ 47), but a jury could find that the missing record reflects the agency's failure to document and its suppression of complaints — not the absence of the contact itself. The Ombudsman's own concession that Jackson came to her about a workplace situation but that she did not "remember the specific incidents" (DSUMF ¶ 49; Heilman Aff. 2) supports the same inference.

### E. The "Counseling" Defendant Recites Was the Mechanism of Sabotage, Not Evidence of Poor Performance.

Defendant's thirty-two paragraphs of "counseling" and "disagreements" (DSUMF ¶¶ 17–42) do not establish poor performance; they document the very campaign Jackson alleges. Each "disagreement" over a donor prospect (DSUMF ¶¶ 18–23) is disputed: prospects Graves dismissed as illegitimate were, according to Sarah Holmes, actual NMAfA donors, and Jackson's pursuit of a major gift-in-kind from Dr. Harland in fact yielded a $40,000 gift — contradicting Defendant's sweeping assertion that Jackson "did not successfully raise any funds." (Compare DSUMF ¶ 14 with Compl. Add. and Cole Aff.) Each travel "denial" (DSUMF ¶¶ 34–38) reflects an obstacle to performing his job, not a justified business call, as Esposito and Sarah Holmes attest. And the "chain of command" and "office absence" paragraphs (DSUMF ¶¶ 39–42) describe the surveillance Jackson endured — including being timed on bathroom breaks and questioned about colleague interactions that were, in fact, donor meetings.

Defendant also recasts the May 8, 2015 episode as Jackson telling Graves "he was not going to let anyone interfere" with his duties (DSUMF ¶ 21) — the same conversation Defendant elsewhere admits Graves recharacterized as a "threat" (DSUMF ¶ 65, Claim 6). That two diametrically opposed accounts of the same conversation appear in Defendant's own papers is the essence of a genuine dispute.

**F. The Broader Record Confirms a Pattern of Discrimination at the Museum.**

Jackson's experience did not occur in isolation. The record reflects pervasive, documented discrimination and retaliation at NMAfA and across the Smithsonian: contemporaneous staff EEO complaints and affidavits (Berry, Esposito, Burke, Holmes, Kitchiner); Dr. Kitchiner's own EEOC and Office of Special Counsel filings against her management colleagues, later resolved by settlement; a 2019 staff complaint letter to the Advisory Board; a 2020 Board-and-staff complaint letter to Secretary Bunch, reported in The New York Times, The Washington Post, and HuffPost; the discovery of nooses on the Smithsonian campus in 2017, which the then-Secretary called "deeply disturbing"; and the 2024 discrimination suit of NMAfA's Docent Coordinator, Dr. Shannen Hill, which the Smithsonian settled for $445,000. While the Court need not resolve the admissibility of each item now, such "other acts" evidence is probative of motive, intent, and the atmosphere in which Jackson worked, and these determinations are highly fact bound judgments for a jury. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

## IV. ARGUMENT

**A. Genuine Disputes of Material Fact Preclude Summary Judgment on Every Claim.**

Defendant's motion fails at the threshold because it depends on the Court adopting management's contested version of nearly every material event: that Jackson's duties were essentially local; that he was "counseled" in good faith; that he simply failed to perform; that his travel was denied for legitimate reasons; and that he was never restricted from doing his job. Each of those propositions is squarely contradicted by sworn affidavits from percipient witnesses and by contemporaneous documents, as set out above and in the accompanying Statement of Genuine Issues. Where "opposing parties tell two different stories," summary judgment is improper unless

the non-movant's account is "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. Here it is Defendant's account — not Jackson's — that the record contradicts. That alone requires denial.

**B. Jackson's Claims Are Timely and Properly Exhausted.**

Defendant contends that every claim except the delayed paycheck is time-barred because Jackson contacted an EEO counselor more than forty-five days after the challenged actions, and that four claims were never administratively raised. (Mot. 6–8; DSUMF ¶¶ 59–62.) These arguments fail for at least five independent reasons, and at a minimum raise fact questions that cannot be resolved on summary judgment.

**(i) The forty-five-day period was equitably extended as a matter of regulation.**

The federal-sector counseling deadline is not a rigid bar; the governing regulation provides that the agency or the Commission shall extend the forty-five-day limit where, among other things, the individual "was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient." 29 C.F.R. § 1614.105(a)(2). The extension is mandatory once those conditions are shown. Here, the record establishes that on July 31, 2015 the Smithsonian's own EEO official, Shadella Davis, affirmatively told Jackson that he had no valid discrimination, harassment, or retaliation claims and that he could not file. (ROI 186.) An employee who is told by the agency's designated EEO officer that he has no claim and cannot file is, by definition, "prevented by circumstances beyond his . . . control" from timely initiating contact — and that misdirection is precisely the kind of agency conduct the regulation, and equitable tolling principles, are designed to address. *See Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1998); *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997). At the very least, whether Jackson

was misled, and whether his reliance was reasonable, are disputed questions of fact that preclude summary judgment on timeliness.

**(ii) Defendant waived timeliness defense by adjudicating the complaint on the merits.**

Title VII's exhaustion requirement is not jurisdictional; it is "a claim-processing rule" subject to waiver and forfeiture. *Fort Bend County v. Davis*, 587 U.S. 541, 551 (2019). Likewise, the federal-sector time limits are non-jurisdictional and "subject to waiver, estoppel, and equitable tolling." *Bowden*, 106 F.3d at 437. An agency that accepts a complaint and decides it on the merits — rather than dismissing it as untimely under 29 C.F.R. § 1614.107(a)(2) — waives any objection to the timeliness of the counselor contact. Here, the agency accepted Jackson's complaint, conducted a full investigation, issued a Report of Investigation, and litigated the claims to a merits disposition before an EEOC administrative judge and the Office of Federal Operations, without dismissing on timeliness grounds. Having elected to adjudicate the merits, Defendant cannot now resurrect a forty-five-day defense it declined to assert below.

**(iii) The hostile-work-environment claim is timely in its entirety.**

A hostile-environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice," and is timely so long as any single contributing act falls within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Because Jackson's termination and the events immediately surrounding it fall within the period, the entire course of harassing conduct — the office confinement, the speech and Board restrictions, the travel denials, the surveillance, and the false "threat" accusation — is properly before the Court as part of the hostile-environment claim. Defendant's incident-by-incident timeliness analysis misapprehends *Morgan*.

**(iv) Discrete acts at the end of Jackson's employment are independently actionable.**

Even setting aside extension and waiver, the discrete acts at the close of Jackson's tenure are timely and actionable in their own right, including the October 26, 2015 termination, the October 20, 2015 denial of a donor meeting (DSUMF ¶ 65, Claim 11), and the delayed final paycheck (DSUMF ¶ 65, Claim 13). At an absolute minimum, the motion must be denied as to these claims, and the surrounding course of conduct remains admissible as background evidence even as to any time-barred discrete act. *Morgan*, 536 U.S. at 113.

**(v) The challenged conduct was administratively exhausted.**

To the extent Defendant argues that four matters were not administratively raised, claims are exhausted if they are "like or reasonably related to" the administrative charge such that they could be expected to grow out of it. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Jackson's administrative complaint and supporting affidavit described management's speech and travel restrictions, the false harassment accusation, and his disparate treatment relative to his colleagues. Whether the challenged conduct falls within the reasonable scope of that complaint is a disputed question that should not be resolved against a then-pro se complainant on this record, particularly given the EEOC's own broad framing of his claims (DSUMF ¶ 65).

**C. A Reasonable Jury Could Find Race and Sex Discrimination.**

Because Defendant has proffered a non-discriminatory explanation, the operative question is the one Brady identifies: whether Jackson has produced evidence sufficient for a reasonable jury to find "that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated." 520 F.3d at 494. Jackson clears that bar comfortably.

**Adverse actions.** Jackson's termination is indisputably an adverse action. But Defendant errs in arguing (Mot. 13-14) that the travel denials, speech and Board restrictions, and resource

deprivations were not actionable because they did not work a "significant" or "objectively tangible" change in his employment. That framing is no longer the law. The en banc D.C. Circuit has held that an employer that imposes adverse terms or conditions of employment because of a protected characteristic violates Title VII regardless of whether the action caused "objectively tangible harm." *Chambers v. District of Columbia*, 35 F.4th 870, 874-75 (D.C. Cir. 2022) (en banc). The Supreme Court has since confirmed that a Title VII plaintiff challenging a change in the terms or conditions of employment need show only "some harm," not "significant" harm. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). Under *Chambers* and *Muldrow*, the denial of donor travel, the prohibition on Board and colleague contact, and the withholding of expense and purchase-card resources — all of which altered the conditions under which Jackson worked — are cognizable adverse actions, not mere inconveniences.

**Inference of discrimination**. The required inference is amply supported. Jackson was replaced by a less-qualified employee outside both of his protected classes, which alone supports an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *see Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012). Dr. Kitchiner's sworn testimony that Morith was pre-selected to replace Jackson supplies that inference directly and powerfully.

**Pretext**. A plaintiff may establish pretext by, among other things, showing that the employer treated similarly situated employees outside the protected classes more favorably, that the employer's explanation is unworthy of credence, or that the employer's account is internally inconsistent or contradicted by the record. *Reeves*, 530 U.S. at 147; *Brady*, 520 F.3d at 495 & n.3; *Aka*, 156 F.3d at 1294–98. Jackson offers all of these. (1) Comparator evidence: the white, female probationer Hartley was retained and "accommodated" despite documented misconduct and a discharge recommendation, while Jackson was separated. (Kitchiner Aff. 6.) (2) Unworthy of

credence: the "failed to raise funds" rationale is undermined by sworn testimony that management made fundraising impossible — confining Jackson to his office, denying travel, ignoring his OCON-420 and purchase-card requests, barring Board contact, and poaching his prospects — and by the $40,000 gift he did secure. (3) Internal inconsistency: management deemed Jackson's donor strategy deficient, then adopted that very strategy (soliciting Disney in Los Angeles) through his replacement immediately after firing him. (Cole Aff. 10; Esposito Aff. 4.) (4) False justification: the "threat" accusation surfaced only after termination and is absent from the termination letter. From any one of these, a jury could infer pretext; together, they are formidable.

The "same-actor" inference does not warrant judgment for Defendant. Defendant leans heavily on the fact that Graves both hired and recommended terminating Jackson. (Mot. 22.) But the same-actor inference is permissive, not mandatory, and its weight is for the jury; it does not entitle an employer to summary judgment where the plaintiff has adduced affirmative evidence of discriminatory motive. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002). The inference is especially weak here, where the tenure was brief and where the record indicates the termination was engineered by Drs. Cole and Kreamer — who favored Morith — with Graves acting as the instrument.

**Cat's-paw causation**. Even if Graves harbored no animus of her own (a proposition the record disputes), Defendant remains liable if a biased supervisor's influence was a proximate cause of the termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Dr. Kitchiner's testimony that senior management pre-selected Morith and used Graves and others to "execute their malicious wishes" states a textbook cat's-paw theory for the jury.

**D. A Reasonable Jury Could Find Unlawful Retaliation.**

**Protected activity**. Defendant argues Jackson engaged in no protected activity until he contacted an EEO counselor in 2016. (Mot. 14–16.) But Title VII's opposition clause protects informal complaints of discrimination, and "no magic words are required"; the employee need only convey opposition to conduct he reasonably and in good faith believes is unlawful. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Jackson's May 8, 2015 report to Graves that he was being harassed and sought relief, his participation in the April 2015 meeting convened to address staff complaints against management, and his July 31, 2015 outreach to EEO official Davis each qualify if a jury finds he was opposing perceived discrimination rather than voicing "frustrated ambition." Whether those communications conveyed opposition to discrimination is a disputed question of fact; Defendant's contrary characterization (DSUMF ¶¶ 47–49) cannot be resolved on summary judgment.

**Materially adverse action and causation**. A retaliation plaintiff need only show action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Termination plainly qualifies, as do the escalating denials of travel and resources and the false "threat" accusation that followed Jackson's complaints. Causation may be inferred from temporal proximity and from a pattern of antagonism. *Hamilton*, 666 F.3d at 1357–59. Here, Graves's "threat" accusation came the very day Jackson reported harassment (May 8, 2015), and the campaign of restrictions intensified after he raised concerns — evidence from which a jury could find a causal link. That Jackson's formal EEO contact post-dated his termination does not defeat the claim, because his earlier protected opposition preceded the adverse actions.

**E. A Reasonable Jury Could Find a Hostile Work Environment.**

A hostile-work-environment claim requires discriminatory conduct sufficiently severe or pervasive to alter the conditions of employment, evaluated under the totality of the circumstances — including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Baird v. Gotbaum*, 662 F.3d 1246, 1250–51 (D.C. Cir. 2011). Defendant's analysis errs by parsing each incident in isolation; the inquiry is cumulative, and conduct not independently actionable may combine to create a hostile environment. *Id.* at 1251.

Viewed cumulatively, Jackson's evidence describes a sustained, months-long campaign: being confined to his office and timed on bathroom breaks; being forbidden to speak with colleagues or the Advisory Board; having his donor travel repeatedly cancelled and his prospects reassigned and later poached; being falsely branded a "threat" and accused of expense misconduct; having disparaging information inserted into his background investigation (ROI 171); and being denied mandatory training and event access afforded to others. Coworker affidavits confirm that this conduct was witnessed, documented, and connected to management's discriminatory and retaliatory animus, and that it interfered with Jackson's ability to perform. Whether that course of conduct was severe or pervasive enough to be actionable, and whether it was because of Jackson's race and sex, are paradigmatic jury questions. *George v. Leavitt*, 407 F.3d 405, 416–17 (D.C. Cir. 2005) (reversing summary judgment where a reasonable jury could find a hostile environment).

Defendant's suggestion that any mistreatment was the product of Graves's "personality" or generalized low morale (DSUMF ¶¶ 56–58) does not entitle it to judgment; it merely frames a credibility contest over whether the conduct was "equal-opportunity" rudeness or race- and sex-

based hostility — a contest the jury must resolve. The affidavits of Esposito, Sarah Holmes, Burke, Berry, and Kitchiner, if credited, permit the latter finding.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety and set this matter for trial.

Respectfully submitted,

______________________________
**Thiruvendran Vignarajah**
*Admitted Pro Hac Vice*
Maryland Bar No. 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, MD 21218
(410) 456-7552
thiru@thirulaw.com

______/s/_______________
**Evan James Taylor**

Combs & Taylor LLP
1025 Thomas Jefferson St NW, Suite 400w
Washington, DC 20007
202-448-1008
Fax: 202-466-0502
evan.taylor@combstaylor.com

*Counsel for Plaintiff Milton Jackson*

Dated: June 1, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of June 2026, a copy of the foregoing was served via MDEC upon counsel of record for all parties.

THIRUVENDRAN VIGNARAJAH