**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MILTON L. JACKSON,

Plaintiff,

v.

LONNIE G. BUNCH, III,
Secretary of the Smithsonian Institution,

Defendant.

Civil Action No. 1:22-cv-02240 (BAH)

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h)(1), Plaintiff Milton Jackson submits this separate, concise Statement of Genuine Issues. Plaintiff responds below to each correspondingly numbered paragraph of Defendant's Statement of Undisputed Material Facts ("DSUMF"), identifying the material facts as to which a genuine dispute exists and must be litigated. Consistent with Federal Rule of Civil Procedure 56(c) and Local Civil Rule 7(h), where a paragraph is "Undisputed" it is admitted solely for purposes of this motion; where "Disputed" or "Disputed in part," the cited record establishes a genuine issue. Plaintiff reserves all objections as to relevance, materiality, and admissibility. Record citations herein are subject to verification against the filed record.

## I. RESPONSES TO DEFENDANT'S NUMBERED PARAGRAPHS

### *The Parties*

**¶ 1.** ***Undisputed in part; disputed in part.*** Undisputed that Jackson, an African-American man, was employed at the Museum from on or about March 23 to November 9, 2015 as Major Gifts Officer. Disputed to the extent the parenthetical "alleged prior EEO activity" implies

the absence of protected activity; Jackson engaged in protected opposition during his employment (*see* ¶¶ 47–49, 60 below).

¶ **2.** ***Undisputed.*** Undisputed that the Museum is an art museum within the Smithsonian Institution.

¶ **3.** ***Undisputed.*** Undisputed as to the composition and appointment of the Advisory Board. Plaintiff notes, as material context, that engagement of Board members in fundraising was an express objective of his position and of Graves's own Development Plan, contrary to Defendant's later assertion that Board contact was outside his duties.

¶ **4.** ***Undisputed.*** Undisputed that Jackson was the MGO, that Graves was his first-line and Cole his second-line supervisor, and that Holmes was the Administrative Officer.

***Jackson's Employment with the Smithsonian***

¶ **5.** ***Disputed in part.*** Undisputed that Jackson previously worked at the National Geographic Society and thereafter applied to the Smithsonian. Disputed as to the characterization of his departure and its relevance; the reasons for a separation from a prior, unrelated employer are immaterial to whether the Smithsonian's stated reason here is pretextual, and Plaintiff objects to the paragraph as an improper propensity inference.

¶ **6.** ***Undisputed.*** Undisputed that Jackson interviewed with Dr. Cole and Ms. Graves — the same managers who later effected his termination, a fact material to the "same-actor" and cat's-paw analyses.

¶ **7.** ***Undisputed.*** Undisputed that the Museum offered Jackson an elevated starting step and enhanced leave accrual — evidence that the Museum valued his qualifications and undercutting any suggestion he was a poor fit at hire.

¶ **8.** ***Undisputed.*** Undisputed that Jackson's supervisors expressed confidence in his selection, including Graves's written statement that she was "confident that Milton will be an excellent match for this position and a strong asset to the Advancement team." This contemporaneous endorsement is inconsistent with Defendant's present narrative.

¶ **9.** ***Undisputed.*** Undisputed as to start date and position title/series.

¶ **10.** ***Disputed in part.*** Undisputed that the position focused on cultivating high-capacity donors. Disputed as to the precise dollar/portfolio metrics: the record contains conflicting figures (*e.g.,* a $1.5M performance-plan goal and a ~$1M figure in Graves's affidavit), and the stated targets were, in any event, rendered unattainable by management's restrictions on travel, Board contact, and donor solicitation.

¶ **11.** ***Undisputed.*** Undisputed that Jackson was a trust (non-federal-civil-service) employee paid from trust funds.

¶ **12.** ***Undisputed.*** Undisputed that the appointment carried a one-year probationary period.

¶ **13.** ***Undisputed in part; disputed in part.*** Undisputed that the quoted policy describes the purpose of probation. Disputed insofar as Defendant implies the policy was followed: by its own terms the probationary period is to assess performance "after a fair opportunity," and Plaintiff's evidence is that he was denied any fair opportunity to perform. (Esposito Aff.; S. Holmes Aff.; Kitchiner Aff. 3–5, 9–10; ROI 128–129.)

¶ **14.** ***Disputed.*** Disputed. Plaintiff secured a $40,000 gift-in-kind, recruited an Advisory Board member, and hosted twelve visitors during a Dante exhibition. (Compl. Add.; Cole Aff.) More fundamentally, the cause of any fundraising shortfall — management's restrictions versus Plaintiff's effort — is the central disputed fact, supported by the Esposito, S. Holmes, Burke, and Kitchiner affidavits.

¶ **15.** ***Undisputed in part; disputed in part.*** Undisputed that Jackson was notified on October 26, 2015 of separation effective November 9, 2015 during probation. Disputed that the separation was "due to lack of performance"; Plaintiff's evidence is that the stated reason is pretext for discrimination and retaliation. (Kitchiner Aff. 8–9; Esposito Aff.; ROI 515.)

¶ **16.** ***Undisputed.*** Undisputed that Jackson received his final paycheck on December 18, 2015. The reason for the delay is disputed (*see* ¶¶ 43–46).

***Jackson's Alleged "Poor Job Performance"***

¶ **17.** ***Disputed in part.*** Undisputed that an early exchange occurred regarding management of the Advisory Board. Disputed as to characterization: Plaintiff's evidence is that when he asked routine questions about Board members, Graves became "short, defensive, and upset" and abruptly left the meeting (ROI 351), marking the onset of the harassment, not a substantive performance dispute.

¶¶ **18–20.** ***Disputed.*** Disputed. Graves's "disagreements" with Jackson's donor identifications were not legitimate performance critiques but pretextual disparagement of prospects he had researched. Sarah Holmes attests that prospects Graves dismissed were in fact NMAfA donors. (S. Holmes Aff.) The reasonableness of Jackson's prospecting is a jury question.

¶ **21.** ***Disputed.*** Disputed. This is the May 8, 2015 conversation that Defendant elsewhere admits Graves recharacterized as a "threat" (¶ 65, Claim 6). Plaintiff's evidence is that he reported being harassed and requested relief, and that Graves responded by fabricating a "threat" — not relayed to the Director until after termination and absent from the termination letter. (Graves Aff. 6; Cole Aff. 2; ROI 515.)

¶¶ **22–23.** ***Disputed.*** Disputed as to characterization. Dr. Harland was a legitimate prospective donor whom Jackson, through diligent research, cultivated; his efforts in fact produced a

$40,000 gift-in-kind. (Compl. Add.) Graves's disparagement of Harland and obstruction of the cultivation are evidence of sabotage, not performance deficiency.

**¶¶ 24–25.** ***Disputed.*** Disputed. Jackson held a Smithsonian travel card issued for non-local travel and donor cultivation and used it for those purposes, including escorting a prospective donor. (2015 Jackson Travel Card record.) The post-hoc recasting of a rental car and meal as "unauthorized," while colleagues raising the same local-travel-card questions were not blamed, reflects disparate, pretextual enforcement. (Esposito 7/2/15 Email to Shippy; Holmes Aff. 3–7.)

**¶¶ 26–27.** ***Disputed.*** Disputed. Plaintiff disputes that he "failed" to introduce Dr. Harland to Dr. Cole; the record contains conflicting accounts, and Plaintiff was denied tickets to the July 4, 2015 event he was expected to leverage. (ROI 62–63; Graves Aff. 17; Cole Aff. 11.) The conflict is itself a genuine dispute.

**¶ 28.** ***Disputed.*** Disputed. The scientific-equipment gift was a $40,000 gift-in-kind that Jackson did secure — directly contradicting ¶ 14's assertion that he raised no funds. Whether the gift was suitable for an art museum is a matter of judgment for which Plaintiff was, again, set up to fail.

**¶ 29.** ***Disputed.*** Disputed. Plaintiff's "absences" were donor and prospect meetings central to his External Affairs role, and the "tardiness" narrative is part of the surveillance regime that included timing his bathroom breaks. (ROI 331, 351.)

**¶¶ 30–32.** ***Disputed.*** Disputed. The "counseling" paragraphs document obstruction, not deficiency. Esposito attests that Graves forced Jackson to rewrite his diversity-fundraising plan multiple times to block it from reaching the Director (Esposito Aff.); the

"deliverables" demands were impossible to meet given the simultaneous bans on travel, Board contact, and colleague interaction.

***Facts Pertaining to Jackson's Travel Requests***

¶ **33.** ***Disputed in part.*** Undisputed that advancement staff typically traveled for donor meetings or Museum events. Disputed insofar as the paragraph implies Jackson's travel was outside the norm; his External Affairs position specifically required national and international donor travel.

¶¶ **34–36.** ***Disputed in part.*** Undisputed that Jackson requested Texas travel and that approval was not immediate. Disputed that the delay was justified: Plaintiff used the Texas trip to cultivate Dallas-area prospects (*e.g.,* Trammell Crow), and Graves's delay and demand for "additional information" were part of the pattern of obstruction. The follow-up "strategy" request (¶ 36) is consistent with that pattern.

¶ **37.** ***Disputed.*** Disputed. The April 2015 New York donor event was a legitimate cultivation opportunity; Plaintiff's evidence is that Graves denied it publicly and "seemed to take pleasure" in doing so (¶ 65, Claim 3), evidencing animus rather than business judgment.

¶ **38.** ***Disputed.*** Disputed. The Los Angeles prospect was legitimate (including Disney/Imagineer leadership Plaintiff had identified). Graves denied the travel and reassigned the relationship to another employee (¶ 65, Claim 10), and — critically — after Plaintiff's termination, Director Cole and Plaintiff's replacement themselves traveled to Los Angeles to solicit that very Disney leadership. (Cole Aff. 10; Esposito Aff. 4; Burke Aff. 5.) Graves's "donor's perspective" rationale is thus contradicted by the Museum's own subsequent conduct.

***Facts Pertaining to the "Chain of Command"***

**¶¶ 39–41.** ***Disputed.*** Disputed as to characterization. The instructions to route all matters through Graves and to limit contact with other staff were not legitimate "chain of command" management but the speech and association restrictions central to Plaintiff's claims, which he reported would prevent him from performing his job. (ROI 128–129; ¶ 65, Claim 5.)

**¶ 42.** ***Disputed.*** Disputed. The "office absence" concerns mischaracterize donor meetings as idleness and form part of the surveillance regime (including monitoring bathroom breaks) that a jury could find was harassing and pretextual. (ROI 331, 351.)

***Facts Pertaining to Jackson's Final Payment***

**¶¶ 43–46.** ***Disputed in part.*** Undisputed that the Smithsonian uses an Automated Clearance process and that Jackson received final payment on December 18, 2015. Disputed that the process justified delay: Plaintiff returned all Smithsonian property (keys, phone, computer) by November 5, 2015, yet payment was withheld for weeks thereafter, contrary to Defendant's assurance of November payment. (ROI/SI 000370, 000374–000375, 000383, 000386, 000388, 000396, 000399.) Whether the delay was neutral or retaliatory is disputed.

***Facts Pertaining to Jackson's Protected Activity***

**¶ 47.** ***Disputed.*** Disputed. Plaintiff contacted EEO official Shadella Davis by telephone on July 31, 2015 to report his hostile workplace. (ROI 186.) The absence of a Smithsonian "record" reflects the agency's failure to document and its suppression of complaints, the same conduct the record attributes to Davis with other complainants, not the absence of contact.

**¶ 48.** ***Disputed.*** Disputed. Whether Jackson's communications conveyed opposition to race- and sex-based discrimination is a disputed fact; "no magic words" are required. Jackson testified he understood and expressed his complaints as discrimination (Jackson Dep. SI

001152), and the surrounding evidence supports a reasonable, good-faith belief that the conduct was unlawful.

¶ **49.** ***Disputed in part.*** Undisputed that Jackson contacted the Ombudsman. Disputed as to characterization: the Ombudsman's admission that Jackson sought her help but that she did not "remember the specific incidents" evidences a failure to document and address his complaints, not the absence of discrimination complaints. (Heilman Aff. 2.)

***Facts Pertaining to Alleged Comparators***

¶¶ **50–53.** ***Disputed.*** Disputed as to materiality and comparator selection. The probative comparator is a similarly situated probationary employee facing discipline — Allison Hartley, a white, female probationer who received six counseling sessions and a discharge recommendation yet was retained and "accommodated" (Kitchiner Aff. 6) — not non-probationary employees in a different job series (Anchin/Morith) who were never required to fundraise nationally. That Anchin and Morith did not travel reflects their different roles, not favorable treatment of Jackson. The proper comparator is a jury question. Moreover, Morith ultimately replaced Jackson. (Kitchiner Aff. 8–9.)

***Facts Pertaining to Dr. LaNisa Kitchiner***

¶ **54.** ***Disputed in part.*** Undisputed that Dr. Kitchiner did not report to Graves and was an educator, not a fundraiser. Disputed as to the implication that her testimony is therefore not probative: Dr. Kitchiner was a senior NMAfA manager with direct knowledge of management's plan to replace Jackson with Morith and of the disparate treatment of the white probationer Hartley. Her affidavit is competent evidence under FRCP 56(c)(4).

¶ **55.** ***Disputed.*** Disputed. The assertion that "Graves treated others similarly" is taken out of context and contradicted by Dr. Kitchiner's broader testimony that Jackson was singled out

and that a white, female colleague was pre-selected to replace him. (Kitchiner Aff. 6, 8–9.) At most, this creates a credibility dispute for the jury.

***Facts Pertaining to Alleged "Personality Differences"***

**¶¶ 56–58.** ***Disputed.*** Disputed. Recasting the conduct as Graves's "personality," "insecurities," or generalized low morale does not negate discrimination; it frames a credibility contest over whether the hostility was "equal-opportunity" or race- and sex-based. The Esposito, S. Holmes, Burke, Berry, and Kitchiner affidavits, if credited, establish discriminatory and retaliatory animus directed at Jackson. The cited "morale" evidence in fact corroborates a pervasively hostile environment.

***Jackson's EEOC Complaint and Procedural History***

**¶ 59.** ***Disputed in part.*** Undisputed that Jackson's first OEEMA contact was January 14, 2016. Equitable tolling applies because agency personnel misinformed Jackson on July 31, 2015 that he had no claims; and Jackson engaged in earlier protected opposition (¶¶ 47–49).

**¶ 60.** ***Disputed.*** Disputed. Whether the responsible management officials knew of Jackson's protected opposition is contested; Jackson reported harassment directly to Graves on May 8, 2015 and raised concerns in the April 2015 all-staff meeting and to the Ombudsman. (Graves Aff. 6; Kitchiner Aff. 9–10.)

**¶¶ 61–62.** ***Undisputed in part; disputed in part.*** Undisputed that Jackson was notified of the 45-day period on October 26, 2015 and stated he would pursue legal action. Disputed as to the inference that his later filing forecloses his claims, for the tolling and continuing-violation reasons stated in ¶ 59.

**¶¶ 63–64.** ***Undisputed.*** Undisputed that Jackson filed a formal complaint on May 3, 2016 alleging race, color, sex, and retaliation, that OEEMA investigated and issued a Report of Investigation, and that Jackson requested an EEOC hearing.

**¶ 65.** ***Undisputed in part; disputed in part.*** Undisputed that the EEOC framed the thirteen enumerated claims. Disputed as to Defendant's characterization of the underlying events within those claims; Plaintiff's responses to the thirteen claims are set forth in Part II below.

**¶¶ 66–69.** ***Undisputed in part; disputed in part.*** Undisputed that the EEOC granted summary judgment, that OFO affirmed on May 2, 2022, and that reconsideration was denied. Disputed as to any preclusive effect: this action proceeds de novo, the administrative outcome is not a material fact under Rule 56, and Plaintiff has identified a perceived conflict of interest and appearance of bias in the administrative adjudication. The administrative result does not bind this Court.

## II. RESPONSES TO THE THIRTEEN ENUMERATED CLAIMS (DSUMF ¶ 65)

Plaintiff disputes Defendant's characterization of each enumerated event and contends each is supported by record evidence creating a genuine issue for trial.

**Claim 1 (Mar. 26, 2015 — hostility over Board contacts).** ***Disputed.*** When Plaintiff asked routine questions about seeking Board members' donor contacts, Graves became angry, called him naïve, and abruptly left — the onset of harassment, not a performance issue. (ROI 351.)

**Claim 2 (Mar. 30–Apr. 2015 — delayed Texas travel; refusal to approve follow-up).** ***Disputed.*** Graves delayed approval and then obstructed follow-up with prospects gained from the event, just like the pattern of travel obstruction. (Esposito Aff.; S. Holmes Aff.)

**Claim 3 (Apr. 15, 2015 — New York donor event denied publicly).** ***Disputed.*** Graves denied a legitimate cultivation opportunity and did so publicly, evidencing animus. (¶ 37 above.)

**Claim 4 (Apr.–May 2015 — disparagement of prospects).** ***Disputed.*** Graves's repeated disparagement of Plaintiff's prospects ("useless," etc.) was pretextual; prospects she dismissed were in fact Museum donors. (S. Holmes Aff.)

**Claim 5 (Apr. 23, 2015 — prohibition on associating with colleagues).** ***Disputed.*** Graves told Plaintiff he could not associate with more than ten colleagues and had to route all matters through her; Plaintiff reported this would limit his ability to perform. (ROI 128–129.)

**Claim 6 (May 8, 2015 — the "snake/gossip" restriction and "threat" accusation).** ***Disputed.*** Graves restricted Plaintiff's contact with a colleague and, when he asserted he could handle himself professionally, fabricated a "threat" — not relayed to the Director until after termination and absent from the termination letter. (Cole Aff. 2; ROI 515.)

**Claim 7 (June 3, 2015 — inappropriate "romantic involvement" inquiry).** ***Disputed.*** Graves's suggestion that Plaintiff was romantically involved with a prospective donor was inappropriate, demeaning, and part of the hostile environment.

**Claim 8 (Summer 2015 — blocking the diversity plan via repeated rewrites).** ***Disputed.*** Graves required numerous rewrites to prevent the diversity-fundraising plan from reaching the Director. Esposito corroborates the unnecessary, repeated rewrites. (Esposito Aff.)

**Claim 9 (July 4, 2015 — "haranguing" over the Harland gift).** ***Disputed.*** Plaintiff secured a commitment for a significant gift; Graves berated him and was "intentionally unhelpful," contributing to its loss. He was also denied tickets to the event. (ROI 62–63.)

**Claim 10 (July 2015 — Los Angeles travel denied; relationship reassigned).** ***Disputed.*** Graves denied the LA donor travel and reassigned the relationship; the Museum later solicited that very donor through Plaintiff's replacement. (Cole Aff. 10; Esposito Aff. 4.)

**Claim 11 (Oct. 20, 2015 — donor meeting denied without reason).** ***Disputed.*** Defendant concedes no reason was given; the denial fits the documented pattern of obstruction and post-dates the limitations cutoff (and is thus independently exhausted).

**Claim 12 (Oct. 26, 2015 — termination for "poor performance").** ***Disputed.*** The central disputed fact: Plaintiff's evidence is that the stated reason is pretext for race and sex discrimination and retaliation, and that management made performance impossible and pre-selected a replacement. (Kitchiner Aff. 6, 8–9; Esposito Aff.)

**Claim 13 (Final paycheck delayed through December 2015).** ***Disputed in part.*** Undisputed that payment was delayed until December 18, 2015; disputed that the delay was attributable solely to a neutral clearance process, given that all property was returned by November 5, 2015. (¶¶ 43–46 above.)

## III. PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

The following material facts are also genuinely disputed and require resolution at trial:

**1.** Within days of hire and throughout his tenure, management instructed Plaintiff not to speak with or interact with colleagues or the Advisory Board, contrary to his position description and Graves's own Development Plan. (ROI 278, 331; Berry Aff. 3; Kitchiner Aff. 4.)

**2.** Management repeatedly delayed, denied, or cancelled Plaintiff's donor travel and ignored his OCON-420 and purchase-card requests, while affording comparable resources to others. (Esposito Aff.; S. Holmes Aff.; Holmes Aff. 3–7; ROI 128–129, 133–134.)

**3.** After Plaintiff's termination, Director Cole and Plaintiff's white, female replacement traveled to California to solicit Disney leadership Plaintiff had identified and been forbidden to pursue. (Cole Aff. 10; Esposito Aff. 4; Burke Aff. 5.)

**4.** A white, female probationary employee (Hartley) with documented misconduct and an attorney's discharge recommendation was retained and "accommodated," while Plaintiff was separated. (Kitchiner Aff. 6.)

**5.** Senior management (Drs. Cole and Kreamer) pre-selected Colleen Morith, a less-qualified white, female colleague, to replace Plaintiff, using Graves and others to effect the termination. (Kitchiner Aff. 8–9.)

**6.** Coworkers attest that Graves created a hostile work environment for Plaintiff and obstructed his duties. (Esposito Aff.; S. Holmes Aff.; Burke Aff.; Berry Aff.)

**7.** Disparaging information was inserted into Plaintiff's background investigation on or about August 19, 2015. (ROI 171.)

**8.** Plaintiff secured a $40,000 gift-in-kind, recruited a Board member, and hosted twelve visitors during a Dante exhibition — contradicting the assertion that he raised no funds. (Compl. Add.; Cole Aff.)

**9.** The broader record reflects a pattern of discrimination and retaliation at the Smithsonian, including contemporaneous staff EEO complaints, Dr. Kitchiner's EEOC/OSC filings, the 2019 and 2020 complaint letters, the 2017 campus nooses, and the settled Hill matter.

Each of the foregoing presents a genuine issue of material fact requiring resolution by the trier of fact and precluding summary judgment.

Respectfully submitted,


________________________
**Thiruvendran Vignarajah**
*Admitted Pro Hac Vice*
Maryland Bar No. 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, MD 21218
(410) 456-7552
thiru@thirulaw.com

______/s/_______________
**Evan James Taylor**

Combs & Taylor LLP
1025 Thomas Jefferson St NW, Suite 400w
Washington, DC 20007
202-448-1008
Fax: 202-466-0502
evan.taylor@combstaylor.com

*Counsel for Plaintiff Milton Jackson*


Dated: June 1, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of June 2026, a copy of the foregoing was served via MDEC upon counsel of record for all parties.

THIRUVENDRAN VIGNARAJAH