# REPLY EX. 2

Smithsonian's MSJ in EEOC

Administrative Proceedings

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**131 M Street, N.E. Room 4NW02F**
**Washington, DC 20507**

| | |
|---|---|
| **Milton Jackson,**<br>Complainant,<br><br>v.<br><br>**Dr. David J. Skorton, Secretary,**<br>**Smithsonian Institution,**<br>Respondent. | **EEOC Case No. 570-2017-00871X**<br>**SI Case No. 16-11-050316**<br><br>**Administrative Judge:**<br>**Marcia Woodham** |

**RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

This is the case of an employee whose own actions caused him to be terminated for lack of performance during his probationary period, and whose delay in asserting this claim warrants dismissal of it as untimely.

Complainant Milton Jackson was employed as the Major Gifts Officer for the Advancement Office of the Smithsonian's National Museum of African Art (the "Museum"). He was hired in Advancement as a trust employee (*i.e.*, paid with private funds) – not a federal employee (paid with appropriated funds). The Museum exercised discretionary authority to hire him at an increased step (5) and leave accrual category (6 hrs). Upon arrival, however, Complainant clashed with his supervisor over the handling of prospective donors, violated Smithsonian policy by submitting personal expenses for reimbursement, did not raise any funds for the Museum, and did not provide a realistic plan for doing so. Following repeated and sustained efforts to improve his performance during the probationary period, the Smithsonian terminated him. Although he alleges that in October 2018 he threatened legal action, he waited

more than 45 days after his termination became effective to contact the Smithsonian's Office of Equal Employment and Minority Affairs and accuse his supervisors and an administrative officer of harassment based on race, sex, and reprisal for EEO activity. Complainant cited to a number of everyday workplace disagreements, many of which concern his unrealistic expectations regarding Smithsonian policies for travel and expense reimbursements. The well-developed record in this case is clear that the Smithsonian did not take any actions against Complainant because of his race, sex, or in reprisal for his EEO activity. In addition to the lack of any evidence of discrimination or retaliation, none of the allegations raised by Complainant – individually or collectively – could constitute a hostile work environment. They are not objectively or subjectively severe or pervasive. Rather, they are ordinary, everyday workplace tribulations. Accordingly, for the reasons set forth herein, the Respondent Smithsonian Institution respectfully requests that the Commission enter summary judgment on all of Complainant's claims for the Smithsonian, and dismiss his complaint with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Parties

1. The National Museum of African Art (the "Museum") is an art museum within the Smithsonian Institution. 20 U.S.C. §§ 80l, 80m.

2. The Museum's Advisory Board is appointed by the Smithsonian Board of Regents, and includes representatives of African descendants in the United, collectors of African Art, and scholars in the field of African art and culture. 20 U.S.C. § 80n. Current membership is publicly available at: https://africa.si.edu/about/board/.

3. At all times during Complainant's employment at the Smithsonian:

   a. Complainant Milton Jackson (African American, Male, alleged prior EEO activity) was employed by the Museum as the Major Gifts Officer. (ROI at

128.)

b. Ms. Marie Graves (female, African American) was his first line supervisor. (ROI at 205, and 445.)

c. The Museum's Director, Dr. Johnetta Cole (female, African American) was his second line supervisor. (ROI at 248, 445.)

d. Mr. William (Bill) Holmes[1] (white, male) was employed as the Museum's Administrative Officer. (ROI at 123, 124.)

**Complainant's Employment with the Smithsonian**

4. Following Complainant Milton Jackson's termination in 2014 from the National Geographic Society for what he has described as communications and travel issues, Jackson Dep. at 16-17, Complainant applied to work at the Smithsonian. (Transcript of the Deposition of Milton Jackson, dated February 11, 2019, relevant excerpts of which are attached hereto at Exhibit A, at 16-17; SI 146, a copy of which is attached hereto as Exhibit B.)

5. Complainant interviewed with Dr. Cole and Ms. Graves. (Exhibit A, at 17-18.)

6. The Museum exercised its discretion to offer Complainant an increased starting step and annual leave accrual. (ROI at 128; SI 151-157, 350, and 362-63, copies of which are attached hereto as Exhibit C.)

7. His supervisor expressed confidence about his selection. (SI 143-145, 147-150 ("I am confident that Milton will be an excellent match for this position and a strong asset to the Advancement team."), copies of which are attached hereto as Exhibit D.)

8. Complainant began work on March 23, 2015 at the Smithsonian in the position of Senior Advancement Program Specialist (Gift Officer), IS-1001-13, working for the Smithsonian's National Museum of African Art (NMAfA's) Office of Development. (ROI

---

[1] Mr. Holmes is deceased.

Exhibit 27; SI 353, a redacted copy of which is attached hereto as Exhibit E.)

9. In this position Complainant was responsible for building and managing a portfolio of prospects and donors to execute a program focused on high capacity giving, specifically, 100 individuals who could give between $25,000 and $1,000,000, and raise $2,000,000 annually in gifts. (ROI at Exhibit 27, at 447, 453.)

10. Complainant was not a federal employee and not part of the federal civil service. Complainant is a trust employee, which means that he is paid from Smithsonian trust funds.[2] (ROI at 128, and Exhibit 27).

11. Complainant's appointment was subject to a one-year probationary period. (Ex. E; *see also* ROI at 148, 208, and 515.)

12. The Smithsonian uses the probationary period "to provide the supervisor with the opportunity to fully assess an individual's performance and conduct to assure that the potential perceived in the interview and selection process is demonstrated by the employee on the job. … It also provides a means for the supervisor to separate the employee if, after a fair opportunity, he or she fails to demonstrate the appropriate conduct or performance." (ROI at 397.)

13. Complainant did not successfully raise any funds for the Museum or Smithsonian. (Ex. A, at 114-116.)

14. On October 26, 2015, Complainant was notified of his separation due to lack of performance, effective November 9, 2019, which was during the probationary period. (ROI Exhibit 36; *see also* ROI at 157.)

15. He received his final pay from the Smithsonian on December 18, 2019. (ROI at

[2] Trust funds are funds received by the Smithsonian from various sources, *i.e.*, endowment, revenue from business activities, donations, grants, and contracts.

164.)

***Facts pertaining to Complainant's harassment allegations: Performance (Issues 1, 4, 7, 8, 9)***

16. Within the first week of his arrival, in March 2015, Complainant got into a work-related disagreement with Ms. Graves regarding who would manage the Museum's Advisory Board. (ROI at 210). Complainant sought this role, but Ms. Graves held that Dr. Cole and she would remain in this role. (ROI at 210, 251.)

17. At some point, Ms. Graves, disagreed with his proposal to hire a vendor in the United Kingdom because the Museum was not in a position to take on more global contacts. (ROI at 92, 142, *see also id.* at 141.)

18. At some point, Ms. Graves disagreed with Complainant's identification of a retired Smithsonian executive assistant and a current employee as prospective donors. (ROI at 142; Exhibit A at 95-96.)

19. At some point, Ms. Graves expressed doubt that two other prospective donors had capacity or interest in making major gifts to the Museum. (ROI at 142.)

20. On or around June 2015, Ms. Graves questioned Complainant's judgment in identifying as a prospective Museum donor a 90-year-old woman whom they both knew from their prior employment at Howard University, and whom Complainant identifies as his "good friend" (Dr. Harland). (ROI, at 148, 219.) Ms. Graves did not agree with his efforts to bring Dr. Harland (i) to a private event, (ii) on a private tour of the Smithsonian's Air and Space Museum, and (iii) to a private lunch with planned giving staff. Ms. Graves states that not only do these activities lack any apparent connection to the Museum, but also that Dr. Harland explicitly disclaimed any interest in making a planned gift to the Smithsonian, and that Complainant unwisely excluded the family from the solicitation of a planned gift from an elderly prospective

donor. (ROI at 215-216, 219, and 226.)

21. Complainant was provided with Smithsonian policy regarding charge card usage, which prohibits use of the card for personal expenses. (SI 158-261, at 158, 237, 242, 257, due to volume relevant excerpts of this document are attached hereto as Exhibit F; *see also* ROI at 413-443, at 439.) Nonetheless, on several occasions in June 2015, Complainant submitted unauthorized and personal expenses to the Smithsonian for such things as a rental car to escort Dr. Harland to and from a meeting at the National Air and Space Museum in Washington, D.C., and a meal with a fellow Smithsonian employee. (SI 97-109, 267, 271, 282-83, 314-16, copies of which are attached hereto as Exhibit G.)

22. On July 1, 2015, Ms. Graves counselled complainant regarding appropriate expenses that may be reimbursed, and requested that he share more information with her, as his supervisor. (*Id.*, at SI 267.)

23. Complainant was provided with an invitation list for a July 4, 2015 fundraising event to which he was bringing Dr. Harland as a prospective donor. (ROI at 194; Jackson Deposition Exhibit 10, a copy of which is attached hereto as Exhibit H.) Complainant failed to act on this information, that is, he did not introduce Dr. Harland to Dr. Cole at the event. (Exhibit A at 111; Exhibit H; SI 269-270, a copy of which is attached hereto at I.)

24. Ms. Graves and Dr. Cole counselled Complainant about his failure to introduce Dr. Harland to Dr. Cole at the July 4, 2015 fundraising event. (ROI at 151, 152.)

25. From July 4, 2015 through August 11, 2015, Complainant sought for the Smithsonian to accept scientific equipment offered as a gift by Dr. Harland, even though the equipment lacked apparent use for, or connection to, the Museum, which is an art museum. (ROI at 167, 195, 221, Exhibit A at 114-116; Exhibit I; SI 295-298, a copy of which is attached

hereto as Exhibit J.) Complainant's efforts were unsuccessful. (SI 303-305, a copy of which is attached hereto as Exhibit K.)

26. On July 6, 2015, Ms. Graves counselled Complainant regarding his tardiness and extended office absences, lack of communication, and the need for improvement in these areas. (SI at 268, a copy of which is attached hereto as Exhibit L.)

27. On July 23, 2015, when Complainant asked for approval of a diversity fundraising proposal from the Associate Director for Collections and Facilities, Steve Mellor, Mr. Mellor stated that while he supported the proposal "there are concerns that need to be articulated and addressed to give clarity to both this museum and the intended funder before the program could be implemented." (ROI at 123 and 187-193, at 192.) These included "how many is in a 'cadre', what is the target of 'underrepresented', what is time frame, what is the anticipated level of skill for applicants, who makes and how is the selection made, what are the liability concerns for the institution and how are they mitigated, as examples." (*Id.*; *see also* ROI at 150.)

28. On July 23, 2015, Complainant was counselled regarding: his failure to advise his supervisor (Ms. Graves) ahead of prospective donor meetings with Dr. Harland and others; misspent time and effort arranging for Dr. Harland to visit and potentially give to other Smithsonian units; poor management of a lunch with the Smithsonian's planned giving employees and Dr. Harland; violation of Smithsonian policy by submitting unauthorized expenses for reimbursement; and bypassing Museum staff who were responsible for addressing his needs. He was instructed to refocus his time and effort on soliciting gifts for the Museum, provided with recommended methods for doing so, and instructed to provide weekly reports. (ROI at 505-508, 502-503, 509.)

29. On August 20, 2015, Ms. Graves counselled Complainant on the need for

improved communication from him, namely to bring fundraising ideas to her rather than communications staff, and instructed him to use his time to research donors more effectively, with a focus on deliverables. (ROI at 172-173 ("Have you qualified 80 to 90 donors for your portfolio? What is the strategy for these individual? How many meetings requests have you initiated…How many asks have you made? How many proposals do you have in your pipeline?").)

***Facts pertaining to Complainant's harassment allegations: travel (issues 2, 3, 10, 11)***

30. Typically, Museum advancement staff travelled for one on one meetings with qualified donors or prospects or to attend events the Museum was hosting. (ROI at 213, 304.)

31. Complainant alleges that on Monday, March 30, 2015, one week after he began work at the Museum, he requested to travel to Texas for an Earth Day Texas Celebration scheduled to occur in less than a month's time (April 24-26, 2015). (ROI at 90.) The Earth Day Texas event lacked an apparent connection to the Museum, which is an art museum. The event was organized by someone Complainant knew from his prior employment. (ROI at 178-181, 212-213, 304.)

32. On or around April 22, 2015, Ms. Graves approved Complainant's request. Ms. Graves did not immediately approve the trip because it lacked a clear connection to the NMAfA, was not structured as a one-on-one meeting, or a fundraising event organized by the museum, and she needed information from Complainant to justify the expense. (ROI at 212-213.)

33. Complainant was prompted, in July 2015, to provide a strategy for following up with any donor prospects from his travel to Earth Day Texas. (SI 292-294, a copy of which is attached hereto as Exhibit M.)

34. Sometime in April 2015, Ms. Graves denied Complainant's verbal request to

travel for an event. (ROI at 213-14, 306.)

35. In July 2015, Complainant told Mr. Holmes (the Museum's Administrative Officer) that he proposed travelling to Los Angeles, California to meet with a donor and play golf. (ROI at 98.) On July 28, 2015, Ms. Graves denied Complainant's verbal request to travel to Los Angeles, California, referencing use of funds concerns she'd previously expressed to him when he'd asked to travel to North Carolina for a golf tournament. (Exhibit M; *Accord* ROI at 223, 256 (denial of travel because "…he never seemed to have a strategy for successful fundraising.").) She wrote: "please think about this from a donor's prospective [sic]. If a donor feels we'll travel 3,000 miles to play golf, I worry that he may feel we will fail to proper [sic] steward their gift or even worse, that we do not need their money and that is not the image we wish to convey to our donors." (Exhibit M)

***Facts pertaining to Complainant's harassment allegation: disregard for the chain of command (issues 5 and 6)***

36. Ms. Graves asked Complainant to limit the requests he made to the Special Assistant to the Museum's Director, for workload reasons. (ROI at 217-218.)

37. Ms. Graves repeatedly counselled Complainant to discuss fundraising issues with her and to keep her apprised of his contacts with donors. (ROI at Exhibits 34, 35; Ex. G. at SI 267.)

38. The Deputy Director reminded Complainant to discuss his fundraising strategies with his supervisor. (ROI at 291 ("…I encouraged Complainant to run his idea by his supervisor and to develop a plan if his supervisor and our director agreed. I pointed out that it was not within my authority to assign or approve his work…").)

39. Ms. Graves expressed a concern about Complainant's office absences, sociability, and practice of explaining long office absences as "meeting with colleagues." (ROI at 217; *see*

*also, e.g.,* ROI at 167, 171; Ex. L; SI 268, 279, 284, 285, 300, 301, copies of which are attached hereto as Exhibit N.)

***Facts pertaining to Complainant's harassment allegation: final payment (issue 13)***

40. Before a departing employee can receive his or her final paycheck and/or lump sum leave payout, he or she must be cleared by various departments to ensure that all Smithsonian property has been returned and all debts settled or acknowledged. This is accomplished through the Smithsonian's Automated Clearance process. (SI 367, a copy of which is attached hereto as Exhibit O.)

41. Museum staff promptly returned Complainant's keys to the Office of Protective Services Locksmith Office in November 2015. (SI 374-375, 388-389, copies of which is attached hereto as Exhibit P.)

42. The Smithsonian Office of Protection Services Locksmith Office was the last office to enter its clearance, which triggered Payroll to process the payment. (ROI at Exhibit 21; SI 398-400, a copy of which is attached hereto as Exhibit Q.)

43. On December 18, 2016, Complainant received this final lump sum payment. (ROI at 164.)

***Facts related to Complainant's Prior EEO Activity Allegations***

44. The Smithsonian has no record of Complainant having visited or called the Smithsonian Office of Equal Employment and Minority Affairs on July 31, 2015. (ROI at Ex. 24; E-mail from Eryn Starun to Milton Jackson, dated April 8, 2019, a copy of which is attached hereto as Exhibit R.)

45. Complainant alleges that he communicated his concerns to multiple people (ROI, at 130) and that he believes he expressed these as relating to discrimination on the basis of race

and sex (Jackson Dep., at 60) but the record does not contain references to race, sex, prior EEO activity, or discrimination:

a. Complainant's notes regarding a meeting with a consultant do not refer to race or sex or prior EEO activity. (ROI at 201-202; Jackson Dep. at 59.)
b. Complainant's communications with central Advancement employees did not reference race or sex or prior EEO activity, and they were unaware that he considered this to be discrimination. (ROI at 186, Exhibit 22 at 371, Exhibit 23 at 378.)

46. Similarly, the Ombudsman stated that Complainant contacted her regarding an "unpleasant" work situation. (ROI at Ex. 25.)

***Facts Pertaining to Alleged Comparators:***
***Catherine (Catie) Anchin and Colleen Morinth.***

47. Complainant's position was Senior Advancement Program Officer, IS 1001-13-5 and subject to a probationary year. (Paragraphs 8 and 11, above.) He was the only person holding this position for the Museum. (ROI at 127, 255.)

48. Mss. Anchin and Morinth held non-senior positions in a different series (IS 0303). Ms. Morinth held the position of Membership Coordinator (Museum Programs), Grade 9. Ms. Anchin held the position of Development Officer, Grade 13. (ROI at 124.)

49. The alleged comparators were not probationary employees. Mss. Anchin and Morinth had been employed by the Museum in their current positions for several years prior to Complainant's hire. (ROI at 302, 356.)

50. Complainant travelled sooner than Mss. Anchin and Morinth. Neither Ms. Anchin nor Ms. Morinth had asked to travel or been issued a travel card. (ROI at 304, 358.) Although she had worked at the Smithsonian for 4 and a half years, Ms. Anchin only had travelled once, to cover an event for which she was the lead coordinator. (ROI at 307.) Although she had been hired in 2012, Ms. Morinth did not travel until 2016, after Complainant had been terminated. (ROI at 358.)

***Facts pertaining to Complainant's harassment allegation: personalities***

51. Multiple museum employees observed that Ms. Graves was non-discriminatory, but suffered from professional insecurities, could be difficult, and said disparaging things. (ROI at 311-12, 316, 324, 348, 350-352, 358; *accord* ROI at 280.) Complainant likewise notes that Ms. Graves disparaged many of his coworkers -- Ms. Anchin, white female; Bonnie Berry, white female; Mr. Frank Esposito, white male; Mr. Eddie Burke, black male (ROI at 92; Exhibit 5) – and did not trust many employees. (ROI at 92-93.)

52. A coworker observed that tension between Complainant and Ms. Graves was "mutual." (ROI at 351.)

53. In 2015, morale at the Museum generally was low due to workload and a perception of micromanagement and incivility. (ROI at 358, 331, and 285; *accord* SI 499-514, at 514, SI 497-499 copies of which are attached hereto as Exhibit S; Exhibit A at 48.)

**Complainant's EEO Complaint and Relevant Procedural History**

54. Complainant's first contact with the Smithsonian's Office of Equal Employment and Minority Affairs (OEEMA) was January 14, 2016. (ROI, Exhibit 24.) This is more than 45 days after the effective date of his termination.

55. The alleged discriminators lack knowledge of the alleged prior EEO activity. (ROI at 206, 249, 385, 387.)

56. On October 26, 2015, he was notified of his termination, as well as the 45 day period to commence a proceeding. (ROI at 515-516; *accord id.* at 518-519.)

57. Complainant testified that on October 26, 2015, he notified Mr. Holmes and Ms. Graves that he would pursue legal action "with all vigor." (Exhibit A at 126-127.) But he waited until January 14, 2016 to first contact OEEMA. (ROI, Exhibit 24.)

58. He filed a formal complaint with the OEEMA on May 3, 2016 in which he styled his complaint as alleged discrimination and hostile work environment on the bases of race (African-American), color (black), sex (male, sexual orientation), Equal Pay, age (44), disability (physical) and retaliation. (ROI at 26.)

59. OEEMA accepted the complaint in part, conducted an investigation, and issued a Report of Investigation containing more than 500 pages. Complainant initiated the pending matter when he requested a hearing before an administrative judge of the Equal Employment Opportunity Commission.

60. The Commission issued a Case Management Order on August 17, 2018 identifying the issues and claims for adjudication as follows:

> "Whether the National Museum of African Art (NMAfA) discriminated against and subjected Complainant to a hostile work environment based on sex (male), race (African American), and/or in reprisal for prior EEO activity:
>
> 1. On March 26, 2015, during his first week, Marie Graves (RMO-1) became angry at him for asking questions concerning seeking board members' contacts for potential donations, calling him naïve, and questioning her [sic] judgment;
> 2. From March 30, 205 [sic] to April 2015, RMO-delayed approving his request to travel to a donor reception which was scheduled to occur on April 24, 2015, and then would not approve visits to prospects gained from that event;
> 3. On April 15, 2015, RMO-1 denied his request to attend a donor event in New York and seemed to take pleasure in denying the request publicly;
> 4. On May 7, 2015, RMO-1 stated a prospective donor with whom he was working with was "useless." RMO- gave similar sharp critic of his work with prospective donors on April 22, 2015, May 27, 2015, and May 29, 2015;
> 5. On April 23, 2015, RMO-1 told him that he could not talk to or associate with more than ten of his colleagues at NMAfA beause they were incompetent, and that he had to go to RMO-1 with all questions and for all needs, which he felt substantially limited his ability to perform his duties.
> 6. On May 8, 2015, RMO-1 told him not to associate with another colleague because she was a "snake" and a "gossip," and when he told her that he was a professional and could handle it, RMO-1 told him that she perceived his statemen[t] as a threat and that she felt uncomfortable in his presence.
> 7. On June 3, 2015, RMO-1 asked if he and a potential donor we[r]e romantically involved, which he felt was very inappropriate.
> 8. During the summer of 2015, RMO-1 blocked his fundraising diversity plan

from reaching the Director by requiring that he perform 14 rewrites and then stating that it would not work;

9. On or around July 4, 2015, after he received a commitment for a large donation at the Smithsonian's 4th of July Celebration, RMO-1 "harangued" him and called him a liar for not introducing the donor to the Director; further RMO-1 was intentionally unhelpful in helping him to arrange receipt of the gift, which was eventually rescinded;
10. In July 2015, RMO-1 denied his request to travel to meet a prospective donor in Los Angeles, California, and assigned a different employee to manage the relationship with that prospective donor;
11. On October 20, 2015, RMO-1 told him that he could not meet with a prospective donor that he had engaged, and did not provide any reason;
12. On October 26, 2015, he was terminated during his probationary period for poor performance; and
13. His final paycheck was delayed through December 2015.

61. Per the Case Management Order, the parties had an opportunity to, and did, engage in discovery. Complainant served document requests and interrogatories on the Smithsonian, to which the Smithsonian responded. The Smithsonian also propounded written discovery requests and took Complainant's deposition.

62. On March 27, 2019, the Administrative Judge held a teleconference hearing on discovery disputes raised by Complainant and Smithsonian, and ordered that additional discovery be conducted. Discovery is now complete, with the Smithsonian having produced 560 pages and conducted multiple telephone record searches. (Exhibit R.)

## ARGUMENT

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of a factual dispute, however, will not defeat summary judgment. The non-moving party must show that the dispute is genuine and material to the case. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

**I. Complainant Lacks Evidence That He Was Subject To Actions Related To Or Based On His Membership in Protected Classes Or His Alleged EEO Activity**

The Commission should grant summary judgment on Complainant's discrimination and hostile work environment complaint because Complainant lacks any evidence that he was subject to conduct by the Smithsonian related to or based on his membership in a protected class or his alleged prior EEO activity. "To establish a claim of harassment, Complainant must show that: (1) [h]e is a member of a statutorily protected class and/or was engaged in prior EEO activity; (2) [h]e was subjected to unwelcome verbal or physical conduct related to h[is] membership in that class and/or h[is] prior EEO activity; (3) the harassment complained of was based on h[is] membership in that class and/or h[is] prior EEO activity; (4) the harassment had the purpose or effect of unreasonably interfering with h[is] work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer." *Howell v. Napolitano*, 2011 WL 345148, *2 (January 27, 2011). Additionally, the incidents must be "sufficiently severe or pervasive to alter the conditions of [Complainant's] employment and create an abusive working environment." *Id.*, *quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("severe or pervasive" requirement is "crucial").

The record in this case is devoid of evidence of unlawful actions by the Smithsonian. Rather, the principal employment action in this case, termination (issue 12), resulted from some very reasonable and apparent reasons: Complainant did not raise any funds for the Museum, nor did he appear to have a successful plan for doing so. (Exhibit A at 114-116; ROI Exhibit 36; *id.* at 157.) The remainder of Complainant's allegations relate to legitimate criticisms of Complainant's performance and efforts (issues 1, 4, 5, 6, 7, 8, and 9), appropriate use of travel

(issues 2, 3, 10, and 11), and the timing of his final lump sum payment from the Smithsonian (issue 13). These also resulted from reasonable, apparent reasons:

*Issue 1 (denial of requested advisory board management role)*:

Dr. Cole managed relations with the Advisory Board, with support from Ms. Graves. (ROI at 210.)

*Issue 2 (delayed travel approval)*

Any brief delay in travel approval was due to the atypical nature of the request. (ROI at 212.)

*Issues 3, 10, 11 (denied travel requests)*

Travel was denied if it would not have been a good use of Smithsonian resources, *e.g.* travel to attend events rather than one-on-one meetings, golf. (ROI Exhibit 7, at 213, Exhibit 9, at 256; ROI at 292-294, at 292.)

*Issues 4, 7, 9 (criticism of complainant's fundraising ideas)*

Ms. Graves expressed legitimate concerns about Complainant's ideas and actions. She disagreed with the proposal to contract with a United Kingdom company because the museum had enough contacts already to manage. She disagreed with Complainant's handling of Dr. Harland as a prospective donor. (Paragraph 20, above.) She disagreed with Complainant's use of time treating a current Smithsonian employee and retired Smithsonian executive assistant as possible donors. (Paragraph 18, above.) She encouraged him to use the Smithsonian's database (PANDA) and selection criteria to better develop his portfolio. (ROI Exhibits 34, 35, *see also* ROI at 398-409 (A Guide to Development Research).) Complainant pursued these prospects despite the legitimate concerns raised by his supervisor, and did not raise any funds for the Museum. The only gift he was able to obtain, which was the gift Dr. Harland offered, was for scientific equipment lacking any connection or utility to the Museum. (ROI at 195, 215, 221;

Exhibit K.)

*Issues 5 and 6 (disregard for chain of command)*

Ms. Graves and the Museum's Deputy Director and Chief Curator advised him to bring ideas to Ms. Graves as his supervisor, but Complainant did not heed this advice. He was social, would be absent from his office, and did not proactively apprise his supervisor of his activities or ideas. (ROI at 92-93, 217-218, 291; ROI Exhibits 34, 35; Exhibit G at SI 267; Exhibits. L, N.)

*Issue 8 (Ms. Graves blocked finalization of a proposal)*

This claim lacks evidentiary support because the record shows that the document objectively needed substantive work. On July 28, 2015, the Associate Director for Collections and Facilities reviewed Complainant's diversity fundraising proposal and identified several substantive questions that would need to be addressed before it could proceed. (ROI at 191-193.) This is both legitimate and non-discriminatory.

*Issue 12 (termination during probationary period)*

Complainant simply did not raise any funds for the museum, or demonstrate a successful strategy for fundraising, and was terminated for this nonperformance. (ROI at 157, Exhibits 6, 9, 36; Exhibit A at 114-116.)

During this time, however, Complainant did demonstrate disregard for Smithsonian policy and protocol by misusing his Smithsonian-issued charge card because he did not read the policy, snubbing the museum director at a fundraising event because he did not look at the attendance list ahead of time, and consistently failing to apprise his supervisor of his activities.

*Issue 13 (Final Payment)*

Complainant's allegation that his final pay was "delayed" misunderstands the

Smithsonian's exit clearance process. The Smithsonian issued payment for his accrued leave as soon as the exit clearance process was complete. (Paragraphs 40-43, above.)

There were no comparators to Complainant (probationary Senior Advancement Program Specialist) who were treated differently from Complainant. (ROI at 124; Paragraphs 47-50, above.)

Complainant has shown no evidence of pretext. Such a conclusion would be contrary to the record and logic since it was Dr. Cole and Ms. Graves who hired complainant in the first place. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2015) ("an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs"); *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."). Indeed, Dr. Cole offered him recruitment incentives, and Ms. Grave expressed confidence in his hiring. (Exhibits C and D.) This action is inconsistent with a person who harbors discriminatory animus against African-Americans and/or males. Additionally, the alleged discriminators are members of the same protected classes as Complainant (Dr. Cole and Ms. Graves identify as African American; Mr. Homes identifies as male).

Simply put, the record shows that Complainant's claim of race and sex discrimination is meritless. In the absence of evidence that the Smithsonian took action or harassed Complainant on the basis of his race, sex, or prior EEO activity, Complainant's hostile work environment claim must fail. Accordingly, the Smithsonian respectfully requests that the Administrative Judge enter summary judgment for the Smithsonian on Mr. Jackson's Complaint.

## II. Complainant Lacks Evidence He Was Subject to an Abusive or Hostile Work Environment, or Severe or Pervasive Conditions at the Smithsonian

In order to be an actionable hostile work environment claim under Title VII, the conduct at issue must be both objectively and subjectively hostile or abusive. *Harris*, 510 U.S. at 21-22. In order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, the decision maker should consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88; *Oncale* at 81 ("severe or pervasive" requirement is "crucial"). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, at 788 (citations omitted). "Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace . . . .'" *Id.*

Here, Complainant's allegations are ordinary workplace tribulations that Title VII was not meant to address. There is nothing in the record to suggest Complainant was subjected to actionably hostile, abusive or offensive conduct – even if Complainant could show that Ms. Graves expressed a work-related frustration by using a "sharp" word on occasion, the alleged sharp words did not include any profanity. The evidence abundantly shows that his supervisors were unsatisfied with his fundraising efforts and methods, and ultimately the Museum decided to terminate him because of his non-performance. This is not discrimination. This is appropriate use of Smithsonian resources and the probationary period.

## III. Complainant's Reprisal Claim Fails Because He Did Not Engage in Protected Activity Prior to his Separation; Even if He Did So, the Alleged Discriminators Were Not Aware of Any Alleged Protected Activity

Summary judgment is appropriate because there is no evidence supporting Claimant's allegation that he has prior EEO activity, and even if he did, the alleged discriminators were unaware. "To establish a prima facie case of retaliation, an employee must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action." *Winston v. Clough,* 174 F. Supp. 3d 224, 237 (D.D.C. 2013). "[F]or an exchange to constitute 'protected activity,' the employee 'must in some way allege unlawful discrimination.'" *Payne v. Salazar*, 899 F. Supp. 2d 42, 52 (D.D.C. 2012). Vague and uncorroborated allegations are insufficient to establish protected activity or defeat a well-supported motion for summary judgment. *Williams v. Spencer*, 883 F. Supp. 2d 165, 177-78 (D.D.C. 2012) (allegation that employee raised vague concern that employer's conduct might be based on race was insufficient to create a genuine issue of material fact at summary judgment.).

Here, Complainant did not pursue an EEO complaint until more than 45 days after his termination. Therefore, the decision to terminate him could not have been influenced by his prior EEO activity. Even if he had contacted the Smithsonian Office of Equal Employment and Minority Affairs on July 31, 2015, the alleged discriminators were unaware of it. (ROI at 206, 249, 385, 387.) As such, the reprisal claims should be dismissed.

Complainant may argue that he engaged in protected activity by discussing his dissatisfactions with various Smithsonian employees, the Smithsonian ombudsman, and a Smithsonian consultant. But the record reflects that when he told various people about the tension between himself and his supervisor, including his unmet desires for travel and a more generous expense account, and concerns about his job security, he did not reference his

membership in any protected class. (Paragraphs 45, 46, above.)

Even if Complainant could demonstrate prior EEO activity and knowledge of it on the part of the alleged discriminators, Complainant's claim for retaliation would fail nonetheless because Complainant cannot show that the Smithsonian's reason for separating him (lack of performance) is a pretext for unlawful retaliation. All evidence is to the contrary. In the short time he worked at the Smithsonian, Complainant created a record of misunderstandings and mistakes instead of successful fundraising or development of a strategy for fundraising success. The Smithsonian is obligated to evaluate an employee during his probationary period and release employees who are not performing successfully. (ROI at 397.) That is what happened here.

## CONCLUSION

For the foregoing reasons, Respondent Smithsonian Institution respectfully requests that the Commission enter judgment in favor of Respondent, and dismiss with prejudice the complaint in its entirety.

Respectfully submitted,

Eryn Starun
Assistant General Counsel
Smithsonian Institution
P.O. Box 37012 MRC 012
Washington, D.C. 20013-7012
(202) 633-5097
Fax (202) 357-4310

Dated: April 24, 2019

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**131 M Street, N.E. Room 4NW02F**
**Washington, DC 20507**

| | | |
|---|---|---|
| **Milton Jackson,**<br>Complainant,<br><br>v.<br><br>**Dr. David J. Skorton, Secretary,**<br>**Smithsonian Institution,**<br>Respondent. | ) | **EEOC Case No. 570-2017-00871X**<br>**SI Case No. 16-11-050316**<br><br>**Administrative Judge:**<br>**Marcia Woodham** |

**ORDER**

Upon consideration of the Respondent's Motion for Summary Judgment, including its statement of undisputed facts, and legal arguments, and the record in this matter, it is hereby ORDERED, that Summary Judgment in favor of Respondent is GRANTED and the above referenced complaint is dismissed in its entirety.

DATED, this ___ day of ___________, 2019.

______________________________

Marcia Woodham, Administrative Judge

To: Milton Jackson, Complainant
milt12.jax@gmail.com
3248 Arrowhead Circle, Apt. D
Fairfax, VA 22030

Eryn Starun, Counsel for Respondent
Smithsonian Institution
P.O. Box 37012 MRC 012
Washington, D.C. 20013-7012
Fax (202) 357-4310

**CERTIFICATE OF SERVICE**

I have caused the foregoing to be served by email (motion, proposed order) and Federa Express (motion, proposed order, and exhibits) today, April 24, 2019, to:

Milton Jackson
milt12.jax@gmail.com
3248 Arrowhead Circle, Apt. D
Fairfax, VA 22030

Eryn Starun
Assistant General Counsel
Smithsonian Institution